Avi Burkwitz, Esq., Bar No.: 217225
aburkwitz@pbbllp.com
Ryan A. Graham, Esq., Bar No.: 310186
rgraham@pbbllp.com
**PETERSON · BRADFORD · BURKWITZ**
100 North First Street, Suite 300
Burbank, California 91502
Tel ....818.562.5800
Fax....818.562.5810

*Attorneys for Defendants,*
STEPHEN CAREY and MARAL HELWAJIAN

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCY ULIKHANOVA, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>COUNTY OF LOS ANGELES, *et al.*,<br><br>    Defendants. | Case No. 2:17-CV-9193-FMO-E<br><br>Hon. Fernando M. Olguin (Dist. Judge)<br>Hon. Charles F. Eick (Mag. Judge)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT; JOINT MEMORANDUM OF SUPPORTING AND OPPOSING POINTS AND AUTHORITIES**<br><br>Date ......................June 20, 2019<br>Time ......................9:30 a.m.<br>Location ................Courtroom 6D<br><br>Complaint Filed: December 28, 2017<br>FAC Filed: April 19, 2018<br>SAC Filed: May 18, 2018<br>TAC Filed: July 2, 2018 |

PLEASE TAKE NOTICE:

On June 20, 2019, at 9:30 a.m., or as soon thereafter as the matter may be heard before the Hon. Fernando M. Olguin, District Judge for the United States District Court for the Central District of California, in Courtroom 6D of the First Street Courthouse, located at 350 W. 1st Street, Los Angeles, California 90012, Defendants Stephen Carey and Maral Helwajian ("Defendants") will move the

Court for an order granting summary judgment—or, in the alternative, partial summary judgment—under Federal Rule of Civil Procedure 56, on the following issues:

1. Neither Plaintiff Lucy Ulikhanova nor Plaintiff P.G. have an actionable liberty interest under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

2. To the extent that either Plaintiff does have an actional liberty interest, neither Defendant Carey nor Defendant Helwajian committed any act that violation such liberty interest.

3. If any act by Defendant Carey or Defendant Helwajian did constitute a violation of the Fourteenth Amendment, they are nevertheless entitled to summary judgment on the basis of qualified immunity.

This motion is made following the conference of counsel pursuant to Local Rule 7-3 and the Court's *Order Re: Summary Judgment Motions* (ECF No. 19), which occurred on April 18, 2019, at the offices of Peterson Bradford Burkwitz, LLP, counsel for Defendants.

This motion is based upon this notice, the accompanying memorandum of points and authorities, the documents and declarations set forth in the evidentiary appendix, the joint appendix of undisputed and disputed facts, the pleadings and papers on file in the present action, and upon such other evidence or argument as may be presented to the Court at the time of the hearing on this motion.

///
///
///
///
///
///
///

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

2

1

2  DATED:  May 22, 2019                    PETERSON · BRADFORD · BURKWITZ

3

4                                          By:   /s/ Ryan A. Graham, Esq.

5                                                Avi Burkwitz, Esq.

6                                                Ryan A. Graham, Esq.
                                                 *Attorneys for Defendants*
7                                                STEVE CAREY, and
                                                 MARAL HELWAJIAN
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

## **TABLE OF CONTENTS**

**I.    INTRODUCTION (Δ)** .................................................................. **11**

**II.   RELEVANT BACKGROUND FACTS (Δ)** ................................... **12**

    II.A.    2007–2015: The Ulikhanova-Garcia family
        before removal. (Δ) ....................................................... 12

    II.B.    Oct. 2015–Jan. 2016: DCFS investigation
        and removal. (Δ) .......................................................... 13

    II.C.    Jan. 2016: Juvenile court proceedings begin. (Δ) ........................ 13

    II.D.    Jan.–Feb. 2016: Escalating friction with Reisch;
        visitation problems. (Δ) ...................................................... 14

    II.E.    Helwajian's February Ex Parte; juvenile court denies
        vaccination order. (Δ) ...................................................... 14

    II.F.    Carey's March reports; conflict with Reisch continues. (Δ) .......... 16

    II.G.    Carey's June Supplemental Report. (Δ) ........................................ 16

    II.H.    June 10, 2016: Juvenile court authorizes vaccination,
        issues TRO. (Δ) .............................................................. 17

    II.I.    Criminal prosecution of Ulikhanova; dependency
        proceedings continue. (Δ) .................................................. 19

    II.J.    Foster Family and reunification. (Δ) ........................................ 19

**III.  LEGAL BACKGROUND OF CALIFORNIA VACCINATION (Δ)** ....... **20**

**IV.   ARGUMENT (Δ)** .................................................................. **21**

    IV.A.    Plaintiffs have no actionable liberty interests. (Δ) .................. 22

            *π's Counterpoints* ........................................................... *23*

        *IV.A.1.*    *Plaintiffs' asserted liberty interest must be*
                *refined to account for the non-investigatory*
                *nature of the vaccinations. (Δ)* ........................ *25*

                *π's Counterpoints* ............................................. *28*

*///*

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

IV.A.2.   *The asserted liberty interests must be refined to account for the special constitutional significance of vaccinations.*................................................30

*π's Counterpoints*.............................................................31

IV.A.3.   *The liberty interests must be refined to account for the custody and visitation orders in the juvenile court. (Δ)*.......................................31

*π's Counterpoints*.............................................................33

IV.A.4.   *The liberty interests must be refined to account for Garcia, as co-parent. (Δ)*.............................................35

*π's Counterpoints*.............................................................36

IV.A.5.   *The liberty interests, properly refined, are not fundamental. (Δ)*.........................................................37

*π's Counterpoints*.............................................................38

IV.A.6.   *The liberty interests, properly formulated, show the rights advanced by here were not clearly established for purposes of qualified immunity. (Δ)*........39

*π's Counterpoints*.............................................................40

IV.B.   Plaintiffs must show that Carey or Helwajian engaged in conscience-shocking conduct to survive summary judgment under *Lewis*. (Δ) ...........................................40

IV.C.   Plaintiffs' liberty interests were not deprived in a way that shocks the conscience. (Δ)..................................43

*π's Counterpoints*.............................................................45

IV.D.   Qualified immunity shields Defendants from any residual liability. (Δ)..............................................................46

*π's Counterpoints*.............................................................47

# <u>TABLE OF AUTHORITIES</u>

**Cases (U.S. Supreme Court)**

*Ashcroft v. al-Kidd*,

    563 U.S. 731 (2011) .................................................................39

*Collins v. City of Harker Heights, Tex.*,

    503 U.S. 115 (1992) ............................................................22, 26

*Cty. of Sacramento v. Lewis*,

    523 U.S. 833 (1998) .................................................................41

*Daniels v. Williams*,

    474 U.S. 327 (1986) .................................................................21

*Harlow v. Fitzgerald*,

    457 U.S. 800 (1982) .................................................................46

*Jacobson v. Commonwealth of Massachusetts*,

    197 U.S. 11 (1905) .................................................25, 30, 31, 39

*Malley v. Briggs*,

    475 U.S. 335 (1986) .................................................................47

*Parham v J.R.*,

    442 U.S. 584 (1979) .................................................................28

*Prince v. Massachusetts*,

    321 U.S. 158 (1944) .................................................................30

*Reno v. Flores*,

    507 U.S. 292 (1993) ............................................................22, 38

*Rochin v. California*,

    342 U.S. 165 (1952) .................................................................43

*Santosky v. Kramer*,

    455 U.S. 745 (1982) ............................................................34, 35

*United States v. Salerno*,

    481 U.S. 739 (1987) .................................................................21

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
Case No. 2:17-CV-9193-FMO-E

*Washington v. Glucksberg*,

    521 U.S. 702 (1997) ...................................................................................22, 37, 41

*Zucht v. King*,

    260 U.S. 174 (1922) ..........................................................................................30, 31

**Cases (Circuit Courts of Appeals)**

*Brittain v. Hansen*,

    451 F.3d 982 (9th Cir. 2006) ................................................................................passim

*Crowe v. Cty. of San Diego*,

    608 F.3d 406 (9th Cir. 2010) ...............................................................................40

*Gibson v. Cty. of Washoe, Nev.*,

    290 F.3d 1175 (9th Cir. 2002), *overruled by Castro v. Cty. of Los Angeles*, 833

    F.3d 1060 (9th Cir. 2016) ....................................................................................42

*Gonzalez v. City of Anaheim*,

    747 F.3d 789 (9th Cir. 2014) (en banc) ..............................................................42

*Hawkins v. Freeman*,

    195 F.3d 732 (4th Cir. 1999) (en banc) ..............................................................41

*Keates v. Koile*,

    883 F.3d 1228 (9th Cir. 2018) .............................................................................38, 43

*Lipscomb By & Through DeFehr v. Simmons*,

    962 F.2d 1374 (9th Cir. 1992) .............................................................................44

*Mann v. Cty. of San Diego*,

    907 F.3d 1154 (9th Cir. 2018) .............................................................................passim

*Marsh v. Cty. of San Diego*,

    680 F.3d 1148 (9th Cir. 2012) .............................................................................42

Mueller v. Auker,

    576 F.3d 979 (9th Cir. 2009) ...............................................................................47, 48

*Mullins v. State of Or.*,

    57 F.3d 789 (9th Cir. 1995) .................................................................................22

PETERSON · BRADFORD · BURKWITZ<br>100 North First Street, Suite 300<br>Burbank, California 91502<br>818.562.5800

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
Case No. 2:17-CV-9193-FMO-E

*Newell v. Sauser*,

   79 F.3d 115 (9th Cir. 1996) ................................................................46

*Nunez v. City of Los Angeles*,

   147 F.3d 867 (9th Cir. 1998) ..............................................................21

*Oien v. Cty. of San Bernardino*,

   680 F. App'x 530 (9th Cir. 2017) .......................................................42

*Porter v. Osborn*,

   546 F.3d 1131 (9th Cir. 2008) .....................................................41, 42

*Raich v. Gonzales*,

   500 F.3d 850 (9th Cir. 2007) ..............................................................37

*Seegmiller v. LaVerkin City*,

   528 F.3d 762 (10th Cir. 2008) ............................................................40

*Stormans, Inc. v. Wiesman*,

   794 F.3d 1064 (9th Cir. 2015) ............................................................22

*Sweaney v. Ada Cty., Idaho*,

   119 F.3d 1385 (9th Cir. 1997) ............................................................46

*Thornton v. City of St. Helens*,

   425 F.3d 1158 (9th Cir. 2005) ............................................................21

*Witt v. Dep't of Air Force*,

   548 F.3d 1264 (9th Cir. 2008) ............................................................41

**Cases (U.S. District Courts)**

*Akey v. Placer Cty.*,

   No. 2:14-CV-2402 KJM DB, 2018 WL 3861410 (E.D. Cal. Aug. 14, 2018),

   *order clarified*, No. 2:14-CV-2402-KJM-DB, 2019 WL 290617 (E.D. Cal. Jan.

   23, 2019) ............................................................................................42

*Alberici v. Cty. of Los Angeles*,

   No. CV 12-10511-JFW VBKX, 2013 WL 5573045 (C.D. Cal. Oct. 9, 2013) ....43

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

*Estate of Diaz v. City of Anaheim*, No. SACV121897JVSRNBX, 2013 WL

    12207504 (C.D. Cal. Dec. 18, 2013) ................................................................43

*Estate of Prasad ex rel. Prasad v. Cty. of Sutter*,

    958 F. Supp. 2d 1101 (E.D. Cal. 2013) ...........................................................42

*Swartwood v. Cty. of San Diego*,

    84 F. Supp. 3d 1093 (S.D. Cal. 2014) ...............................21, 26, 27, 29

*Whitlow v. California*,

    203 F. Supp. 3d 1079 (S.D. Cal. 2016) ........................................20, 30

**Cases (State Supreme)**

*In re Angelia P.*,

    28 Cal. 3d 908 (1981) ...............................................................34, 35

**Cases (State Appellate)**

*Brown v. Smith*,

    24 Cal. App. 5th 1135 (2018) ...............................................................20

*In re Isayah C.*,

    118 Cal. App. 4th 684 (2004) ...............................................................33

*Love v. State Dep't of Educ.*,

    29 Cal. App. 5th 980 (2018), *review denied* (Feb. 13, 2019) .............................20

**Statutes (State)**

Cal. Education Code § 51745 ...............................................................23

Cal. Health & Safety Code § 120335 ...............................................23, 24

Cal. Health & Safety Code § 120335(b) .................................................20

Cal. Health & Safety Code § 120335(g)(2) ...........................................20

Cal. Health & Safety Code § 120365 (repealed by Stats. 2015, ch. 35 (S.B. 277), §

    4, eff. Jan. 1, 2016.) ...............................................................20

Cal. Welfare &  Institutions Code § 369(a) ...............................29, 30, 39

Cal. Welfare & Institutions Code § 361(c)(1) ...........................................33

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

**Incomplete Citations from Plaintiffs' Sections**

§ 319, subd. (b) ................................................................................34

§ 355, subd. (a) ................................................................................34

§ 361, subd. (c) ................................................................................34

§§ 309 & 319 ...................................................................................34

**Other Authorities**

H.R. 179, 116th Cong. (2019–2020) .......................................24

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
Case No. 2:17-CV-9193-FMO-E

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION (Δ)

When the Court dismissed the majority of Plaintiffs' action, it permitted one claim under 42 U.S.C. § 1983 to move forward: that the vaccination of P.G. while detained from her mother, Ulikhanova, violates the Due Process Clause of the Fourteenth Amendment. Plaintiffs face an uphill battle: *i.e.*, the Supreme Court's decision that compulsory vaccination does not violate the Constitution in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 27 (1905). Discovery has confirmed that this case is nothing more than a routine dependency case.

After P.G. was detained, Carey and Helwajian found themselves between two feuding parents embroiled in a years-long divorce with conflicting opinions on vaccination and education—complicated by a change in the law that required P.G. to be vaccinated in order to stay with her caregiver, an aunt who ran an in-home daycare. Carey and Helwajian turned to the juvenile court for guidance. Ulikhanova had an opportunity to object—and did. She lost. And when Ulikhanova began an aggressive campaign of surveillance against P.G.'s caregiver that involved a bugged doll, a private investigator, and stakeouts, the juvenile court issued a restraining order protecting the caregiver. The juvenile court also confined Ulikhanova's contact with P.G. to nine hours per week at a DCFS facility (to the obvious exclusion of seeing P.G. at a physician's office for routine vaccination).

Ulikhanova tried to save her § 1983 action by claiming that the juvenile court was robbed of important vaccination forms she gave to Carey and Helwajian—even though Carey submitted them to the juvenile court. She claims Helwajian violated her due process rights in seeking an order on vaccination, even though Helwajian's request was denied. Empaneling a jury in this case would be a waste of time and resources; Defendants respectfully request summary judgment in their favor.

///

///

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

## II.    RELEVANT BACKGROUND FACTS (Δ)

### II.A.        2007–2015: The Ulikhanova-Garcia family before removal. (Δ)

Ulikhanova married Brian Garcia ("Garcia") in 2007. ¶ 3. [1]) In 2010, they had a daughter: P.G. ¶¶ 1, 2. Ulikhanova has no other children. ¶ 1. In 2013, Garcia moved out of the family home and Ulikhanova filed for divorce; the proceedings remain ongoing. ¶¶ 4–6; Ex. 1, 14:5–10, 47:25.[2] At various times, Ulikhanova has accused Garcia of sexually abusing P.G. *Third Amended Complaint* (*TAC*) ¶¶ 68–70, ECF No. 39. A family court judge found that "sexual abuse of the minor did occur," but did not tether the finding to Garcia. Ex. 15, 17. DCFS, in its own investigation, found the accusations inconclusive. Ex. 16, 23.

Dr. David Boxstein was P.G.'s pediatrician from birth. ¶¶ 7, 8. On at least three occasions, June 2011, January 2012, and November 2012, he recommended P.G. be vaccinated; Ulikhanova refused each time. ¶¶ 18, 19; Ex. 2, 48:13–24; 50:24–51:7. Three forms from Dr. Boxstein's records are relevant to this case.

On November 13, 2012, Ulikhanova signed an American Academy of Pediatrics Form HE0342, titled "Refusal to Vaccinate" ("FORM HE 0342"). ¶ 12; Ex. 4, COLA_001413, -15. This form does not exempt P.G. from California's compulsory vaccination requirements or state that P.G.'s vaccination would be unsafe. ¶¶ 13, 14; Ex. 2, 26:15–27:22.

On September 25, 2014, Ulikhanova signed a California Department of Social Services Form LIC 701 (version 08/08), titled "Physician's Report - Child Care Centers" ("FORM LIC 701"). ¶ 9; Ex. 4, COLA_001414. It neither states that vaccination is unsafe nor exempts P.G. from vaccination. ¶¶ 10, 11; Ex. 2, 28:3–

---

[1] For brevity, citations to the *Joint Appendix of Undisputed and Disputed Facts*, filled concurrently with this motion, are designated with a freestanding pilcrow (¶) alone and underlined typeface.

[2] Exhibit citations are to the *Joint Evidentiary Appendix*, and such exhibits have been filed as exhibits to the *Declaration of Ryan A. Graham, Esq.*

29:10. The same day, Ulikhanova signed a California Department of Public Health Form CPDH 8262 (version 10/13), titled "Personal Beliefs Exemption to Required Immunizations" ("FORM CPDH 8262") ¶ 15; Ex. 4, COLA_001416. It does not state that vaccination is unsafe because of any particular physical condition, and it does not exempt P.G. from vaccination for purposes of entering school. ¶¶ 16, 17; Ex. 2, 29:21–31:13.

Dr. Boxstein was the only pediatrician P.G. saw before being removed. ¶ 7. He testified that he would have never exempted P.G. from vaccination for any medical reason. ¶ 20; Ex. 2, 22:23–24:1. P.G. was, accordingly, never exempt from compulsory vaccination for medical reasons before being detained. ¶¶ 7, 20, 21.

**II.B.          Oct. 2015–Jan. 2016: DCFS investigation and removal. (Δ)**

On October 4, 2015, at about 1:00 a.m., Ulikhanova called police to report threatening calls from Garcia that occurred a week earlier. Ex. 32, 7–10. A Glendale Police Department (GPD) officer responded. *Id.* The officer called DCFS "due to the nature of the call." *Id.* at 10. Ultimately, an investigation was assigned to social worker Maria Sosa. *See generally*, Ex. 14, 11–19. On December 30, 2015, Sosa and a GPD detective interviewed P.G. *Sosa Decl.* ¶¶ 17–22. P.G. told Sosa she (P.G.) did not have any friends, did not play outside, and did not go to stores. *Id.* at ¶ 20. Sosa's investigation also disclosed that P.G. had not seen her father, grandfather, or an aunt in two years. *Id.* at ¶ 11. Sosa applied for an order authorizing removal of P.G., which was approved by the juvenile court on January 8, 2016. *Id.* at ¶ 25.

On January 13, 2016, P.G. was removed from Ulikhanova's care and placed with Mary Louise Reisch ("Reisch"), P.G.'s great aunt, who runs a daycare facility out of her home. ¶¶ 22–24; Ex. 1, 74:14–19, 75:22–24. P.G. began to see a new pediatrician while living with Reisch: Dr. Susan Hammar. ¶¶ 25, 26.

**II.C.          Jan. 2016: Juvenile court proceedings begin. (Δ)**

A juvenile dependency petition was filed against both parents on January 19, 2016, and detention hearings were held on January 19 and 20, 2016 before Judge

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

13

Akemi Arakaki. Exs. 21, 23, 24. On January 19, the juvenile court (1) vested temporary custody of P.G. with DCFS and (2) authorized DCFS to detain P.G. with either a relative or a non-relative extended family member (NREFM). ¶ 35; Ex. 23, ¶¶ 4, 8, 13. At the January 20 hearing, Judge Arakaki "detain[ed] from both parents," "order[ed] monitored visits for both parents," and "indicate[d] that the parents do remain the educational rights holders and developmental decision makers for [P.G.]" ¶¶ 36–39; Ex. 11, 12:10–28. Visitation for both parents was set at three times per week, at three hours each visit or nine cumulative hours. Ex. 24, ¶ 38. For Ulikhanova,  but not Garcia, visitation was restricted to occurring at the DCFS office in Pasadena. ¶ 44. After the detention hearings, Carey and Helwajian were assigned to Plaintiffs' DCFS case. *Carey Decl.* ¶ 3; *Helwajian Decl.* ¶ 3. Neither were involved before P.G. was detained. *See id.*; *accord Sosa Decl.* ¶ 7.

### II.D.        Jan.–Feb. 2016: Escalating friction with Reisch; visitation problems. (Δ)

Ulikhanova objected to P.G.'s placement with Reisch and, even though the juvenile court had ordered her placed with a relative or NREFM, Ulikhanova demanded that P.G. be placed in foster care. ¶¶ 32, 42; *Helwajian Decl.* ¶ 7. On January 28 and February 1, 2016, Ulikhanova tried to audio-record monitored visits with P.G. at the Pasadena DCFS office. *Helwajian Decl.* ¶¶ 11, 12. On February 3, 2016, Helwajian received a telephone call from Reisch, stating that her home had been egged and that she suspected Ulikhanova was responsible. *Id.* at ¶ 11. Reisch also told Helwajian that, on February 5, 2016, a man hired by Ulikhanova was staked outside her home monitoring her household activity. *Id.* During this period, Ulikhanova accused Reisch of planting drugs in a bag of clothes given to her. *Id.*

### II.E.        Helwajian's February Ex Parte; juvenile court denies vaccination order. (Δ)

By February 2016, there were three disagreements occurring between the parties in Plaintiffs' DCFS case. First, because of the accusations of sexual abuse,

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

14

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

Sosa had recommended a forensic examination at a County-affiliated medical clinic (called a "Hub Clinic"). *Helwajian Decl.* ¶ 9. While Garcia consented, Ulikhanova did not. *Id.* Second, the vaccinations had become a problem for P.G.'s placement with Reisch. Because children in daycare facilities are required to be vaccinated, Reisch was concerned that her clients being exposed to an un-vaccinated child (*i.e.*, P.G.) would have repercussions on her business. *Id.* at ¶ 8. Garcia consented to the vaccinations; Ulikhanova did not. *Id.* at ¶ 7. Third, DCFS had objections to Ulikhanova's tendency to record her visits. *Id.* at ¶ 14(b).

Consequently, Helwajian filed an *Ex Parte Application* with the juvenile court in February 2016 ("*February Ex Parte*") seeking an order on P.G.'s vaccinations, the forensic examination, and Ulikhanova's tendencies on recording. ¶ 47; *Helwajian Decl.* ¶ 14.

On February 18, 2016, Helwajian sent an email to Ulikhanova and her dependency counsel, Ronald Funk, Esq. ("Funk"), informing them that a hearing had been set for February 25, 2016 on the issues set forth in the *February Ex Parte*. ¶¶ 41, 51; Ex. 8. At the hearing, Judge Arakaki provided Ulikhanova with a *Jackson W.* waiver, instructing her that it was a "waiver of competent counsel." ¶ 53. Judge Arakaki and Ulikhanova engaged in the following colloquy:

> The Court: [...] My understanding is that Mr. Funk is a specialist in the family law arena and [h]as some experience here in juvenile dependency. But you are understanding this is a very specialized area of the law and waiving any issues with regard to competent counsel; is that correct?
> The Mother: Yes. He did a wonderful job in family court, and he is the only attorney I trust.

¶ 54. At the hearing, DCFS (through counsel) requested that the court order P.G. be vaccinated. ¶ 55; Ex. 11, 20. P.G., through counsel, took the position that her parents should be making the decision. Ex. 11, 20:22–24. Garcia requested that P.G. receive immunizations. ¶ 56. Ulikhanova, through Funk, objected. ¶¶ 57, 62.

Judge Arakaki acknowledged Funk's representation, ex. 11, 23:18–22, but nevertheless continued to indicate that the parents—both parents—"are still the

educational rights holders and developmental decision makers," ¶ 60. She also acknowledged DCFS' concerns, but declined to authorize the vaccination. ¶ 59.

On the issue of surveillance, Judge Arakaki admonished Ulikhanova and ordered her (1) to stop recording her interactions with P.G., (2) to stop recording her interactions with DCFS employees, and (3) "not to go to the home of [Ms. Reisch] nor park across the street of the home of [Ms. Reisch]." ¶¶ 61, 63. She also refused to order a forensic examination of P.G. Ex. 11, 23:23–24

### II.F.         Carey's March reports; conflict with Reisch continues. (Δ)

In March 2016, Carey filed a *Jurisdiction and Disposition Report* with the juvenile court. *Carey Decl.* ¶ 4. Beforehand, Carey had been inundated with over 500 pages of email from the juvenile court parties. *Id.* The email included FORM LIC 701, FORM HE 0342, and FORM CPDH 8262. Ex. 17. Carey indicated that he would file a supplemental report after reviewing the material to identify pertinent evidence for the court. *Carey Decl.* ¶ 4; Ex. 5, 6. On April 12, 2016, Carey filed a *Supplemental Report*, which included all three vaccination forms. ¶¶ 66, 67; Ex. 17.

On March 1, 2016, Ulikhanova told Helwajian she had hired a private investigator to surveil the Reisch household. ¶ 64; *Helwajian Decl.* ¶ 18. Gina Sarkissian, Ulikhanova's mother, called Helwajian the next day. ¶ 65; *Helwajian Decl.* ¶ 19. Sarkissian reported that Ulikhanova asked her to report that P.G. was not being taken care of at the Reisch household and that P.G. was fearful for her safety. *Helwajian Decl.* ¶ 19. On April 29, 2016, Ulikhanova gave P.G. a doll during a monitored visit and told her to take it with her everywhere—*e.g.*, out to eat, to bed—and to bring it back to all her visits. *Carey Decl.* ¶¶ 10–12. On May 2, 2016, Reisch told Carey that her family found a voice-activated recording device implanted in the doll. ¶ 69; *Carey Decl.* ¶ 11.

### II.G.         Carey's June Supplemental Report. (Δ)

By May 2016, the family friction required court intervention yet again. Reisch had asked Carey for a restraining order against Ulikhanova due to the doll incident.

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

16

¶ 70; *Carey Decl.* ¶ 11. The impact of P.G.'s vaccination status on Reisch's daycare business remained unresolved; vaccination would have enabled P.G. to stay with Reisch.¶ 74. But P.G.'s parents still disagreed about vaccination. ¶ 68. They also disagreed about whether to put P.G. in kindergarten. ¶ 72. P.G. had a speech impediment that made certain sounds difficult to understand. *Carey Decl.* ¶ 13. DCFS was concerned that P.G. might need speech therapy and wanted her to be enrolled in school to receive a speech assessment. ¶ 71. To address these issues, Carey wrote a Supplemental Report for the juvenile court, filed in June 2016 ("*June Supplemental Report*"). ¶ 75; Ex. 18. In it, Carey recommended that the juvenile court (1) issue a TRO protecting Reisch, her family, her home, and her daycare business from Ulikhanova, and (2) issue an order that P.G. be vaccinated so that she could enroll in school. *Id.* The hearing was set for June 9, 2016. ¶ 76. On June 3, 2016, Carey sent an email providing notice of the hearing to Ulikhanova and Funk. ¶ 77; Ex. 9. The hearing was trailed to June 10 to accommodate another trial. ¶ 83.

## II.H.   June 10, 2016: Juvenile court authorizes vaccination, issues TRO. (Δ)

At the June 10, 2016 hearing, with respect to immunization, DCFS' counsel emphasized that Reisch "does run a daycare out of her home," and that "pursuant to the law, there cannot be any children [there] who are unimmunized." ¶ 85; Ex. 12, 4:10–12. DCFS also argued that immunization was required for school, and that P.G. needed to receive services and socialization that school provides. ¶ 86; Ex. 12, 4:13–18. Garcia, through counsel, submitted on both issues. ¶ 87, Ex. 12, 5:28–6:1. P.G., through counsel, submitted on the TRO request, but *joined* DCFS on the request to be immunized—noting "otherwise, it will jeopardize her placement." ¶ 88; Ex. 12, 4:21–24. Funk, for Ulikhanova, objected:

> With regard to the immunizations, I think that should be addressed after the court takes jurisdiction; that the law requiring or removing the personal belief exception, doesn't take effect until next month. And I know there are lawsuits going on, and one request that its effect be delayed. And if those have not been resolved, I think more appropriate addressed at the trial.

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

¶ 89; Ex. 12, 5:3–9. Judge Arakaki noted she was "abundantly aware of the circumstances with regard to the current placement," and stated the following:

> Based on the circumstances and based on the information that's been provided to this court, the court at this time is going to authorize the immunizations of the child. I will note [Ulikhanova]'s objection to it. [Garcia] is in agreement with it. [P.G.]'s counsel is in agreement with it. Based on the need for the child to have those immunizations to salvage her current placement, but also to attend school. I do believe based on all of the information that's been provided, and again based on the fact that [Garcia] is, in fact, in agreement with that, the court does believe it's appropriate for the court to make that order. And so again, I will note the mother's objection.

¶ 92; Ex. 12, 10:15–27. With respect to the TRO, Judge Arakaki reminded the parties that "[Ulikhanova] has been advised that she is not to be recording any of the visits or any of the interaction[s] with the child" and that "to secret a microphone in a doll to have the child recorded is in complete violation of this court's order." Ex. 12, 7:18–22. She granted the TRO, prohibiting Ulikhanova from having any contact with Reisch, her husband, and her children. ¶ 90; Ex. 12, 8:11–14.

At the hearing, Funk made a request to expand Ulikhanova's visitation. ¶ 93. Until then, all of her visits had taken place inside a DCFS office. Ex. 2, 11:18-19. Ulikhanova wanted "to be able to visit outdoors at times with her daughter." ¶ 93; Ex. 2, 11:19–22. But he did not specifically ask for Ulikhanova to be present during any occasion when P.G. was vaccinated. *See* Ex. 12. Judge Arakaki refused to remove any restrictions on Ulikhanova's visitations, and made clear that both parents were to have visits with P.G. "monitored by a DCFS approved monitor and DCFS approved setting." ¶¶ 94, 95. She continued, "if [DCFS] is requiring those visits to occur in the DCFS office based on the current situation, again [DCFS] has been given that discretion to allow visits to occur in a setting that they deem appropriate and that will remain to be the order." ¶ 96; Ex. 12, 12:2–8.

Dr. Hammar vaccinated P.G. on June 10, August 18, and October 6, 2016. ¶¶ 122–124. At no point did Funk seek an order for his client to be present.

///

///

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
Case No. 2:17-CV-9193-FMO-E

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

## II.I.    Criminal prosecution of Ulikhanova; dependency proceedings continue. (Δ)

Reisch reported the doll incident to Burbank police. *Carey Decl.* ¶ 10. On June 17, 2016, the Burbank City Attorney filed a criminal complaint against Ulikhanova for surreptitiously recording a confidential communication in violation of the California Penal Code. ¶ 78; Ex. 3, 20. She was found guilty and convicted. ¶¶ 79-80; Ex. 3, 7. A criminal restraining order (CRO) issued on December 6, 2016, protecting the Reisch family for three years. ¶ 81; Ex. 3, at 10. On August 16, 2016, an amended juvenile petition was sustained against Ulikhanova, and all counts against Garcia were dismissed. ¶ 97; Ex. 28, ¶¶ 11–15. The juvenile court found that P.G. was a person described by California Welfare and Institution Code section 300(b). ¶ 98.

Ulikhanova's visitation was liberalized on December 12, 2016, enabling her to visit with P.G. outside of the DCFS Pasadena office and without a monitor. ¶ 100.

## II.J.    Foster Family and reunification. (Δ)

Eventually, Reisch asked for P.G. to be placed elsewhere, and she was moved to the care of an unrelated foster family ("Foster Family") on December 21, 2016. ¶ 101; *Helwajian Decl.* ¶ 6. By then, Ulikhanova was allowed overnight weekend visits with P.G. ¶ 102. With the Foster Family, P.G. saw a new pediatrician, Dr. Shaista Parveen, who vaccinated P.G. on January 19, 2017. ¶¶ 103, 125.

P.G. came home to Ulikhanova's care in April 2017 under the supervision of DCFS. ¶ 108; Ex. 1, 127:6–7. By then, P.G. had "one or two" vaccinations left. Ex. 1, 129:22–129:5. In May 2017, for the first time, Ulikhanova obtained a letter from a doctor in San Diego exempting P.G. from vaccination based on a supposed history of family autoimmune diseases. Ex. 33, 6–8. Ulikhanova never suggested to Carey or Helwajian that she should ask any of P.G.'s pediatricians for such a letter. ¶ 111. Ulikhanova used this letter to enroll P.G. in public school and, after obtaining the letter, no further vaccinations occurred. Ex. 1, 163:25–164:15. The juvenile court

19

1  terminated jurisdiction over P.G. on December 8, 2017. ¶ 112; Ex. 29.

2  **III.   LEGAL BACKGROUND OF CALIFORNIA VACCINATION (Δ)**

3       In California, children must be "fully immunized" prior to being

4  unconditionally admitted to "any private or public elementary or secondary school,

5  child care center, day nursery, nursery school, family day care home, or

6  development center." Cal. Health & Safety Code § 120335(b). Until December 31,

7  2015, a parent could exempt a child from vaccination by filing a document with the

8  school (or family day care home) noting vaccination is "contrary to his or her

9  beliefs." Cal. Health & Safety Code § 120365 (repealed by Stats. 2015, ch. 35 (S.B.

10  277), § 4, eff. Jan. 1, 2016.) California's Senate Bill 277 "repealed the personal

11  belief exemption." *Love v. State Dep't of Educ.*, 29 Cal. App. 5th 980, 984 (2018),

12  *review denied* (Feb. 13, 2019); *accord Brown v. Smith*, 24 Cal. App. 5th 1135, 1139

13  (2018). It became "effective January 1, 2016." *Id.* at 986 (citing Stats. 2015, ch. 35).

14  It otherwise "left undisturbed the prior law's vaccination requirements for school-

15  aged children in California." *Whitlow v. California*, 203 F. Supp. 3d 1079, 1082

16  (S.D. Cal. 2016). Plaintiffs suggest that P.G.'s prior personal beliefs exemptions

17  from preschool would have been grandfathered forward—that it "should have

18  applied until the next grade span." *TAC* ¶ 181. Plaintiffs ignore that "grade span" is

19  a statutory term of art, defined as the periods from (1) from birth to preschool, (2)

20  from kindergarten to sixth grade, and (3) from seventh grade to twelfth grade. Cal.

21  Health & Safety Code § 120335(g)(2). One district court explained the concept

22  succinctly as follows:

23       The law now provides that if a parent had on file or filed a [personal beliefs
        exemption] prior to January 1, 2016, his or her child could be enrolled in
24       school or day care, unless that child was at a "checkpoint," *i.e.*, was a first-
        time enrollee in day care or kindergarten or was enrolling in the seventh
25       grade.

26  *Whitlow v. California*, 203 F. Supp. 3d 1079, 1082 (S.D. Cal. 2016).

27  ///

28  ///

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

## IV.    ARGUMENT (Δ)

Only the seventh claim for relief remains: a § 1983 claim that Plaintiffs characterize as "substantive due process claims for the invasive and not agreed to medical procedures pursuant to *Wallis v. Spencer*[,] 202 F.3d 1126 and *Swartwood v. Cnty. of San Diego*, 84 F.Supp.3d 1093 (S.D. Cal. 2014)." *TAC* ¶ 179. As the Court has noted, *Wallis* and *Swartwood* are colored by the Ninth Circuit's decision in *Mann v. Cty. of San Diego*, 907 F.3d 1154 (9th Cir. 2018) (collectively referred to as "*San Diego Cases*"). ECF No. 71, 12:22–23.

To prevail in a § 1983 action, "a plaintiff must show that (1) acts by the defendants (2) under color of state law (3) deprived [her] of federal rights, privileges or immunities and (4) caused him damage." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163–64 (9th Cir. 2005) (internal citations, quotation marks, and alterations omitted). The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. U.S. CONST. AMEND XIV. While procedural due process concerns fair process, substantive due process bars "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). It "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). As a threshold matter, a plaintiff must show that a protected life, liberty, or property interest is at stake. *Nunez*, 147 F.3d at 871.

Defendants are entitled to summary judgment because (1) on the evidence, Plaintiffs have no actionable liberty interests at stake, (2) even if they did, Defendants did not violate those interests by way of conscience-shocking behavior, and (3) even if Defendants did engage in such behavior, they are nevertheless entitled to qualified immunity.

PETERSON· BRADFORD· BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

21

IV.A.        **Plaintiffs have no actionable liberty interests. (Δ)**

"Substantive due process analysis must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (internal citations, alterations, quotations omitted). "Only those aspects of liberty that we as a society traditionally have protected as fundamental are included within the substantive protection of the Due Process Clause." *Mullins v. State of Or.*, 57 F.3d 789, 793 (9th Cir. 1995). The "first task" is, accordingly, to "describe carefully the asserted liberty interest." *Id.* (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 123–25 (1992)). "[V]ague generalities, such as 'the right not to be talked to,' will not suffice." *Chavez v. Martinez*, 538 U.S. 760, 776 (2003). The focus of the inquiry must be the scope of the challenged conduct and the nature of the allegations. *See Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1085 (9th Cir. 2015).

Plaintiffs attempt to shoehorn routine vaccination within the interests set forth in *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000). *TAC* ¶¶ 179, 181, 182. *Wallis* provides that the "right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Id.* at 1141. Parents and children have a right to be with each other "while [children] are receiving medical attention." *Id.* at 1142. In the context of this case, however, characterizing the fundamental liberty interests at stake as either of these two rights "does not paint an entirely accurate picture of the interest here truly at stake." *Mullins*, 57 F.3d at 793. The right must therefore be re-framed before assessing whether it is fundamental. *Washington v. Glucksberg*, 521 U.S. 702 (1997) (rejecting suggested description of asserted right to assisted suicide as being one "to die," or "to choose how to die," or to "control one's final days," instead analyzing right more narrowly as one "to commit suicide which itself includes a right to assistance in doing so").

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

22

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

*a.*      *π's Counterpoints*

**PLAINTIFF'S OPPOSITION TO A: PARENTS' RETAIN A RIGHT TO MAKE VACCINATION DECISIONS FOR THEIR CHILD. NEITHER THE STATE NOR THE FEDERAL TAKE THAT RIGHT AWAY FROM THE PARENTS.**

The first issue before this Court is whether a vaccination of a parent's child is considered a medication decision that a parent retains a right to make under the Fourteenth Amendment of the US Constitution within the bounds of the limiting state law, or whether, as the Defendants argue, that right is non-existent to a parent and ultimately solely within the discretion of the State where which the child is a resident. The Defendants' approach is wholly incompatible with the existing law on the issue, Health & Safety Code § 120335 in California, which only limits the parents' rights to make this decision when they ***choose*** to enroll their child into a private or public schooling without obtaining a medical exemption, where one is available. Parents could still choose to homeschool their children and/or seek a medical exemption when applicable to continue their enrollment in a private or public schooling subject to the regulation. By its terms, Health & Safety Code § 120335 (f), reads: "This section does not apply to a pupil in a home-based private school or a pupil who is enrolled in an independent study program pursuant to Article 5.5 (commencing with Section 51745) of Chapter 5 of Part 28 of the Education Code and does not receive classroom-based instruction."

Moreover, the constitutional protections of *Wallis* and *Mann* of parental notice and opportunity to make a decision apply to vaccinations per se due to their permanent and potentially dangerous nature. This is best illustrated by the everchanging state and federal law to strike the balance

between the parent's right to choose to skip the vaccinations and the state's right to prevent spread of disease in public school children. This is not a minor issue as the California Legislature, as well as now the Congress, have been focused on striking the perfect balance. Thus far, parents maintain the right to skip immunizations until at least the child is of school age, and thereafter, with a grandfather's clause or a medical exemption, which mother indeed obtained in May 2017. (See also Cal. Health & Safety Code § 120335  (requiring vaccination of public school students); H.Res.179 - Recognizing the importance of vaccinations and immunizations in the United States, 116th Congress (2019-2020).) (PJA, Ex. 36, 545-546.)

The issue of mandatory vaccination has also appropriately gathered the attention of the medical community due to the health and safety risks. As relevant here, on February 26, 2019, the following statement was posted by the Association of American Physicians and Surgeons with regard to this issue, quoted below, showing that there are many and permanent risks involved with these vaccinations.[3]

Therefore, the decision whether to vaccinate or not vaccinate one's

---

[3] Association of American Physicians and Surgeons (AAPS) strongly opposes federal interference in medical decisions, including mandated vaccines. After being fully informed of the risks and benefits of a medical procedure, patients have the right to reject or accept that procedure. The regulation of medical practice is a state function, not a federal one. Governmental preemption of patients' or parents' decisions about accepting drugs or other medical interventions is a serious intrusion into individual liberty, autonomy, and parental decisions about child-rearing. Vaccines are necessarily risky, as recognized by the U.S. Supreme Court and by Congress. The Vaccine Injury Compensation Program has paid some $4 billion in damages, and high hurdles must be surmounted to collect compensation. The damage may be so devastating that most people would prefer restored function to a multimillion-dollar damage award. Many serious complications have followed MMR vaccination, and are listed in the manufacturers' package insert, though a causal relationship may not have been proved. According to a 2012 report by the Cochrane Collaboration, the design and reporting of safety outcomes in MMR vaccine studies, both pre- and post-marketing, are largely inadequate. The smallpox vaccine is so dangerous that you can't get it now, despite the weaponization of smallpox. Rabies vaccine is given only after a suspected exposure or to high-risk persons such as veterinarians. The whole-cell pertussis vaccine was withdrawn from the U.S. market, a decade later than from the Japanese market, because of reports of severe permanent brain damage. The acellular vaccine that replaced it is evidently safer, though somewhat less effective. (https://aapsonline.org/measles-outbreak-and-federal-vaccine-mandates/?fbclid=IwAR2RlQsr-8gvi4HZEx3Cl6s2fPJvA4we74aT65wtch1lh37Jqz9f41is4lg.)

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
Case No. 2:17-CV-9193-FMO-E

child is still within the conclusive discretion of the parent, until the parent chooses to enroll a child into a school setting that requires these vaccinations unless a medical exception is appropriate. Again, home-based schooling is not subject to this regulation.

The Defendants appear to confuse the question here with whether the State has a right to impose vaccination on those children attending its private or public schools to stop the spread of disease. However, this is not the question in this case or before this Court. Nor are the Plaintiffs challenging the laws of the State of California in this regard. (*Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 27 (1905) [upheld state mandatory vaccination law under the Fourteenth Amendment].)

Therefore, the Defendants argument that the Fourteenth Amendment substantive due process rights do not apply to a parent's medical decision to vaccinate their child or not as if to argue they have no right to make a choice is wholly out of line and should be rejected by this Court.

### IV.A.1. *Plaintiffs' asserted liberty interest must be refined to account for the non-investigatory nature of the vaccinations. (Δ)*

(i.) In order for due process to apply to a particular medical examination, the examination must be investigatory in nature. *Mann*, 907 F.3d at 1162. In *Wallis*, two children were detained from their parents without a warrant. 202 F.3d at 1131. Three days later, two detectives took the children to Palomar hospital, where "an evidentiary physical examination of both children" was conducted. *Id.* at 1134–35. "The medical procedures, . . . , included internal body cavity examinations of the children, vaginal and anal[,]" as well as "photographs of both the inside and outside of [the children's] vagina and rectum." *Id.* at 1135. The purpose of the examinations was "to determine whether either child had been sexually abused." *Id.* at 1135.

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

25

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

In *Mann*, the Ninth Circuit extended *Wallis* to "dual purpose" medical examinations. 907 F.3d at 1162. *Mann* concerned "ten- to fifteen-minute medical examination[s]" performed at San Diego County's Polinsky facility in which a "physician is looking for signs of physical and sexual abuse." *Id.* at 1158, 1161. The Polinsky facility is "a San Diego County emergency shelter and group home." *Swartwood*, 84 F. Supp. 3d at 1101. The exams "included a twenty-two point assessment of general appearance, behavior, mental status, and specific parts of the body," but "also included a gynecological and rectal exam, which involved a visual and tactile inspection of the children." *Mann*, 907 F.3d at 1158, 1165. "If staff observed signs of abuse, [San Diego] County required them to photograph the abuse for the children's records." *Id.* San Diego County tried to "distinguish *Wallis* on the ground that its holding applie[d] only to investigatory medical examinations, contending that the Polinsky examinations were not investigatory because "the examinations are conducted to assess the child's 'mental health' and . . . in a 'light, pleasant atmosphere.'" *Id.* at 1161. The Ninth Circuit disagreed, expressly acknowledging that the "Polinsky medical examinations are not routine pediatric exams." 907 F.3d 1154, 1161.  The Ninth Circuit "conclude[d] that the same rules apply to purely investigatory examinations as to dual-purpose examinations, where one of the purposes is investigatory." *Id.* at 1162.

The Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (citation omitted). Here, the Ninth Circuit has been clear: the <u>*investigatory nature*</u> of an examination is a necessary feature of any examination for it to fall within the substantive protections of the Fourteenth Amendment. The Ninth Circuit could have taken the opportunity in *Mann* to clarify that due process applied to all medical examinations in a dependency proceeding, even the routine ones. But it did not. Instead, the *Mann* panel admonished the

26

district court that its "analysis should have stopped with its determination that the medical examinations had an investigatory purpose." *Id.* at 1162. The investigatory nature of the examination is, accordingly, the most reliable guidepost for determining whether substantive due process applies here.

(ii.) Unlike the examinations at issue in the *San Diego Cases*, the vaccinations at issue here have no investigatory purpose at all. The examinations in the *San Diego Cases* were conducted for the purpose of discovering indicia of abuse. Here, the purpose of the examination was to provide a medical service: *i.e.*, to administer vaccinations, allowing P.G. to enroll in school and salvaging her placement.

The investigatory nature of the Polinsky examinations "is also borne out by the fact that the exam involves the examination of '22 items.'" *Swartwood*, 84 F. Supp. 3d at 1118. Here, the examinations concern a single item: vaccinating P.G. In *Wallis*, minors were taken to their examinations by government agents (detectives), and a social worker was present for the examination. 202 F.3d at 1134–35. Here, there is no evidence that Carey or Helwajian took P.G. to her vaccination appointments. ¶¶ 122, 124. The Polinsky examinations were conducted by "a Board certified child-abuse specialist" or by one of its medical directors. *Swartwood*, 84 F. Supp. 3d at 1101; *Mann*, 907 F.3d at 1161. The vaccinations were performed by P.G.'s regular pediatricians, Dr. Hammar and Dr. Parveen, and neither Carey nor Helwajian had anything to do with the selections of these physicians. ¶¶ 30, 31, 107, 108, 127–130. There is no evidence that either physician is affiliated with DCFS or that the vaccinations were conducted in County facilities. ¶¶ 32–34, 132. The closest analog to Polinsky, on this evidence, would be Los Angeles County's Hub Clinics. *See Helwajian Decl.* ¶ 9. However, neither Dr. Hammar's office or El Proyecto del Barrio (Dr. Parveen's office) are Hub Clinics. ¶¶ 34, 132.

(iii.) Consequently, *Wallis* is not an accurate representation of the liberty interests at stake here—and such interests must be refined accordingly.

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

*b.*     *π's Counterpoints*

**PLAINTIFFS' OPPOSITION TO A(1): Fourteenth Amendment Does Not Require An Investigatory Purpose for a Constitutional Violation to Occur. The Defendants confuse and misapply the analysis under the Fourth Amendment unreasonable searches and seizures.**

It is well established that the Fourteenth Amendment protects the right to family association without governmental interference. (*Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000).) The Ninth Circuit in *Wallis v. Spencer*, *supra*, held that the right to familial association "includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." Id. at 1141 (citing *Parham v J.R.*, 442 U.S. 584, 602 (1979).) The Ninth Circuit in *Wallis v. Spencer*, *supra*, also held that the parents have a right to be with their children while they are receiving medical care and "children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations ... that are invasive or upsetting." (*Id*. at 1142.) That case involved genital exams of children, without parents' consent or presence, to determine if they were sexually abused. (*Id*.)

Consequently, 18 years later, the Ninth Circuit in *Mann v. Cty. of San Diego*, 907 F.3d 1154, 1160–62 (9th Cir. 2018) expanded the *Wallis* protections to investigatory or dual purpose medical exams, holding that the state violates the parents' substantive due process rights by performing "medical examinations without notifying the parents about the examinations and without obtaining either the parents' consent or judicial authorization." There, the County argued that the medical exams were of children's mental health in pleasant atmosphere, but the *Mann* court held

that even this served a dual purpose and could have uncovered physical or sexual abuse. (*Id*. at 1161.) Further, there was evidence of visual and tactile inspections of their external genitalia, hymen, and rectum, as well as potentially painful tuberculosis and blood tests. (*Id*. at 1165.)

The Ninth Circuit in *Mann* further explained when expanding *Wallis* to the facts at bar, "A parent's due process right to notice and consent is not dependent on the particular procedures involved in the examination, or the environment in which the examinations occur, or whether the procedure is invasive, or whether the child demonstrably protests the examinations. 'Nothing in *Wallis* or *Greene* suggests that the Fourteenth Amendment liberty interest only applies when a magnifying scope is used.' *Swartwood*, 84 F.Supp.3d at 1118. The amount of trauma associated with a medical examination, particularly for young children, is difficult to quantify and depends upon the child's developmental level, previous trauma exposure, and available supportive resources, among other factors. Given this reality, a parent's right to notice and consent is an essential protection for the child and the parent, no matter what procedures are used." (*Mann v. Cty. of San Diego*, *supra*, at p. 1162.)

As to the application of these constitutional rights to the California child welfare law, the Ninth Circuit in *Mann* emphasized that "California law requires County social workers to 'notify the parent, guardian, or person standing in loco parentis of the person, if any, of the care found to be needed before that care is provided' and permits the County to provide the care 'only upon order of the court in the exercise of its discretion.' Cal. Welf. & Inst. Code § 369(a)." (*Mann v. Cty. of San Diego*, *supra*, at p. 1163.)

The constitutional protections of *Wallis* and *Mann* are therefore codified in the California juvenile law under Cal. Welf. & Inst. Code §

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

29

369(a), as recognized by the Ninth Circuit in *Mann*. They also specifically apply here to the 18 chemical permanent injections into the Minor over estimated 8 shots during four different medical visits in a period of six months, when she was still not of required age to start school. These injections were permanent in nature, and at the minimum, painful and uncomfortable, especially for a child who was never injected before for the first five years of her life and was denied the company of her mother to ease the traumatic experience.

### IV.A.2.   The asserted liberty interests must be refined to account for the special constitutional significance of vaccinations. (Δ)

(i.) "For more than 100 years, the United States Supreme Court has upheld the right of the States to enact and enforce laws requiring citizens to be vaccinated." *Whitlow v. California*, 203 F. Supp. 3d 1079, 1083 (S.D. Cal. 2016) (citing *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 27 (1905); *Zucht v. King*, 260 U.S. 174 (1922)). In *Zucht*, the Supreme Court held that compulsory vaccination did not violate the Due Process Clause of the Fourteenth Amendment. *Zucht*, 260 U.S. at 176. In the First Amendment context, the Supreme Court has held "neither rights of religion _nor rights of parenthood_ are beyond limitation," and that parental rights are subordinated to society's interests in protecting against the spread of disease. *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944) (emphasis added).

(ii.) None of the *San Diego Cases* concerned medical procedures that were compulsory (by statute). While *Wallis* found that parental consent for "important medical decisions" falls is protected by substantive due process, the Supreme Court has held that compulsory vaccination is not a "decision" to begin with.

///

///

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
Case No. 2:17-CV-9193-FMO-E

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

c.      *π's Counterpoints*

**PLAINTIFFS' OPPOSITION TO AT(2): Defendants Are Confusing The Issues Herein. Plaintiffs Are Not Challenging The State's Rights To Mandatory Vaccination Of Its Pupils In School Setting.**

Plaintiffs challenge here the involuntary vaccination of the Minor who was not school aged. Plaintiffs do not challenge the laws that are established mandating vaccination of school-aged children. These have been upheld by various courts as promoting a compelling governmental interest of ensuring health and safety by preventing the spread of contagious diseases. (*Jacobson v. Commonwealth of Massachusetts,* supra, 197 U.S. 11, 27 [upheld state mandatory vaccination law under the Fourteenth Amendment]; *Zucht v. King* (1922) 260 U.S. 174, 176, 43 S.Ct. 24, 25, 67 L.Ed. 194, 198 [ordinances mandating certificate of vaccination prior to allowing school attendance did not violate substantive due process rights because it was "settled that it is within the police power of a state to provide for compulsory vaccination"].)

Therefore, the Defendants appear to confuse the issue at hand with one challenging the State's right to mandate vaccination of its pupil not to spread disease, which is not the issue of this case or before this Court.

### IV.A.3.      *The liberty interests must be refined to account for the custody and visitation orders in the juvenile court. (Δ)*

(i.) In *Brittain v. Hansen*, the Ninth Circuit concluded that "non-custodial parents with court-ordered visitation rights have a liberty interest in the companionship, care, custody, and management of their children"—but that it is "unambiguously lesser in magnitude than that of a parent with full legal custody." 451 F.3d 982, 992. In determining immunity, a district court "relied upon precedents concerning seizure of children from custodial parents based on allegations of child

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

abuse," concluding that "there was 'no functional difference' between the issues of custody and visitation." *Id.* at 988. The Ninth Circuit reversed, finding that there "are vital distinctions between the child abuse precedents and the present matter that the district court failed to consider," such as the fact that "*permanent custody* is a greater interest than a single visitation period." *Id.* at 989 (emph. added). The Ninth Circuit refused to create "a new substantive due process right by extending the child abuse precedents into child custody disputes between parents." *Id.* at 991. The plaintiff-parent's liberty interest in such care, custody, and management had been "substantially reduced by the terms of the state court custody judgment." *Id.* (internal citation, quotation marks omitted).

 (ii.) As in *Brittain*, Ulikhanova's rights were reduced by court orders. In January 2016, the juvenile court issued orders authorizing P.G.'s removal from Ulikhanova's custody (¶ 26), authorizing P.G.'s detention from Ulikhanova and placement with Reisch after a petition had been filed ¶ 36.5, 38, restricting Ulikhanova's contact with P.G. to nine hours per week in monitored visitation occurring at the DCFS Pasadena office ¶ 39.5, and indicating that both parents remained educational rights holders. ¶¶ 34-39, 61, 90, 92-95. In February 2016 the juvenile court issued orders prohibiting Ulikhanova from visiting the caregiver. ¶ 57. In June 2016, the juvenile court authorized P.G.'s vaccination, issued a TRO restraining Ulikhanova from the caregiver, and refused to order DCFS to permit Ulikhanova to visit with P.G. outside the DCFS office. ¶¶ 93, 95, 98, 99.

None of the parents in the *San Diego Cases* had similarly reduced liberty interests, as none of the cases even involved lawful dependency proceedings. *Wallis*, 202 F.3d at 1133 (no detention order or decision to detain); *Mann*, 907 F.3d at 1158 (parents appearing in court at detention hearing while exams occurred); *Swartwood*, 84 F. Supp. 3d at 1103 (county decided not to initiate dependency proceedings).

 (iii.) *Brittain* counsels hesitation before using cases where parents have permanent custody to create liberty interests for parents who do not. Ulikhanova did

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

not have custody of P.G. as of January 2016: she had court-ordered visitation, exactly like the plaintiff in *Brittain*. While her liberty interests are not negligible, they are "substantially reduced" compared to the parents in the *San Diego Cases*.

### d.     π's Counterpoints

**PLAINTIFFS' OPPOSITION TO A(3): AS OF JUNE 2016, WHEN THE DECISION TO VACCINATE WAS SOUGHT BY THE DEFENDANTS AND OBTAINED FROM THE COURT, ULIKHANOVA'S LEGAL DECISION MAKING RIGHTS HAD NOT DIMINISHED AT ALL AS THE CHILD WAS ONLY TEMPORARILY REMOVED FROM HER LEGAL CUSTODY.**

As relevant here, the Fourteenth Amendment due process rights apply with full force and effect until the disposition hearing in the juvenile court when the burden of proof to remove a child from a custodial parent is clear and convincing evidence. Welfare and Institutions Code, section 361, subdivision (c)(1), permits removal of a child from his or her parent's custody only if the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if the child is returned home and "there are no reasonable means by which the [child]'s physical health can be protected without removing" the child from his or her parent's custody."

"[I]n dependency proceedings the burden of proof is substantially greater at the dispositional phase than it is at the jurisdictional phase if the minor is to be removed from his or her home." (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 694.) The burden of proof at the jurisdictional phase is preponderance of the evidence; the burden of proof at disposition is clear and convincing evidence. (*Ibid*.; see also § 355, subd. (a) [jurisdiction

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
Case No. 2:17-CV-9193-FMO-E

findings by preponderance of evidence]; § 361, subd. (c) [disposition findings by clear and convincing evidence].) This heightened burden of proof at disposition balances the constitutionally protected rights of parents to the care, custody and management of their children with the need to protect the child when that care, custody and management threatens the child's safety and well-being. (*Santosky v. Kramer* (1982) 455 U.S. 745, 753 [102 S.Ct. 1388, 71 L.Ed.2d 599]; *In re Angelia P.* (1981) 28 Cal.3d 908, 917.)

The detention hearing, which was the only hearing that had taken place here before June 2016, is the first hearing conducted once a child has been taken into temporary custody and a petition is filed with the juvenile court to exercise its dependency jurisdiction. (§§ 309 & 319.) At such a hearing, the social worker must report on: (1) the reasons for the children's removal, (2) the need, if any, for continued detention, (3) the available services that could facilitate the return of the child to the parent's custody, and (4) whether there are any relatives who are able and willing to take temporary physical custody of the child. (§ 319, subd. (b).) The social worker must make a prima facie showing that the child comes within section 300 (the grounds for jurisdiction) as well as that continuance in the parent's home is contrary to the child's welfare. (§ 319, subd. (b).)

The detention hearing under section 319 was the only hearing that had taken place here before June 2016 under the standard of prima facie evidence and was absolutely insufficient to strip a parent of their constitutional rights under such a bare minimum standard. Therefore, the *Wallis* and *Mann* protections not only apply to the issue of the unauthorized vaccination, but also to the particular facts of this case, because as of the June 10, 2016, juvenile court hearing on the immunization, the Minor P.G. was only temporarily detained from her sole

34

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

custodial parent Plaintiff Mother under the standard of prima facie evidence. (PJA, Ex. 5, 109-110; Ex. 6, 112-115.)

The Fourteenth Amendment constitutional rights continue in full force and effect at least until the disposition hearing held under Welfare and Institutions Code section 361, when the standard of proof on the State is clear and convincing evidence. That hearing did not happen here until several months later in October 2016. Again, the heightened burden of proof of clear and convincing evidence at disposition balances the constitutionally protected rights of parents to the care, custody and management of their children with the need to protect the child when that care, custody and management threatens the child's safety and well-being. (*Santosky v. Kramer*, *supra*, 455 U.S. 745, 753; *In re Angelia P.*, *supra*, 28 Cal.3d 908, 917.)

Therefore, the protections guaranteed under the Fourteenth Amendment were not diminished even a bit at the procedural juncture of this case as it requires more than just mere prima facie evidence to do so.

### IV.A.4.     *The liberty interests must be refined to account for Garcia, as co-parent. (Δ)*

Ulikhanova is the only one who objected to the vaccination. Garcia and P.G. both favored vaccination, and P.G. even told Helwajian she wanted to go to school like other children;  ¶¶ 56, 88, 89; *Helwajian Decl.* ¶ 20. Plaintiffs claim that Garcia, due to the divorce proceedings, had no right to consent. Judge Arakaki was aware of the prior custody determinations in the divorce proceedings, ¶ 62, but nevertheless emphasized that Garcia, along with Ulikhanova, maintained educational rights for P.G. ¶¶ 39, 60; Ex. 11, 23. And when she authorized the vaccination, she expressly did so on the basis that "father is in agreement with it" and "[P.G.]'s counsel is in agreement with it." ¶ 92; Ex. 12, 10:18–22.

Neither *Wallis* nor *Mann* recognized a liberty interest in one parent, without permanent custody, embroiled in ongoing dependency *and* divorce proceedings, to unilaterally make medical decisions to the exclusion of the other parent. *Wallis* speaks of the right "of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." 202 F.3d at 1141. It does not endow one parent to subordinate the rights of another parent or the rights of the child.

e.      *π's Counterpoints*

**PLAINTIFFS' OPPOSITION TO A(4): Both Defendants Testifies At Their Depositions That Brian Had No Decision Making Rights As To The Minor, Because He Either Pre- or Post- Dependency Case, Ulikhanova Was The Sole Legal Custodian Of The Minor. Defendants Are Making Disingenuous Arguments That Contradict Their Own Testimonies Under Oath.**

Here, the Family Court's pre-detention orders that Mother was the sole legal and physical custodian of the Minor still remained and were not overturned until the disposition hearing held several months later in October 2016. (PJA Ex. 14, 190-192; Ex. 24, 259-261.) Since father had only monitored visitation rights as of the previous family court order, he did not have equal rights as the custodial mother to make decision as to medical and educational care of the child.

Remarkably, Defendant Carey wrote in his report for the June 9, 2016 hearing on the issue including immunization:

> The mother refuses to allow Penelope to be immunized. The father wants her to be immunized, but since the mother has sole legal custody from family law court, the father cannot give consent. Penelope needs to be enrolled in school, but since she is not immunized, she cannot enroll in school. The home school closest to the Paternal - home is already full. In addition, Penelope may need speech: therapy as she has difficulty making

36

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

several sounds that make her speech difficult to understand at times. DCFS respectfully recommends the Court order Penelope to be immunized so she can be enrolled into school, and so she can receive a speech assessment, and if needed, speech therapy through the district. (PJA Ex 17, 222.)

Indeed, both Defendants testified at their depositions under oath the father had no decision making rights before, during, or after the dependency case for the minor a Mother was the sole legal custodian of the Minor. (PJA Ex. 36-37, pp. 501-502, 639.) Now, Defendants are making disingenuous arguments and mislead this Court to believe that what is not true. These efforts should be rejected forthwith.

### IV.A.5.	The liberty interests, properly refined, are not fundamental. (Δ)

The next question concerns "whether the asserted right is 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Raich v. Gonzales*, 500 F.3d 850, 864 (9th Cir. 2007) (citing *Glucksberg*, 521 U.S. at 720).

(i.) *Consent*. As *Jacobson* and *Zucht* demonstrate, the ability for a parent to withhold consent for compulsory vaccination is not so deeply rooted in the Nation's traditions to be ranked as fundamental. As one district court stated succinctly,

> the question presented by the facts of this case is whether the special protection of the Due Process Clause includes a parent's right to refuse to have her child immunized before attending public or private school where immunization is a precondition to attending school. The Nation's history, legal traditions, and practices answer with a resounding "no."

*Boone v. Boozman*, 217 F. Supp. 2d 938, 956 (E.D. Ark. 2002).

One parent's right to veto a co-parent's right to make medical decisions for foster children in dependency proceedings is also not deeply rooted in the Nation's traditions—by design. Such an interest wades into the domain of domestic relations: an area in which the Supreme Court "has urged particular caution." *Brittain*, 451 F.3d at 990 (citations omitted).

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

37

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

(ii.) *Presence*. While the right to familial association "is a fundamental liberty interest [citations], officials may interfere with the right if they provide the parents with fundamentally fair procedures." *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018) (internal citations, quotation marks omitted).

Here, Plaintiffs effectively seek to impose a shared custody arrangement on DCFS, in which social workers must make foster children available to their natural parents for every single routine medical (or dental) appointment. Children have been detained by child welfare agencies for not an insignificant amount of U.S. history, and no case has ever found that substantive due process guarantees foster children and their biological parents to be periodically reunified for every toothache. As the Supreme Court has instructed, when a right is asserted as fundamental that has not been recognized before, "[t]he mere novelty of such a claim is reason enough to doubt that substantive due process sustains it" as "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Reno*, 507 U.S. at 303.

(iii.) Because the interests advanced by Plaintiffs are not fundamental, Defendants proffer they are entitled to summary judgment as a matter of law.

## f.     π's Counterpoints

**PLAINTIFFS' OPPOSITION: AS ARGUED ABOVE, PARENT HAS A FUNDAMENTAL RIGHT TO MAKE MEDICAL DECISION AND BE PRESENT AT THE CHILD'S MEDICAL APPOINTMENT, UNLESS CONFINED BY LAW THAT IS NOT PRESENT OR APPLICABLE HERE.**

As argued above, the Fourteenth Amendment due process rights apply with full force and effect until the disposition hearing in the juvenile court when the burden of proof to remove a child from a custodial parent is clear and convincing evidence. The constitutional protections of *Wallis* and *Mann* are therefore codified in the California juvenile law under Cal.

Welf. & Inst. Code § 369(a), as recognized by the Ninth Circuit in *Mann*. "California law requires County social workers to 'notify the parent, guardian, or person standing in loco parentis of the person, if any, of the care found to be needed before that care is provided' and permits the County to provide the care 'only upon order of the court in the exercise of its discretion.' Cal. Welf. & Inst. Code § 369(a)." (*Mann v. Cty. of San Diego*, *supra*, at p. 1163.)

Again, Plaintiffs challenge here the involuntary vaccination of the Minor who was not school aged. Plaintiffs do not challenge the laws that are established mandating vaccination of school-aged children. These have been upheld by various courts as promoting a compelling governmental interest of ensuring health and safety by preventing the spread of contagious diseases. (*Jacobson v. Commonwealth of Massachusetts*, *supra*, 197 U.S. 11, 27 [upheld state mandatory vaccination law under the Fourteenth Amendment].)

Lastly, under the existing California vaccination law, parents still regain the choice to vaccinate or not vaccinate their child, so long as the child is homeschooled or is medically exempted from mandatory vaccination. Thus, it is surely a fundamental right to make medical decisions for their children.

### IV.A.6.     *The liberty interests, properly formulated, show the rights advanced here were not clearly established for purposes of qualified immunity. (Δ)*

For qualified immunity analyses, the Supreme Court instructs "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (citations omitted). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

1  determining whether the violative nature of particular conduct is clearly

2  established." *Id.* Qualified immunity is discussed in Part IV.C., *infra*, but

3  Defendants proffer that the interest-narrowing points described above apply with

4  equal force to a qualified immunity analysis. The existing law today—let alone

5  before *Mann*—does not establish that the conduct at issue here, vis-à-vis non-

6  investigatory procedures and the rights of non-custodial parents to visit with their

7  children for purposes of vaccination, violates substantive due process.

8           g.      *π's Counterpoints*

9      **PLAINTIFFS' OPPOSITION TO A(6) & (D): Defendants Are Not**

10     **Shielded By The Protections Of Qualified Immunity: (Please see**

11     **below.)**

12     **IV.B.      Plaintiffs must show that Carey or Helwajian engaged in**

13                 **conscience-shocking conduct to survive summary judgment**

14                 **under *Lewis*. (Δ)**

15         Even if Plaintiffs do have actionable liberty interests, simply identifying a

16  protected liberty interest is not the same as concluding it has been violated. In its

17  order dismissing most of the TAC, the Court observed that *Mann* expressly rejected

18  application of a shocks-the-conscience test. ECF No. 71, 13 n.4. "The Supreme

19  Court has described two strands of the substantive due process doctrine," which

20  have produced "two separate approaches to analyzing governmental action under the

21  Fourteenth Amendment"—*i.e.*, the *fundamental rights* test and the *shocks the*

22  *conscience* test. *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008);

23  *accord Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999). The Ninth Circuit

24  formerly applied a third test, "unwarranted interference," in familial association

25  cases. *Crowe v. Cty. of San Diego*, 608 F.3d 406, 441–42 (9th Cir. 2010).

26  Defendants respectfully maintain that a shocks-the-conscience standard applies to

27  Plaintiffs' claim for at least three reasons.

28

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

40

(i.) This is not a case challenging legislative activity, where conscience-shocking behavior would be unnecessary. The "touchstone" of substantive due process is protection from arbitrary government action. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998). "While due process protection in the substantive sense limits what the government may do in both its legislative, [citation], and its executive capacities, [citation], criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." *Id.* at 846. The "cognizable level of executive abuse of power [is] that which shocks the conscience." *Id. Lewis* emphasized that "executive action challenges raise a particular need to preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to what we have called a font of tort law." *Id.* at 847 n.8. "Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action." *Id.*

In *Glucksberg*, the Supreme Court determined culpability using a multi-part test based on whether a fundamental right is at stake. 521 U.S. at 721–22. Where state action implicates a fundamental right, it must meet strict scrutiny; but "other laws restricting the freedom of individuals to act [. . .] receive rational basis review only." *Witt v. Dep't of Air Force*, 548 F.3d 1264, 1273 (9th Cir. 2008). *Glucksberg* is the used for challenges to legislative activity. *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999) (en banc).

In *Porter v. Osborn*, the Ninth Circuit "clarif[ied]  the standard of culpability for a due process right to familial association claim." 546 F.3d 1131, 1137 (9th Cir. 2008). *Porter* acknowledged that "[t]he Supreme Court has made it clear, . . . , that only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Id.* at 1137 (citing *Lewis*, 523 U.S. at 846).

(ii.) Since *Crowe*, the Ninth Circuit reverted to *Lewis*' shock-the-conscience test several times in familial association cases—even in an en banc decision. *Marsh*

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

41

*v. Cty. of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012); *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014) (en banc). It has even cited *Crowe*, along with *Porter* and *Gonzalez*, to applied a shocks-the-conscience test. *Oien v. Cty. of San Bernardino*, 680 F. App'x 530, 533 (9th Cir. 2017).

(iii.) *Mann*'s rejection of a *Lewis*-style approach is perfectly consistent with *Lewis*. *Mann* relied on the Ninth Circuit's previous recognition in *Gibson v. Cty. of Washoe, Nev.* that there are two species of *Monell* claims. 290 F.3d 1175, 1185 (9th Cir. 2002), *overruled on unrelated grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). *Gibson* observes that the most straightforward *Monell* claims are those in which the injury follows a "direct path" from an affirmative act by the entity itself—*e.g.*, an ordinance. *Id.* at 1185-86. *Gibson* described a second, more "indirect" *Monell* claim in which "a plaintiff can allege that through its omissions the municipality is responsible for a constitutional violation committed *by one of its employees*." *Id.* at 1186 (emphasis in original). This second path has "much more difficult problems of proof." *Id.* at 1186. *Mann* refused to apply a shocks-the-conscience test specifically because the plaintiffs asserted a "direct" type *Monell* claim, free from the difficult problems of proof attendant with the indirect type and no other claim. *Mann*, 907 F.3d at 1164.

*Mann* therefore did not confront any "specific act of a government officer" that would warrant application of *Lewis*' shocks-the-conscience. *See also*, *Wallis*, 202 F.3d at 1136 ("the Wallis family did not sue any officers in their individual capacities"). Where individual officer misconduct *is* alleged, the Ninth Circuit uniformly applies *Lewis*: *e.g.*, *Porter*, *Marsh*, and *Gonzalez* (en banc).

(iv.) Other district courts have acknowledged that "the Ninth Circuit has articulated different standards for familial deprivation claims," but nevertheless followed the Supreme Court's instruction in *Lewis* and applied a shocks-the-conscience test. *E.g.*, *Akey v. Placer Cty.*, No. 14-CV-2402-KJM-DB, 2018 WL 3861410, at *8 (E.D. Cal. Aug. 14, 2018); *accord Estate of Prasad ex rel. Prasad v.*

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

42

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

*Cty. of Sutter*, 958 F. Supp. 2d 1101, 1126, 1126 n.7 (E.D. Cal. 2013); *Estate of Diaz v. City of Anaheim*, No. 12-CV-1897-JVS-RNB, 2013 WL 12207504, at *5 n.6 (C.D. Cal. Dec. 18, 2013); *Alberici v. Cty. of Los Angeles*, No. 12-CV-10511-JFW-VBK, 2013 WL 5573045, at *16 (C.D. Cal. Oct. 9, 2013).

### IV.C.   Plaintiffs' liberty interests were not deprived in a way that shocks the conscience. (Δ)

The Due Process Clause does not "impos[e] liability whenever someone cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848. In *Lewis*, the Supreme Court emphasized that "our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.* at 850. Only state action that "do[es] more than offend some fastidious squeamishness or private sentimentalism," and instead "shocks the conscience" to the point that it "is bound to offend even hardened sensibilities," violates substantive due process. *Rochin v. California*, 342 U.S. 165 (1952).

(i.) The elaborate procedural protections observed by Defendants precludes their pursuit of the vaccination orders over Ulikhanova's objection from being condemned as conscience-shocking. As *Wallis* and *Keates* confirm, Plaintiffs' allegations of substantive due process violations conceptually collapse into procedural ones. As the Ninth Circuit has noted, "officials may interfere with the [familial association] right if they provide the parents with fundamentally fair procedures." *Keates*, 883 F.3d at 1236. And *Wallis* specifically contemplates parental consent being override by a court order. *Wallis*, 202 F.3d at 1141; *accord Mann*, 907 F.3d at 1163.

Defendants provided Ulikhanova and her attorney with notice of each hearing. ¶¶ 51, 77; Exs. 8-10. Ulikhanova and her attorney were present for each hearing, objected, and were heard on their objections. ¶¶ 52, 57, 84, 89, 92; Exs. 11-12. At the first hearing, she prevailed; at the second hearing, she did not. ¶¶ 58, 92.

43

Ulikhanova cannot create a due process violation simply because she lost.

(ii.) Plaintiffs try to create a due process violation by claiming, alternatively, that vaccination was procured by judicial deception. *TAC* ¶ 186. Ulikhanova claims that various vaccination forms were not filed with the juvenile court. Given that Ulikhanova was represented by counsel, it does not shock the conscience that any records she submitted to Defendants were not filed by them— Ulikhanova or Funk were both present at the June 10 hearing that authorized the vaccination to correct any deception. ¶ 84. In any case, Ulikhanova is wrong: Carey filed the forms months before the vaccination was authorized. ¶¶ 66, 67. With respect to Helwajian, Ulikhanova is unable to specify any particular false statements. ¶ 46, Ex. 1, 40-42.

(iii.) To the extent that Plaintiffs' claim is based on alleged misinterpretations of Garcia's ability to consent, *Brittain* held that an officer's conduct of refusing to accept one parent's interpretation of a visitation order in a family dispute is not conscience-shocking. 451 F.3d at 996. "[S]ubstantive due process secures individuals from 'arbitrary' government action that rises to the level of 'egregious conduct,' not from reasonable, though possibly erroneous, legal interpretation." *Id.*

(iv.) There is no evidence Carey prevented Ulikhanova from attending any medical procedures. Carey and Helwajian were under no duty to proactively inform Ulikhanova that she had any right to be present: "[t]he government generally is under no obligation to facilitate or fund the exercise of constitutional rights." *Lipscomb By & Through DeFehr v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992).

While Ulikhanova cannot remember if she ever asked Carey if she could attend the vaccination ¶ 113, it would be impossible because they did not even speak after the vaccination was authorized. They spoke once over the phone, ¶¶ 114, 115; after that call, they met on March 17, 2016 for an in-person interview, ¶¶ 116, 117.

There is also no evidence that Helwajian prevented Ulikhanova's presence at the vaccination. Ulikhanova was prevented from attending the June 10, August 18, and October 6, 2016 vaccinations because she was not allowed to see P.G. outside

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

44

of the DCFS Pasadena office. ¶¶ 93-96, 106. Ulikhanova testified that she asked Helwajian to be present at the vaccinations, but that Helwjian told Ulikhanova "that can't happen because there's a conflict with you and [Reisch] and the restraining order." Ex. 1, 174:23–146:4. Such an instruction would be nothing more than Helwajian acting within the discretion given to her by Judge Arakaki. ¶ 96.

By the time of the January 2017 vaccination, P.G. was no longer living with someone who had a TRO against Ulikhanova and their visitation would have allowed them to go to routine medical appointments together. ¶¶ 100-102.

h.      π's Counterpoints

**PLAINTIFFS' OPPOSITION TO B & C: SHOCK THE CONSCIOUSNESS TEST DOES NOT APPLY HERE. This Court Should Follow The Ninth Circuit In Mann v. City of San Diego To Reject The Shock The Conscious Test, Where Here There Is Clear Evidence Of Failure To Train The Defendants.**

This Court should follow the lead of our Ninth Circuit in Mann, supra, and reject the application of the very basic shock the consciousness test to the Defendants' actions that had outmost disregard to mother's and child's constitutional rights to make these decisions for themselves. Remarkably, both Defendants testified that they, had no training on the medical or education rights of parents by their employer County of Los Angeles, and had no idea that a Grandfather Clause existed to the new California vaccination law, what it was or what it meant. (PJA, Ex. 36, 544, 567; Ex. 37, 603-605, 607-610, 633-634.) Defendant Carey had been a social worker for 24 years and Helwajian for 10 years. (PJA, Ex. 36, p. 499; Ex. 37, 603-604.) Remarkably, Defendant Helwajian stated: "Q.· ·But as for you, you have not been called to attend a training for past or present vaccination laws of the State of California? · · · ·A.· ·No, no

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

45

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

1      training on vaccinations, ever." (PJA, Ex. 36, pp. 544, 567.) Indeed,

2      Defendant Helwajian testified that she reviewed the clause the morning of

3      the deposition on March 29, 2019. (PJA, Ex. 36, 524.)

4         This case comes squarely under the direct Monell analysis of Mann,

5      where the Ninth Circuit explained: "We reject the County's argument that

6      we must also apply a 'shocks the conscience' standard to [Plaintiffs']

7      Fourteenth Amendment substantive due process claim under Monell.

8      Neither Wallis nor Greene applied such a test, and the County cites no

9      Ninth Circuit authority for the proposition that this test applies here."

10     (Mann v. Cty. of San Diego, supra, at 1163-1164.) While this Court

11     dismissed the Monell claims, Plaintiffs respectfully request that this Court

12     consider the Motion to Reconsider being concurrently filed with this

13     Motion to revive the Monell claim for failure to train its social workers,

14     just like in Mann, because the discovery produces clear evidence of such

15     in this case. (PJA, Ex. 36, 544, 567; Ex. 37, 603-605, 607-610, 633-634.)

16 **IV.D.**        **Qualified immunity shields Defendants from any residual**

17           **liability. (Δ)**

18        In determining whether an official is entitled to qualified immunity, courts

19 "must consider (1) whether the plaintiff has identified a specific federal statutory or

20 constitutional right that has been allegedly violated, (2) whether that right was so

21 clearly established as to alert a reasonable official to its parameters, and (3) whether

22 a reasonable officer could have believed his or her conduct was lawful." *Sweaney v.*

23 *Ada Cty., Idaho*, 119 F.3d 1385, 1388 (9th Cir. 1997) (citing *Newell v. Sauser*, 79

24 F.3d 115, 117 (9th Cir. 1996)). Qualified immunity shields officials "from liability

25 for civil damages insofar as their conduct does not violate clearly established

26 statutory or constitutional rights of which a reasonable person would have known."

27 *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *accord Brittain*,

28

451 F.3d at 987–88.

Regarding the first factor, as discussed in Part IV.B, *supra*, no constitutional violation occurred. Consequently, Defendants are entitled to qualified immunity. Regarding the second factor, as discussed in Part IV.A.6, *supra*, there is no liberty interest under *Wallis* or *Mann* for the specific claims advanced here. Regarding the third factor, any reasonable officer in Carey's and Helwajian's position would believe their conduct was lawful. They were attempting to resolve a dispute between two individuals (Garcia and Ulikhanova) who both had liberty interests in P.G. of at least some degree. *Brittain*, 451 F.3d 982. Ulikhanova even told Helwajian she <u>*did not want the vaccinations to occur on her visitation days*</u>. ¶ 99. Defendants were also navigating the difficult relationship between Reisch and Ulikhanova, and any reasonable social worker would interpret Judge Arakaki's visitation orders and TRO as good cause to keep Ulikhanova limited to the contact at the DCFS Pasadena office—the juvenile court specifically stated that DCFS was authorized to limit Ulikhanova's contact with P.G. (*i.e.*, her visits) to the DCFS office in Pasadena.

Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Carey and Helwajian are neither: they simply sought clarification on a series of complex issues from the juvenile court.

### i.     π's Counterpoints

**PLAINTIFFS' OPPOSITION TO A(6) & (D): Defendants Are Not Shielded By The Protections Of Qualified Immunity.**

The defendants are not shielded by the qualified immunity due to misleading conduct and incompetence. (Mueller, 576 F.3d at 993.) The facts show that Defendants knew of the clearly established law that parents could skip kindergarten and no immunization was needed before the Minor was of school age. They also knew, as illustrated by their attempts

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

and requests for several hearings starting in February 2016 and ending on June 10, 2016, that they would need a court order to have the Minor immunized over the custodial Mother's objection. They did in fact get this court order on June 10, 2016, but only by way of judicial misleading, and therefore, they don't qualify for the immunity for this act of deception. (Mueller, 576 F.3d at 993.)

Also, given that both Defendants testified as to their lack of training and lack of knowledge about the general rights of parents with regard to making education and medication decision as to their children brought to the attention of the juvenile court, in general, these Defendants are simply too incompetent to be afforded such an immunity. (PJA, Ex. 36, 544, 567; Ex. 37, 603-605, 607-610, 633-634.) Ignorance of the law is surely no defense. (Mueller, 576 F.3d at 993.)

///
///
///
///
///
///
///
///
///
///
///
///
///
///

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

1

2    DATED:  May 22, 2019                    PETERSON · BRADFORD · BURKWITZ

3                                            By:   */s/ Ryan A. Graham, Esq.*
4                                                  Avi Burkwitz, Esq.
                                                   Ryan A. Graham, Esq.
5                                                  *Attorneys for Defendants*
                                                   STEVE CAREY, and
6                                                  MARAL HELWAJIAN

7
     DATED: May __, 2019                     SEROBIAN LAW, INC.
8
                                             By:   [4]
9
                                                   Liana Serobian, Esq.
10                                                 *Attorneys for Plaintiffs,*
                                                   LUCY ULIKHANOVA, and
11                                                 P.G., a minor

12

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
     _____
28   [4] Counsel for Plaintiffs, Liana Serobian, Esq., refused to sign this filing, as described in further detail in the
     *Supplemental Declaration of Ryan A. Graham, Esq.*, filed this date.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
Case No. 2:17-CV-9193-FMO-E

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 100 North First Street, Suite 300, Burbank, California 91502.

On May 23, 2019, I served the foregoing document described as:

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

on interested parties in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

## SEE ATTACHED MAILING LIST

☒ **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed document(s) with the Clerk of the Court by using the CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the CM/ECF system. Participants in this case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

☒ **FEDERAL:** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 23, 2019, at Burbank, California.

/s/ Lilliana Rosales

Lilliana Rosales

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California  91502
818.562.5800

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PETERSON · BRADFORD · BURKWITZ
100 North First Street, Suite 300
Burbank, California 91502
818.562.5800

## **SERVICE LIST**

**RE:**   **Ulikhanova, Lucy v. County of Los Angeles**

**Case No.:**   2:17-CV-9193-FMO-E

Liana Serobian, Esq.
Serobian Law, Inc.
100 North Brand Blvd., Suite 600
Glendale, CA 91203
Tele: (818) 539-2249
L.Serobian@yahoo.com

**Attorney for Plaintiffs
Lucy Ulikhanova and
P.G., a Minor**

51