PETERSON · BRADFORD · BURKWITZ

# JOINT EVIDENTIARY APPENDIX

# EXHIBIT 1

*Lucy Ulikhanova, et al. v. County of Los Angeles, et al.*
(2:17-CV-09193-FMO-E)

```
 1                   UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES
 3
 4    LUCY ULIKHANOVA AND P.G.,        )   CASE NO.
      A MINOR, individuals,           )   2:17-cv-9193-FMO-E
 5                                     )
                         Plaintiffs,  )
 6                                     )
                    vs.               )
 7                                     )
      COUNTY OF LOS ANGELES; THE       )
 8    LOS ANGELES COUNTY               )
      DEPARTMENT OF CHILDREN           )
 9    AND FAMILY SERVICES;             )
      RONALD TIGERINO, MARIA           )
10    HERRERA SOSA, in her personal    )
      capacity; VICKI RAMIREZ, in her  )
11    personal capacity; STEVE         )
      (STEPHEN) CAREY, in his personal )
12    capacity; MARAL HELWAJIAN, in    )
      her personal capacity, DOES 1-10 )
13    inclusive,                       )
                                       )
14                       Defendants.   )
      _____)
15
16
17
18        VIDEO-RECORDED DEPOSITION OF LUCY ULIKHANOVA
19                     Burbank, California
20                  Thursday, March 14, 2019
21
22    Reported stenographically by:
23    Elizabeth Schmidt
24    CSR No. 13598
25    Pages 1 to 330
```

                                                    Page 1

Lucy Ulikhanova - March 14, 2019

```
 1              UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES
 3
 4   LUCY ULIKHANOVA AND P.G.,      )  CASE NO.
     A MINOR, individuals,         )  2:17-cv-9193-FMO-E
 5                                 )
                      Plaintiffs,  )
 6                                 )
                 vs.               )
 7                                 )
     COUNTY OF LOS ANGELES; THE    )
 8   LOS ANGELES COUNTY            )
     DEPARTMENT OF CHILDREN        )
 9   AND FAMILY SERVICES;          )
     RONALD TIGERINO, MARIA        )
10   HERRERA SOSA, in her personal )
     capacity; VICKI RAMIREZ, in her )
11   personal capacity; STEVE      )
     (STEPHEN) CAREY, in his personal )
12   capacity; MARAL HELWAJIAN, in )
     her personal capacity, DOES 1-10 )
13   inclusive,                    )
                                   )
14                    Defendants.  )
     _____)
15
16
17
18        Video-recorded deposition of LUCY ULIKHANOVA,
19   taken on behalf of Defendants, at 100 North First
20   Street, Suite 300, Burbank, California, beginning at
21   9:15 a.m. and ending at 5:57 p.m., on March 14, 2019,
22   before Elizabeth Schmidt, Certified Shorthand Reporter
23   No. 13598.
24
25
                                              Page 2
```

Lucy Ulikhanova - March 14, 2019

```
 1    APPEARANCES:
 2            For Plaintiffs:
 3                      SEROBIAN LAW, INC.
                        BY:  LIANA SEROBIAN, ESQ.
 4                      100 North Brand Boulevard
                        Suite 600
 5                      Glendale, California 91203
                        (818) 539-2249
 6                      L.Serobian@yahoo.com
 7
 8            For Defendants:
 9                      PETERSON BRADFORD BURKWITZ
                        BY:  RYAN A. GRAHAM, ESQ.
10                      100 North First Street
                        Suite 300
11                      Burbank, California 91502
                        (818) 562-5800
12                      rgraham@pbbllp.com
13
14
15
16    ALSO PRESENT:  DAVID WEST, Videographer
17
18
19
20
21
22
23
24
25
```

Page  3

Lucy Ulikhanova - March 14, 2019

```
 1                          I N D E X

 2   WITNESS

 3   LUCY ULIKHANOVA

 4            Examination by:                Page

 5            Mr. Graham                     8, 315

 6            Ms. Serobian                   229

 7

 8                       E X H I B I T S

 9

10   Exhibit        Description              Page

11   Exhibit 1 - Selected pages from Rule 26(e)   60

12              supplemental disclosures

13              COLA 2201-2217

14   Exhibit 2 - 2/12/16 e-mail, COLA 1504-1511   61

15   Exhibit 3 - 3/31/16 e-mail               228

16   Exhibit 4 - 5/24/17 e-mail chain         160

17              COLA 1512-1518

18   Exhibit 5 - 4/6/16 e-mail                232

19   Exhibit 7 - 6/3/16 e-mail                236

20   Exhibit 8 - 2/18/16 e-mail chain         81

21              COLA 1521-1524

22   Exhibit 9 - 6/4/16 e-mail                244

23   Exhibit 10 - 6/3/16 e-mail, COLA 1525-1526   110

24   Exhibit 11 - 5/23/17 doctor's note       267

25   ///
```

Page 4

Lucy Ulikhanova - March 14, 2019

```
 1                    E X H I B I T S

 2

 3   Exhibit         Description              Page

 4   Exhibit 12 - 3/17/17 e-mail chain        188

 5              COLA 1527-1530

 6   Exhibit 13 - 3/23/17 e-mail chain        269

 7   Exhibit 15 - medical records            282

 8   Exhibit 16 - 5/4/17 e-mail, COLA 1533-1534  191

 9   Exhibit 17 - 3/7/19 e-mail              286

10   Exhibit 19 - printed information        289

11   Exhibit 21 - printed information        293

12   Exhibit 24 - 3/2/16 e-mail, COLA 1976-1980  105

13   Exhibit 26 - 3/3/16 e-mail, COLA 1981-1982  117

14   Exhibit 32 - 3/3/16 e-mail chain        112

15              COLA 2005-2007

16   Exhibit 34 - 6/20/16 e-mail, COLA 2008-2010  144

17   Exhibit 36 - 3/31/16 e-mail, COLA 2011-2012  133

18   Exhibit 40 - 10/4/16 e-mail chain       179

19              COLA 2015-2019

20   Exhibit 70 - 6/10/16 minute order       171

21              COLA 897-898

22   Exhibit 72 - Selected pages from Rule 26(e)  187

23              supplemental disclosures

24              COLA 2689

25   Exhibit 74 - text message, COLA 3860-3863  212
```

Hahn & Bowersock, A Veritext Company
800.660.3187

Lucy Ulikhanova - March 14, 2019

1                    INSTRUCTIONS NOT TO ANSWER

2                         Page            Line

3                          15               2

4                          50              12

5                          73               6

6                          74               4

7                         164              23

8                         167              15

9                         168               8

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

Lucy Ulikhanova - March 14, 2019

```
 1                    Burbank, California

 2                Thursday, March 14, 2019

 3                       9:15 a.m.

 4                       *   *   *

 5           THE VIDEOGRAPHER:  Good morning.  We are        09:15:06

 6    on the record.  The time is 9:14 a.m., the date

 7    today, March 14, 2019.  Please note that the

 8    microphones are sensitive and may pick up

 9    whispering, private conversations, and cellular

10    interference.  Please turn off all cell phones or      09:15:20

11    place them away from the microphones as they can

12    interfere with the deposition audio.  Audio and

13    video recording will continue to take place unless

14    all parties agree to go off the record.

15           This is media unit 1 of the video-recorded      09:15:35

16    deposition of Lucy Ulikhanova taken by counsel for

17    Defendant in the matter of Lucy Ulikhanova, et al.,

18    vs. County of Los Angeles, et al., filed in United

19    States District Court, Central District of

20    California, case No. 2:17-cv-9193-FMO-E.  The          09:15:52

21    deposition is being held at 100 North First Street,

22    Suite 300, Burbank, California.

23           My name is David West; I am the

24    videographer.  The court reporter is Elizabeth

25    Schmidt.  We are from Veritext Legal Solutions.  I     09:16:10
```

Page 7

Lucy Ulikhanova - March 14, 2019

```
 1    am not authorized to administer an oath.  I am not

 2    related to any party in this action, nor am I

 3    financially interested in the outcome.

 4            Counsel will now state their appearances

 5    and affiliations for the record.  If there are any      09:16:23

 6    objections to proceeding, please state them at the

 7    time of your appearance.

 8            MR. GRAHAM:  I am Ryan Graham, and I am

 9    appearing for Defendants Stephen Carey and Maral

10    Helwajian.                                              09:16:38

11            MS. SEROBIAN:  I'm Liana Serobian from

12    Serobian Law, Inc., and I'm here for the plaintiffs.

13            THE VIDEOGRAPHER:  Thank you.  The court

14    reporter may now swear the witness in and we will

15    proceed.

16                    LUCY ULIKHANOVA,

17       having first been duly sworn, testified as follows:

18                       EXAMINATION

19    BY MR. GRAHAM:

20       Q    Good morning.                                  09:16:58

21       A    Good morning.

22       Q    So I'm going to start off with some basic

23    admonitions and instructions, kind of the ground

24    rules.  First question I'm going to ask, have you

25    ever had your deposition taken before?                 09:17:11
```

Page 8

```
 1        Q    Have you discussed the nature of your
 2   deposition testimony with your attorney, without
 3   getting into specifics, but you've discussed this
 4   day today with your attorney?
 5        A    We discussed that I'm going to be in      09:20:36
 6   deposition.
 7        Q    Did she kind of emphasize that you have to
 8   be open and honest and truthful?
 9        A    Of course.
10        Q    Because of the nature of this case, we're  09:20:47
11   going to be discussing some kind of sensitive and
12   personal issues.  I just want you to know it's not
13   personal, it's not to embarrass you.  It's just the
14   nature of this case.  If you do need a moment or a
15   break, just let us know.                            09:20:59
16            Is there any reason you feel like you
17   can't proceed today?
18        A    No.
19        Q    Are you on any medications that would
20   interfere with your ability to testify?            09:21:09
21        A    No.
22        Q    Do you have any questions about the
23   deposition procedure today before we start?
24        A    Not -- no.
25        Q    I'm going to ask you the most difficult   09:21:18
```

Page 12

Lucy Ulikhanova - March 14, 2019

```
 1    question of the day.  Could you please state your

 2    full name.

 3         A    Okay.  Lucy Ulikhanova.

 4         Q    Could you spell that for the record.

 5         A    L-u-c-y U-l-i-k-h-a-n-o-v-a.              09:21:28

 6         Q    And Lucy, that's not short for Lucille.

 7    It's just Lucy?

 8         A    Just Lucy.

 9         Q    And have you ever used any other names in

10    the past?                                          09:21:44

11         A    When I was married.  Smith.

12         Q    Smith.  Okay.  You never went by Garcia?

13         A    No.

14         Q    And your date of birth?

15         A    11/18/1980.                              09:21:53

16         Q    Okay.  And your current address?

17         A    1429 North Columbus Avenue, Glendale,

18    California, 91202.

19         Q    And who do you currently live with?

20         A    My daughter.                             09:22:10

21         Q    Okay.  And is she your only child?

22         A    Yes.

23         Q    And what is her birth date?

24         A    11/5/2010.

25         Q    And can you just real quick confirm your  09:22:21
```

                                                    Page 13

Lucy Ulikhanov - March 14, 2019

```
 1    e-mail address.  Is that agentnova@yahoo.com?

 2        A    Yes.

 3        Q    And could you spell that for me.

 4        A    A-g-e-n-t-n-o-v-a at Yahoo.com.

 5        Q    What's your current marital status?          09:22:39

 6        A    Divorcing.  Separated.

 7        Q    Is that divorce finalized?

 8        A    Will be soon.

 9        Q    When did you file for divorce?

10        A    2013.                                         09:22:51

11        Q    When did you get separated?

12        A    That would be 2013.

13        Q    So you filed for divorce and separated

14    about the same time?

15        A    Well, my divorce attorney told me that       09:23:04

16    when you file -- once you file, that's the date that

17    counts as separation.  It starts from that date.

18        Q    And then the date that you -- this is to

19    Mr. Garcia; is that correct?

20        A    Yes.                                          09:23:21

21        Q    Brian?  And the date that you were

22    married?

23        A    November 18, 2007, I believe.  I don't

24    remember exactly.

25        Q    And any prior marriages before that?         09:23:33
```

Page 14

Lucy Ulikhanyan - March 14, 2019

```
 1        A     One prior marriage.

 2        Q     Who was that to?

 3              MS. SEROBIAN:  Objection.  Relevance.

 4              THE WITNESS:  I don't feel that's

 5      relevant.                                        09:23:45

 6              MS. SEROBIAN:  Objection.  Relevance.

 7      BY MR. GRAHAM:

 8        Q     You can answer.

 9              MS. SEROBIAN:  She doesn't need to.

10              THE WITNESS:  I don't think that's        09:23:53

11      relevant to this case.

12              MS. SEROBIAN:  Yeah.  She's not answering.

13      It's not relevant to any of the allegations in this

14      case.

15              MR. GRAHAM:  Relevance is not a ground to  09:24:05

16      withhold an answer in a deposition.

17              MS. SEROBIAN:  It's not relevant to any of

18      the claims.  It's not brought up in the Complaint.

19              MR. GRAHAM:  These are just basic

20      foundational information.  The grounds to withhold  09:24:20

21      an answer in a deposition are privilege,

22      Ms. Serobian.

23              MS. SEROBIAN:  Well, it would be marital

24      privilege at the time it applied.

25              MR. GRAHAM:  Not the identity of the       09:24:30
```

Page 15

Lucy Ulikhanova - March 14, 2019

```
 1        A     Tremendous losses.  Because the money that
 2   I could have used from the 200,000 that I had to let
 3   go of plus the money that I pulled out sooner from
 4   the man who owed me from the hard money loan, I
 5   could have reinvested that.  We don't know what that      09:36:51
 6   future outcome would have been.
 7        Q     Absolutely.  If I wanted to look at
 8   documents to establish -- to show that loss of
 9   money, are there any documents that we could ask
10   for?                                                      09:37:05
11        A     There are documents.
12        Q     Okay.  What would those documents be?
13        A     I've showed the promissory note.
14        Q     Promissory notes?
15        A     And then there was something drafted by a      09:37:16
16   real estate attorney that I had where I signed
17   agreeing to letting go of the Howard project in
18   order to receive the funds.  So there's that
19   contract that I have to look up.  It was a while
20   back.  I'll have to look it up.  But it's there.          09:37:33
21        Q     Moving on, are there any loss of benefits
22   from employment, health insurance, retirement that
23   you can think of that you lost because of the
24   conduct of the social workers?
25        A     Health insurance?                              09:37:51
```

                                                   Page 26

Lucy Ulikhanov - March 14, 2019

```
 1        Q    Probably not because it doesn't sound
 2   like --
 3        A    No.
 4        Q    -- you had a regular employer.
 5             Okay.  Let's talk about the parties.        09:37:58
 6   Let's talk about Defendant Stephen Carey.  When is
 7   the first time that you met Stephen Carey?
 8        A    I don't remember the exact date.  It was
 9   maybe a couple months after the -- or a month after.
10   I don't remember exactly.                             09:38:15
11        Q    So it was after the --
12        A    The removal.
13        Q    I'm just going to ask if you can wait
14   until I finish the question until you answer just so
15   we have a clean record.                               09:38:29
16             And you're not personal friends with him.
17   You just know him through the DCFS case, obviously.
18        A    Correct.
19        Q    And the first interaction you had with him
20   was over the phone or in person?                      09:38:36
21        A    Phone.
22        Q    Phone?  And how many times would you say
23   you spoke to him over the phone?
24        A    Once.
25        Q    And have you met him in person as well?    09:38:42
```

Page 27

Lucy Ulikhanian - March 14, 2019

```
 1        A     Yes.

 2        Q     How many times have you met him in person?

 3              MS. SEROBIAN:  Objection as to time.  Can

 4   you give a time frame as to when you mean she talked

 5   to him over the phone and when she met him in          09:38:55

 6   person.

 7              MR. GRAHAM:  I'm going to just read

 8   something into the record.  This is federal rule of

 9   civil procedure 30(c)(2):

10              An objection at the time of               09:39:07

11              examination, whether it's to

12              evidence, to a party's conduct, to

13              the officer's qualification, to the

14              manner of taking the deposition, or

15              to any other aspect of the deposition     09:39:15

16              must be noted on the record, but the

17              examination still proceeds.  The

18              testimony is taken subject to any

19              objection.

20              I'm going to emphasize this:              09:39:25

21                An objection must be stated

22              concisely in a nonargumentative and

23              nonsuggestive manner.  A person may

24              instruct the deponent not to answer

25              only when necessary to preserve a         09:39:37
```

Page 28

Lucy Ulikhanov - March 14, 2019

```
 1              privilege.

 2              Ms. Serobian, if you would please make

 3    your objections and not speak to me to try to argue

 4    them.  As I stated in the admonitions in the very

 5    beginning, there's no judge here to rule on them.        09:39:48

 6    If the question is ambiguous, we can read it back,

 7    but this is a conversation between me and the

 8    deponent.

 9              MS. SEROBIAN:  Yes.  My objection is

10    clear.  You never gave a time frame as to when she       09:39:58

11    talked or when she met him in person.  I'm objecting

12    to that.

13              MR. GRAHAM:  You are coaching right now.

14              MS. SEROBIAN:  I'm not coaching.

15              MR. GRAHAM:  You are giving --                  09:40:05

16              MS. SEROBIAN:  I'm stating my objection.

17              MR. GRAHAM:  You can just say "objection,"

18    you can say that it's vague, and then we can move

19    on.

20              MS. SEROBIAN:  Vague as to time.  That's        09:40:11

21    what I'm saying.  It's vague as to time.

22              MR. GRAHAM:  Then say "vague as to time,"

23    and we'll end it there.

24    BY MR. GRAHAM:

25         Q    So I'm going to ask that again.  Ma'am,         09:40:19
```

Page 29

Lucy Ulikhanov - March 14, 2019

```
 1    how many times have you spoken with Mr. Carey in

 2    person?

 3              MS. SEROBIAN:  Objection.  Vague as to

 4    time.

 5              THE WITNESS:  I'll go with what she said.    09:40:31

 6              MR. GRAHAM:  Can I have the question read

 7    back.

 8              (Record read.)

 9              MS. SEROBIAN:  Can you give a time frame?

10    Vague as to time.                                     09:40:52

11              THE WITNESS:  Because -- can I just say

12    something?  Because there was the interview

13    initially, but then during my visits, I've seen him

14    come around once in a while.  So he would say hello.

15    So I can't pinpoint every time that I saw him in      09:41:09

16    there.

17    BY MR. GRAHAM:

18         Q    Right.  So let's have a talk about

19    estimates, then.  If you had to estimate, would you

20    say that you had spoken with him, had a               09:41:15

21    conversation -- I don't mean just seeing him in the

22    hallways of the Pasadena office but actually had a

23    conversation with him -- would you say more than

24    five times?

25         A    Does e-mail and phone count, or we're       09:41:26
```

Page 30

Lucy Ulikhanov - March 14, 2019

```
1      talking just strictly in person?

2          Q    Just in person.

3          A    Just the interview only.

4          Q    Okay.  So once.

5          A    Yes.                                    09:41:32

6          Q    Okay.  Thank you.

7          A    That I can remember.  Again, I was going

8      through a traumatic time.

9          Q    Absolutely.  And it's kind of unfair.

10     Attorneys ask you about small things that happened a   09:41:42

11     thousand years ago.  So if you don't remember

12     anything, you know, that's a fine thing.

13              When is the last time that you had any

14     interaction with him via e-mail, phone, or in

15     person?                                          09:41:57

16         A    The last time was e-mail.  I believe it

17     was him e-mailed me saying something that he knew

18     that I would get my child back, in regards to

19     something of that nature.  Like, sending me well

20     wishes.                                          09:42:21

21         Q    Do you have a rough estimation of when

22     that was?  Was it before or after the case closed?

23         A    It was before the case closed.

24         Q    Okay.  And that was in an e-mail, you

25     said?                                            09:42:36
```

Page 31

Lucy Ulikhanov - March 14, 2019

```
 1        A    Yes.

 2        Q    Okay.  And you haven't kept in touch with

 3   him since the case closed?

 4        A    No.

 5        Q    Okay.  So just tell me did you and him get      09:42:42

 6   along?

 7        A    It's a bit complicated.  I found him to be

 8   very kind, but when I read the reports, I was

 9   absolutely shocked.  But to be fair, out of

10   everyone, he did a better job at quoting me.          09:43:02

11   Except, I mean, it was still misquoted.  But he did

12   a better job than everyone else did.  But there were

13   so many things in there that I was pretty shocked to

14   read.

15        Q    If I can ask you for some examples of some    09:43:18

16   of the things in particular that you found shocking?

17        A    I would have to go through the

18   supplemental report with you --

19        Q    Sure.

20        A    -- and point them out.                        09:43:26

21        Q    Off the top of your head, do any of those

22   things that you found shocking concern vaccination?

23        A    He didn't even mention anything in there

24   about vaccination, which I found odd because I

25   mentioned that to him, how that was important to me.    09:43:41
```

Hahn & Bowersock, A Veritext Company
800.660.3187

Lucy Ulikhanov - March 14, 2019

```
1     I even e-mailed him making sure that the aunt that
2     they placed my -- the great aunt that they placed my
3     daughter with wasn't doing that, wasn't vaccinating
4     her without my knowledge.
5          Q    So you did, though -- you say as a general      09:44:00
6     matter, you found him kind.  You just had some
7     issues with him, it sounds like, about the way he
8     didn't include things about the vaccination?
9          A    And several misquotes.
10         Q    Misquotes, okay.                                09:44:13
11         A    Taking things out of context.  I mean,
12    many things that he wrote down in the supplemental
13    report.
14         Q    As part of your claim, are you alleging
15    that he personally vaccinated [P.G.]                      09:44:25
16         A    No.
17         Q    Are you alleging that he -- let me
18    withdraw that.
19              A doctor would be the person who would
20    have vaccinated [P.G.]    correct?                        09:44:37
21         A    Correct.  I would hope so.
22         Q    That's a good point.  Are you alleging
23    that Mr. Carey is the one who escorted [P.G.]  to
24    the vaccination appointment?
25         A    No.                                             09:44:50
```

Page 33

Lucy Ulikhanov - March 14, 2019

```
 1              MS. SEROBIAN:  Objection.  Speculation,

 2     lack of foundation.

 3              THE WITNESS:  How -- I'll go with what she

 4     said.  I don't know how to answer that exactly.  How

 5     do you --                                          09:45:01

 6              MR. GRAHAM:  Can I have the question read

 7     back.

 8              (Record read.)

 9     BY MR. GRAHAM:

10         Q    Ma'am, it's a question about what you're    09:45:14

11     alleging.

12         A    Oh, if he physically escorted her to the

13     vaccination.

14         Q    Did he accompany her?

15              MS. SEROBIAN:  Objection.  Lack of          09:45:21

16     foundation.

17              THE WITNESS:  I would not know.  I doubt

18     that, but how am I to know that?

19     BY MR. GRAHAM:

20         Q    Very good.                                  09:45:28

21         A    How am I to know if he escorted her or not

22     unless he told me?

23         Q    Do you find him to be an honest person?

24         A    Not really.

25         Q    Okay.  What makes you say that?            09:45:40
```

                                                    Page 34

Lucy Ulikhanova - March 14, 2019

```
 1        A    Because of the supplemental report.

 2   Especially, my daughter's psychologist was pretty

 3   upset to find out that her phone call was taken as a

 4   interview when she specifically told him that she

 5   was not planning an interview until she could get        09:45:55

 6   her records.  And she actually wrote a letter back

 7   objecting to every single item that he wrote down

 8   about her what she said because he took her words

 9   and twisted them to make me look in a bad light.

10        Q    What is the name of the psychologist?          09:46:13

11        A    Dr. Reinhart, Thea Reinhart.

12        Q    Okay.  She's all over the records, I

13   believe.  This is the one --

14        A    The forensic psychologist for my daughter.

15        Q    Okay.                                          09:46:25

16        A    There were others who came forward, too,

17   that said that they never said the things that

18   Stephen Carey said.  Even the man who owed me money

19   came out and e-mailed and said that he found that

20   very strange because he's not scared of me.  He said   09:46:40

21   that there's no -- why would he be scared of me.

22   This isn't something that's commonly said about me

23   ever that you can find in my history that someone is

24   scared of me.

25             So he thought that was a joke.  Even          09:46:57
```

Page 35

Lucy Ulikhanu - March 14, 2019

```
 1      though he was basically -- excuse my French --
 2      screwing me over financially, he said when it comes
 3      to your daughter, I have to say something.  So he
 4      e-mailed them back saying I would never have said
 5      that I don't want to say anything because I'm scared    09:47:12
 6      of Lucy.  I find this ridiculous.  And he said only
 7      good things about my daughter and I.  So there was
 8      many, many things wrong.
 9          Q     So about the way he represented the
10      vaccination issues to the juvenile court, I heard       09:47:25
11      you testify just now that you believe he didn't say
12      certain things, he omitted information to the
13      juvenile court; is that correct?
14          A     Can you clarify that question?
15          Q     That was a terrible question.  That's one     09:47:41
16      of those great examples where an attorney asks a
17      question that's confusing.
18          A     Okay.
19          Q     Is it your testimony that Mr. Carey
20      omitted information regarding vaccines to the           09:47:48
21      juvenile court?
22          A     I never saw Mr. Carey in the court say
23      anything to the judge.  Or I never -- I don't know
24      how they planned to do the vaccination when I sent
25      them several e-mails and told them in person I do       09:48:08
```

Page 36

Lucy Ulikhanian - March 14, 2019

```
 1      not want my daughter vaccinated.

 2              I just remember receiving an e-mail from

 3      him saying after he answered me back on the others,

 4      saying that he's going to be going to court -- DCFS

 5      is going to be going to court to ask on two issues,      09:48:23

 6      and one was for vaccination.  And I remember

 7      e-mailing him back in an emotional state and saying

 8      something to that effect.  Because he already knew

 9      months prior that I was against it.  But I'd have to

10      look into the minute order or the e-mail to see what    09:48:41

11      he said exactly.

12          Q    Okay.

13              MR. GRAHAM:  Did you have an objection

14      that I saw?

15              MS. SEROBIAN:  I was going to say             09:48:49

16      objection, seemed like the question was vague.  I

17      don't think she understood or answered your

18      question.

19              MR. GRAHAM:  I'm glad that you didn't say

20      that.                                                   09:48:59

21      BY MR. GRAHAM:

22          Q    So when he was representing -- let me

23      withdraw that.

24              Did he as far as you understand file any

25      reports with the juvenile court that informed the       09:49:10
```

Page 37

Lucy Ulikhanian - March 14, 2019

```
 1    juvenile court about your thoughts on vaccination?
 2         A    He never filed anything about my thoughts
 3    about vaccination to the court as far as I know.
 4    And what my attorney, Ronald Funk, at the time told
 5    me, there was nothing.                              09:49:28
 6         Q    Okay.  Let's talk about Defendant Maral
 7    Helwajian.  When is the first time that you met her?
 8         A    I don't remember exactly.  It was a few
 9    months, couple months, three months after they
10    removed    P.G.      I did have a phone call with her  09:49:48
11    prior to meeting her.
12         Q    But everything was after the removal?
13         A    Yes.  Because they took away Sosa, and
14    then Maral came into the picture.
15         Q    Okay.  And the first interaction that you  09:50:03
16    had with her, you said, was over the phone?
17         A    Correct.
18         Q    And how many times would you say -- she
19    was your social worker for the back end of your
20    case; right?                                        09:50:17
21         A    Yes.
22         Q    She probably had a ton of interaction --
23         A    Tons.  Text messages, e-mails, phone
24    calls.
25         Q    When was the last time that you interacted  09:50:23
```

                                                        Page 38

Lucy Ulikhanov - March 14, 2019

```
 1    with her?

 2         A    I don't remember.

 3         Q    Do you remember if it was by phone?  In

 4    person?

 5         A    It had to be text.  Because I sent her      09:50:42

 6    pictures of my daughter even after the case was

 7    over, you know.

 8         Q    Okay.  So you guys kept in touch?

 9         A    A little bit, yeah.

10         Q    So you guys got along?                      09:50:54

11         A    Not in the beginning.

12         Q    Why is that?

13         A    Because she -- I was upset with her

14    because I felt that she was being lazy and not

15    reading the material and was making false           09:51:06

16    statements.  It took her a while to catch up.  And I

17    understand that it's overwhelming for social

18    workers.  I get that.  But her laziness caused a lot

19    of conflict.  A lot of conflict.  By the time she

20    caught up and saw what was going on, what my ex was  09:51:23

21    doing, it took quite a while.

22              But by then, everything was done.  The

23    vaccines, the supplemental report, things of that

24    nature, they were already done.

25         Q    When you say "false statements," do any of 09:51:39
```

Page 39

Lucy Ulikhanian - March 14, 2019

```
1    those false statements concern vaccination?

2            MS. SEROBIAN:  Objection.  Vague.

3            THE WITNESS:  Let me think about that.  I

4    believe it was Mr. Carey that wrote the supplemental

5    report.  Is that correct or not?                    09:51:57

6    BY MR. GRAHAM:

7       Q    You can't ask your attorney questions.

8       A    Oh.  I don't know.

9       Q    I'm asking for what's in your

10   recollection.  What false statements did            09:52:05

11   Ms. Helwajian make?

12      A    I don't remember her making -- it's a bit

13   vague.  I don't know who writes the report.  It's

14   Stephen Carey; correct?

15      Q    I'll just withdraw that question.           09:52:21

16           You just testified that Defendant Maral

17   Helwajian made some false statements.

18      A    Oh, okay.  Okay.  There was a -- I forget

19   what the wording is -- MTF meeting or MFT meeting or

20   something of that nature.  There was a meeting with  09:52:40

21   DCFS, and two other ladies were present, Laura

22   Criado, I believe, the unlicensed therapist they

23   hired for any daughter, and another individual.  I

24   think they call it a MAT meeting.  I'm not sure.

25      Q    The MAT team or the MAT assessment?         09:53:02
```

Page 40

Lucy Ulikhanov - March 14, 2019

```
 1        A    Yes.  Yes.  Yes.  I don't remember the

 2   exact -- I just remember her saying things that were

 3   not true.  And I said to her you need to look into

 4   the paperwork and read it.

 5        Q    Uh-huh.                              09:53:13

 6        A    And she made some statements about my ex.

 7   So it just -- especially the Hillary Clinton thing

 8   got brought up, and so I showed her the book and I

 9   said here you go, this is my father's name there in

10   the book.                                      09:53:29

11        Q    Sure.

12        A    And, you know, these are, like, made-up

13   things about me.  And then there were other times

14   that I met her that she said certain things that I

15   said Maral, you need to look further and research    09:53:40

16   into the paperwork.  So she wasn't really doing her

17   due diligence per se.

18        Q    Right.  So --

19        A    It took her some time to catch up.

20        Q    Sure.  So you testified that she had made  09:53:52

21   false statements; is that correct?

22        A    Correct.

23        Q    Were any --

24        A    I can't remember the exact verbiage or

25   thing she said.  It was in that meeting.         09:54:01
```

Page 41

Lucy Ulikhanov - March 14, 2019

1        Q    Sure.

2        A    And if that meeting was recorded, then we

3   could use that.

4        Q    You know, I've only got you for seven

5   hours, and I would love to get us out before seven        09:54:06

6   hours.  So if I ask you a yes-or-no question, if you

7   could just keep it at yes or no.

8             So when you said she made those false

9   statements, did she make those to the juvenile court

10  in a report, or did she just make those casually in       09:54:20

11  conversation?

12       A    I wouldn't know if she made them in the

13  report, but I do know she made them casually.  And

14  that may have been placed in the report.  I don't

15  know.                                                      09:54:37

16       Q    Fair enough.  As far as her involvement in

17  the vaccination issues, as part of your claim do you

18  allege that she was the one actually injecting

19  ███P.G.███ with the vaccines?

20            MS. SEROBIAN:  Objection.  Speculation,          09:54:48

21  lack of foundation.

22            MR. GRAHAM:  Can I have the question read

23  back.

24            (Record read.)

25            THE WITNESS:  No.  I presume a doctor's          09:55:17

                                                        Page 42

Lucy Ulikhanyan - March 14, 2019

```
 1    only legally qualified to do such a thing.

 2    BY MR. GRAHAM:

 3         Q    Are you alleging that she was the one who

 4    escorted her or accompanied her to the vaccination?

 5         A    I wouldn't know.                          09:55:31

 6              MS. SEROBIAN:  Objection.  Lack of

 7    foundation, speculation.

 8    BY MR. GRAHAM:

 9         Q    You can answer.

10         A    I'm going to go with what my attorney     09:55:38

11    said.  She's my attorney.

12         Q    You need to give an answer, ma'am.

13         A    Oh.  I wouldn't know.

14         Q    Okay.  And do you think that Maral is an

15    honest person?                                      09:55:52

16         A    I can't answer that.

17         Q    Okay.

18         A    I don't --

19         Q    Based off of what you kind of just

20    disclosed earlier.  Is that fair to say?            09:56:03

21         A    It's hard to say.  Maybe the thing she

22    said was partly due to her not doing her due

23    diligence or -- I don't know.  I can't speak on her

24    character.

25         Q    Okay.  Have you spoken with her verbally  09:56:19
```

Page 43

Lucy Ulikhanyan - March 14, 2019

```
 1    since the DCFS case closed, like, over the phone or
 2    in person, or has everything been digital?
 3         A    There's been phone calls, there's been
 4    texts.  I just can't remember them all, specific
 5    dates and whatnot.                              09:56:36
 6         Q    Did you invite her to P.G.'s -- P.G. is
 7    what we call   P.G.   in the papers -- to her
 8    birthday party in November 2017?
 9         A    I believe so.  I've become friendly with
10    the monitor.                                    09:56:55
11         Q    Uh-huh.  And what's that monitor's name?
12         A    Lusine.
13         Q    Can you spell that name?
14         A    There was other monitors that I became
15    friendly with, too.  So it's not just her.      09:57:09
16         Q    Right.  Can you spell that name.
17         A    L-u-c-i-n-e.
18         Q    And the last name?
19         A    I don't know her last name.
20         Q    Does it begin with a P?               09:57:20
21         A    I think so.  I'm not sure.
22         Q    Did you ever send Defendant Helwajian
23    cookies?
24         A    I don't remember that.  I think when she
25    visited my home, yeah, I gave her cookies.      09:57:37
```

Page 44

Lucy Ulikhanyan - March 14, 2019

```
 1         Q    You never sent her a box of cookies?

 2         A    Oh, I sent her -- I think it was

 3    Christmastime, something near the end of the -- when

 4    we were very near of the end of the case.  I think I

 5    sent her something then.                           09:57:51

 6         Q    Like, around --

 7         A    A edibles arrangement.

 8         Q    An edible arrangement?

 9         A    Yes.

10         Q    Around December 2017?                    09:57:57

11         A    I think so, that's correct.  I also gave

12    the monitors things, too.  That's just my way.

13    That's how I've always been.

14         Q    Did you ever send her videos of  P.G.

15    learning to speak Armenian?                        09:58:12

16         A    Yes.  Because Maral is Armenian; so we had

17    that in common.

18         Q    So names of any other social workers

19    besides the defendants in this case that you have

20    discussed vaccines with, can you think of any?      09:58:28

21         A    The emergency -- not the emergency.  The

22    complaint line where I called to make a complaint

23    about Sosa.

24         Q    Is that the hotline, the DCFS hotline?

25         A    I believe so.  It's some complaint line.  09:58:48
```

Page 45

Lucy Ulikhanyan - March 14, 2019

```
 1    And they sent out a social worker, I forget her name

 2    exactly.  I told her about the issues that were

 3    going on, everything.

 4         Q    Do you remember her name?

 5         A    It was -- Medinwa -- I forget -- with a M.    09:59:01

 6         Q    Do you remember approximately what time

 7    this was?

 8         A    Near the beginning of the case.

 9         Q    Okay.  Was this before Maral was on your

10    case and it was Maria Sosa, or was Maral --          09:59:20

11         A    No.  Maral was already on the case, I

12    believe.

13         Q    And this was in response to a phone call

14    that you had made or that somebody else had made?

15         A    That I made.                               09:59:32

16         Q    And you were complaining about the social

17    workers.

18         A    Yeah.  Sosa, yes.

19         Q    Was it Vicki Ramirez?

20         A    No.                                        09:59:40

21         Q    Okay.  It was not one of the defendants.

22         A    No.  They sent out a completely different

23    social worker to speak to me about the matters.

24         Q    So let's talk about your life before

25    ▮P.G.▮  was removed.  What was your living          09:59:57
```

Page 46

Lucy Ulikhanov - March 14, 2019

```
1    situation like?

2         A    That's kind of vague.  Can you ask --

3         Q    Sure.  Who were you living with?

4              MS. SEROBIAN:  Objection as to time.

5              THE WITNESS:  It's still kind of vague.      10:00:07

6    BY MR. GRAHAM:

7         Q    In October of 2015, how many people were

8    living in your home?

9         A    Just my daughter and I.

10        Q    Okay.  And at the time of removal in          10:00:19

11   January 2016, how many people were living in your

12   home?

13        A    Just my daughter and I.

14        Q    Were you living in the same home that you

15   are today?                                             10:00:31

16        A    Yes.

17        Q    Brian was not living there?

18        A    No.

19        Q    At that time, how long had it been since

20   Brian had lived in that home?                          10:00:38

21        A    He only lived there from -- for four

22   months after my father's death.  It was

23   approximately 2013, and then that's -- then

24   something occurred and I had him leave.  And he

25   hadn't been living there since.  So 2013, he left.     10:01:03
```

Page 47

Lucy Ulikhanov - March 14, 2019

```
1       And then I filed for divorce.

2            Q    As part of your claim for emotional

3       damages and distress, do you claim that these events

4       have affected the way that you interact with your

5       daughter, your life generally?                        10:01:22

6            A    About just the vaccination or the whole

7       case?

8            Q    The vaccination.

9            A    Can you say that -- can you repeat that.

10           Q    Your life activities, the way that you     10:01:34

11      participate in your life, has the vaccination

12      affected that for you or for your daughter?

13           A    The way I participate in --

14           Q    Are there activities that you can't do

15      today that you could do before?                       10:01:44

16           A    No.

17           Q    Okay.  Let's talk about schools that P.G.

18      attended before the removal.  Did she go to any

19      preschools?

20           A    I sent her to a preschool, Saint Mark's.   10:01:58

21           Q    For what years?

22           A    I don't remember exactly.  It was 2014, I

23      believe, '13, '14.

24           Q    Where is that school located?

25           A    It's in Glendale.                           10:02:13
```

Page 48

Lucy Ulikhanov - March 14, 2019

```
 1        Q    And why did she stop going there?

 2        A    She had enough, I thought, of preschool.

 3   And then she was complaining that a little boy was

 4   bullying her there.  So I was not okay with that.

 5        Q    So she just aged out, basically?          10:02:27

 6        A    Yeah.  And she didn't like it because she

 7   said a boy there was bullying her.  I had a talk

 8   with the administrators about that so that they

 9   could watch her on the playground.  She said a boy

10   was bullying her.                                   10:02:45

11        Q    Has she ever been to any Head Start

12   programs?

13        A    I don't know what that is, but I've taken

14   her to many mommy-and-me classes.

15        Q    What's mommy-and-me class?                10:02:53

16        A    Gymboree hosts these mommy-and-me classes

17   where you do music and, you know, playing and things

18   of that nature.  We've always done classes together.

19        Q    Are those educational or are they play?

20        A    It's a little bit of both.               10:03:08

21        Q    Okay.  And then did you ever homeschool

22   [P.G.]  before she was removed?

23        A    In what sense?  I taught her her ABCs.

24   She knew how to write her name, things of that

25   nature.  I don't know if you consider that          10:03:26
```

                                                    Page 49

Lucy Ulikhanov - March 14, 2019

```
 1    homeschooling.

 2         Q    Did you have to regularly submit reports

 3    to a school district?

 4         A    No.  Not in that sense.

 5              MS. SEROBIAN:  Objection as to time.        10:03:36

 6    BY MR. GRAHAM:

 7         Q    And let's talk about day care.  Again,

 8    we're talking about the period before removal.  Had

 9    you ever enrolled ███ P.G. ███ in day care before

10    removal?                                              10:03:51

11         A    No.

12         Q    Okay.  And before removal, did you and

13    Brian -- when you were together, did you as a couple

14    ever discuss your plans for vaccination for

15    ███ P.G. ███                                          10:04:06

16              MS. SEROBIAN:  Objection.  Marital

17    privilege.

18              MR. GRAHAM:  Are you instructing her not

19    to answer?  That's a privilege.  You can --

20              THE WITNESS:  I'm going to go with what my  10:04:21

21    attorney.

22              MR. GRAHAM:  She didn't tell you not to

23    answer.

24              MS. SEROBIAN:  Yeah.  It's a marital

25    privilege.  You do not need to answer as to          10:04:29
```

                                                    Page 50

Lucy Ulikhanyan - March 14, 2019

```
 1    conversations with your spouse.

 2    BY MR. GRAHAM:

 3        Q    So she has to say the magic words.  She

 4    has to instruct you not to answer.  So...

 5             MS. SEROBIAN:  The magic words are it's          10:04:37

 6    covered by marital privilege.  You do not need to

 7    answer.

 8             THE WITNESS:  I do not need to answer.

 9    BY MR. GRAHAM:

10        Q    You don't -- yeah, no.                           10:04:47

11        A    I'm going to stick with what she says.

12             MR. GRAHAM:  I had to try; right?

13    BY MR. GRAHAM:

14        Q    Let's talk about doctors that  ███P.G.███  saw

15    before removal.  Did she have a regular pediatrician      10:04:59

16    that she saw?

17        A    I'm just checking if I'm allowed to

18    answer.  Okay.  Yes.  She had a pediatrician.

19        Q    Okay.  And how many pediatricians did she

20    have before she was removed?  Was it one               10:05:17

21    consistently?

22        A    It was one consistent.

23        Q    And what was the name of that doctor?

24        A    Dr. Boxstein.

25        Q    And how did you find this doctor?            10:05:25
```

                                                    Page 51

Lucy Ulikhanov - March 14, 2019

```
 1          A    I liked him.

 2          Q    Oh.  That was an ambiguous question.  How

 3     were you referred to this doctor?

 4          A    Through my ex-husband-to-be, his work

 5     insurance, medical insurance that they provide him.      10:05:41

 6     Through Motion Picture.

 7          Q    When I asked that question the first way,

 8     you said that you liked him.  I'm assuming that you

 9     got along well with Dr. Boxstein?

10          A    Yes.                                            10:05:53

11          Q    Okay.  And he's located where?

12          A    In Burbank.

13          Q    And is he a speciality pediatrician or

14     just a general pediatrician?

15          A    I don't know.                                  10:06:03

16          Q    What years approximately were you taking

17     ███P.G.███ to Dr. Boxstein?

18          A    Since her birth to -- till the insurance

19     paused.  So 2015 it paused, I believe.

20          Q    Do you have an estimate of the last visit    10:06:30

21     that you saw Dr. Boxstein?

22          A    I don't remember exactly.

23          Q    And you said that was billed through

24     insurance; is that correct?

25          A    Correct.                                       10:06:40
```

Page 52

Lucy Ulikhanov - March 14, 2019

```
 1          Q    Which insurance company is that?

 2          A    It was Anthem Blue Cross Motion Picture.

 3          Q    Okay.  I'm going to ask you about a

 4    Dr. Susan Hammar.  Are you familiar with that name?

 5          A    I think that's the pediatrician to my ex's      10:06:56

 6    aunt's children that they took   P.G.   to.

 7          Q    Do you have any familiarity with that

 8    doctor?  Have you ever met that doctor?

 9          A    No.  I just requested medical records from

10    them recently, that's all.                                 10:07:15

11          Q    So you did not get a referral to that

12    doctor from an insurance company like you did

13    Dr. Boxstein?

14          A    No.  And I believe that doctor is the

15    doctor that Mary Lou, the aunt of Brian Garcia, used       10:07:28

16    for   P.G.    while she was in their care.

17          Q    Just for the record because we said her

18    name for the first time, can we get a spelling for

19    Mary's name.

20          A    I believe it's M-a-r-y L-o-u.                   10:07:41

21          Q    And then her last name is --

22          A    R-e-i-c-h.

23          Q    Is it R-e-i --

24          A    I'm not sure if I'm correct.

25          Q    I'll just say for the record it's Mary and      10:07:52
```

Page 53

Lucy Ulikhanyan - March 14, 2019

```
1    go to Exhibit No. 2.

2            (Exhibit 2 was marked for identification.)

3            THE WITNESS:  Do I keep this?

4    BY MR. GRAHAM:

5        Q    You're the parent; you can keep everything        10:16:41

6    today.  They're the 827 records.  They're super

7    secret and private.  But, you know, because you're

8    the parent, you already have those records.  I

9    always forget.

10           So you probably recognize this; right?          10:16:57

11       A    Huh?

12       Q    You probably recognize this e-mail, yes?

13       A    Refresh my memory.  It's been a while.

14   Can I read it?

15       Q    Yeah.                                          10:17:11

16       A    Where is the attachment?  It says

17   there's -- "Here is my signed paperwork."  But where

18   is the -- this is it?

19       Q    Uh-huh.

20       A    Okay.  Oh.  Regarding the -- I think I was     10:18:03

21   making a statement about vaccines.

22       Q    But you recognize that e-mail as an e-mail

23   that you sent?

24       A    To Maral.  Yes.  There were others.  I'm

25   surprised I couldn't find this one.                     10:18:25
```

Page 61

Lucy Ulikhanov - March 14, 2019

```
 1        Q    You can confirm where it says "from," that

 2    is your e-mail address; correct?

 3        A    Yes.

 4        Q    And this was sent on February 12, 2016?

 5        A    February?  Yeah.                        10:18:38

 6        Q    And on the "to" line, it's addressed to

 7    Maral Helwajian; is that correct?

 8        A    Yes.

 9        Q    And why did you send this e-mail?

10        A    I believe I had a phone call discussion   10:18:50

11    with her about vaccines.  Because you know,

12    sometimes you'll have a phone conversation, and then

13    you'll text someone or e-mail someone to -- you

14    know, about that conversation.  So it was just,

15    like, a followup.  So I said here is my -- I just    10:19:06

16    was telling her here is my paperwork.  That's what I

17    believe this was.  It was my following up of a

18    conversation I had with her on the telephone or in

19    person.

20        Q    Do you remember whether or not there was a  10:19:20

21    hearing on the vaccinations going to be in February

22    2016?

23        A    Do I remember -- can you say that one more

24    time.

25        Q    Was there going to be a hearing on         10:19:29
```

Page 62

Lucy Ulikhanova - March 14, 2019

```
 1              THE VIDEOGRAPHER:  We're off the record,
 2      10:56.
 3              (Discussion off the record.)
 4              THE VIDEOGRAPHER:  On the record, 10:57.
 5      BY MR. GRAHAM:                                    10:57:48
 6        Q    Do you know -- without disclosing specific
 7      conversations that you had with Brian, do you know
 8      if he was opposed to vaccination?
 9              MS. SEROBIAN:  Objection.  Speculation.
10              THE WITNESS:  Can you say that one more     10:58:06
11      time.
12              MR. GRAHAM:  Can I have the question read
13      back.
14              (Record read.)
15              MS. SEROBIAN:  Objection.  Marital          10:58:22
16      privilege.
17              THE WITNESS:  I don't want to answer that.
18              MS. SEROBIAN:  The magic words?
19              MR. GRAHAM:  That comes from you.  Do you
20      want to instruct your client to answer?  I mean,   10:58:38
21      there's no privilege for her personal knowledge.
22      It's a communication privilege.
23              MS. SEROBIAN:  But it would only come from
24      him telling her something.  So it would be from the
25      marital communication, which is privileged.  Her    10:58:54
```

Page 73

Lucy Ulikhanyan - March 14, 2019

```
 1    knowledge would only come from that communication.

 2    Therefore, I believe marital privilege does apply.

 3    BY MR. GRAHAM:

 4         Q    Did you and Brian disagree about

 5    vaccination?                                          10:59:03

 6              MS. SEROBIAN:  Same objection.  Marital

 7    privilege and lack of foundation.

 8              THE WITNESS:  I'm not going to say

 9    anything about that.  Sorry.

10    BY MR. GRAHAM:                                        10:59:18

11         Q    You are refusing to answer my question?

12         A    Due to the terms that my attorney stated.

13         Q    Very good.

14              Let's talk about placement.  Where was

15    P.G. placed after she was removed?                    10:59:30

16         A    Into my ex's aunt's home.

17         Q    And this is Ms. Reisch who we discussed

18    earlier.

19         A    Yes.  Brian Garcia's aunt.

20         Q    And when  P.G.  was placed there, who       10:59:47

21    else lived in that home?

22         A    As far as my knowledge goes, I know that

23    she has a daughter and a son and a husband.  I don't

24    know who else was living there.

25         Q    Okay.  And how do you know Ms. Reisch?      11:00:00
```

Page 74

Lucy Ulikhanova - March 14, 2019

```
 1        A     Through Brian.

 2        Q     And when did you two first meet?

 3        A     I don't remember.  I didn't see her that

 4   often.  We were not that close.  When I was dating

 5   Brian.                                          11:00:20

 6        Q     Okay.  And did you two get along?

 7        A     I didn't know her that well.

 8        Q     Okay.

 9        A     Yes and no.  I mean, we got along as far

10   as conversing with each other.                  11:00:32

11        Q     So when you guys saw each other on

12   holidays, family holidays, you didn't pick fights?

13        A     No.  There wasn't really that many family

14   holidays that we spent together.  Maybe one or two

15   in that entire ten years or whatever.           11:00:51

16        Q     But she was polite to you; is that fair to

17   say?

18        A     She's very -- I don't want to get into it.

19   I've heard things from the ex-girlfriend that were

20   not favorable about her, and it came to be true   11:01:12

21   later.

22        Q     Okay.  Is it true that she owns a day

23   care?

24        A     Yes.

25        Q     Okay.  And do you know how long she's    11:01:19
```

Page 75

Lucy Ulikhanov - March 14, 2019

```
 1      owned that day care?

 2          A    No.

 3          Q    Do you know if she inherited that day

 4      care?

 5          A    I think she did.  I'm not sure.  Because I      11:01:28

 6      know that the day care -- I knew that the day care

 7      started first with Brian's grandmother.  So it was

 8      passed on.

 9          Q    Do you think that that was a good

10      placement for ▇▇P.G.▇▇                                  11:01:43

11          A    No.

12          Q    Okay.  Why is that?

13          A    Because there's a conflict of interest.

14      She was in the family law hearings and gave

15      testimony, and she did not believe that sexual abuse   11:01:55

16      occurred; yet she's never spoken to my daughter or

17      knows anything about the case.  And the judge made

18      it clear that even the father was not allowed to be

19      a monitor for my child because he also didn't

20      believe it, and that was a risk to my daughter.        11:02:17

21              So she was a risk to my daughter.  Because

22      she doesn't believe that the sexual abuse occurred,

23      she allowed free access to my child being the

24      monitor for Brian.

25          Q    Just one thing real quick.  You said "he."    11:02:28
```

Page 76

Lucy Ulikhanova - March 14, 2019

```
 1     The family court judge was a she.

 2          A     Was a she.  Holly Fujie.

 3          Q     There we go.  So your concern about the

 4     placement was that Ms. Reisch had a conflict of

 5     interest because of the family court proceedings and      11:02:44

 6     not believing what the family court judge had found.

 7          A     Correct.

 8          Q     Okay.  And the monitoring issue -- I think

 9     there was some issues I saw in the e-mails.  You

10     were worried about the monitoring; is that right?         11:03:00

11          A     Yeah.  He was -- she was placed as being

12     the monitor for Brian's visits with the child, which

13     my daughter disclosed to me that there was several

14     times she was left alone with him, and even he

15     picked her up from the elementary school and drove        11:03:12

16     her playing blasted music, rap music, back to the

17     house.  So she was even alone with him.  They

18     violated many rules and got away with it.

19          Q     So I want to get my handle on the

20     visitation issues.  Because I know every DCFS case        11:03:30

21     seems to have a different kind of visitation set of

22     rules.  So when    P.G.    was first removed, you have

23     a visitation schedule; is that right?

24          A     Correct.

25          Q     What was your schedule?                        11:03:44
```

Page 77

Lucy Ulikhanova - March 14, 2019

```
 1    can look at page 1523 at the bottom part of this.

 2    Can you confirm this is an e-mail from Ms. Helwajian

 3    to you; correct?

 4         A    Where do you want me to look?  Sorry.

 5         Q    Page 1523 in the corner where it says the      11:09:00

 6    COLA number.  This is Exhibit 8.

 7         A    From Maral.

 8         Q    To you.

 9         A    To me.

10         Q    So can you confirm this is an e-mail from      11:09:52

11    Ms. Helwajian?

12         A    Right.  But I don't remember reading this.

13    I don't remember receiving this.

14         Q    It is from Ms. Helwajian, though; right?

15         A    Yes.  I do see that it's from her.  I         11:10:02

16    don't doubt it.  I'll look into my e-mail and see

17    how I missed this one.

18         Q    On the "to" line, to Lucy Ulikhanova, is

19    that your e-mail address?

20         A    Yes.                                           11:10:17

21         Q    On the next person, it says Ron Funk,

22    rfunk@hbplaw.com.  Do you know is that Mr. Funk's

23    e-mail address?

24         A    I believe so.  He has two or three

25    different ones because he also represented me in my     11:10:35
```

Page 82

Lucy Ulikhanova - March 14, 2019

```
1    divorce case and then his e-mail changed.  I don't
2    know if that's the new one or the old one.
3         Q    Ron Funk, was he your attorney at this
4    time in February 2016?
5         A    Yes.                                      11:10:50
6         Q    Okay.  And then it says here:
7              "Good morning Ms. Ulikhanova and
8              Mr. Funk, this e-mail shall serve as
9              written notice to both of you that we
10             have requested a SET ON hearing at       11:10:59
11             our court, and it has been set for
12             2/25/2016.  The issues we are trying
13             to have the court address are the
14             following:
15             "No. 1, Penelopy's immunizations,        11:11:09
16             mother's refusal to vaccinate versus
17             father wishes to vaccinate."
18             As you're sitting here today, do you have
19   a memory of receiving this e-mail?
20        A    I don't have a memory of receiving this.  11:11:25
21        Q    But is it correct, this representation
22   that you refused to vaccinate  P.G.  as of
23   February 18, 2016?
24        A    Yeah.  I do refuse to vaccinate.  I've
25   made that clear since the beginning of the case.   11:11:41
```

Page 83

Lucy Ulikhanova - March 14, 2019

```
 1          Q    Is it your -- let me withdraw that.

 2               Do you have an understanding as to whether

 3    or not it was correct as of February 18, 2016,

 4    whether Brian wishes or wished to vaccinate P.G.?

 5          A    I don't know.  All I remember is in the        11:11:57

 6    courtroom, him saying something to the effect that

 7    he wanted to.

 8          Q    Okay.

 9          A    And again, he never had custody prior to

10    that, and we were not under jurisdiction at the         11:12:11

11    time.

12          Q    In the last paragraph, the last sentence,

13    it says, "Ms. Ulikhanova, your presence is

14    required."  I thought that was a little interesting.

15    I don't practice dependency law, but were you          11:12:25

16    required to be at every hearing?

17          A    I don't know if I was required to be at

18    every hearing.  I remember reading some e-mail where

19    it said that I was not required to but I still

20    attended.  There was some hearings that I didn't       11:12:42

21    attend that my attorney told me wasn't necessary,

22    and some of them he told me were necessary, I

23    attended.

24          Q    Okay.  Then if you could look at

25    page 1522, the page before it, this is an e-mail,      11:12:54
```

Page 84

Lucy Ulikhanova - March 14, 2019

```
 1     of this event in her driveway.

 2          Q    Yes.  I've seen that.  We've actually

 3     exchanged that in discovery.  I'm not going to play

 4     it during the deposition.  But what do you recall

 5     about that video?                                    11:33:22

 6          A    I was telling her that -- not just that

 7     video.  I've told her before.  She's known about

 8     this because she's known that I have a father who is

 9     a naturopathic doctor.

10          Q    Right.

11          A    So this is something she's known.

12          Q    Right.  Did she agree with your position

13     on vaccination or did she disagree?

14          A    She was in the middle.  She didn't say one

15     way or another.  She did bring up that her daughter  11:33:46

16     has -- I think it was an allergy.  She brought up

17     that her daughter has allergies, that she wears a

18     medical bracelet.  She has an allergy to I think

19     penicillin or something of that nature.  So she

20     brought up allergies with her kids in discussion.    11:34:07

21          Q    I think we talked earlier that there was a

22     lot of tension between you and Ms. Reisch.  Were

23     there ever any issues with ███P.G.███ being abused

24     when she was in that home that you know of?

25          A    How would I know?                          11:34:17
```

Page 102

Lucy Ulikhanova - March 14, 2019

```
1        Q    I just asked that you knew of.

2             MS. SEROBIAN:  Objection.  Speculation,

3     lacks foundation.

4             THE WITNESS:  I wouldn't know.

5     BY MR. GRAHAM:

6        Q    Okay.  So you did not know of any physical

7     abuse of   P.G.   in that home; is that correct?

8        A    Right.

9        Q    Okay.  Did   P.G.   ever tell you that she

10    was hit while she was in that home?            11:34:36

11       A    No.

12       Q    Did you ever call the child abuse hotline

13    to report any abuse while   P.G.   was in that home?

14       A    I don't remember.

15       Q    Okay.  Did you ever call the police to     11:34:48

16    report any physical abuse?

17       A    No.  I think I remember I called -- I

18    called because my ex began texting me some weird

19    things that instigated me to become emotional and

20    call 911.  911 or something.  And --            11:35:08

21       Q    That's between you and Brian.

22       A    Yeah, but he was over there.

23       Q    Oh, okay.

24       A    And I mean, I hired a private investigator

25    who did see that he was there at night, he was there  11:35:16
```

Page 103

Lucy Ulikhanov - March 14, 2019

```
 1    during the day.  So his supposed two-hour visits, he

 2    was there overnight.  They caught him coming out

 3    overnight, going back in, things of that nature.

 4    That was submitted into court, I believe.

 5         Q    Did this kind of contribute to the tension      11:35:29

 6    and your suspicion with Ms. Reisch and the whole

 7    placement issue?

 8         A    It added to it.

 9         Q    Okay.  All right.  When was the first time

10    that vaccination came up in the DCFS case?  It          11:35:39

11    sounds pretty early.

12         A    Again, from the moment that they

13    interviewed me.  I made it very clear throughout the

14    whole thing.

15         Q    You're consistent.  So who first told you     11:35:53

16    that    P.G.    might get vaccinated?

17         A    From what I remember was the e-mail from

18    Stephen Carey saying we're going to court on -- in

19    June 2016.

20         Q    Okay.                                          11:36:12

21         A    That e-mail to discuss those two issues.

22         Q    Okay.

23         A    I don't know why my memory is a little bit

24    fuzzy on the February thing.  Because I guess that

25    didn't happen because it was the June hearing that      11:36:26
```

Hahn & Bowersock, A Veritext Company
800.660.3187

Lucy Ulikhanova - March 14, 2019

```
 1      and then when it started to backfire on her and they

 2      were saying that stuff about Maral, then she really

 3      cared to do something about, you know, moving her.

 4          Q    So let's get to -- you mentioned -- yeah.

 5      Let's go to Exhibit 10.                              11:50:01

 6              (Exhibit 10 was marked for identification.)

 7      BY MR. GRAHAM:

 8          Q    This is going to be an e-mail dated

 9      June 3.  Just want you to confirm for me -- this is

10      page 1526.  This is an e-mail from Steve Carey to    11:50:20

11      you and Mr. Funk; is that correct?

12          A    It doesn't show my e-mail.  It just says

13      my name.

14          Q    Do you recall receiving this e-mail?

15          A    No.  I recall receiving an e-mail from him  11:50:43

16      like this around the same time.  But I don't

17      remember this one specifically.

18          Q    Okay.

19              THE WITNESS:  Did you give him the

20      paperwork?  Am I able to bring that up or not?       11:51:02

21              MS. SEROBIAN:  Off the record, please.

22              THE VIDEOGRAPHER:  Off the record, 11:50.

23              (Discussion off the record.)

24              THE VIDEOGRAPHER:  On the record, 11:51.

25      ///                                                  11:52:14
```

                                                    Page 110

Lucy Ulikhanov - March 14, 2019

```
 1    BY MR. GRAHAM:

 2        Q    Exhibit 10, 1526, can you confirm for me

 3    that this is an e-mail sent to you by Defendant

 4    Stephen Carey?

 5        A    Yes.                                    11:52:25

 6        Q    And also copied -- or pardon me -- also

 7    sent --

 8             I'd just like to note for the record that

 9    the deponent is looking at exhibits that plaintiff's

10    counsel is showing her.  I'm not sure if that is in   11:52:36

11    the frame.

12             MS. SEROBIAN:  It's your Exhibit 10.  You

13    have the same exhibit.

14             THE WITNESS:  Oh, yeah.  It is.  It's the

15    same.                                            11:52:45

16    BY MR. GRAHAM:

17        Q    And also on the "to" line is rfunk@hbplaw.

18    Do you have an understanding, is that your attorney

19    from the dependency proceeding, Ronald Funk?

20        A    Yes.                                    11:52:52

21        Q    Okay.  And what do you understand this

22    e-mail to be?

23        A    Them letting me know that a hearing was

24    scheduled for -- to discuss the vaccination issue

25    and a restraining order issue.                   11:53:06
```

Page 111

Lucy Ulikhanov - March 14, 2019

```
1        Q    Okay.  We are done with Exhibit 10.

2             And then this is Exhibit 32, which has

3    already been designated in our discovery.

4             (Exhibit 32 was marked for identification.)

5    BY MR. GRAHAM:

6        Q    So this is your response.

7        A    Right.

8        Q    I'm going to apologize.  There's an e-mail

9    on top from someone named edwart4re.  I don't know

10   who that is.                                      11:53:46

11       A    Uh-huh.  Yes.  He's the one who owes me

12   money on the hard money loan I was discussing with

13   you earlier that found out about my situation and

14   used it against me to get out.

15       Q    So we're not interested in that.  But --   11:53:54

16       A    But he's also the one that came forward

17   and said I never said that I'm scared of you, Lucy.

18   Because the supplemental report said he didn't want

19   to give a comment because he was scared of me, and

20   that was not true.  And he wrote an e-mail saying    11:54:05

21   that he never said such a thing and he's not scared

22   of me.

23       Q    This e-mail says, "Lucy, I have asked you

24   several times and asking again stop sending me

25   e-mails.  I paid $3,500 to your attorney for an      11:54:16
```

Page 112

```
 1      agreement signed by you that you will not sending me
 2      garbage e-mails.  So stop -- "
 3           A    Right.  The attorney he's referring to was
 4      the real estate attorney who formed the contract
 5      saying that I will let go of the $200,000 he owes me      11:54:28
 6      on the Howard project so that I could receive the
 7      full amount of the hard money loan.  That's what
 8      that is.
 9           Q    He's saying that he paid an attorney
10      $3,500 so that you would, quote, "not sending me         11:54:45
11      garbage e-mails."
12           A    No.  He sent the lawyer that money so that
13      we could draft the contract.  In there, he said
14      okay, you're not going to contact me anymore.
15           Q    Okay.                                          11:54:57
16           A    Like, to ask him for money for anything.
17           Q    Anyway, we're not interested in that.
18           A    Yeah.  So I'm going to deal with that
19      matter later because what he did was -- he's not
20      going to get off easy.                                  11:55:09
21           Q    I wish you luck.
22                If you turn to page 2007, on the bottom
23      part you'll see this e-mail, it says on June 3,
24      2016.  Will you confirm that this e-mail is the same
25      body of the e-mail that we saw in Exhibit 10.  And      11:55:25
```

                                                    Page 113

Lucy Ulikhanova - March 14, 2019

```
 1    you can refer back to that if you need to.

 2         A    By the way, sometimes on my using my

 3    iPhone, I would do, like, speech-to-text, and then

 4    cc in all the e-mails would pop up.  So sometimes a

 5    lot of people were included I didn't mean to          11:55:37

 6    include.  So there would be, like, a bunch of cc's.

 7         Q    Ma'am, I only have seven hours with you.

 8         A    Okay.  Sorry.

 9         Q    So I need you to answer the questions that

10    I ask.  So on June 3, 2016, at 2:29 P.M., Stephen     11:55:47

11    Carey wrote, and then it says this.  And then he

12    wrote over at Exhibit 10 --

13         A    Wait.  You said June 3.  I see June 4.

14         Q    On page 2007?

15         A    Okay.  I see now.                           11:56:01

16         Q    That bottom part.  Will you confirm for me

17    that that body of e-mail, that's the same as it is

18    in Exhibit 10; right?

19         A    Correct.

20         Q    So this part above it, that's your          11:56:12

21    response.

22         A    Right.

23         Q    Is it not?

24         A    Yes.  An emotional response.

25         Q    And in this response, you are objecting to  11:56:21
```

                                                    Page 114

Lucy Ulikhanov - March 14, 2019

```
 1    I would have dealt with it when I was ready to put

 2    her in school, but they took her.

 3         Q    What is your understanding of when that

 4    change in the law took place?

 5         A    Sometime -- I was hearing rumors about it        12:09:57

 6    somewhere on Facebook sometime around the time that

 7    I believe before the interviews took place with

 8    the first -- I don't want to say first -- with Maria

 9    Sosa.  So around that time.

10         Q    So, like, January 2016?                          12:10:17

11         A    Before that.  Before that.

12         Q    2015 you heard it took effect?

13         A    I was hearing rumors about it floating

14    around on Facebook.  But I didn't investigate it

15    fully.  There was no need to.  I wasn't ready to put       12:10:35

16    her into school yet.  We were dealing with other

17    issues.

18         Q    Now when did you reunify with ███P.G.███

19         A    Well, it wasn't just a whole

20    reunification.  It was -- they first put her in my         12:10:49

21    care -- they put -- I think it was April 28.  It was

22    return to mom under DCFS supervision, and then

23    November 2017, it was permanent.

24         Q    Can I ask that you not look at your notes.

25         A    I know.  It's just dates.  I can't               12:11:13
```

                                                    Page 126

Lucy Ulikhanian - March 14, 2019

```
 1    remember the dates.
 2         Q    So she reunified with you you said in
 3    November 2017?
 4         A    For permanent.  There was a time where she
 5    was still under DCFS supervision.                    12:11:22
 6         Q    Let me clarify.  When did she come home?
 7         A    Again, she came home in April under DCFS
 8    supervision.
 9         Q    April.  There we go.
10         A    Right.                                      12:11:33
11         Q    When she came home, was she enrolled in
12    school?
13         A    Yes.  They chose the school.
14         Q    And which school was that?
15         A    Jefferson.  I mean -- wait.  Hold on.  She  12:11:41
16    went from McKinley to Fernangeles, then Jefferson
17    was the only option that was open.  The school that
18    I wanted wasn't.  So that's the school they put her
19    in.  But they were still in control.  DCFS was still
20    in control and gave the vaccination paperwork to put  12:12:00
21    her in there.
22         Q    Did she have any vaccinations left -- let
23    me withdraw that.
24              Do you have an understanding that
25    vaccinations are all at once, or are they in a        12:12:10
```

Page 127

Lucy Ulikhanova - March 14, 2019

```
 1    series?

 2         A    You could prefer to have them in a series.

 3    There's different ways you could space them out.

 4    But I believe they spaced them out for her.  She

 5    still had, I think, one or two left.              12:12:23

 6         Q    Yeah.

 7         A    Right.  And then I got the exemption, the

 8    medical exemption.

 9         Q    Could you have gotten the medical

10    exemption before then?                            12:12:32

11         A    No, because she wasn't in my -- I wasn't

12    allowed to.  Because the pediatrician said she has

13    to be in your custody, in your care.  So under the

14    DCFS, you know, in the -- how do you -- I don't know

15    the word.  Under the jurisdiction of the court,    12:12:45

16    juvenile court, I was not allowed to do that.

17         Q    So which pediatrician told you that?

18         A    I can't pronounce the last name.

19         Q    The one in San Diego?

20         A    Yes.                                     12:13:01

21         Q    Zandvliet?

22         A    Yes.

23         Q    We'll call her Dr. Z today.

24         A    Dr. Z.

25         Q    Dr. Z.  So you had consulted with Dr. Z  12:13:06
```

Page 128

Lucy Ulikhanyan - March 14, 2019

```
 1    series?
 2         A    You could prefer to have them in a series.
 3    There's different ways you could space them out.
 4    But I believe they spaced them out for her.  She
 5    still had, I think, one or two left.              12:12:23
 6         Q    Yeah.
 7         A    Right.  And then I got the exemption, the
 8    medical exemption.
 9         Q    Could you have gotten the medical
10    exemption before then?                            12:12:32
11         A    No, because she wasn't in my -- I wasn't
12    allowed to.  Because the pediatrician said she has
13    to be in your custody, in your care.  So under the
14    DCFS, you know, in the -- how do you -- I don't know
15    the word.  Under the jurisdiction of the court,    12:12:45
16    juvenile court, I was not allowed to do that.
17         Q    So which pediatrician told you that?
18         A    I can't pronounce the last name.
19         Q    The one in San Diego?
20         A    Yes.                                     12:13:01
21         Q    Zandvliet?
22         A    Yes.
23         Q    We'll call her Dr. Z today.
24         A    Dr. Z.
25         Q    Dr. Z.  So you had consulted with Dr. Z  12:13:06
```

Page 128

Lucy Ulikhanyan - March 14, 2019

```
 1   before  [P.G.]  came home?

 2       A    I called and asked her some questions

 3   beforehand.

 4       Q    Dr. Hammar was the doctor that  [P.G.]

 5   saw during the time that she was removed from you.    12:13:19

 6       A    That's the doctor that Mary Lou took her

 7   to.

 8       Q    Did you ever suggest to Mary Lou to ask

 9   about getting a medical exemption from Dr. Hammar?

10       A    No, because I didn't talk to her.  Mary      12:13:30

11   Lou -- after I made it clear to Mary Lou that I

12   didn't want vaccinations and all these fights began,

13   I stopped talking to her.  We stopped talking.  They

14   wanted a restraining order.

15       Q    Did you ever suggest to Ms. Helwajian or    12:13:41

16   Mr. Carey that they should ask Dr. Hammar to issue a

17   medical exemption?

18       A    No, because I didn't even know the name of

19   the doctor at that time.  I don't know.  I don't

20   remember.                                             12:13:54

21       Q    Okay.

22       A    I don't remember.  I said she shouldn't be

23   in school.  She's not supposed to be vaccinated.

24   That's my choice.  And my educational rights I

25   believe were violated, too.                           12:14:09
```

Page 129

Lucy Ulikhanyan - March 14, 2019

```
 1        Q    Now, she could have gone to school --

 2        A    As to if I wanted her in school or not.

 3        Q    They could have put her in school and not

 4   had her vaccinated if they had gotten this medical

 5   exemption; is that correct?                              12:14:21

 6        A    I don't think they even knew that.  Like I

 7   said, I had heard about the rumors of the exemption.

 8   I wasn't fully knowledgeable about how it exactly

 9   worked.

10        Q    There's no question.                           12:14:35

11        A    But it wouldn't even matter.  Because they

12   took her away, they took away my chance to deal with

13   that issue when the time would have arrived to deal

14   with it.

15        Q    There's no question pending, ma'am.  I         12:14:42

16   don't want you to speculate about what they knew.

17   But as far as your understanding, they could have

18   put her in school -- even if you didn't want to --

19   but could they have put her in school and not

20   vaccinated her --                                        12:14:59

21        A    Yeah, they could have, but they didn't.

22        Q    Let me get my whole question out.  I

23   understand that the vaccination issue is really

24   important to you.

25        A    Uh-huh.
```

Lucy Ulikhanian - March 14, 2019

```
 1        Q    -- "because she's been sick for so long

 2    and first time in this manner could be from a

 3    possible side effect by a vaccination."

 4        A    Right.

 5        Q    And then Mr. Carey confirmed to you that      12:20:20

 6    ▇P.G.▇   had not been vaccinated; is that correct?

 7        A    Yes, he did.  He spoke to Mary Lou, and

 8    Mary Lou said no.

 9        Q    So would you say that you brought a

10    concern to him that he took care of here, or no?       12:20:37

11        A    He answered back.

12        Q    Yeah.

13        A    Okay.

14        Q    I mean, it seems like you had been

15    expressing some worry and anxiety about the            12:20:49

16    vaccination --

17        A    Yeah.  Initially she was sick.  She got

18    over that.  Then when she started to get the

19    vaccinations, it was just nonstop.  Every time I saw

20    her, she was sick.  She was sick and she developed     12:21:03

21    ticks, all sorts of stuff.

22        Q    Right.  Now, part of your claim is that

23    you couldn't be present at the vaccination; is that

24    correct?

25        A    Yes.  And I was not allowed to be there.      12:21:16
```

Page 135

Lucy Ulikhanyan - March 14, 2019

```
 1        Q    In this e-mail, did you ask please ask
 2   Mary Lou if I can be present at the vaccination?
 3        A    No, because there was nothing mentioned
 4   that she was being vaccinated.  I think I made it
 5   pretty clear that I don't want her vaccinated.  You      12:21:33
 6   would think that they would let me know about when
 7   it would happen.  So if it happened -- I did tell
 8   Maral, I told her several times over the phone I
 9   want to be there, and she told me you can't.
10   There's a conflict because the aunt and you don't        12:21:45
11   get along and the father.
12             And there's medical records that I pulled
13   from Dr. Hammar that showed in her notes that the
14   father was present, yet I was not allowed to be.
15   And I pulled those records recently.  We have them.     12:22:01
16        Q    We have them.  We gave them to you last
17   week.
18             MS. SEROBIAN:  We also have them here
19   today.
20             THE WITNESS:  So he was somehow allowed to     12:22:13
21   be, but I was not allowed to be there.  She kept
22   telling me no, there's a conflict.  You can't be
23   there.
24   BY MR. GRAHAM:
25        Q    Were your visits limited to occurring at      12:22:24
```

Page 136

Lucy Ulikhanov - March 14, 2019

```
1    the DCFS office in Pasadena?

2         A    Yeah.  They were limited to only the DCFS

3    office.

4         Q    Were his?

5         A    No.  They were free with the aunt, which      12:22:28

6    is totally shocking to me.  Especially that he's

7    tested for methamphetamines positive.

8         Q    Did you attach any forms to this e-mail

9    when you sent it to Mr. Carey that you can recall?

10        A    No, I did not to this one.                    12:22:49

11        Q    Any medical documents about family history

12   that you can recall?

13        A    I didn't attach anything like that there.

14        Q    You said here, "My late father has treated

15   many children who had adverse to even nearly deathly   12:23:03

16   reactions to vaccines."

17        A    Yeah.  There's a vaccine court where you

18   can go and pull up stuff.  There's been death

19   related to within hours after being vaccinated.

20   This stuff exists.                                      12:23:19

21        Q    You're saying your late father --

22        A    Yeah.  He told me yes, he had clients who

23   came to him because they were vaccine injured, and

24   he treated them and they got well.

25        Q    When did he pass away?                        12:23:30
```

Page 137

Lucy Ulikhanov - March 14, 2019

```
 1        A     In 2012.

 2        Q     Okay.  Did he ever have a chance to treat

 3   ████████

 4        A     No, because ████████ wasn't -- what do you

 5   mean?  Sorry.  Make it clear.  Treat her in which        12:23:40

 6   way?

 7        Q     Pardon.  I should lay a foundation there.

 8   He is an N.D., you said.

 9        A     Right.

10        Q     So is he the type of practitioner who is      12:23:49

11   treating kids for coughs, a sprained ankle, things

12   like that?

13        A     Kids with brain damage came to him where

14   doctors said they couldn't do anything for the kid

15   with brain damage, and he actually reversed it.          12:24:01

16        Q     Okay.

17        A     People who couldn't give birth.  All sorts

18   of things.  He was so good at what he did that he

19   was in newspapers and magazines and books.

20        Q     Then you saw Dr. Boxstein.  Why wouldn't      12:24:11

21   you take ████████ to your father?

22        A     Because he's a naturopathic doctor.  You

23   still -- and my father wasn't just only homeopathic.

24   He had common sense.  When you need to, you use

25   western medicine.  When you don't need to, you use       12:24:26
```

Page 138

Lucy Ulikhanov - March 14, 2019

```
 1        Q    Okay.  Anybody else?

 2        A    In court, when asked, Brian said something

 3   that he agreed with DCFS.

 4        Q    Okay.  Do you know what -- if you --

 5        A    Again, like, he didn't have any parental       01:46:59

 6   rights, and we were not under jurisdiction at that

 7   time; so it wouldn't even matter.  I had full

 8   custody at that time.

 9        Q    Only if you know, I don't want you to

10   speculate, but do you know what Brian's motivations      01:47:15

11   were for wanting  █ P.G. █  to be vaccinated?

12        A    To gain points with DCFS.  It becomes

13   pretty obvious once you look into the case, his

14   behavior, what happened, and all the things that led

15   up to the end of the case.                               01:47:32

16        Q    And how would supporting the vaccination

17   gain points with DCFS in your opinion?

18        A    Because it would appear that he's

19   complying with what they're asking, what they want.

20        Q    And then Mary Louise Reisch, what do you       01:47:47

21   think her motivation was as far as supporting the

22   vaccination?

23        A    Probably to do with the day care and

24   whatever the father I presume told her to do.

25        Q    Do you think that Ms. Reisch loved             01:48:05
```

Page 154

Lucy Ulikhanov - March 14, 2019

```
1        ██████P.G.██████

2        A    No.

3        Q    No.  That's a big thing to say.

4        A    That is a big thing to say.  Because

5   someone who loves someone wouldn't do the things        01:48:18

6   that she's done.  You understand what I'm saying?

7   She was given an opportunity to speak to my child

8   with the psychologist.  She chose not to.

9        Q    Which psychologist was that?

10       A    Dr. Reinhart.  And she chose not to.  She    01:48:34

11  chose to -- it wasn't that she even wanted -- she

12  didn't want to stay in the middle about it.  She

13  just outright denied and tried everything she could

14  to help her nephew get off the hook.  That's not

15  love.  Not does she care to ask to see my child when   01:48:49

16  we knew each other.  We didn't see each other that

17  often.

18       Q    Now, the vaccination would have enabled

19  ██████P.G.██████ to stay with Mary Lou Reisch; is that

20  correct?                                                01:49:01

21       A    Correct.  Can I add one more thing to

22  that?

23       Q    Sure.

24       A    She was receiving funds for having my

25  daughter there.                                         01:49:09
```

Page 155

Lucy Ulikhanov - March 14, 2019

```
 1        Q    What kind of funds?

 2        A    From DCFS.  They paid -- she was getting,

 3   I don't know, approximately $600 a month to care for

 4   ████ P.G.

 5        Q    DCFS has about 1,000 different programs.        01:49:15

 6   Do you know --

 7        A    I don't know which program, but I know

 8   that that was happening.  I saw some evidence of

 9   that in an e-mail from Maral or something like that.

10        Q    All right.                                      01:49:30

11        A    I asked Maral, too, I remember, about

12   that, and she said yes.  And I remember there was an

13   argument where -- Maral told me there was some

14   argument between Mary Lou and her because DCFS asked

15   for one of the checks to be refunded and Mary Lou     01:49:43

16   made a big deal about it.  And Maral was getting

17   upset with her and calling her, you know, crazy and

18   things of that nature.  I remember that.  That was

19   another motivation.  Money.

20        Q    Okay.  Do you think that it was personal     01:50:05

21   against you on Mary Louise Reisch's part?

22        A    I think that she wanted to help her nephew

23   regardless of whether it hurt me or my daughter.

24        Q    All right.  Let's talk about on the

25   opposite side of consent, let's talk about           01:50:32
```

Lucy Ulikhanyan - March 14, 2019

```
 1      that there was a vaccination that  P.G.  needs to

 2      have that she was supposed to tell  [  ]  -- which is

 3      the name of the foster mom, parent -- to do in order

 4      for  P.G.  to have gone to -- I don't know -- to

 5      the Jefferson school in Glendale.  But it's vague.    01:53:01

 6      My memory is vague about that.

 7              MR. GRAHAM:  Okay.  I just want to put in

 8      the record a note to myself that if this transcript

 9      is ever filed, to redact the name  [  ] because

10      foster parents.  This is a note to me to redact       01:53:19

11      that.

12      BY MR. GRAHAM:

13          Q    Did you ever have conversations with them

14      about  P.G.  's autoimmune history, about the

15      family history?                                       01:53:32

16          A    No.  No, wait.  When?

17          Q    Fair point.

18              MS. SEROBIAN:  Objection.  Vague as to

19      time.

20      BY MR. GRAHAM:                                        01:53:40

21          Q    I'll withdraw that.  During the period

22      that  P.G.  was in their care, did you ever have a

23      conversation with them about your family's

24      autoimmune medical history?

25          A    No.  I don't remember having that            01:53:50
```

Page 159

Lucy Ulikhanova - March 14, 2019

```
 1    conversation.

 2        Q    Okay.

 3        A    We didn't spend too much time.  It was

 4    just she dropped her off, I picked her up from the

 5    car, brought her back.  It was, you know...          01:54:00

 6        Q    Your visits with   P.G.   when they were

 7    in -- when she was in the care of this family, they

 8    were unmonitored at that point; is that correct?

 9        A    Right.  I would pick her up and    P.G.

10    would stay with me I think over the weekend, and     01:54:13

11    then -- yeah.  Then she would go back.

12        Q    Okay.  So I want to talk about Exhibit

13    No. 4.

14            (Exhibit 4 was marked for identification.)

15    BY MR. GRAHAM:

16        Q    So tell me about this.  What do you

17    recognize this as?

18        A    This is Tara Zandvliet, the pediatrician.

19    This is a medical exemption.

20        Q    As far as page 1513, the e-mail that you    01:55:24

21    sent, it looks like kind of a blank e-mail where you

22    just sent the vaccination letter as an attachment.

23    Do you remember sending this e-mail on May 24?

24        A    Without an attachment to it?

25        Q    Oh, no.  The attachment -- let me direct    01:55:51
```

                                             Page 160

Lucy Ulikhanova - March 14, 2019

```
 1      you actually to page 1514.  It was actually the next

 2      page.

 3          A    During this time in May, she was --

 4      [ P.G. ]  was returned to me.

 5          Q    Uh-huh.  So I'm just curious because you        01:56:13

 6      seem to have sent the attachment, but there was

 7      no --

 8          A    But this isn't -- wait.  The date on this

 9      one, May 23.  Okay.

10          Q    I was just curious if you had a                01:56:29

11      recollection of what your purpose was in sending

12      this because usually there's kind of like a Dear

13      Maral, kind of a description of why you're

14      e-mailing.  But there's nothing in this.

15          A    Oh.  Because I had to -- I believe it was      01:56:45

16      because I had to let her know, especially the

17      dentist, if she went to the dentist.  I had to show

18      that I took her to the dentist, the records.

19          Q    Okay.

20          A    So I showed Maral that this says I went to     01:56:56

21      the pediatrician.  And she knew that I was going to

22      be doing that.  I said as soon as [ P.G. ] is in my

23      care, I'm going to have her go to a pediatrician.

24          Q    So this is just you reporting the

25      routine --                                              01:57:13
```

Page 161

Lucy Ulikhanova - March 14, 2019

```
 1          A     Yeah, I'm guessing.  It's just blank here.
 2          Q     Okay.  All right.  So let's move on to
 3     page 1516.  What I did want --
 4          A     And she wasn't against me getting it.  She
 5     knew that I was going to get it.  She wasn't against      01:57:23
 6     me to go and get the exemption.
 7          Q     Page 1516 and 1517, I just want you to
 8     confirm for me that these are the exact same
 9     document.  The only difference is that it appears as
10     though on one of them,   P.G.   has the last name       01:57:38
11     ████, and the other one it looks like ████████
12     But other than that, I just want to make sure that
13     these two documents are the same, there's no
14     differences.
15          A     How weird is the ████████.  Oh.  The         01:57:50
16     doctor made a mistake, but she said to take both
17     letters.
18          Q     But there's no difference between these
19     two.  They're basically the same.
20          A     Same thing.  The doctor made a mistake       01:58:03
21     about the last name.  Or -- yeah.
22          Q     And if you can confirm for me that unlike
23     the previous letters that we talked about, this one
24     does describe   P.G.  's family history of
25     autoimmune conditions; is that correct?               01:58:19
```

Page 162

```
 1        A    Yes.  Now that I see the arthritis thing

 2   here, my father's sister in Armenia who is in

 3   Armenia now, she has issues with that, with her

 4   bones and things like that.  Arthritis, they tell

 5   me.  But they don't speak English very well.          01:58:47

 6        Q    This letter does say that it would be

 7   unsafe to have vaccines for     P.G.     is that

 8   correct?

 9        A    Yes.  The benefits don't -- yeah.  Don't

10   outweigh the risk.  And if I decide to later that I   01:59:01

11   want to vaccinate her, I can later.

12        Q    There's no mention in here of flu

13   vaccines, I noticed; is that correct?

14        A    Right.  Flu vaccines are not mandatory as

15   far as I know.  It would -- it's not limited to --    01:59:24

16   see where it says it's not limited to Hep B.  See,

17   influenza.  It says there influenza.  That's the flu

18   vaccine, I believe.

19        Q    Ah.  Good catch.  And this says the

20   medical exemption for vaccines is permanent; is that  01:59:43

21   right?

22        A    Correct.

23        Q    Okay.

24        A    I think it's there, yeah.

25        Q    And you used this letter to enroll         01:59:51
```

                                                      Page 163

Lucy Ulikhanyan - March 14, 2019

```
1       P.G.    in a public school; is that right?

2            A    To Balboa, yes.

3            Q    So this is a medical exemption for

4       vaccinations; is that correct?

5            A    Yes.  This is what I would have gotten        02:00:04

6       prior had I known that I was ready to take her to

7       school and needed one before DCFS interjected and

8       took my child.

9            Q    Okay.  As of this date, she had already

10      had some vaccinations; is that correct?                02:00:21

11           A    Yeah.  She already had.  But there was I

12      think one or two left behind lingering.

13           Q    Did any vaccinations occur after this date

14      or none?

15           A    None after this.                             02:00:33

16           Q    None.  All right.

17           A    And Maral knew that I was getting this

18      done.

19           Q    Okay.  So she has personal knowledge about

20      this?                                                  02:00:44

21           A    Of course.  We spoke about it over the

22      phone.

23           Q    All right.  Were you referred to Dr. Z by

24      your attorney, Ron Funk?

25                MS. SEROBIAN:  Objection.  Attorney-client   02:00:54
```

Page 164

Lucy Ulikhanov - March 14, 2019

```
 1    privilege.

 2              THE WITNESS:  I'm not answering that.

 3              MS. SEROBIAN:  You don't have to answer.

 4    It's a privileged communication.

 5              MR. GRAHAM:  It's just a fact.  I'm not      02:01:02

 6    asking about the communication.

 7              MS. SEROBIAN:  It's a referral.  It's a

 8    communication.

 9    BY MR. GRAHAM:

10        Q    Is your answer that you're not going to      02:01:12

11    answer?

12        A    Right.  I'm not going to answer that.

13        Q    All right.  Are you friends with Mr. Funk

14    personally outside of his representation with you?

15        A    No.                                          02:01:29

16        Q    Okay.  Are you familiar with his wife?

17        A    No.

18        Q    Okay.  Do you have an understanding as to

19    whether or not his children are vaccinated?

20        A    I don't want to answer that.               02:01:41

21              MS. SEROBIAN:  Objection.  Speculation,

22    lacks foundation.

23    BY MR. GRAHAM:

24        Q    She's not asserting a privilege.  No one

25    is asserting a privilege.                            02:01:53
```

Hahn & Bowersock, A Veritext Company
800.660.3187

Lucy Ulikhanov - March 14, 2019

```
 1            MR. GRAHAM:  You can put in your objection

 2     after I'm done.  I'm not going to interrupt you on

 3     the cross; do not interrupt me on the direct.

 4            MS. SEROBIAN:  Okay.

 5            MR. GRAHAM:  Thank you.                    02:19:33

 6     BY MR. GRAHAM:

 7       Q    So I'm going to start over again.  So you

 8     as a very caring, protective mother who has very

 9     strong feelings about vaccination, your father who

10     you're very close with has imparted you with this    02:19:48

11     wisdom, I imagine that these are very sincere,

12     important issues.  You brought a lawsuit about it;

13     right?  You've been reaching out to these social

14     workers for months and months and months.

15            And then you get this order that comes        02:20:02

16     down and says the child can be vaccinated over all

17     of these objections.  You yourself admitted that you

18     were very emotional in some of these e-mails.

19            So my question is when that order comes

20     out about the immunizations and then there's this    02:20:16

21     restraining order issue that may or may not impact

22     whether or not you can be there for the

23     immunizations, did you ever think hey, I've got this

24     lawyer.  Let me try and use him as a way to be

25     there.  Maybe he has a solution.                     02:20:32
```

                                              Page 178

Lucy Ulikhanyan - March 14, 2019

```
 1        A    First of all, I didn't even know I had a
 2   right to that such thing.  I didn't even know.  And
 3   I already spoke to Maral.  Maral told me no.  And I
 4   already thought that that was it, that was over,
 5   done for.  My attorney knows -- he knows.  I've had        02:20:47
 6   conversations with him that I was very angry about
 7   this, and they were not allowing me to go to the --
 8   to go to the visits.  But again, Maral already told
 9   me that I cannot go.
10        Q    Okay.                                            02:21:08
11        A    There was many things I also told my
12   attorney to talk about, and he didn't bring it up.
13   Also, I was on a limited budget, how much I could
14   call him, how much that's going to cost.
15        Q    Right.                                           02:21:20
16        A    And I had no idea that I had a right to be
17   at the -- like, I actually had a right to be there.
18   I learned about that later, much later.  Recently.
19   I had no idea.
20        Q    All right.  I'm done with that exhibit.         02:21:32
21             Okay.  I'm going to talk about Exhibit 40.
22          (Exhibit 40 was marked for identification.)
23   BY MR. GRAHAM:
24        Q    This is a lot of e-mails; so bear with me.
25   I want to start on page 2018.  And it says on the         02:22:14
```

Page 179

Lucy Ulikhanova - March 14, 2019

```
 1    very bottom on October 4, 2016, at 7:19 P.M., Maral

 2    Helwajian wrote.  And this is an e-mail, and it

 3    says, " P.G.     has a doctor's appointment after

 4    school Thursday for her next set of shots.  I don't

 5    see a visit happening Thursday for this reason."        02:22:40

 6            Do you remember this e-mail, receiving

 7    this e-mail?

 8        A    I don't remember, but okay.  She had

 9    already said to me that I can't be at any of those

10    visits.  So what's the purpose of continuing to ask     02:23:03

11    this.  She already made it clear that I was not

12    allowed to be there.

13        Q    I'm trying to establish whether or not you

14    received the e-mail.

15        A    Yes.  I received the e-mail.  But I know       02:23:13

16    where you're heading with it; so I'm just answering

17    that now.

18        Q    All right.

19        A    It doesn't matter at this point.  She had

20    already made it clear to me -- after the hearing, I     02:23:24

21    called her.  And I was very upset with her.  She

22    told me I can't be at any of these things.

23        Q    Okay.  And then if you look at page 2017,

24    on the very bottom, you'll see it says original

25    message and that it says from Lucy Ulikhanova and       02:23:40
```

Page 180

Lucy Ulikhanov - March 14, 2019

```
 1     have religious beliefs.  But it was not...

 2             But they didn't even do that.  They didn't

 3     even ask the doctor -- they didn't come back to me

 4     and answer me about that, either.

 5         Q    Now, was there a restraining order in          02:28:54

 6     place at this time as of October 5, 2016?

 7             MS. SEROBIAN:  Vague as to what type of

 8     restraining order against whom and protecting whom.

 9     BY MR. GRAHAM:

10         Q    If we go back to Exhibit 70, we see that      02:29:11

11     the temporary restraining order --

12         A    The temporary was on the 6th -- 7 --

13         Q    It expired, it says, 7/11/16, so July 11,

14     2016.  And then your testimony was that the criminal

15     matter, there was -- that was not an issue when you    02:29:28

16     answered questions about it.

17         A    So the temporary was not -- I don't know.

18     You have to figure the math out in that one.  I'm

19     confused.

20         Q    What was the reason why you could not be      02:29:41

21     present at a vaccination in October 2016?

22         A    Because Maral told me that I could not

23     because there was a conflict.

24         Q    Okay.

25         A    She didn't even mention to me that I had a    02:30:04
```

Page 185

Lucy Ulikhanyan - March 14, 2019

```
 1    right.  She didn't even offer for me to invite me to
 2    any of the vaccinations.  That's another thing.
 3         Q    We're talking a lot right now in this late
 4    2016 period, kind of June 2016 period or June 2016
 5    forward period.                                    02:30:29
 6              Let me withdraw that whole thing.  It's
 7    like I've lost the ability to speak English.
 8              We're talking a lot in the second half of
 9    2016 about Defendant Helwajian and the
10    representations that she made to you about being    02:30:40
11    able to be present.  Did you have any of these
12    conversations with Defendant Stephen Carey that you
13    can recall?
14         A    I don't remember.  I don't remember.
15         Q    Okay.  And then on that same e-mail, I see  02:30:51
16    you have a line here, "Please do not vaccinate
17    █P.G.█ any more than what her school requires."
18         A    Right.  Flu shots, those are extras.
19         Q    Okay.
20         A    Because they've already determined they're  02:31:12
21    doing it.  So don't add more to it is what I was
22    asking.
23         Q    Okay.  When █P.G.█ came home, you
24    testified earlier that you enrolled her in public
25    school or you kept her enrolled in the same public   02:31:44
```

                                              Page 186

Lucy Ulikhanova - March 14, 2019

```
 1      school that she was at.

 2           A    No.  She moved cities; so she had to move

 3      to a different district.  Right?  So she had to go

 4      to a different school.  So they put her in

 5      Jefferson.                                          02:32:00

 6           Q    Did you consider homeschooling her at that

 7      point?

 8           A    There was no point at that time.  And

 9      plus, I've already financially spent everything into

10      the court case.  I mean, how was I to homeschool     02:32:09

11      her?  It was a disastrous time.  And she's already

12      been given her vaccines.  What's the point?

13           Q    I just want to discuss -- we'll mark this

14      as Exhibit 72.

15           (Exhibit 72 was marked for identification.)

16      BY MR. GRAHAM:

17           Q    If you could just look at that, this is a

18      letter dated January 27, 2016, page No. Bates

19      COLA 2689, addressed to Lucy Ulikhanova from Maral

20      Helwajian.                                          02:33:12

21           A    Uh-huh.

22           Q    This notes your visitation schedule is

23      Mondays, Wednesdays, Thursdays at 10:00 A.M. to

24      1:00 P.M. at the DCFS office at 532 East Colorado

25      Boulevard.  Does this accurately reflect what your   02:33:26
```

Page 187

```
 1    visitation was as of January 2016?

 2         A    But that's not what was happening.  I

 3    wasn't getting always those three days a week.

 4         Q    Okay.  But this is what your visitation --

 5         A    Was supposed to be, yes.                    02:33:42

 6         Q    And how long was this plan in effect?

 7         A    It was -- it's kind of vague because they

 8    moved out of there, then they went -- we went to the

 9    mall out of the department.  Then from there,

10    [P.G.]  then stayed for weekends, then from the       02:33:58

11    weekends she stayed under the supervision of DCFS

12    and then permanent.  So which -- it wasn't in effect

13    the whole time.  It was in effect until she was

14    doing the weekend visit overnights with me.

15         Q    When were you able to visit outside of the  02:34:17

16    DCFS office if you can recall?

17         A    I cannot remember that.

18         Q    Okay.

19         A    Maybe seven months or eight months into.

20         Q    All right.  We'll discuss Exhibit 12.       02:34:34

21         (Exhibit 12 was marked for identification.)

22              THE WITNESS:  I'm sorry.  Are we going

23    through all of those?

24    BY MR. GRAHAM:

25         Q    All of what?  There's, like, three left.    02:35:01
```

Page 188

Lucy Ulikhanov - March 14, 2019

```
 1        A    Okay.  I just wanted to know.

 2             MS. SEROBIAN:  Do you need a break?

 3             THE WITNESS:  If it's just three left.

 4   BY MR. GRAHAM:

 5        Q    And if you can confirm for me that this is    02:35:12

 6   an e-mail you sent to Maral on March 17, 2017.

 7        A    Yes.

 8        Q    Okay.  And this is confirming that you

 9   tried to put    P.G.    in a public school called Mark

10   Keppel but were unsuccessful; is that right?            02:35:40

11        A    Yeah.  They were full.  That was my first

12   choice.  My second choice was Balboa.

13        Q    They had asked for immunization paperwork

14   at Balboa; is that correct?

15        A    Yes.  They did -- but Balboa didn't --       02:35:55

16   Jefferson.  She ended up at Jefferson.  And

17   Jefferson asked for that.

18        Q    Would you have been able to enroll

19    P.G.    at that school if you didn't have the

20   exemption letter that you got from Dr. Z?              02:36:10

21        A    No, no.  She didn't -- I didn't get that

22   letter, I don't think.  That exemption letter, the

23   medical exemption letter from Dr. Z was not in

24   effect at that time while she was in Jefferson.  So

25   it was when Balboa had space, then, for the first      02:36:25
```

Page 189

Lucy Ulikhanov - March 14, 2019

```
 1    grade.  So she finished off elementary there,

 2    Jefferson.  And then first grade, Balboa, then I

 3    used the medical exemption.

 4         Q    Okay.  Let's talk about the pediatricians

 5    that you saw, that  [P.G.]  saw after she came home.    02:36:47

 6    Did you go back to Dr. Boxstein?

 7         A    No.

 8         Q    Okay.  Why not?

 9         A    Because my medical -- the medical

10    insurance for  [P.G.]  cut off because the father        02:37:01

11    chose not to sign the paperwork that was needed from

12    his work or the medical insurance to continue the

13    insurance for my daughter.  So that cut off.  And I

14    was in limbo trying to find a different

15    pediatrician.                                            02:37:23

16              And it wasn't that I didn't -- and there

17    was another factor, too.  It was also after the

18    court ruling that they found Brian guilty of the

19    sexual abuse, they believed that it happened, that I

20    felt as  [P.G.]  was getting more mature, older,         02:37:38

21    that it might feel weird for her to have a physical.

22    Because, you know, he would do a physical and check

23    everything.  So a male doing that --

24         Q    Ah, I see.

25         A    -- a trauma thing.  But I liked him very       02:37:49
```

                                                     Page 190

Lucy Ulikhanov - March 14, 2019

```
 1    recollection.

 2         A    Right.

 3         Q    And you do not remember whether -- and

 4    you --

 5         A    I don't remember the judge ever going        03:57:31

 6    through this stuff and saying here I have from the

 7    mother a personal, you know, refusal.  I didn't hear

 8    any of that.

 9         Q    Do you remember whether in a report for

10    that hearing -- presumably there was a report for      03:57:46

11    that hearing, the June hearing -- whether any of the

12    defendant social workers, being Carey and Helwajian,

13    whether they included these forms as attachments to

14    that report?

15         A    I don't remember anything like that being    03:58:05

16    attached.

17         Q    Okay.  All right.  Now, also, still on

18    Exhibit 7 of the plaintiffs, here the reasoning that

19    Stephen Carey is giving to -- for the hearing on

20    June 9 to get court order to immunize your child        03:58:29

21    against your wishes is so she can attend school.

22         A    Uh-huh.

23         Q    Is that --

24         A    That's what it says.

25         Q    Is that what it says?  Okay.  Now, did        03:58:41
```

Hahn & Bowersock, A Veritext Company
800.660.3187

Lucy Ulikhanov - March 14, 2019

```
 1     Stephen Carey or Maral Helwajian ever ask you

 2     whether you permit your child to be enrolled in a

 3     school setting?

 4         A    Did they ask me --

 5         Q    For your permission.                           03:58:55

 6         A    No.  They never asked.  Not even one time.

 7     Nothing.

 8         Q    Were you put under the impression that you

 9     did not have a right to make educational decisions

10     for your child?                                         03:59:07

11         A    The impression that I didn't have a right,

12     that's what it felt like, yes.

13         Q    Did you feel like you could tell them that

14     you refuse your child to go to school and therefore

15     no immunization was needed?  Did you feel you could    03:59:17

16     do that?

17         A    I remember having a discussion with Maral

18     saying that I decide if I want my daughter in

19     kindergarten.  I'm not ready to put her in

20     kindergarten.                                           03:59:33

21         Q    And what was the answer Maral gave you

22     when you said that?

23         A    She didn't answer me back.

24         Q    Were you just informed that your child was

25     going to go to school, the decision was made already
```

Page 242

Lucy Ulikhanov - March 14, 2019

```
 1    and she needs to be immunized?
 2         A    Right.  Mary Lou wants to put her in
 3    school, and...
 4         Q    And that was the reason used to get an
 5    order to immunize her?  Was that the reason given to    03:59:51
 6    you?
 7         A    I don't know what -- yeah, I guess it was
 8    about school.  They used school.  But I don't know
 9    who --
10         Q    I'm not asking who.  I'm asking whether    04:00:02
11    that was the reason given to you --
12         A    That was the reason.
13         Q    -- to get a court order to immunize her.
14         A    Yes.  It was school.
15         Q    But none of the defendants here, Maral    04:00:09
16    Helwajian or Stephen Carey, asked you for permission
17    to enroll your child in school.
18         A    Right.  They never did.
19         Q    Did you ever object to your child being
20    enrolled in kindergarten since she was not enrolled    04:00:23
21    when she was under your care?
22         A    I told that to Maral in the phone call.
23         Q    And what was the answer again?
24         A    She didn't respond.  She just changed the
25    subject talking about Mary Lou and something else    04:00:35
```

                                               Page 243

Lucy Ulikhanov - March 14, 2019

```
 1    and the father and Mary Lou's day care and I don't

 2    know.  Mary Lou wants her in school.

 3         Q    So the end result was that over your

 4    objection for enrollment in kindergarten and

 5    immunization of your child, your child was enrolled      04:00:51

 6    in school and immunized for that purpose; is that

 7    correct?

 8         A    Yes.

 9         Q    Moving on to plaintiff's Exhibit 9.

10         (Exhibit 9 was marked for identification.)

11    BY MS. SEROBIAN:

12         Q    Oh, yes.  Going back to your wish for your

13    child not to be enrolled in school, after that

14    June 9 or overlap 10 hearing -- and I'm going to

15    give Exhibit 9 for now, but the question is a           04:01:26

16    followup after Exhibit 7.

17              At the June 9 or the later June 10

18    hearing -- at the June 9 or the later June 10

19    hearing for which you were noticed and you were

20    present from what I understand, do you remember        04:01:43

21    county counsel or the social worker discussing the

22    fact that you did not want your child enrolled in

23    school at all?

24         A    No, they did not.  That I didn't want --

25    they didn't discuss that.                              04:01:57
```

Page 244

Lucy Ulikhanov - March 14, 2019

```
 1    document --

 2         A    This document says it, too.

 3         Q    Yeah.  And this is before the hearing;

 4    correct?

 5         A    Yes.                                    04:08:15

 6         Q    This e-mail is done before the hearing.

 7         A    This is before the -- I've also verbally

 8    discussed this with Stephen Carey in an interview

 9    that he knows that my father was renowned and he's

10    seen paperwork.  I brought some paperwork.        04:08:26

11         Q    And in this third paragraph, you make

12    another point that's important.  You say, quote,

13    "and is not in jurisdiction."  What does that mean,

14    "is not in jurisdiction"?

15         A    Under the jurisdiction of the court.  My  04:08:37

16    attorney kept telling me your daughter is still not

17    under the jurisdiction.

18         Q    What does that mean to you?  What is the

19    understanding of that to you?

20         A    Well, that I still have my parental     04:08:48

21    rights, I would assume.  They're not taken away.

22         Q    Uh-huh.  Now, before the June 9, 2016,

23    hearing -- or actually, let me say it in another

24    way, strike that and say it in another way.

25              Before your child was removed from your  04:09:08
```

Page 250

Lucy Ulikhanian - March 14, 2019

```
 1      physical custody in January of 2016, who was the
 2      legal and physical custodian of your child?
 3           A    I.
 4           Q    What type of custody did you have over
 5      your child?  Was that shared?  Sole?  What did you        04:09:23
 6      have?
 7           A    Sole physical and legal.
 8           Q    So you had sole physical and sole legal
 9      custody.
10           A    Correct.                                        04:09:31
11           Q    Were you the decision-maker over her
12      medical, educational, health care, and other similar
13      rights?
14           A    Yes.
15           Q    Did her father, Brian Garcia, have any say      04:09:39
16      as to whether your mutual child was going to be
17      immunized, not immunized at this point in time?
18           A    No.  He had no rights.
19           Q    Did her father, Brian Garcia, have any
20      legal right to enroll or not enroll her in a school?      04:10:01
21           A    No.
22           Q    Did her father, Brian Garcia, have any
23      legal right at the time to object to your legal
24      decisions over your child's medical, educational,
25      health care, and other decisions?                        04:10:21
```

                                                     Page 251

Lucy Ulikhanyan - March 14, 2019

```
 1        A    No.

 2        Q    Now, so when you reference in this e-mail

 3    "is not in jurisdiction," what are you trying to

 4    tell defendants here, Carey and Helwajian?

 5        A    What I'm trying to tell -- as best as I        04:10:35

 6    can recommunicate what my attorney told me, Ronald

 7    Funk and Sherwin Amazan, is that my rights as sole

 8    custody, physical and legal, are not taken away.

 9    That they haven't determined and taken her into

10    jurisdiction.  So it wasn't decided yet.               04:10:58

11             As a matter of fact, there were two other

12    hearings that my attorney went to, and the judge

13    kept asking DCFS you have no evidence, why did you

14    take this child.  They asked to amend the petition.

15    Same thing after the amended petition.  Again, the    04:11:11

16    judge said I still don't see any evidence of why you

17    removed this child.  And they asked him in a

18    petition again.  So this just kept prolonging until

19    we gave in because I thought I was never going to

20    see my kid.

21             But no.  I thought I had my rights before

22    jurisdiction.

23        Q    When you say "before jurisdiction," you

24    mean jurisdictional hearing, to clarify for the

25    record?                                                04:11:36
```

Page 252

Lucy Ulikhanov - March 14, 2019

```
 1     positions -- were not forwarded to the 730 evaluator

 2     by Carey and Helwajian; is that correct?

 3          A    Correct.

 4          Q    Uh-huh.  Would these things then be --

 5     would fall under the category of false presentation     04:27:24

 6     of evidence or omission of material evidence for

 7     you?

 8          A    I believe so.  I believe so.

 9          Q    Uh-huh.  Now, moving on to --

10          A    Can I please ask for a break?               04:27:41

11          Q    Yeah.  Sure.

12               THE VIDEOGRAPHER:  Off the record?

13               MS. SEROBIAN:  Off the record.

14               THE VIDEOGRAPHER:  Off the record at 4:27.

15               (A recess was taken from 4:28 p.m. until    04:28:51

16               4:34 p.m.)

17               THE VIDEOGRAPHER:  Okay.  On the record at

18     4:34.

19               MS. SEROBIAN:  Now, this is plaintiff's

20     11, please.                                           04:35:08

21          (Exhibit 11 was marked for identification.)

22     BY MS. SEROBIAN:

23          Q    Can you please tell us what is this

24     document I referenced to plaintiff's 11.

25          A    This is a medical exemption from           04:35:20
```

Page 267

Lucy Ulikhanova - March 14, 2019

```
 1    pediatrician for [ P.G. ] to be permanently exempt

 2    from any vaccinations.

 3         Q    And when did you obtain this?

 4         A    May 23, 2017.

 5         Q    And was this sufficient for you to get an      04:35:39

 6    exemption from any further immunizations of your

 7    child while she was still enrolled in a public

 8    school?

 9         A    Yes.

10         Q    Is she now enrolled in a public school?       04:35:52

11         A    Yes.

12         Q    Uh-huh.  And does the public school

13    require any further documentation before enrolling

14    her, or was this sufficient?

15         A    This was sufficient.                          04:36:06

16         Q    Are they going to ask you for an annual

17    check for another medical exemption, or this is one

18    that will cover her for the years to come?

19         A    Because it says that it's permanent, it

20    covers her for the years to come.                       04:36:21

21         Q    Do you know the school policy whether

22    every year they're going to ask you for a new

23    document, or once they have this in their file, this

24    is going to be sufficient?

25         A    I don't know, but from what I've read in      04:36:30
```

Page 268

Lucy Ulikhanyan - March 14, 2019

```
 1    our vaccine groups online, that's only required for

 2    those people who only get one-year exemptions that

 3    they have to annually -- there's some rumor going

 4    around that the law is going to require only yearly.

 5        Q    But at this point in time, did the          04:36:49

 6    school -- not the groups, the school itself, the

 7    administration of the school in which your child is

 8    enrolled -- did they tell you you're going to need

 9    more of this later to come, or is this sufficient

10    for them?                                            04:37:03

11        A    No.  They said this is sufficient.

12        Q    Okay.  Wonderful.

13             Moving on to plaintiff's Exhibit 13.

14        (Exhibit 13 was marked for identification.)

15    BY MS. SEROBIAN:

16        Q    Can you tell us the content of the e-mail,

17    the parties involved, and the date of the e-mail.

18        A    It's from Maral.  Subject is medical

19    information, and it's on March 23, 2017.

20        Q    And it's to who?                            04:37:49

21        A    It's to me.

22        Q    What does the e-mail say?

23        A    "This is all the medical info I have on

24    [P.G.]   Hope the document helps."

25        Q    Were you seeking certain documents from     04:38:01
```

Page 269

Lucy Ulikhanova - March 14, 2019

```
 1        A    He was a real estate investor.  And he had

 2   LLCs attached to the shopping centers that he owned.

 3        Q    If we wanted to get documents to support

 4   the loss-of-income claim from that, is there a

 5   company we could ask for records from, or you said      05:48:46

 6   there's LLCs?

 7        A    I can give you the document from the

 8   probate case.

 9        Q    There we go.

10        A    The administrators that were on the case.     05:48:56

11        Q    The inhalers that you have been

12   prescribed -- I'm sorry.  You said you were on an

13   inhaler when you were a child; is that right?

14        A    Yeah.  Because of asthma.

15        Q    Were those prescription inhalers or          05:49:11

16   over-the-counter?

17        A    Correct.  Prescription.

18        Q    Prescription.  Did the doctor who

19   prescribed those tell you that you needed them

20   because of vaccination-related issue?                   05:49:16

21        A    How would I remember that?  I don't think

22   many doctors -- many doctors are not knowledgeable

23   about this stuff.

24        Q    I'm just going to run some sentences by

25   you, and I just want you to tell me if you believe      05:49:29
```

                                                Page 323

Lucy Ulikhanov - March 14, 2019

```
 1     that they are true or false.

 2          Mother does not consent to immunization as

 3     she says it is due to religious reasons.  Was this

 4     true as of February 2016?

 5          A    It's partly true.  Because there's more to      05:49:46

 6     that.  I've said more.  So they cherry-pick what

 7     they want.

 8          Q    So you're saying it's true but it might

 9     not be fully --

10          A    Fully true.                                     05:49:56

11          Q    There we go.  And as of February 2016, was

12     it true to say mother refuses school until age 6?

13          A    Partly true.  I don't remember saying

14     age 6.  I just said I refuse school.

15               MS. SEROBIAN:  Misstates testimony.            05:50:15

16               THE WITNESS:  It was partly true.  I don't

17     remember giving an age.  I do remember saying I

18     didn't want her in school.

19     BY MR. GRAHAM:

20          Q    Did you say you didn't want her in             05:50:25

21     kindergarten because you wanted to have her

22     homeschooled?

23          A    I said -- to be clear, the homeschooling

24     is only an option if that rumor that I heard of that

25     this mandated vaccination for the public school, if    05:50:37
```

Page 324

```
 1      that was to happen, then that was going to be my

 2      option was going to be homeschool.  So I had

 3      pre-prepared for such a thing.

 4          Q    You wanted the homeschool option as kind

 5      of a backstop if the personal exemption wasn't going    05:50:53

 6      to be enough?

 7          A    Correct.  So I prepared for that a long

 8      time ago.

 9          Q    Okay.

10          A    And I didn't give an age, as well.  I        05:51:02

11      don't remember -- not I don't remember.  I didn't

12      tell them an age.  I just said no.

13          Q    I'm just asking you if things are true or

14      false, not if you actually said them.

15          A    Okay.

16          Q    The mother refuses to allow   P.G.   to be

17      immunized.  Would that have been true as of

18      June 2016?

19          A    Yes.  True then, true before, true after.

20          Q    And then the mother has sole legal custody    05:51:26

21      from family law court.  Would that have been true as

22      of June 2016?

23          A    Yes, true.

24          Q    And would it have been true as of

25      June 2016, the father cannot give consent?             05:51:35
```

                                              Page 325

Lucy Ulikhanov - March 14, 2019

```
 1        A     True.

 2        Q     That's all I've got.

 3        A     Okay.

 4              MR. GRAHAM:  We can do a stipulation with

 5     the transcript.  The original --                    05:51:54

 6              MS. SEROBIAN:  You can go if you need to

 7     go.

 8              THE WITNESS:  I have to go.

 9              MR. GRAHAM:  Stipulation that the court

10     reporter does not have to keep the original; that    05:52:06

11     the original will go to you.  You will keep the

12     original.  Or --

13              Can we go off the record.

14              THE VIDEOGRAPHER:  Off the record at 5:52.

15              (Discussion off the record.)                05:52:23

16              THE VIDEOGRAPHER:  On the record, 5:53.

17              MR. GRAHAM:  So you will get sent the

18     original transcript to make any corrections, and

19     then she will sign and then send that to us.  And

20     then we will keep the original, and then you will    05:53:34

21     get a certified copy if you want to order it.

22              MS. SEROBIAN:  Okay.

23              MR. GRAHAM:  So I propose the following

24     stipulation:  That once the transcript has been

25     prepared, the court reporter be relieved of any      05:53:45
```

Page 326

Lucy Ulikhanyan - March 14, 2019

```
 1                Certification of Court Reporter
 2                         Federal Jurat
 3
 4          I, the undersigned, Certified Shorthand Reporter
 5   of the State of California, do hereby certify:
 6          That the foregoing proceedings were taken before
 7   me at the time and place herein set forth; that any
 8   witnesses in the foregoing proceedings, prior to
 9   testifying, were placed under oath; that a verbatim
10   record of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under my
12   direction; further, that the foregoing is an accurate
13   transcription thereof.
14          That before completion of the deposition, a
15   review of the transcript [X] was [ ] was not
16   offered/requested.
17          I further certify that I am neither financially
18   interested in the action nor a relative or employee of
19   any attorney of any of the parties.
20          IN WITNESS WHEREOF I have hereunto subscribed my
21   name on March 29, 2019.
22
23
24
             Elizabeth Schmidt
25           CSR No. 13598
```

Page 330

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.