Liana Serobian, Esq. (SBN 235466)
Serobian Law, Inc.
100 N. Brand Blvd., Suite 600
Glendale, CA 91203
(818) 539-2249
L.Serobian@yahoo.com

Attorneys for Plaintiffs, Ulikhanova and Minor P.G.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCY ULIKHANOVA, *ET AL.*,, <br><br>         Plaintiffs, <br><br> vs. <br><br> COUNTY OF LOS ANGELES, ET AL., <br><br>         Defendant | **Case No. 2:17-CV-9193-FMO-E** <br> **Hon. Fernando M. Olguin (Dist. Judge)** <br> **Hon. Charles F. Eick (Mag. Judge)** <br><br> PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT; <br> JOINT MEMORANDUM OF POINTS AND AUTHORITIES <br><br> DATE: JUNE 20, 2019 <br> TIME: 9:30 A.M. <br> LOCATION: COURTROOM 6D <br><br> COMPLAINT FILED: DECEMBER 23, 2017 <br> FAC FILED: APRIL 19, 2018 <br> SAC FILED: MAY 18, 2018 <br> TAC FILED: JULY 2, 2018 |

PLEASE TAKE NOTICE:

On June 20, 2019, at 9:30 a.m., or as soon thereafter as the matter may be heard before the Hon. Fernando M. Olguin, District Judge for the United States District Court for the Central District of California, in Courtroom 6D of the First Street Courthouse, located at 350 W. 1st Street, Los Angeles, California 90012, Plaintiffs Lucy Ulikhanova and P.G. ("Plaintiffs") will move the Court for an order granting summary judgment—or, in the alternative, partial summary judgment—under Federal Rule of Civil Procedure 56, on the following issues:

1.      Both Plaintiff Lucy Ulikhanova nor Plaintiff P.G. have an actionable liberty interest under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

2.      Both Defendant Carey and Defendant Helwajian committed acts that violated such liberty interest.

3.      Neither Defendants Carey or Defendant Helwajian are entitled to summary judgment on the basis of qualified immunity.

This motion is made following the conference of counsel pursuant to Local Rule 7-3 and the Court's Order Re: Summary Judgment Motions (ECF No. 19), which occurred on April 18, 2019, at the offices of Peterson Bradford Burkwitz, LLP, counsel for Defendants.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT
PAGE | 2

This motion is based upon this notice, the accompanying memorandum of points and authorities, the documents and declarations set forth in the evidentiary appendix, the joint appendix of undisputed and disputed facts, the pleadings and papers on file in the present action, and upon such other evidence or argument as may be presented to the Court at the time of the hearing on this motion.

DATED:  May 23, 2019

By:     /s/ Liana Serobian

Counsel for the Plaintiffs

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................... 4

TABLE OF AUTHORITIES ........................................... 5

MEMORANDUM OF POINTS AND AUTHORITIES.................. 6

I.      INTRODUCTION TO THE ISSUES BEFORE THIS COURT ON
        PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT AS TO
        THEIR SEVENTH CAUSE OF ACTION WITH REGARD TO
        UNAUTHORIZED MEDICAL PROCEDURES IN MOTHER'S
        ABSENCE THAT SURVIVED DISMISSAL, PER DOCKET
        NUMBER 71.................................................................6
II.     RELEVANT BACKGROUND FACTS......................8.
III.    THE APPLICABLE FEDERAL AND STATE RULES OF LAW…15
IV.     STANDARD OF REVIEW.......................................................20
V.      ARGUMENT......................................................21
        a.  The Constitutional Protections of *Wallis* and *Mann* Apply Here To
            The 18 Chemical Permanent Injections Into The Minor Over Four
            Appointments In Six Months, When She Was Still Not Of
            Required Age To Start School. Mother Did Not Approve The
            Early Enrollment Of Her Child In School. ....................................21
        b.  The Order For Vaccination Was Obtained By Judicial Deception.
            The Vaccination Still Violated 14th Amendment Due Process
            Rights of Plaintiffs....................................24
        c.  Defendant Helwajian Deliberately Denied Mother Access and
            Admission To The Minor's Medical Appointments For No Good
            Cause In Violation of the 14th Amendment of Both Plaintiffs…29
        d.  This Court Should Follow The Ninth Circuit In *Mann v. City of
            San Diego* To Reject The Shock The Conscious Test, Where as
            There, Here There Is Clear Evidence Of Failure To Train The
            Defendants By The County. . ....................................30
        e.  Defendants Are Not Shielded By The Protections Of Qualified
            Immunity. . ....................................31
        DEFENDANTS' OPPOSITION ATTACHED SEPARATELY . 32
        CONCLUSION.............................................................................. 33

PROOF OF SERVICE.................................................................34

# TABLE OF AUTHORITIES

**US CONSTITUTION**

Fourteenth Amendment.................................................pass

**CASES**

Ashcroft v. Iqbal, 556 U.S. 662.................................................15
Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1066 (9th Cir. 2016) ........19
Cruzan v. Director, MO Health Dept. (1990) 497 U.S. 261.......................20
Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009) ........15
Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1092–93 (9th Cir. 2013) .......19
Greene v. Camreta, 588 F.3d 1011, 1036-1037 (9th Cir. 2009) ........pass
Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) ........19
Hardwick v. County of Orange, 844 F.3d 1112, 1118-20 (9th Cir. 2017) ...20
Hope v. Pelzer, 536 U.S. 730, 739 (2002) ........19
In re Angelia P. (1981) 28 Cal.3d 908........17, 24
In re Isayah C. (2004) 118 Cal.App.4th 684........17
Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 27 (1905) ........7
Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002) ........15
Kougasian v. TMSL, 359 F.3d 1136, 1140 (9th Cir. 2004) ........18
Malley v. Briggs, 475 U.S. 335, 341 (1986) ........19
Mann v. Cty. of San Diego, 907 F.3d 1154 (9th Cir. 2018) ........pass
Mueller v. Auker, 576 F.3d 979, 992 (9th Cir. 2009) ........19-20, 32-33
Parkes v. County of San Diego, 345 F. Supp. 2d 1071 (S.D. Cal. 2004) . 19
Reynolds v. County of San Diego, 224 F. Supp. 3d 1034, 1063-64 (S.D. Cal. 2016) ........19
Santosky v. Kramer (1982) 455 U.S. 745........17, 24
Saucier v. Katz, 533 U.S. 194, 206 (2001) ........19
Simmons v. Navajo County, Ariz., 609 F.3d 1011 (9th Cir. 2010) ....15
Swartwood v. Ct of San Diego, 84 F. Supp. 3d 1093 (S. D. Cal. 2014) 16
Wallis v. Spencer, 202 F.3d 1126, 1136 (9th Cir. 2000) ........pass
Zucht v. King (1922) 260 U.S. 174........7

**STATUTES**

42 U.S.C. § 1983........7, 15, 19
Cal. Health & Safety Code § 120335........pass
Cal. Welf. & Inst. Code § 319........18
Cal. Welf. & Inst. Code § 361........17, 25
Cal. Welf. & Inst. Code § 369(a) ........17

## MEMORANDUM OF POINTS AND AUTHORITIES

I.    **INTRODUCTION TO THE ISSUES BEFORE THIS COURT ON PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT AS TO THEIR SEVENTH CAUSE OF ACTION WITH REGARD TO UNAUTHORIZED MEDICAL PROCEDURES IN MOTHER'S ABSENCE THAT SURVIVED DISMISSAL, PER DOCKET NUMBER 71.**

In its Order on the Defendants' Motions to Dismiss, docket number 71, this Court wrote, as quoted verbatim below in relevant part the issues pending the instant Motion for Summary Judgement by the Plaintiffs, and separately by Defendants.

Plaintiffs' unauthorized medical procedure claim stems from their allegation that after P.G. was removed from Ulikhanova's custody, defendants vaccinated P.G. over Ulikhanova's objections. (See Dkt. 39, TAC at ¶ 91). Plaintiffs allege that Carey and Helwajian arranged for P.G. to be vaccinated in June 2016, when P.G. was five years old. (See id. at ¶ 92). Plaintiffs claim that their First, Fourth and Fourteenth Amendment rights were violated by the vaccination. (See id. at ¶¶ 179-98).

¶¶

Plaintiffs also claim their Fourteenth Amendment substantive due process rights were violated by the vaccination. (See Dkt. 39, TAC at ¶¶ 179-88). The Fourteenth Amendment embodies a constitutional right for parents and children "to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000). This "right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Id*. at 1141. Additionally, it encompasses the right of parents to be with their children during medical procedures. See *id*. at 1142 ("Moreover, parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention[.]"); (see also Dkt. 39, TAC at ¶ 92) (alleging that Ulikhanova was

not permitted to be present during P.G.'s vaccination, since defendants failed to inform her of when the vaccination would occur).

Recently, the Ninth Circuit addressed a situation similar to the one at issue in this case. In *Mann v. Cty. of San Diego*, 907 F.3d 1154 (9th Cir. 2018), social workers removed four children from their family home because of suspicions of child abuse. *Id*. at 1156. After removal, the children were subjected to a battery of invasive medical examinations without their parents' approval, and without the parents having an opportunity to be present. See *id*. at 1158. The children were eventually returned to their parents, who filed a § 1983 action against the county alleging that the examinations violated their and their children's Fourth and Fourteenth Amendment rights. See *id*. at 1158-59. In concluding that the parents had asserted a viable Fourteenth Amendment substantive due process claim, see id. at 1160-64, the Ninth Circuit observed that "parental consent is critical in medical procedures involving children because children rely on parents or other surrogates to provide informed permission for medical procedures that are essential for their care." *Id*. at 1162 (quotation marks omitted).[1]

Plaintiffs' claim that P.G.'s vaccination violated their Fourteenth Amendment rights therefore sets forth a viable claim for relief. The TAC alleges that P.G. would not have had to attend school until September 2017. (See Dkt. 39, TAC at ¶ 181). Thus, the court is unpersuaded by defendants' argument that they needed to vaccinate P.G. in June 2016 in order to put her in public school. (See *id*.) (alleging that the vaccination occurred in or around June 2016); see also Cal. Health & Safety Code § 120335 (requiring vaccination of public school students).[2]

---

[1] "The Ninth Circuit also held that a court should not "apply a shocks the conscience standard" for the substantive due process challenge at issue there. Mann, 907 F.3d at 1163 (quotation marks omitted)."

[2] Plaintiffs challenge here the involuntary vaccination of the Minor who was not school aged. Plaintiffs do not challenge the laws that are established mandating vaccination of school-aged children. These have been upheld by various courts as promoting a compelling governmental interest of ensuring health and safety by preventing the spread of contagious diseases. (*Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 27 (1905) [upheld state mandatory vaccination law under the Fourteenth Amendment]; *Zucht v. King* (1922) 260 U.S. 174, 176, 43 S.Ct. 24, 25, 67 L.Ed. 194, 198 [ordinances mandating certificate of vaccination prior to allowing school attendance did not violate substantive due process rights because it was "settled that it is within the police power of a state to provide for compulsory vaccination"].)

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT
PAGE | 7

(See Dkt. 71, pp. 11-13).

## II.    RELEVANT BACKGROUND FACTS

On November 18, 2007, Plaintiff Ulikhanova and non-party Brian G. ("Brian") were married. In November 2010, the couple had a daughter, Minor Plaintiff P.G.  The couple separated after Brian physically attacked Ulikhanova. They shared legal and physical custody of P.G. until it was determined by the Family Court sometime in 2014 that Brian sexually abused P.G. and granted Ulikhanova sole legal and physical custody of P.G. and monitored visits to Brian. (PJA, Ex. 4, p. 73, Ex. 14, p. 178, 189, 190-192.)

On October 4, 2015, an anonymous caller made a child neglect referral to the Department of Children and Family Services (DCFS) regarding Plaintiff Ulikhanova, alleging that while she was not a threat to herself or others, nor needed an involuntary hospitalization, she should be assessed for mental health issues and the impact on her child P.G. (PJA Ex 2, p. 32, Ex. 4, p. 55.)  The referral was substantiated by DCFS and P.G. removed from Ulikhanova by way of a warrant for removal in January 2016 on the ground that mother was making statements that did not make sense, kept P.G. from father, and made false accusations of sexual abuse of P.G. against father. (PJA, Ex. 1, pp. 12-30.) That application for the warrant did not disclose that per the existing Family Law court orders, Ulikhanova was the sole legal and physical custodian of P.G. and Brian had monitored visits due to the finding that he sexually abused P.G. (PJA, Ex. 1, pp. 12-30.)

On January 19, 2016, DCFS filed a dependency petition with the juvenile court under Welfare and Institutions Code section 300, subdivision (b) alleging that P.G.'s father, Brian G., had an unresolved substance abuse problem

and criminal history of driving under the influence of drugs/alcohol and mother had mental and emotional problems making it difficult to provide regular care for P.G. (PJA, Ex. 3, 46-48.) DCFS filed a detention report with the juvenile court requesting to detain P.G. from her parents. (PJA, Ex. 4, p. 82.) DCFS did not attach to this detention report the existing Family Court orders governing the family. (PJA, Ex. 4, p. 84.)

On January 19, 2016, the juvenile court found that prima facie evidence supported the emergency temporary detention of P.G. from parents and continued the matter for another detention hearing the next day. (PJA, Ex. 5, pp. 109-110.) Defendant Carey was assigned as the investigating social worker and Defendant Helwajian the servicing social worker for P.G.'s case.

On January 20, 2016, the juvenile court maintained its temporary detention of P.G. and set the matter for a hearing on the petition. (PJA, Ex. 6, 112-115.) Mother was present and represented by counsel, who complained that none of the DCFS reports to the court reflected the previous Family Law orders and findings with respect to father sexually abusing P.G. (PJA, Ex. 10, 143-144.) The court ordered DCFS to provide to the court the family court's orders governing the family and the visitation orders made by the family court in case number BD582295. (Id. at p. 147.) The court stated that if indeed findings as to sexual abuse were made in Family Court, the court should be made aware as well as the Department should file an appropriate amended petition if needed. (PJA, Ex. 10, 147.)

In several emails that followed, Plaintiff Ulikhanova verbalized her objection to P.G. being vaccinated for several reasons from February 12, 2016 to June 2016: due to the family's autoimmune disease history, the fact that P.G. was

not of school age, and her own negative side effects of asthma and other conditions following being immunized, and the safety risks associated. On February 12, 2016, mother attached three documents in her email to Defendant Helwajian that allowed her to previously enroll P.G. to a licensed daycare, St. Marks, without being immunized: Refusal to Vaccinate signed by P.G.'s pediatrician Dr. Boxstein dated November 13, 2012, and Personal Beliefs Exemption to Required Immunization and St. Mark's Physician's Report signed by Dr. Boxstein, both dated September 25, 2014. (PJA Ex. 7, 118-122; Ex. 12, p. 171, Ex. 16, Ex. 19, 230-231.) The same forms were send again to Defendants Carey on April 6, 2016. (PJA Ex. 16, p. 213-216.)

On February 9, 2016, Defendant Maral Helwajian filed an Ex Parte Request with the juvenile court to have P.G. immunized over mother's objection, claiming that father, who had legal rights, wanted her immunized.  (PJA, Ex. 8, 127-128.)

The matter came for a hearing on February 25, 2019, when county counsel, joined by father, but objected by mother, asked for the court to order immunization of P.G. and permit forensic examination of the child. (PJA, Ex. 10, 154-157.) The court denied both requests, stating that it had not yet taken jurisdiction over P.G. and mother, as the sole legal custodian, had the decision-making rights as to both immunization and forensic examination. (Id. at 157.)

For the first time in the juvenile case for P.G., on March 14, 2016, Defendant Carey attached for the court's review the Family Law Court's December 18, 2014, order making findings after a contested hearing at which father testified, that Minor P.G. was indeed sexually abused by father. (PJA, Ex. 14, 190-192.) Also for the first time, Defendant Carey attached for the court's

review the Family Court's existing custody orders granting mother sole legal and physical custody of P.G. and father monitored visits by a professional monitor. (Id. at 192.) Still, Defendant Carey made no mention of these findings of sexual abuse in the jurisdiction report itself, but said that the only neutral party was a Glendale City police detective who did not charge father. (Id. at 187.) Defendant Carey explained away father not visiting his daughter for two years stating he had no money to pay for visits. (Id.)

Following seeing the Family Court orders, on March 28, 2016, the juvenile court ordered DCFS to file an amended petition to include sexual abuse and an amended report for amended petition. (PJA, Ex. 13, p. 173, see also Ex. 10, 143-144.)

On April 12, 2016, DCFS filed a First Amended Petition alleging among other things that Brian sexually abused P.G. and suffered from a Bipolar Disorder, and that mother had emotional problems and coached P.G. to make sexual abuse allegations against father. (PJA, Ex. 15, 205-209.)

In a supplemental report for the June 9, 2016 hearing on the amended petition, Defendant Carey requested that the court set a hearing to immunize P.G. over mother's objection so that she could enroll in school. (PJA Ex 17, 222.) Defendant Carey failed to attach to this report the Refusal to Vaccinate and the Personal Beliefs form, or the St. Marks Vaccination Exemption signed by P.G.'s pediatrician Dr. Boxstein. (Id. 219-224.)

The June 9, 2016, hearing was continued to June 10, 2016. (PJA Ex 20, 233-234.) On June 10, 2016, over mother's objection, the court granted DCFS' requested order for P.G. to be immunized so that she could attend school and to salvage her placement. (PJA Ex 21, p. 247.) The court also issued a temporary

restraining order against mother to protect the paternal aunt after mother placed a recording device in P.G.'s doll. (Id. at 245-246.) That order expired on July 11, 2016. (PJA Ex 22, p. 252.) Mother was granted a diversion for the related criminal charges that were dismissed on June 17, 2016, in lieu of the three-year restraining order to protect the paternal aunt. (PJA Ex 34, 330-336.)

The juvenile court held the jurisdictional hearing on the amended petition on August 16, 2016, when mother and father waived their right to trial and pled no contest. (PJA, Ex 23, 255-256.) The court dismissed all of the original allegation and sustained an amended count that their conflict caused the child harm. (PJA Ex. 15, 207-209.) The court held the disposition hearing on October 17, 2016, when the juvenile court declared P.G. a dependent of the court and removed her from Ulikhanova's custody. (PJA Ex. 24, 259-260.) The juvenile court ordered Ulikhanova and Brian to complete a case plan to reunify with P.G. (Id.)

Defendants Helwajian and Carey testified during their depositions that all along the dependency case, Brian was not compliant with the juvenile court case plan and tested positive for methamphetamine or missed scheduled drug tests. Brian was only permitted monitored contact with P.G. throughout the dependency case. (PJA Ex. 36, 502-503; Ex. 37, 637-639.) Brian also threatened social workers or visitation monitors, including Helwajian, that she would regret this, that he was not going down without a fight, and that there would be "guns a-blazing" and harm. (PJA Ex. 36, 503-505.) DCFS took no protective measures to document this in an incident report or get a protective order to protect Helwajian. (Id.)

Initially, P.G. was placed in the home of her paternal great aunt, who Ulikhanova suspected allowed Brian unauthorized access to P.G. since she didn't believe that the sexual abuse occurred. (PJA, Ex. 36, p. 552-557.)

The evidence obtained during the discovery showed that father indeed had unauthorized contact with P.G. in December 2016, while she was placed with the paternal aunt, when he accompanied P.G. to a doctor's appointment without any of the authorized monitors present and without Helwajian's prior knowledge or approval. Helwajian testified at her deposition that she was surprised to know that Brian accompanied P.G. to this doctor's appointment in December 2016, did not approve his presence, and did not know who was the person "Nathan" there with him as "Nathan" was not one of paternal great aunt's family members. She also testified she would not have allowed Brian's presence at this doctor's appointment with P.G. (PJA, Ex. 36, 552-557.)

Shortly before Christmas 2016, DCFS removed P.G. from the paternal aunt's home. Helwajian explained at the deposition that the decision was made, because the paternal aunt was not following the DCFS' instructions and repeatedly threatened to ask for P.G.'s removal from her home. There was also the concern that she was permitting Brian unauthorized contact with P.G. (PJA, Ex. 36, 552-558.)

Helwajian testified at her deposition that all along the dependency case, Ulikhanova complied with the juvenile court case plan and successfully reunified with her daughter P.G. (PJA, Ex. 36, 501-502.) First, in May 2017, P.G. was returned to her mother Ulikhanova under the court's supervision of family maintenance. (PJA, Ex. 36, 501-502.) At that time, Ulikhanova obtained a medical exemption which permanently permitted P.G. to be enrolled in a public school

without further immunizations due to the family history of autoimmune disease. (PJA, Ex. 36, 545-546.) Then, in December 2017, the court terminated its jurisdiction over P.G. with family law exit orders mirroring the ones that existed before the juvenile court case started – sole legal and physical custody to Ulikhanova over P.G. and monitored visits to Brian. (PJA, Ex. 14, 190-192; Ex. 28, 293.)

Defendant Helwajian admitted at her deposition that mother requested to be present during P.G.'s medical appointments, including the vaccination, but Helwajian denied this request, explaining there was a conflict between the paternal aunt and mother. Mother was not given the date, time or place of these appointments. Defendant Helwajian acknowledged that mother could have easily gone with a monitor if permitted. (PJA Ex. 36, pp. 548-550.)

Both Defendants testified they did not ask mother, who still retained education rights, if she wanted to skip or enroll P.G. in public school although acknowledged that the right was that of a parent to skip kindergarten. (PJA, Ex. 36, 506-507; Ex. 37, 603-605.) The Defendants testified that DCFS provided them with no training as to the parents' medical and education decision making rights and they had no idea what the grandfather's clause meant. (PJA, Ex. 36, 544, 567; Ex. 37, 603-605, 607-610, 633-634.)

Defendant Helwajian stated: "Q.· ·But as for you, you have not been called to attend a training for past or present vaccination laws of the State of California? · · · ·A.· ·No, no training on vaccinations, ever." (PJA, Ex. 36, pp. 544, 567.)

Defendant Carey had been a social worker for 24 years and Helwajian for 10 years. (PJA, Ex. 36, p. 499; Ex. 37, 603-604.)

### III.   THE APPLICABLE FEDERAL AND STATE RULES OF LAW.

To state a claim under 42 U.S.C. § 1983, Plaintiffs must demonstrate that each defendant personally participated in the deprivation of his or her rights. *Ashcroft v. Iqbal*, 556 U.S. 662, 677; *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1020-21 (9th Cir. 2010); *Ewing v. City of Stockton*, 588 F.3d 1218, 1235 (9th Cir. 2009); *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002).

It is well established that the Fourteenth Amendment protects the right to family association without governmental interference. (*Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000).) The Ninth Circuit in *Wallis v. Spencer*, *supra*, held that the right to familial association "includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Id*. at 1141 (citing *Parham v J.R.*, 442 U.S. 584, 602 (1979).) The Ninth Circuit in *Wallis v. Spencer*, *supra*, also held that the parents have a right to be with their children while they are receiving medical care and "children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations ... that are invasive or upsetting." (*Id*. at 1142.) That case involved genital exams of children, without parents' consent or presence, to determine if they were sexually abused. (*Id*.)

Consequently, 18 years later, the Ninth Circuit in *Mann v. Cty. of San Diego*, 907 F.3d 1154, 1160–62 (9th Cir. 2018) expanded the *Wallis* protections to investigatory or dual purpose medical exams, holding that the state violates the parents' substantive due process rights by performing "medical examinations without notifying the parents about the examinations and without obtaining either

the parents' consent or judicial authorization." There, the County argued that the medical exams were of children's mental health in pleasant atmosphere, but the *Mann* court held that even this served a dual purpose and could have uncovered physical or sexual abuse. (*Id*. at 1161.) Further, there was evidence of visual and tactile inspections of their external genitalia, hymen, and rectum, as well as potentially painful tuberculosis and blood tests. (*Id*. at 1165.)

The Ninth Circuit in *Mann* further explained when expanding *Wallis* to the facts at bar, "A parent's due process right to notice and consent is not dependent on the particular procedures involved in the examination, or the environment in which the examinations occur, or whether the procedure is invasive, or whether the child demonstrably protests the examinations. 'Nothing in *Wallis* or *Greene* suggests that the Fourteenth Amendment liberty interest only applies when a magnifying scope is used.' *Swartwood*, 84 F.Supp.3d at 1118. The amount of trauma associated with a medical examination, particularly for young children, is difficult to quantify and depends upon the child's developmental level, previous trauma exposure, and available supportive resources, among other factors. Given this reality, a parent's right to notice and consent is an essential protection for the child and the parent, no matter what procedures are used." (*Mann v. Cty. of San Diego*, *supra*, at p. 1162.)

As to the application of these constitutional rights to the California child welfare law, the Ninth Circuit in *Mann* emphasized that "California law requires County social workers to 'notify the parent, guardian, or person standing in loco parentis of the person, if any, of the care found to be needed before that care is provided' and permits the County to provide the care 'only upon order of

the court in the exercise of its discretion.' Cal. Welf. & Inst. Code § 369(a)." (*Mann v. Cty. of San Diego*, *supra*, at p. 1163.)

Further, the Fourteenth Amendment due process rights apply with full force and effect until the disposition hearing in the juvenile court when the burden of proof to remove a child from a custodial parent is clear and convincing evidence. Welfare and Institutions Code, section 361, subdivision (c)(1), permits removal of a child from his or her parent's custody only if the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if the child is returned home and "there are no reasonable means by which the [child]'s physical health can be protected without removing" the child from his or her parent's custody." "[I]n dependency proceedings the burden of proof is substantially greater at the dispositional phase than it is at the jurisdictional phase if the minor is to be removed from his or her home." (*In re Isayah C*. (2004) 118 Cal.App.4th 684, 694.) The burden of proof at the jurisdictional phase is preponderance of the evidence; the burden of proof at disposition is clear and convincing evidence. (*Ibid*.; see also § 355, subd. (a) [jurisdiction findings by preponderance of evidence]; § 361, subd. (c) [disposition findings by clear and convincing evidence].) This heightened burden of proof at disposition balances the constitutionally protected rights of parents to the care, custody and management of their children with the need to protect the child when that care, custody and management threatens the child's safety and well-being. (*Santosky v. Kramer* (1982) 455 U.S. 745, 753 [102 S.Ct. 1388, 71 L.Ed.2d 599]; *In re Angelia P*. (1981) 28 Cal.3d 908, 917.)

The detention hearing is the first hearing conducted once a child has been taken into **temporary** custody and a petition is filed with the juvenile court to exercise its dependency jurisdiction. (§§ 309 & 319.) At such a hearing, the social worker must report on: (1) the reasons for the children's removal, (2) the need, if any, for continued detention, (3) the available services that could facilitate the return of the child to the parent's custody, and (4) whether there are any relatives who are able and willing to take temporary physical custody of the child. (§ 319, subd. (b).) The social worker must make a prima facie showing that the child comes within section 300 (the grounds for jurisdiction) as well as that continuance in the parent's home is contrary to the child's welfare. (§ 319, subd. (b).)

Moreover, the state court order obtained by an "extrinsic fraud" by the defendants would not serve as a proper defense against a claim that medical procedure was authorized as it was conducted upon a court order. (*Kougasian v. TMSL*, 359 F.3d 1136, 1140 (9th Cir. 2004). "Such a plaintiff is not "not alleging a legal error by the state court; rather, he or she is alleging a wrongful act by the adverse party" and can therefore "seek to set aside a state court judgment obtained through extrinsic fraud" in federal court." (*Id*. at 1141.)

As relevant here, California compulsory education law requires a child to be six years old on or before September 1 for the 2014–15 school year and each school year thereafter to be legally eligible for first grade. (EC Section 48010.)

Regardless of whether the state court order was valid or obtained by fraud, the parents still have a constitutional right to be present at the medical examinations, and the minor children had the "corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical

procedures, including examinations - particularly those.... that are invasive or upsetting." *Wallis*, 202 F.3d at 1141-42. See also *Greene v. Camreta*, 588 F.3d 1011, 1036-1037 (9th Cir. 2009); *Parkes v. County of San Diego*, 345 F. Supp. 2d 1071 (S.D. Cal. 2004); *Swartwood v. County of San Diego*, 84 F. Supp. 3d 1093, 1118 (S. D. Cal. 2014); *Mann v. Cty. of San Diego, supra,* at 1160-1164; *Reynolds v. County of San Diego*, 224 F. Supp. 3d 1034, 1063-64 (S.D. Cal. 2016).

Finally, "Qualified immunity shields government actors from civil liability under 42 U.S.C. § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ). It "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To determine whether the Defendants are immune from suit, the court must consider "whether [their] conduct violated a constitutional right, and if so, whether that right was clearly established at the time of the event in question." *Mueller*, 576 F.3d at 993 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. In other words, the right's "contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092–93 (9th Cir. 2013) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "This inquiry 'must be undertaken in light of the specific context of the case, not as

a broad general proposition.'" *Mueller*, 576 F.3d at 994 (quoting *Saucier*, 533 U.S. at 201).

Nonetheless, a social worker who made affirmative misrepresentations to the juvenile court in dependency proceedings is not entitled to qualified immunity. *Hardwick v. County of Orange*, 844 F.3d 1112, 1118-20 (9th Cir. 2017).

## IV. STANDARD OF REVIEW

For this Court to determine whether a person's liberty interest for purposes of substantive due process has been violated, the court must balance his or her liberty interest against the relevant state interests. (*Cruzan v. Director, MO Health Dept.* (1990) 497 U.S. 261, 279, 110 S.Ct. 2841, 2852, 111 L.Ed.2d 224, 242.) Where the state infringes on a fundamental constitutional right, strict scrutiny applies; otherwise, the rational basis test applies. (*Adoption of Kay C.* (1991) 228 Cal.App.3d 741, 748, 278 Cal.Rptr. 907.) In order to uphold a law subject to strict scrutiny, it must be narrowly tailored to promote a compelling governmental interest. (*Johnson v. California* (2005) 543 U.S. 499, 505, 125 S.Ct. 1141, 1146, 160 L.Ed.2d 949, 958.) Under rational-basis review, by contrast, a law need only bear a rational relationship to a legitimate governmental interest. (*Vacco v. Quill* (1997) 521 U.S. 793, 799, 117 S.Ct. 2293, 2297.)

In *Mann*, the Ninth Circuit rejected the "shocks the conscience" test as follows: "We reject the County's argument that we must also apply a 'shocks the conscience' standard to [Plaintiffs'] Fourteenth Amendment substantive due process claim under *Monell*. Neither *Wallis* nor *Greene* applied such a test, and the County cites no Ninth Circuit authority for the proposition that this test applies here." (*Mann v. Cty. of San Diego*, *supra*, at 1163-1164.)

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT
PAGE | 20

Therefore, this Court should apply the strict scrutiny test. However, regardless which test is applied, Plaintiffs have met their burden under this Motion.

## V.   ARGUMENT

**A. The Constitutional Protections of *Wallis* and *Mann* Apply Here To The 18 Chemical Permanent Injections Into The Minor Over Four Appointments In Six Months, When She Was Still Not Of Required Age To Start School. Mother Did Not Approve The Early Enrollment Of Her Child In School.**

The first issue before this Court is whether the Defendants violated the Plaintiffs' Fourteenth Amendment Due Process Rights when they vaccinated the Minor P.G. over objection of her custodial Mother, with 18 different chemicals during four medical appointments, each two months apart. These appointments were on June 10, August 9, October 6, 2016, and January 19, 2017. (PJA, Ex. 25, 268-269; Ex. 36, 548-549.)

The answer is yes for reasons explained below. The constitutional protections of *Wallis* and *Mann* apply here to the 18 chemical permanent injections into the Minor over estimated 8 shots during four different medical visits in a period of six months, when she was still not of required age to start school. These injections were permanent in nature, and at the minimum, painful and uncomfortable, especially for a child who was never injected before for the first five years of her life and was denied the company of her mother to ease the traumatic experience.

They were also potentially dangerous, hence, the everchanging state and federal law to strike the balance between the parent's right to choose to skip the vaccinations and the state's right to prevent spread of disease in public school

children. This is not a minor issue as the California Legislature, as well as now the Congress, have been focused on striking the perfect balance. Thus far, parents maintain the right to skip immunizations until at least the child is of school age, and thereafter, with a grandfather's clause or a medical exemption, which mother indeed obtained in May 2017. (See also Cal. Health & Safety Code § 120335[3] (requiring vaccination of public school students); H.Res.179 - Recognizing the

---

[3] Health & Safety Code § 120335 reads as follows in relevant part: (a) As used in this chapter, "governing authority" means the governing board of each school district or the authority of each other private or public institution responsible for the operation and control of the institution or the principal or administrator of each school or institution.

(b) The governing authority shall not unconditionally admit any person as a pupil of any private or public elementary or secondary school, child care center, day nursery, nursery school, family day care home, or development center, unless, prior to his or her first admission to that institution, he or she has been fully immunized. The following are the diseases for which immunizations shall be documented:
…
(f) This section does not apply to a pupil in a home-based private school or a pupil who is enrolled in an independent study program pursuant to Article 5.5 (commencing with Section 51745) of Chapter 5 of Part 28 of the Education Code and does not receive classroom-based instruction.

**(g) (1) A pupil who, prior to January 1, 2016, submitted a letter or affidavit on file at a private or public elementary or secondary school, child day care center, day nursery, nursery school, family day care home, or development center stating beliefs opposed to immunization shall be allowed enrollment to any private or public elementary or secondary school, child day care center, day nursery, nursery school, family day care home, or development center within the state until the pupil enrolls in the next grade span.**

(2) For purposes of this subdivision, "grade span" means each of the following:

(A) Birth to preschool.

(B) Kindergarten and grades 1 to 6, inclusive, including transitional kindergarten.

(C) Grades 7 to 12, inclusive.
…
**(h) This section does not prohibit a pupil who qualifies for an individualized education program, pursuant to federal law and Section 56026 of the Education Code, from accessing any special education and related services required by his or her individualized education program.**
(Amended by Stats. 2015, Ch. 35, Sec. 2. (SB 277) Effective January 1, 2016, emphasis added.)

importance of vaccinations and immunizations in the United States, 116th Congress (2019-2020).) (PJA, Ex. 36, 545-546.)

The issue of mandatory vaccination has also appropriately gathered the attention of the medical community due to the health and safety risks. As relevant here, on February 26, 2019, the following statement was posted by the Association of American Physicians and Surgeons with regard to this issue:

> Association of American Physicians and Surgeons (AAPS) strongly opposes federal interference in medical decisions, including mandated vaccines. After being fully informed of the risks and benefits of a medical procedure, patients have the right to reject or accept that procedure. The regulation of medical practice is a state function, not a federal one. Governmental preemption of patients' or parents' decisions about accepting drugs or other medical interventions is a serious intrusion into individual liberty, autonomy, and parental decisions about child-rearing. Vaccines are necessarily risky, as recognized by the U.S. Supreme Court and by Congress. The Vaccine Injury Compensation Program has paid some $4 billion in damages, and high hurdles must be surmounted to collect compensation. The damage may be so devastating that most people would prefer restored function to a multimillion-dollar damage award. Many serious complications have followed MMR vaccination, and are listed in the manufacturers' package insert, though a causal relationship may not have been proved. According to a 2012 report by the Cochrane Collaboration, the design and reporting of safety outcomes in MMR vaccine studies, both pre- and post-marketing, are largely inadequate. The smallpox vaccine is so dangerous that you can't get it now, despite the weaponization of smallpox. Rabies vaccine is given only after a suspected exposure or to high-risk persons such as veterinarians. The whole-cell pertussis vaccine was withdrawn from the U.S. market, a decade later than from the Japanese market, because of reports of severe permanent brain damage. The acellular vaccine that replaced it is evidently safer, though somewhat less effective.

(https://aapsonline.org/measles-outbreak-and-federal-vaccine-mandates/?fbclid=IwAR2RlQsr-8gvi4HZEx3Cl6s2fPJvA4we74aT65wtch1lh37Jqz9f41is4lg.)

The *Wallis* and *Mann* protections not only apply to the issue of the unauthorized vaccination, but also to the particular facts of this case, because as of the June 10, 2016, juvenile court hearing on the immunization, the Minor P.G. was only temporarily detained from her sole custodial parent Plaintiff Mother under the standard of prima facie evidence. (PJA, Ex. 5, 109-110; Ex. 6, 112-115.) As cited earlier, the Fourteenth Amendment constitutional rights continue in full force and effect at least until the disposition hearing held under Welfare and Institutions Code section 361, when the standard of proof on the State is clear and convincing evidence. That hearing did not happen here until several months later in October 2016. Again, the heightened burden of proof of clear and convincing evidence at disposition balances the constitutionally protected rights of parents to the care, custody and management of their children with the need to protect the child when that care, custody and management threatens the child's safety and well-being. (*Santosky v. Kramer*, *supra*, 455 U.S. 745, 753; *In re Angelia P*., *supra*, 28 Cal.3d 908, 917.) Therefore, the protections guaranteed under the Fourteenth Amendment were not diminished even a bit at the procedural juncture of this case as it requires more than just mere prima facie evidence to do so.

**B. The Order For Vaccination Was Obtained By Judicial Deception. The Vaccination Still Violated 14th Amendment Due Process Rights of Plaintiffs.**

The State law is clearly established that the parents have a right to make vaccination decisions until the child is school aged in California. In California children between six and eighteen years of age are subject to compulsory full-time education (Education Code [EC] Section 48200). Pursuant to EC 48000(a), a child must be six years old by September 1 to enroll in that year's

academic year. On June 30, 2015 Governor Brown signed SB 277, under which the personal and religious belief exemptions will not be allowed in California, effective July 1, 2016. However, if a parent files a letter or affidavit stating beliefs opposed to immunization prior to Jan. 1, 2016 that exemption will apply until the next grade span. Moreover, a medical exemption is still a viable option as the law only does not permit unconditional waiver of vaccination of personal beliefs. (Cal. Health & Safety Code § 120335, sub. (b).)

Critically here, the Defendants obtained the juvenile court's order of June 10, 2016, to vaccinate the Minor over Mother's objection, by misleading the juvenile court to believe that the Minor was of school age in June 2016 or the coming 2016 academic year and needed to be vaccinate to enroll. (PJA Ex. 8, 127; Ex 17, 222.) This was not true. P.G. was to turn 6 years old in November 2016, therefore, she could not start 1st grade until 2017-2018 academic year. (EC Section 48200).

The Defendant Helwajian also mislead the court to believe that father, Brian, had legal decision-making rights either to her school or vaccination. (PJA, Ex. 8, 127.) This was not true. As of June 10, 2016, the minor was only temporarily detained from her sole custodial parent mother under the standard of prima facie evidence at a hearing held pursuant to Welfare and Institutions Code section 319. (PJA, Ex. 5, 109-110; Ex. 6, 112-115; Ex. 14, 190-192.) Hence, the family court's pre-detention orders that Mother was the sole legal and physical custodian of the Minor still remained and were not overturned until the disposition hearing held several months later in October 2016. (PJA Ex. 14, 190-192; Ex. 24, 259-261.) Since father had only monitored visitation rights as of the previous

family court order, he did not have equal rights as the custodial mother to make

decision as to medical and educational care of the child.

To illustrate, on February 9, 2016, Defendant Maral Helwajian filed

an Ex Parte Request with the juvenile court, stating as follows:

> DCFS would like to ask the Court to make a recommendation/order
> regarding the minor being immunized. Mother does not consent she says it
> is due to religious reasons, but the Father (who still has legal rights to the
> child) would like for the child to receive all of her immunizations. Not
> having her immunizations at this time is jeopardizing her current relative
> placement. The relative caregiver runs a daycare out of her ho e. The child
> Penelopy is home with her and is exposed to a dozen other children and as
> of 01/01/2016 the new law says that every child in a school/daycare setting
> needs immunizations. If the child ·does not get immunized, she may not be
> able to stay with that relative or possibly any other placemen. The Father
> would like the child to be able to attend school, but Mother refuses school
> until age 6. (PJA, Ex. 8, 127.)

Defendant Carey wrote in his report for the June 9, 2016 hearing on

the issue including immunization:

> The mother refuses to allow Penelope to be immunized. The father
> wants her to be immunized, but since the mother has sole legal custody
> from family law court, the father cannot give consent. Penelope needs to be
> enrolled in school, but since she is not immunized, she cannot enroll in
> school. The home school closest to the Paternal - home is already full. In
> addition, Penelope may need speech: therapy as she has difficulty making
> several sounds that make her speech difficult to understand at times. DCFS
> respectfully recommends the Court order Penelope to be immunized so she
> can be enrolled into school, and so she can receive a speech assessment,
> and if needed, speech therapy through the district. (PJA Ex 17, 222.)

Further, the Defendants deliberately and in violation of their duties to

provide information to the court, withheld information that would have shown that

mother's previously signed personal belief's exception qualified P.G. under the

grandfather's clause of the new law or could have simply enrolled in her previous

daycare St. Marks where it was still valid. (Cal. Health & Safety Code § 120335, sub. (b).) While Plaintiff Ulikhanova emailed both Defendants the previously signed Refusal to Vaccinate and the Personal Beliefs form, as well as the St. Marks Vaccination Exemption signed by P.G.'s pediatrician Dr. Boxstein,[4] neither Defendant included these for the court's review with their above-noted requests. (PJA Ex. 8, 128, Ex 17, 219-224.)

Remarkably, the Defendants admitted at their depositions that the Minor was not of required school age in 2016, which is 1st grade in California, and that they never asked Mother about sending the Minor to school early. Both Defendants also testified that they knew that parents had a right to skip kindergarten and acknowledged to receiving emails from Mother objecting to her child being enrolled in school earlier than required by law – 1st grade. Both Defendants testified that they didn't ask mother if she wanted to skip kindergarten, had alternative education plans for her child, or whether she wanted her child enrolled back to the private pre-school St. Marks where the exemption to vaccination was still in effect. (PJA, Ex. 36, 506-507; Ex. 37, 603-605.) While under the Defendants' care and supervision, the Minor was enrolled in a kindergarten in the 2016 academic year. (PJA, Ex. 36, 510.) Had she not been enrolled early, there would have been no need to immunize her at all since mother got her back in May 2017, at which time P.G. was medically exempted from further immunizations due to the family history of autoimmune disease. (PJA, Ex. 36, 545-546.)

---

[4] (PJA Ex. 7, 118-122; Ex. 12, p. 171, Ex. 16, Ex. 19, 230-231.)

The Defendant Carey also misled the court to believe that P.G.'s placement at the time with her paternal great aunt required her immunization since the aunt run a day care from home. (PJA Ex 17, 222.) This was not true. P.G. was not a pupil in the aunt's day care, but was under her foster care placement, and anyway, the new law did not apply to the home-based private schools as the aunts. (Cal. Health & Safety Code § 120335, subs. (b), (f).) In particular, Defendant Carey further mislead the court to believe that the child's need for speech therapy required her enrollment in school, and hence, immunization. (PJA Ex 17, 222.) However, the law specifically carves out an exception for students qualified for an individualized program, such as speech therapy, so not to meet the special needs of children. (*Id*. at (h).) Therefore, P.G.'s need for speech therapy could have been accomplished by simple referral to such therapist, but also the district would not deny her services unless she is vaccinated as the law specifically waives this requirement.

Thus, the Defendants mislead the court to believe that the child had to go to school and had to be immunized in June 2016. This couldn't be further from the truth. Moreover, the September 25, 2014, personal beliefs exemptions signed by mother constituted effective waiver of the required immunizations until the next grade span, 1st grade, since P.G. did not need to enroll in kindergarten. (Cal. Health & Safety Code § 120335, (g)(1).) The Defendants failure to provide the court with these important documents while misleading the court to believe the need for school was immediate caused the unwarranted judicial consent.

Therefore, the facts are clear that the Defendants deliberately mislead the juvenile court to believe that the Minor was of school age in 2016, needed to go to school for speech therapy, needed immunization to go to school as well as to

remain in her placement, and that her father had decision making rights and wanted her immunized. In reliance on this façade of incorrect representations, the court made an order to vaccinate the Minor over Mother's objection, without knowledge that the Defendants were omitting the very documents that could have stopped it all – the grandfathered personal exemption forms. The facts also clearly show that the Defendants violated Mother's right to make educational decisions for her child when they voluntarily decided to enroll her child in school early, over mother's objection, without a court order.

### C. Defendant Helwajian Deliberately Denied Mother Access and Admission To The Minor's Medical Appointments For No Good Cause In Violation of the 14th Amendment of Both Plaintiffs.

The second issue before this Court is whether the Defendants violated the Plaintiffs' Fourteenth Amendment Due Process Rights when after obtaining the juvenile court's June 10, 2016, order to vaccinate the Minor over Mother's Objection, Plaintiffs' then refused to allow Mother to attend any of the medical procedures. Indeed, Defendant Maral Helwajian testified that Mother asked to be present and was denied access to these appointments, and that no information was provided about the appointments to Mother, when and where they took place. (PJA Ex. 36, pp. 548-550.) This was collaborated by Mother's own testimony at the deposition that she asked Defendant Helwajian several times to be present at her daughter's medical appointments, but was denied access. (PJA Ex. 38, 799.)

Defendant Helwajian explained that she preferred the paternal aunt, with whom the child was placed and eventually removed from by the Department, over the Mother to attend these appointments. Defendant Helwajian explained that mother was not invited, because of the conflict between the paternal aunt and

mother, but agreed that Mother could have easily been there with a monitor instead of the paternal aunt. (PJA Ex. 36, pp. 548-550.)

Therefore, the facts are clear that the constitutional violations did in fact take place. The paternal aunt was essentially a foster placement, but was afforded more constitutional rights than the Mother herself when Mother could have easily been the one present at the appointment with a monitor, and not the aunt. The aunt did not need to be there, whether there was a conflict between her and mother or not. (PJA Ex. 36, pp. 548-550.)

Thus, regardless of whether the state court order was valid or obtained by fraud, the Mother's right to be present and Minor's right for her presence at these medical appointments, especially upon Mother's request and Defendant Helwajian's admission that she knew mother had a right to be present, shows a constitutional violation of a clearly established law by a lengthy number of Ninth Circuit cases as cited below. (*Wallis*, 202 F.3d at 1141-42. See also *Greene v. Camreta*, supra, 588 F.3d 1036-1037.)

**D. This Court Should Follow The Ninth Circuit In *Mann v. City of San Diego* To Reject The Shock The Conscious Test, Where Here There Is Clear Evidence Of Failure To Train The Defendants.**

This Court should follow the lead of our Ninth Circuit in *Mann*, *supra*, and reject the application of the very basic shock the consciousness test to the Defendants' actions that had outmost disregard to mother's and child's constitutional rights to make these decisions for themselves. Remarkably, both Defendants testified that they, had no training on the medical or education rights of parents by their employer County of Los Angeles, and had no idea that a Grandfather Clause existed to the new California vaccination law, what it was or what it meant. (PJA, Ex. 36, 544, 567; Ex. 37, 603-605, 607-610, 633-634.)

Defendant Carey had been a social worker for 24 years and Helwajian for 10 years. (PJA, Ex. 36, p. 499; Ex. 37, 603-604.) Remarkably, Defendant Helwajian stated: "Q.· ·But as for you, you have not been called to attend a training for past or present vaccination laws of the State of California? · · · ·A.· ·No, no training on vaccinations, ever." (PJA, Ex. 36, pp. 544, 567.) Indeed, Defendant Helwajian testified that she reviewed the clause the morning of the deposition on March 29, 2019. (PJA, Ex. 36, 524.)

This case comes squarely under the direct *Monell* analysis of *Mann*, where the Ninth Circuit explained: "We reject the County's argument that we must also apply a 'shocks the conscience' standard to [Plaintiffs'] Fourteenth Amendment substantive due process claim under *Monell*. Neither Wallis nor Greene applied such a test, and the County cites no Ninth Circuit authority for the proposition that this test applies here." (*Mann v. Cty. of San Diego*, *supra*, at 1163-1164.) While this Court dismissed the *Monell* claims, Plaintiffs respectfully request that this Court consider the Motion to Reconsider being concurrently filed with this Motion to revive the *Monell* claim for failure to train its social workers, just like in Mann, because the discovery produces clear evidence of such in this case. (PJA, Ex. 36, 544, 567; Ex. 37, 603-605, 607-610, 633-634.)

## E. Defendants Are Not Shielded By The Protections Of Qualified Immunity.

The defendants are not shielded by the qualified immunity due to misleading conduct and incompetence. (*Mueller*, 576 F.3d at 993.) The facts show that Defendants knew of the clearly established law that parents could skip kindergarten and no immunization was needed before the Minor was of school age. They also knew, as illustrated by their attempts and requests for several hearings

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT
PAGE | 31

starting in February 2016 and ending on June 10, 2016, that they would need a court order to have the Minor immunized over the custodial Mother's objection. They did in fact get this court order on June 10, 2016, but only by way of judicial misleading, and therefore, they don't qualify for the immunity for this act of deception. (*Mueller*, 576 F.3d at 993.)

Also, given that both Defendants testified as to their lack of training and lack of knowledge about the general rights of parents with regard to making education and medication decision as to their children brought to the attention of the juvenile court, in general, these Defendants are simply too incompetent to be afforded such an immunity. (PJA, Ex. 36, 544, 567; Ex. 37, 603-605, 607-610, 633-634.) Ignorance of the law is surely no defense. (*Mueller*, 576 F.3d at 993.)

<u>DEFENDANTS' OPPOSITION ATTACHED SEPARATELY</u>

The Defendants' Counsels Mr. Ryan Graham and Mr. Avi Burkwitz were emailed this brief by the stipulated deadline on May 7, 2019, in pdf format, and then again on May 10 and 18, 2019, in Microsoft Word format. The Defendants did not emaile back an integrated Opposition within this brief on May 18, 2019, when it was due. However, on May 19, 2019, at 11:59 pm, Mr. Graham emailed a word document that is not on pleading form, titled Opposition, and asked Plaintiffs' counsel to integrate the 20 page document in several parts in this brief while not having proper headings. The Undersigned refused to complete Mr. Graham's unfinished work, but allowed him until May 23, 2019, 5 p.m. to complete it for filing. Mr. Graham did not do this, while claiming the word document was hard to work with. Mr. Graham did not claim that the Plaintiffs' Statement of Facts in word was also hard to work with. (Decl. of Liana Serobian, parags. 10-16.) Defendants' Opposition and supporting documents attached.

# CONCLUSION

The Plaintiffs request that this Court rule in favor of the Plaintiffs in this Motion for Summary Judgment or Partial Summary Judgement. Consequently, this Court should deny the Defendants' Motion for Summary Judgment on this same set of facts.


DATE: May 23, 2019                    /s/ Liana Serobian

                                       Counsel for the Plaintiffs

**PROOF OF SERVICE**

STATE OF CALIFORNIA, County of Los Angeles:

LIANA SEROBIAN states: that I am and at all times herein mentioned have been a citizen of the United States and a resident of the County of Los Angeles, over the age of eighteen years and not a party the within action; that my business address is 100 North Brand Blvd., Suite 600, Glendale, County of Los Angeles, State of California.

That on the 23rd day of May 2019, I served the attached Plaintiffs' Motion for Summary Judgement, and accompanying Plaintiffs Joint Evidentiary Appendix Exhibits 1 to 41, and Plaintiffs' Statement of Uncontroverted Facts (per the stipulated deadline of May 7, 2019) upon the interested parties listed below by electronic service via email addressed as follows:

- Avi Burkwitz; Esq., ABurkwitz@pbbllp.com
  Ryan A. Graham, Esq., rgraham@bbllg.com
  PETERSON · BRADFORD · BURKWITZ
  100 North First Street, Suite 300
  Burbank, California 91502

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of May 2019, at Glendale, California.

/s/ Liana Serobian
LIANA SEROBIAN, ESQ.