**PETERSON · BRADFORD · BURKWITZ**

# JOINT EVIDENTIARY APPENDIX

# EXHIBIT 47

*Lucy Ulikhanova, et al. v. County of Los Angeles, et al.*
(C.D. Cal. 2:17-CV-9193-FMO-E)

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4   LUCY ULIKHANOVA, ET AL.,        )

                                    )

5              PLAINTIFFS,          )

                                    )

6        VS.                        )   CASE NO.

                                    )   2:17-CV-9193-FMO-E

7                                   )

    COUNTY OF LOS ANGELES, ET AL.,  )

8                                   )

               DEFENDANTS.          )

9                                   )

10

11

12

13        DEPOSITION OF DAVID AARON BOXSTEIN, M.D.

14             THURSDAY, MARCH 7, 2019

15

16

17

18

19   JOB NO. 3246824

20

21   REPORTED BY IZUMI KONO, CSR NO. 14156

22

23

24

25

                                              Page 1

```
 1    DEPOSITION OF DAVID AARON BOXSTEIN, M.D., TAKEN ON BEHALF
 2    OF THE DEFENDANTS, AT 10:07 A.M., THURSDAY, MARCH 7,
 3    2019, AT 1411 NORTH HOLLYWOOD WAY, BURBANK, CALIFORNIA
 4    91505, BEFORE IZUMI KONO, CSR NO. 14156.
 5
 6    APPEARANCES OF COUNSEL:
 7    FOR THE PLAINTIFFS:
 8            SEROBIAN LAW, INC.
              BY:  LIANA SEROBIAN, ESQ.
 9            100 NORTH BRAND BOULEVARD, SUITE 600
              GLENDALE, CALIFORNIA 91203
10            (818) 539-2249
              L.SEROBIAN@YAHOO.COM
11
12    FOR THE DEFENDANTS:
13            PETERSON BRADFORD BURKWITZ
              BY:  RYAN A. GRAHAM, ESQ.
14            100 NORTH FIRST STREET, SUITE 300
              BURBANK, CALIFORNIA 91502
15            (818) 562-5800
              RGRAHAM@PBBLLP.COM
16
17
18
19
20
21
22
23
24
25
```

                                                    Page  2

```
 1                        INDEX
 2
 3  WITNESS                  EXAMINATION                PAGE
 4  DAVID AARON BOXSTEIN, M.D.
 5                          BY MR. GRAHAM              5, 91
 6                          BY MS. SEROBIAN            56, 96
 7
 8
 9                    DEFENDANT'S EXHIBITS
10  NO.        PAGE            DESCRIPTION
11  EXHIBIT 50   13   LETTER DATED 11/12/10, BATES STAMPED
                      COLA_001389
12
    EXHIBIT 52   23   DOCUMENTS BATES STAMPED COLA_001413 -
13                    COLA_001416
14  EXHIBIT 54   36   INITIAL COMPREHENSIVE VISIT, BATES
                      STAMPED COLA_001360
15
    EXHIBIT 56   37   PROGRESS NOTES, BATES STAMPED
16                    COLA_001420
17  EXHIBIT 58   38   CONSULT NOTE FROM PATRICIA MCKEEVER,
                      M.D., BATES STAMPED COLA_001370 -
18                    COLA_001371
19  EXHIBIT 60   39   LETTER DATED 9/25/13, BATES STAMPED
                      COLA_001372 - COLA_001373
20
    EXHIBIT 62   41   CV OF THEA REINHARD, PH.D., BATES
21                    STAMPED COLA_001394 - COLA_001397
22  EXHIBIT 64   43   JENNY CRAIG COMMUNICATION WITH
                      PHYSICIAN, BATES STAMPED COLA_001386 -
23                    COLA_001388
24  EXHIBIT 66   45   PROGRESS NOTES, BATES STAMPED
                      COLA_001355 - COLA_001359
25
                                                   Page  3
```

David Aaron Boxstein , M.D. - March 7, 2019

```
1                    PREVIOUSLY MARKED EXHIBITS

2    NO.           PAGE       DESCRIPTION

3    EXHIBIT 2      34    E-MAIL DATED 2/12/16, BATES STAMPED

                         COLA_0015040 - COLA_001511

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  4
```

David Aaron Boxstein , M.D. - March 7, 2019

```
 1              BURBANK, CALIFORNIA; THURSDAY, MARCH 7, 2019;

 2                         10:07 A.M.

 3

 4              (Prior to the deposition commencing, all

 5              counsel stipulated to waive the reporter

 6              read on and read off pursuant to Federal

 7              Rule 30.

 8

 9                   DAVID AARON BOXSTEIN, M.D.,

10              having been duly sworn by the reporter,

11               was examined and testified as follows:

12

13                         EXAMINATION

14    BY MR. GRAHAM:

15       Q      Thank you, Dr. Boxstein.  My name is Ryan

16    Graham.  We noticed this deposition -- our law firm did

17    on behalf of two social workers, Maral Helwajian and

18    Stephen Carey.

19              Our firm represents the interests of the County

20    of Los Angeles in a federal civil rights action that's

21    been filed by Lucy Ulikhanova and Penelopy Garcia.

22    Penelopy Garcia is referred to as P.G. in the records.  I

23    will be referring to her mostly as P.G. in this

24    deposition mostly for just efficiency's sake.  If this

25    deposition is ever filed publicly, I will be the one to
```

Page 5

1    have to redact her name so it's just less work for me.

2          Just a few instructions at the beginning.  Have

3    you ever been deposed before?

4       A    Yes.

5       Q    Okay.  So you're familiar with the -- most of

6    the procedures.

7          How many times have you been deposed?

8       A    15.

9       Q    Okay.  And what type of cases?

10      A    Most of them have been where I was deposed as

11   the expert witness.

12      Q    Okay.  So you understand today that you are

13   under oath?

14      A    Yes.

15      Q    All right.  You understand that that oath

16   requires you to be truthful and forthcoming in your

17   answers?

18      A    Yes.

19      Q    You understand that even though the testimony

20   that you're giving today is in the informal setting of an

21   office, it still has the same effect as though it were

22   given in a court of law?

23      A    Yes.

24      Q    You understand that your questions today are

25   going to be taken down by a court reporter and will be

```
 1    written into a little booklet and may be read later to a

 2    jury at the time of trial?

 3         A    Yes.

 4         Q    Okay.  And you will have the opportunity to

 5    review that transcript.

 6         A    Yes.

 7         Q    And do you understand that you can make changes

 8    to that transcript?

 9         A    Yes.

10         Q    And if you make changes to those, we will have

11    the opportunity to comment on those changes at trial, and

12    that may prove embarrassing to you, so it's important to

13    be accurate as possible.

14         A    I understand.

15         Q    If you don't understand a question that I ask,

16    just let me know so that I can rephrase that.  If you

17    don't let me know, I'll assume that you understand the

18    question.

19              If you do have anything that you want to ask me,

20    to clarify, just wait to let me finish the question.

21              If there's an objection made by plaintiff's

22    counsel, we'd ask -- just let her finish the objection

23    before answering the question.  That way the reporter can

24    get down the entire objection.

25              So people have a tendency to nod or grunt in
```

Page 7

1    response to a question.  The court reporter can't take

2    that down with any accuracy, so we'd ask that you just

3    give oral answers.

4          If you need a break, let us know.

5          Is there any reason why you think you can't

6    proceed today?

7      A    No, I don't.

8      Q    Okay.  And do you have any questions about the

9    deposition procedure before we start?

10     A    No, I don't.

11     Q    All right.  And then before we -- we're on the

12   record, plaintiff's counsel said she wanted to make some

13   standing objections so just give her a few moments for

14   that.

15         MS. SEROBIAN:  Attorney Liana Serobian on behalf

16   of the plaintiffs in the matter stated.  I would like to

17   make standing objections to this deposition under the

18   medical records privilege and psychotherapist patient

19   privilege when applicable.

20         And I'll proceed with further objections when

21   necessary.

22         MR. GRAHAM:  Great.

23   BY MR. GRAHAM:

24     Q    And, Dr. Boxstein, are you represented by

25   counsel in this deposition --

Page  8

David Aaron Boxstein, M.D. - March 7, 2019

1      A      No.

2      Q      -- today?

3             All right.  And just to make clear, physicians

4      are often deposed in depositions where you certainly know

5      if you are testifying in cases as an expert, oftentimes

6      when their care is at issue.

7             This is not a case where your care is at issue,

8      just to make that clear.

9             So with that said, easiest thing, what is your

10     name and how do you spell it.

11     A      David, D-A-V-I-D, A for Aaron, Boxstein,

12     B-O-X-S-T-E-I-N, M.D.

13     Q      And what is your occupation?

14     A      Medical doctor, pediatrician.

15     Q      And you -- I imagine you're also in some kind of

16     corporate capacity?  You run this business Burbank

17     Pediatrics or --

18     A      David A. Boxstein, M.D., Inc. fictitious name

19     known as Burbank Pediatrics Medical Corporation.

20     Q      And so when we subpoenaed records from Burbank

21     Pediatrics, those would have been records that were from

22     your offices; correct?

23     A      Correct.

24     Q      And which type of doctor are you?

25     A      Pediatrician.

David Aaron Bornstein, M.D. - March 7, 2019

```
1        Q     Okay.  And is there a special kind of
2    pediatrician?  Are you a general --
3        A     General pediatrician.
4        Q     Okay.  And what ages of children do you treat?
5        A     From birth to -- through young adulthood.
6        Q     And could you briefly describe your education.
7        A     After college I went to four years of medical
8    school at Mt. Sinai School of Medicine in New York, after
9    which I completed three years of residency training at
10   Children's Hospital of Los Angeles in pediatrics.
11       Q     Any fellowships?
12       A     I'm board certified by the Academy of
13   Pediatrics.
14       Q     And where did you go to undergrad?
15       A     Brandeis University.
16       Q     Very good.  And do you have a CV by chance?  We
17   didn't ask you for one, but --
18       A     I can e-mail it to you.  I can --
19       Q     That's all right.
20       A     -- print it out afterward if we have some time.
21       Q     That's fine.  Just quick conflicts.  So County
22   of Los Angeles, I imagine you're familiar with that?
23             You practice in Los Angeles --
24       A     Correct.
25       Q     -- correct?
```

Page 10

David Aaron Bowersock, M.D. - March 7, 2019

```
 1              County of Los Angeles has a child welfare agency
 2    called DCFS.
 3              Have you heard of DCFS?
 4       A    Yes.
 5       Q    Have you ever been employed by DCFS?
 6       A    No.
 7       Q    You're not currently employed by DCFS then
 8    either?
 9       A    No.
10       Q    Are you familiar with someone named Maral
11    Helwajian, one of the defendants in this case?
12       A    No.
13       Q    How about Stephen Carey?
14       A    Not that I'm aware of.
15       Q    Okay.  Those are both social workers for DCFS.
16              You're familiar with Lucy Ulikhanova, the
17    plaintiff in this action?
18       A    Yes.
19       Q    And that nature of that relationship is
20    through --
21       A    Penelopy Garcia.
22       Q    Okay.  You don't have any personal friendship
23    with her?
24       A    No.
25       Q    Okay.  And then Penelopy Garcia, you're familiar
```

David Aaron Bowers, M.D. - March 7, 2019

```
 1    with her through your treatment with her; is that
 2    correct?
 3         A    Correct, which is all in the past.
 4         Q    Right.  These are not, you know, friends of
 5    yours, your families don't go out to eat on the weekends
 6    together, or things like that?
 7         A    No.  And they're not current patients here --
 8         Q    Okay.
 9         A    -- so it's been a while.
10         Q    When's the last time you treated Penelopy?
11         A    I prefer the notes for the exact date, but I
12    believe it was sometime in 2014.
13         Q    Okay.  Did you review any documents in
14    preparation for today?
15         A    I did review our chart.  Yes.
16         Q    Okay.  Very good.  All right.  So you have a
17    recollection of the patient named P.G. or Penelopy
18    Garcia?
19         A    Yes.
20         Q    How good is your recollection of Ms. Garcia?
21         A    Fairly cloudy.  It's been a while.
22         Q    Okay.  What years did you see her?
23         A    It was ten days or so after birth.  It was my
24    first care for her here at my office and till that date
25    in 2014.
```

Hahn & Bowersock, A Veritext Company
800.660.3187

David Aaron Bowsock, M.D. - March 7, 2019

1      Q      Was she a healthy baby when she was first born?

2      A      She had some minor problems.

3      Q      Could you talk about those problems.

4      A      She had been in the NICU at St. Joe's and was

5   managed for some temporary problems and came here

6   basically at that point stable, ready for routine care,

7   following up those conditions, basically, to its

8   resolution which happened pretty uneventfully.

9      Q      Do you recall what those minor problems in the

10  NICU were?

11     A      One of them was neonatal jaundice, but that

12  wasn't (inaudible) at NICU.  I have to go back and look

13  and see what they wrote in the notes.

14            (Reporter clarification.)

15            THE WITNESS:  That wasn't why she was in the

16  NICU.  It occurred while she was there, but I don't

17  remember what the incident was at birth that brought her

18  into the NICU.  I'd have to go back and look.

19            If you have the notes I could determine.

20            MR. GRAHAM:  I would like to mark as Exhibit 50

21  a letter dated November 12, 2010.

22            (Whereupon Defendant's Exhibit 50 was

23            marked for identification by the court

24            reporter and is attached hereto.)

25  ///

David Aaron Boxstein, M.D. - March 7, 2019

```
 1    BY MR. GRAHAM:

 2        Q    It says,

 3                "Dear David" or "Dear Dr. Boxstein,

 4             today we are discharging baby girl

 5             Ulikhanova from the Providence St.

 6             Joseph Neonatal Intensive Care Unit."

 7             Do you have an understanding that neonatal

 8    intensive care unit is abbreviated N-I-C-U and often

 9    called the NICU?

10        A    Yes.

11        Q    So the infant was born at 35 weeks gestation and

12    birth weight, 2,595 grams.

13             Is that early, 35 weeks?

14        A    A little bit.

15        Q    Not a cause for concern?

16        A    Not by itself.

17        Q    Okay.  It says she initially had mild

18    respiratory distress.  It required nasal cannula flow for

19    approximately --

20             THE REPORTER:  I'm sorry.  Can you slow down.

21             MR. GRAHAM:  Sure.

22             THE REPORTER:  Required --

23             MR. GRAHAM:  Nasal cannula flow for

24    approximately 24 hours.

25    ///
```

Page 14

David Aaron Bookbinder, M.D. - March 7, 2019

 1    BY MR. GRAHAM:

 2        Q    Is that concerning?

 3        A    At the time it required intervention, but after

 4    the fact, it was a minor incident 'cause it didn't

 5    progress.

 6        Q    Okay.  Go to the second to last sentence in that

 7    paragraph.  It says,

 8                "Hepatitis B vaccine was refused."

 9            Is it typical to give a Hepatitis B vaccine to a

10    newborn?

11        A    Yes.

12        Q    Okay.  Do you have any understanding as to why

13    that Hepatitis B would have been refused at birth?

14        A    The parents' preference.

15        Q    Okay.  We can put that down to the side for the

16    moment.

17            THE REPORTER:  Can I mark that so we don't lose

18    track.

19            Thank you.

20    BY MR. GRAHAM:

21        Q    Generally in your care for her, was she a

22    healthy kid?

23        A    Yes.

24        Q    Okay.  Did you ever have any conversations with

25    her mother, Ms. Ulikhanova, about vaccinations?

                                          Page 15

David Aaron Bowersock, M.D. - March 7, 2019

```
 1      A    Yes.

 2      Q    Okay.  Could you describe those conversations.

 3      A    As I remember them, it was a discussion about

 4   her preference to not give -- not to vaccinate her child

 5   and my preference that she would reconsider.  So those

 6   discussions were repeated frequently and documented in

 7   the chart, I believe, at least three times -- well, at

 8   least three times in her signature and numerous times in

 9   my notes.

10      Q    Tell me, Doctor, why are immunizations

11   important?

12      A    Because they prevent serious life-threatening

13   illnesses.

14      Q    Are there people who refuse to get immunizations

15   that you see in your offices?

16      A    Absolutely.

17      Q    Okay.  And what do you counsel them as a matter

18   of routine, not specific patients, but as a general

19   practice?

20      A    I counsel all, even those who take them, why I

21   think that's a good idea -- they should be informed --

22   and also with what the side effects or concerns can be so

23   they understand what's happening in the public.  And

24   those who have serious questions or refusals, like this

25   situation, then we discuss the basis of their refusals
```

Page 16

David Aaron Baskin, M.D. - March 7, 2019

```
 1   and what would it take to reconsider and what are the,
 2   you know, of all the multitude of vaccines, which ones I
 3   would prioritize and what risks they are undertaking by
 4   not being vaccinated.  Those are the kinds of discussions
 5   we have on a regular basis.
 6       Q    Okay.  Would you ever recommend a child not be
 7   vaccinated?
 8       A    Sure.  On a temporary basis that happens
 9   frequently enough, when a child is sick, suffering from
10   something else, maybe on a medication that weakens the
11   vaccine, et cetera, maybe had another vaccine so it's not
12   the right time --
13       Q    Okay.
14       A    -- or it's contraindicated in the presence of
15   another vaccine.  There are times, but those are
16   temporary.
17       Q    So talk to me about that there are times you say
18   when it would not be appropriate because of circumstances
19   in the child's life -- you say contraindications with
20   another vaccine.
21            Those are situations where it would become
22   appropriate to vaccinate the child at a later date?
23       A    Correct.
24       Q    Okay.  Would there ever be a circumstance where
25   you recommend a child not be vaccinated ever?
```

David Aaron Bowersock M.D. - March 7, 2019

1    A    It hasn't happened in my practice with the
2  exception of an isolated vaccine that there may have been
3  a bad reaction to before that left everybody very
4  nervous, concerned.  I had one patient who had serious
5  reactions, and we had consultations with neurologists.
6  And we deferred them for a number of years and then many
7  years later decided to redo the vaccine and -- with good
8  outcome.
9    Q    So that wasn't a permanent choice where you
10 said, "It's my medical judgment that this child should
11 never be vaccinated"?
12   A    I mean, nothing should be permanent.  Everything
13 should be revisited based on current understandings --
14   Q    Okay.
15   A    -- so everything is as permanent as it is for
16 today and the near foreseeable future.
17   Q    So would a better word be indefinitely
18 postponing?
19   A    Frequently revisited.
20   Q    I like that.
21        Okay.  Any of those reasons that would justify a
22 child to not be immunized in the short-term, did any of
23 those reasons apply to P.G.?
24   A    Not that I remember at all.
25   Q    Is there any other reason besides the ones that

                                        Page 18

David Aaron Bolton, M.D. - March 7, 2019

1    you discussed why you could think of why P.G. should not

2    have been vaccinated?

3        A    You mean at all under my care or you just

4    mean -- you're not talking about this visit at birth?

5        Q    At all --

6        A    At all?

7        Q    -- under your care, ever.

8        A    I mean, she certainly came in ill.  So if her

9    mother wanted her to be vaccinated on the day that they

10   were ill, I might recommend under prudence that we would

11   defer a few days or a week.  So I don't know that those

12   discussions came up on her ill visits, but those are the

13   only ones I remember.

14       Q    And is it not the case that if a child is ill,

15   that you would want to vaccinate that child because of

16   them having a weakened immune system than being more

17   subject to becoming ill due to environmental factors,

18   that you wanted to give them more protection?

19       A    If I'm understanding you, you're asking me that

20   I would want to give a vaccine to an ill child?

21       Q    Not when they're ill, but if somebody is

22   immunosuppressed, for example.

23            MS. SEROBIAN:  Objection.  Misstates the

24   testimony.

25            I think he was saying completely something

Page 19

David Aaron Boxer, M.D. - March 7, 2019

```
 1    different.
 2             THE WITNESS:  That isn't what I was saying.  I'm
 3    not sure if I understand.
 4    BY MR. GRAHAM:
 5        Q    No.  I'm asking a different question.
 6             Say you had a child that was born premature far
 7    more than 35 weeks, and the child was born, you know,
 8    underweight and they were small, and then the child
 9    stayed small for their age and the child was chronically
10    ill.
11             Would it be a better decision to vaccinate that
12    child than to not vaccinate because they would be more
13    subject to becoming ill in their environment?
14        A    First of all, that is not the case here.  So
15    we're talking about --
16             MS. SEROBIAN:  Objection.
17             MR. GRAHAM:  Right, right.  I'm asking a --
18             THE WITNESS:  -- hypothetical?
19             (Simultaneous speaking).
20             MR. GRAHAM:  -- hypothetical.
21             THE REPORTER:  I'm sorry --
22             MS. SEROBIAN:  Witness said does not apply here.
23             Objection.  Not relevant.
24    BY MR. GRAHAM:
25        Q    I'm asking you a hypothetical.
```

                                                        Page 20

David Aaron Boxer, M.D. - March 7, 2019

```
 1       A      On a hypothetical, those considerations would
 2   weigh into the decisions of what to give and when.
 3       Q      Understood.
 4       A      But I would pursue vaccines at the soonest and
 5   safest date is my preference.
 6       Q      Is your charting by hand, or is it electronic?
 7       A      Well, if you asked that question in the present,
 8   in the present we have electronic records.
 9              At the time of my care it was all by hand.
10       Q      Okay.  Did Ms. Ulikhanova ever ask you for a
11   medical exemption to vaccination?
12       A      She refused vaccines.  I don't remember her
13   asking me to write a letter of exemption, if that's what
14   you're asking, 'cause it was my policy not to do it
15   unless I absolutely felt that was necessary, and she was
16   not under consideration for that.
17       Q      Did she know that?
18       A      That I wouldn't write a letter?
19       Q      Uh-huh.
20       A      I don't -- I can't recollect that discussion.  I
21   can't recollect her knowledge of it.
22       Q      Okay.  But you have no reason to think that she
23   would be aware that if she asked you, you would say no?
24              MS. SEROBIAN:  Objection.  Speculation.  He said
25   he has no way to know that.
```

Page 21

David Aaron Bowersock, M.D. - March 7, 2019

```
 1            THE WITNESS:  But she could talk to my nurses,

 2    she could talk to my office manager.  I wouldn't have

 3    that memory of it.  I wouldn't have it noted in the

 4    chart.

 5    BY MR. GRAHAM:

 6       Q    But you have no reason to think she would know

 7    that --

 8            MS. SEROBIAN:  Speculation.  Objection.

 9            THE REPORTER:  I'm sorry.  I didn't get the

10    question.

11    BY MR. GRAHAM:

12       Q    But you have no reason to think that she would

13    know that you would have refused?

14            MS. SEROBIAN:  Objection.  The witness never

15    said he would refuse.  He would consider it at the time.

16    He never said he would refuse.

17            THE WITNESS:  I can't remember specifics about

18    her.  That discussion came up frequently with lots of

19    patients -- lots of patients -- that refuse vaccines.  So

20    I can't specifically remember any -- that with her.  Been

21    many years.

22    BY MR. GRAHAM:

23       Q    Would you have ever written a medical exemption

24    for P.G.?

25       A    Based on the records that I have reviewed and my
```

                                                Page 22

David Aaron Boxstein, M.D. - March 7, 2019

```
 1   recollection, no.
 2      Q    Okay.  So I want to go over some documents.
 3           These are from the records that we subpoenaed
 4   from your office.  This will be Exhibit 52.
 5           (Whereupon Defendant's Exhibit 52 was
 6           marked for identification by the court
 7           reporter and is attached hereto.)
 8   BY MR. GRAHAM:
 9      Q    This is a run of documents, and this first page
10   here, the numbers in the corner are called Bates stamps
11   and so you'll see it says COLA, which is just County of
12   Los Angeles -- and the 1413, so I'm going to call that
13   page 1413.
14           On the top it says "Refusal to Vaccinate," and
15   then it says parents' name and then your name, "My child,
16   doctor/nurse, Dr. Boxstein has advised me that my child
17   should receive the following vaccines," and then it says
18   a list of vaccines.
19           On the left it says "Recommended" and then those
20   box -- are just not checked, but you did in fact
21   recommend that Penelopy would --
22           MS. SEROBIAN:  Speculation.
23           THE REPORTER:  I'm sorry.  I'm not getting
24   the --
25           MS. SEROBIAN:  Objection.  Speculation.  Witness
```

Page 23

David Aaron Boxstein, M.D. - March 7, 2019

```
 1    never said that.
 2              MR. GRAHAM:  I'm just going to go on the record
 3    here and ask that opposing counsel please allow me to
 4    finish my questions before she make her objection.
 5              Can I please have the question read back until
 6    the objection was made.
 7              (The record read as follows:
 8                  "Q  On the left it says 'Recommended'
 9              and then those box -- are just not
10              checked, but you did in fact recommend
11              that Penelopy would --")
12    BY MR. GRAHAM:
13       Q    -- receive the Hepatitis B vaccine; is that
14    correct?
15       A    Yes.
16       Q    And you did recommend that she receive the
17    diphtheria, tetanus, acellular pertussis, DTaP or Tdap
18    vaccine; is that correct?
19              MS. SEROBIAN:  I'm going to --
20              Can I intervene at this moment and say I object
21    to this line of questioning.  Speculation.  Misstates the
22    testimony -- earlier testimony.  Witness said he did not
23    recall.  There are many other patients who refuse
24    vaccinations.
25              THE WITNESS:  Can I explain the form?
```

Page 24

David Aaron Boxstein, M.D. - March 7, 2019

```
 1              MR. GRAHAM:  Can we go off the record real
 2      quick.
 3              (Whereupon a discussion was held off the
 4              record from 10:28 a.m. to 10:28 a.m.)
 5              MR. GRAHAM:  Back on the record.
 6      BY MR. GRAHAM:
 7         Q    Dr. Boxstein, you said you wanted to explain
 8      this document.
 9              Please explain it.
10         A    Yes.  So this was a basically blanket
11      declaration that we recommend these vaccines in total at
12      the appropriate times.  And that she was declining all of
13      them unconditionally whenever they were applied for.
14              So this wasn't a recommendation for that date.
15      This was basically I recommend all these vaccines at the
16      right time, and she's saying, "Whatever that is at this
17      point in time, my declared preference is that I would not
18      do any of these."
19         Q    Thank you.
20         A    And that was establishing our relationship.
21         Q    Thank you.  And the fact that those boxes are
22      not checked does not mean anything?  It's just probably
23      an oversight; is that correct?
24         A    Yes, because this was not applying to the date
25      but to the general relationship that we agreed to
```

Page 25

David Aaron Boxt, M.D. - March 7, 2019

1    disagree.

2        Q    Understood.  And the date on this is November

3    13, 2012, on the bottom; is that correct?

4        A    Correct.

5        Q    Okay.  And then if you turn the page to page

6    1414, this says "Physician's Report Childcare Center."

7             Can you explain this page to me.

8        A    Okay.  The childcare centers have a standard

9    form for maintenance of health care.  So the physician's

10   report on the bottom basically asks us to complete this

11   for her admittance to the school or -- so we would fill

12   this thing out.

13       Q    And this is your signature on the bottom?

14       A    That is -- yes.

15       Q    Okay.  Let me just go back previously to page

16   1413.  I just want to real quick -- this document does

17   not state that immunization is not safe for P.G. because

18   of any physical condition; is that correct?

19       A    Correct.

20       Q    And it doesn't even mention any physical

21   condition; is that correct?

22       A    Correct.

23       Q    It makes no mention of rheumatoid arthritis; is

24   that correct?

25       A    Correct.

David Aaron Bowersock, M.D. - March 7, 2019

1      Q    And it makes no mention of asthma; is that

2   correct?

3      A    Correct.

4      Q    It doesn't mention any medical circumstances

5   that relate to P.G.; is that correct?

6      A    Correct.

7      Q    It doesn't even mention any medical

8   circumstances; is that correct?

9      A    That relate to P.G., correct.

10     Q    Specific -- yes.

11          Does this document state the duration that any

12   immunization would be unsafe for?

13     A    It wasn't referring to anything being unsafe.

14     Q    Does this form describe any medical history of

15   P.G.?

16     A    No.

17     Q    Does this form describe the medical history of

18   P.G.'s family?

19     A    No.

20     Q    Does this document exempt P.G. from vaccination

21   for purposes of entering school?

22     A    No.

23     Q    Does it exempt P.G. from vaccinization for

24   enrollment in any daycare?

25     A    That would depend on the policies of the daycare

Page 27

David Aaron Boxerman, M.D. - March 7, 2019

1    and the school.

2         Q    That is true.

3              Next page, 1414 -- those same questions, real

4    quick -- does this document state that immunization is

5    not safe because of P.G.'s physical condition?

6         A    No.

7         Q    Does it mention any physical condition?

8         A    No.

9         Q    Does it mention rheumatoid arthritis?

10        A    No.

11        Q    Does this page 1414 mention asthma?

12        A    No.

13        Q    Does this page 1414 mention any medical

14   circumstances relating to P.G. specifically?

15        A    No.

16        Q    Does it even mention any specific medical

17   circumstances?

18        A    In the sense that on the bottom it says that

19   risk factors were not present for tuberculosis, we are

20   testifying to that at that point in time.

21        Q    Does this document state that immunization would

22   be unsafe for any particular period of time?

23        A    No.

24        Q    Does it describe the medical history of P.G.?

25        A    In the sense that she got no vaccines, that is

Page 28

David Aaron Boxerbaum, M.D. - March 7, 2019

```
 1    part of her history.
 2         Q    But does it describe past medical conditions
 3    that she had experienced?
 4         A    No.
 5         Q    Does it describe the medical history of her
 6    family?
 7         A    No.
 8         Q    Does it exempt P.G. from vaccinization to enter
 9    into any school?
10         A    No.
11         Q    Does it exempt P.G. from vaccination for
12    enrollment at a daycare?
13         A    Again, medically, no, but that would depend on
14    the policies of the school.
15         Q    For purposes of enrollment, you mean?
16         A    Correct.
17         Q    And then page -- next page, 1415, will you
18    confirm for me that this is just a duplicate of page
19    1413?
20         A    Yes, it is.
21         Q    Okay.  And then page 1416.  This is titled
22    "Personal Beliefs Exemption to Required Immunization."
23              What is your understanding of this page?
24         A    This is a documentation that I have done my duty
25    of informing her of the benefits of the vaccines, et
```

Page 29

David Aaron Bortz, M.D. - March 7, 2019

```
 1    cetera, and that I have, you know -- she understands what

 2    the benefits are, what the risks could be based on

 3    medical information, and that I've done that.

 4           What I'm citing is that I have completed that

 5    which essentially is documenting our agreement to

 6    disagree.

 7    Q      Earlier on in this deposition you mentioned that

 8    you had had several conversations with Ms. Ulikhanova

 9    about immunizations and that you could not reach an

10    agreement about them generally.

11           This would memorialize one of those

12    conversations; is that correct?

13    A      Correct.

14    Q      Okay.  Does this form anywhere state that

15    immunization is not safe because of P.G.'s physical

16    condition?

17    A      No, it does not.

18    Q      Does this document anywhere even mention any

19    particular physical condition?

20    A      No, it does not.

21    Q      Does this document mention rheum --

22    A      Physical condition of P.G.?

23    Q      Correct.

24    A      Right.  Does not.

25    Q      It does not.
```

Page 30

David Aaron Bock, M.D. - March 7, 2019

```
 1              Does this document anywhere mention rheumatoid

 2    arthritis?

 3         A    No.

 4         Q    Does this document anywhere mention asthma?

 5         A    No, it does not.

 6         Q    Does this document mention anywhere any medical

 7    circumstances relating to P.G.?

 8         A    By inference that there is a disagreement about

 9    being vaccinated.

10         Q    Very good.  Does this document, page 1416, state

11    anywhere that immunization would be unsafe for any

12    particular duration?

13         A    No, it does not.

14         Q    Does this form, page 1416, describe any medical

15    history of P.G.?

16         A    No, it does not.

17         Q    Does --

18         A    Other than not being vaccinated.

19         Q    Very good.  Does this page 1416 describe any

20    medical history of P.G.'s family?

21         A    No, it does not.

22         Q    All right.  Does this document exempt P.G. from

23    vaccination for entry into school based off of any

24    medical reasons?

25         A    No, it does not.
```

Page 31

David Aaron Bowie, M.D. - March 7, 2019

```
 1       Q    Does it exempt P.G. from vaccination for
 2    enrollment at a daycare based on any medical reasons?
 3       A    No, it does not.
 4       Q    Okay.  Does it state that vaccinization would be
 5    medically unsafe?
 6       A    For P.G.?
 7       Q    Correct.
 8       A    No, it does not.
 9       Q    As of the -- well, pardon -- let me withdraw
10    that and rephrase.  That was a terrible question.
11            The bottom, the date here, what date is that?
12       A    September -- I'm assuming that's 25, 2014.
13       Q    Actually, let's use the date in the middle.
14    That one's a little bit more clear.
15       A    September 25, 2014.
16       Q    As of that date, would you have written the
17    medical exemption for P.G.?
18       A    No.  I would not have.
19       Q    Okay.  Do you believe that this document could
20    be reasonably interpreted to be a medical exemption for
21    vaccination?
22       A    No.
23       Q    Okay.  So are you familiar with P.G.'s family's
24    medical history at all -- are you?
25       A    I don't have much recollection.
```

Page 32

David Aaron Borsuk, M.D. - March 7, 2019

1    Q    Okay.  Did her mother ever tell you that her

2    family had a history of rheumatoid arthritis?

3    A    Based on my memory of this, I do not remember

4    specifically.

5    Q    Okay.  What about asthma?

6    A    I do not remember that specifically.

7    Q    Would those be reasons not to vaccinate P.G. if

8    her family had those in her family history?

9    A    Not for me.

10   Q    If she had told you about that history and you

11   were -- very hypothetical, I understand -- and you were

12   of the mind that that would militate in favor of a

13   medical -- or a medical exemption to vaccination, what

14   kind of documents would you want to see to establish the

15   family history?  Would you take a patient at face value?

16        That was a terrible question.  Let me rephrase.

17   A    Yes, it is.

18   Q    If I'm a patient and I'm telling you my kid

19   should not be vaccinated because the medical history in

20   our family is dangerous because there's rheumatoid

21   arthritis, there's asthma, are you going to believe me at

22   face value?

23   A    I would take the history at face value, and the

24   value of that would be it would generate a discussion

25   about what makes them, the patient, the patient's family,

Page 33

David Aaron Boxstein, M.D. - March 7, 2019

```
 1   think that's a contraindication, and why I would explain
 2   that it isn't and let the conversation flow from that as
 3   to why perhaps the vaccines are actually beneficial, et
 4   cetera, and let the information that they have serve the
 5   purpose of generating a helpful conversation.
 6         But it wouldn't at this point in time require
 7   any documentation just to have that conversation.
 8     Q    Okay.  You would try to encourage me as that
 9   patient's parent to change my mind and have that child
10   vaccinated; is that correct?
11     A    That would be my responsibility and my goal.
12     Q    In my hypothetical?
13     A    In the hypothetical circumstance, yes.
14     Q    Understood.  I have another exhibit here.  This
15   has previously been marked in discovery.  This is going
16   to be Exhibit No. 2.
17         (Whereupon Plaintiff's previously marked
18          Exhibit 2 is attached hereto.)
19   BY MR. GRAHAM:
20     Q    This is an e-mail sent from Ms. Ulikhanova to
21   defendant Maral Helwajian.  Just on page 1505 it says,
22              "DCFS, here is my signed paperwork
23          from Penelopy's pediatric doctor, Dr.
24          Boxstein."
25          The date of this on the top, February 12th,
```

Page 34

David Aaron Boxer, M.D. - March 7, 2019

```
1    2016.
2              Were you Penelopy's pediatrician as of that
3    February 12, 2016?
4        A    Hard to say.  I mean, did she consider me still
5    or did we -- was I still seeing her?  Depends on how you
6    define that.  So I believe the last visit was 2014, so
7    where after that did my responsibilities cease, hard to
8    say.
9              If she'd called up and wanted care we would have
10   taken care of her.
11       Q    If you turn to page 1507 and then if you go back
12   to those previous immunization documents that are from
13   your chart, I just want you to compare that to page 1414.
14             And can you just confirm for me that page 1507
15   and 1414 are the same document?
16       A    Yes, it is.
17       Q    All right.  And 1414, that's a true and accurate
18   copy of the document from your files?
19       A    That's what I remember.
20       Q    All right.  And if you could turn in that e-mail
21   to the next page, page 1508 -- have you compare that to
22   page 1413 -- if you could confirm for me that page 1508
23   and 1413 are the same document?
24       A    Yes, they are.
25       Q    And that 1413 is a true and correct copy of the
```

                                        Page 35

David Aaron Bowers, M.D. - March 7, 2019

```
 1    document from your file?
 2        A    Correct.
 3        Q    Great.  And then if you could turn to page 1509,
 4    if you could confirm for me that 1509 is the same
 5    document as 1416, page 1416?
 6        A    Yes, it is.
 7        Q    Okay.  And page 1416, is that a true and correct
 8    copy of the document from your files?
 9        A    Yes.
10        Q    Okay.  Very good.  We're done with that e-mail.
11        A    Do you want me to hold onto these?
12        Q    You can keep those, you can toss them.
13        A    No.  Are you going to keep referring to them?
14        Q    Oh.  Those ones we're done with.
15             And then this is the next exhibit.  Not sure
16    which number we're at yet.  This is a document we
17    subpoenaed from you, Bates number 1360, titled "Initial
18    Comprehensive Visit."
19             (Whereupon Defendant's Exhibit 54 was
20             marked for identification by the court
21             reporter and is attached hereto.)
22    BY MR. GRAHAM:
23        Q    Could you describe this document for me.
24        A    Sure.  This is the first visit to the office --
25        Q    Okay.
```

Page 36

David Aaron Bowser, M.D. - March 7, 2019

```
 1      A      -- ten days of birth, and describes the
 2   information, the examination that I summarized on this
 3   page.
 4      Q    And on the bottom it says "Immunizations today."
 5   Sir, you truly have a doctor's handwriting.
 6            What does that say right beneath that?
 7      A     "Refusing vaccines by parents."
 8      Q    Very good.  Great.  We are finished with that
 9   document.
10            This next document we're going to mark as
11   Exhibit, I believe, as 56.
12            (Whereupon Defendant's Exhibit 56 was
13            marked for identification by the court
14            reporter and is attached hereto.)
15   BY MR. GRAHAM:
16      Q    Page 1420 -- and these are your progress notes;
17   is that right?
18      A     Correct.
19      Q    And is there anything about vaccines that you
20   see from these visits on 9/12/13 and 9/25/13?
21      A     Well, 9/12/13, under Immunizations, it says
22   "None per Mom."
23      Q    Does that indicate that you had a conversation
24   with her?
25      A     Well, actually that visit was done by my
```

                                                     Page 37

David Aaron Bowersock, M.D. - March 7, 2019

1    associate, Dr. Friend (phonetic).

2         Q    Okay.

3         A    That was his notation, whatever he meant by

4    "None per Mom."

5         Q    We don't know what that meant.

6              But then the one for 9/25/13, was that you or

7    was that --

8         A    Well, we knew they were not doing any vaccines.

9    It was Mom's decision.  We do know that.

10             And then on 9/25/13, there is no comments -- the

11   comment there is about PPD which is not really a vaccine.

12        Q    Okay.  This is going to be Exhibit 58.

13             (Whereupon Defendant's Exhibit 58 was

14             marked for identification by the court

15             reporter and is attached hereto.)

16   BY MR. GRAHAM:

17        Q    This is from your subpoenaed documents, pages

18   1370 and 1371.  This is titled Patricia C. McKeever, M.D.

19             Could you describe what this document is.

20        A    This is a consult note from Dr. McKeever who is

21   a pediatric orthopedist.  This is a summary of her note

22   to me.

23        Q    Describe just for the record what a pediatric

24   orthopedist is.

25        A    So a physician who specializes in the care of

                                                  Page 38

David Aaron Bol[redacted] M.D. - March 7, 2019

```
 1    orthopedic bone and joint related problems in children.
 2        Q    Okay.  And why did you refer the child to her?
 3        A    I have to refer to the note because I don't
 4    recollect, but the note cites that she was complaining of
 5    knee pain off and on for two months.
 6        Q    Okay.  I think we're done with that one.
 7             This next one will be Exhibit 58.
 8             THE REPORTER:  60.
 9             MR. GRAHAM:  Pardon me, 60.
10             (Whereupon Defendant's Exhibit 60 was
11             marked for identification by the court
12             reporter and is attached hereto.)
13    BY MR. GRAHAM:
14        Q    This also is a two-page document subpoenaed from
15    your subpoenaed records, pages 1372 and 1373.
16             Do you recall this document?
17        A    Only to the extent I read it over again
18    yesterday.
19        Q    Tell me about this document.
20        A    I mean, it's a letter addressed from the mother,
21    Lucy, reflecting a series of concerns that she wanted to
22    update me on.  This, again, was on September 25th, 2013.
23        Q    Now, there's a lot of issues here that don't
24    seem to concern the treatment of her daughter; is that
25    correct?
```

                                                    Page 39

David Aaron Bolton, M.D. - March 7, 2019

1      A    I mean, I'm of the opinion that all information

2  is relevant at some point in some way, so I won't say.

3      Q    That's a fair point.  I want to direct your

4  attention to the bottom paragraph.  It says,

5              "I have recently been diagnosed with

6           a hereditary autoimmune liver disease

7           negative 4 Hep ABC or HIV, AIDS, or

8           STDs and fatty liver which has gone

9           down since switching from Metformin

10          that was prescribed for my recent

11          Type II diabetes that gave me horrible

12          side effects for 30 days.  It made

13          insulin worse and liver enzymes to

14          rise as well, gained 20 pounds."

15          And I'm not going to read the rest.

16          Why was she communicating that part of the

17  letter to you?

18      A    I don't have a specific recollection of any

19  issues that we were discussing, if that's what you're

20  asking.  I can infer, but I don't...

21      Q    Okay.  Was she trying to use a family autoimmune

22  disease as a reason for trying to argue that P.G. should

23  have been exempt from vaccinations?  Do you have a

24  recollection of Ms. Ulikhanova ever saying that as you

25  sit here today?

David Aaron Bowsock, M.D. - March 7, 2019

```
 1        A    I don't have any specific recollection of that

 2   discussion.

 3        Q    Okay.  Then we'll leave it there.

 4        A    Yeah.

 5        Q    Was she seeking treatment for herself from you

 6   at any point -- Ms. Ulikhanova?

 7        A    I do remember, which is a common thing in our

 8   practice, us doing PPDs, tuberculin test on parents.  We

 9   vaccinate parents.  We help out with -- sometimes we do

10   blood tests on them that we do in the office when their

11   doctors have requested these things for -- to help out

12   the families --

13        Q    Right.

14        A    -- but not in terms of my diagnosing or managing

15   a problem.

16        Q    Okay.  Next exhibit -- we're at 62.

17             (Whereupon Defendant's Exhibit 62 was

18             marked for identification by the court

19             reporter and is attached hereto.)

20   BY MR. GRAHAM:

21        Q    This is also a document from your subpoenaed

22   records, pages 1394 to 1397.  It's a resume, a letter

23   from Thea Reinhart, Ph.D.

24             Do you have an understanding as to who

25   Dr. Reinhart is?
```

David Aaron Bowersock, M.D. - March 7, 2019

1      A     I mean, a licensed psychologist.

2      Q     Do you have any understanding as to why

3   Dr. Reinhart's resume was in your files?

4      A     I believe at the time when Lucy was looking for

5   a referral, she wanted somebody on her insurance 'cause

6   the referrals that we had working relationships with in

7   our practice were not covered by her insurance.  So she

8   was seeking out somebody that was referred by her

9   insurance company, if I remember correctly, which is

10  pretty common.  And we would say we could help out, but

11  it would be nice, if we don't know the specialist, if we

12  could get some information about them.  And this is one

13  of the nice ways of doing it, at least letting us have a

14  CV.

15     Q     So did Ms. Ulikhanova have an HMO?

16     A     I do not remember.

17     Q     Did she require a referral?

18     A     I do not -- I doubt -- we have very little in

19  the way of HMO, almost nothing.  So -- but the idea of

20  requiring referrals is sort of a confusing way to put it.

21           People want us to recommend, not the referral.

22  Is it required from the insurance standpoint?  Sometimes

23  they do, sometimes they don't.  They need a letter from

24  us or maybe they don't.  So...

25     Q     Where it says, "Dear Doctor," and it says

                                                Page 42

David Aaron Boxstein, M.D. - March 7, 2019

```
 1    Doxstein -- she misspelled your name --
 2        A    Right.
 3        Q    -- says,
 4                 "Per your request I'm faxing my CV."
 5             I'm just curious why you would have requested
 6    the CV.
 7        A    To know something about the specialist who was
 8    going to be caring for my patient, to understand their
 9    qualifications for their conclusions.
10        Q    So it's part of your comprehensive care of the
11    child?
12        A    Sure.
13        Q    Okay.  All right.
14        A    That's a nice way to put it.
15        Q    And then my last exhibit in this series is 64.
16             (Whereupon Defendant's Exhibit 64 was
17             marked for identification by the court
18             reporter and is attached hereto.)
19    BY MR. GRAHAM:
20        Q    This is a Jenny Craig communication with
21    physician, pages 1386 through 1388.  Says,
22                 "Dear David Boxstein, your patient
23             requested enrollment in Jenny Craig
24             weight management program.  Patient's
25             named Lucy Ulikhanova."
```

Page 43

David Aaron Borison, M.D. - March 7, 2019

1            One of the claims for damages against my client
2   states that the stress caused by my clients caused a lot
3   of weight gain, so this interests us naturally.
4            What do you recall about Ms. Ulikhanova's
5   communications with you about weight?
6       A    I can't remember any specific recollections.  It
7   is a common complaint in mothers in the practice so it
8   comes up in just a general way, my memory, but I do not
9   remember specifics of her particular care.
10      Q    Okay.  This says it's dated April 4th, 2011.  It
11  says current weight there, 245.1 pounds.
12           Now, I don't imagine that you are -- in your
13  practice in the habit of weighing your patients' parents,
14  but do you have a recollection as to whether that sounds
15  about right that she weighed 245 pounds in April of 2011?
16      A    I cannot remember that date.  Could it be true?
17  Sure.
18      Q    When P.G. was an infant, do you recall Ms.
19  Ulikhanova appearing to weigh about 245?
20      A    At the time of her birth?
21      Q    No.  When she was an infant.  When she would
22  have been about one.
23           MS. SEROBIAN:  I need to object.
24           THE WITNESS:  I can't remember.
25           MS. SEROBIAN:  Yeah.  He just --

                                            Page 44

David Aaron Bosket, M.D. - March 7, 2019

```
 1              You answered several times -- he can't remember,
 2    he can't remember.
 3              THE WITNESS:  Specific to that date.
 4              I do remember her being overweight, but I can't
 5    remember to that particular date.
 6              MR. GRAHAM:  Okay.  All right.  And then if we
 7    can go off the record.
 8              (Whereupon a discussion was held off the
 9              record from 10:55 a.m. to 10:56 a.m.)
10              MR. GRAHAM:  Back on the record.
11              MS. SEROBIAN:  Also here is part of the office
12    file; right?
13              MR. GRAHAM:  The difference is Exhibit 2 are the
14    copies.
15              MS. SEROBIAN:  E-mail.
16              MR. GRAHAM:  Right.
17              MR. GRAHAM:  We are at exhibit number?
18              THE REPORTER:  66.
19              (Whereupon Defendant's Exhibit 66 was
20              marked for identification by the court
21              reporter and is attached hereto.)
22    BY MR. GRAHAM:
23         Q    66, this is a series of what I believe to be
24    progress notes, beginning with page 1355 going to 1359.
25    So the first page just has an X on it.  We'll go to the
```

Page 45

David Aaron Bornstein, M.D. - March 7, 2019

1    second one dated May 5, 2014.

2            Is this in your handwriting?

3        A    Progress notes are chart notes.  They include

4    any visit.  They're not specific to one kind of visit.

5        Q    Okay.  So then let's go through them.  Explain

6    to me May 25, 2014.  What does this look like to you?

7        A    A re-check for an ear exam, from an ear

8    infection.

9        Q    Anything about vaccines that would interest us

10   about this visit?

11       A    No.

12       Q    Next one, May 13, 2014.

13            Is this a visit that you conducted?

14       A    Yes, it is.

15       Q    And what is this visit?

16       A    Also a follow-up for an ear infection.

17       Q    Anything about vaccines that would interest us

18   there?

19       A    No.

20       Q    All right.  If we go to page 1357, April 14th,

21   2014, is that a visit that you conducted?

22       A    Yes, I did.

23       Q    And what is the visit?

24       A    Evaluation for an ear infection.

25       Q    Sounds like me.  I had tons of ear infections

                                            Page 46

David Aaron Borok, M.D. - March 7, 2019

```
 1   when I was a kid.
 2           Anything here about vaccines that would interest
 3   us?
 4       A    Not that's obvious to me.
 5       Q    Okay.  Anything that would be obvious to anybody
 6   else?
 7       A    Well, it's my horrible handwriting, so I'll just
 8   admit that -- we'll stipulate that.  But right after the
 9   Immunizations, there's some chicken scratch.  I'm not
10   sure what I was referring to here.
11       Q    Okay.
12       A    So could I have brought up the discussion or
13   something or other and I was trying to put something
14   down?  Not sure, but I don't think so.
15       Q    Okay.  What about April 29th, 2014?
16       A    That's my signature, my exam, and at this point
17   this was about a new cold along with her ear infection
18   being reevaluated.
19       Q    Okay.  Anything about vaccines there?
20       A    No.
21       Q    Okay.  And then that bottom part, 4/16/2014,
22               "Mom called, wanted noted in chart
23           went to Children's Hospital."
24           That's not anything interesting about vaccines,
25   is it?
```

                                              Page 47

David Aaron Botkin, M.D. - March 7, 2019

```
 1      A     No.

 2      Q     Okay.  Next page 1358.  We jumped to April 21st,

 3   2012.  It's a "Sick with MRSA."

 4            What do you recall about this?

 5      A     Interesting.  I do remember this -- the

 6   discussions and visits.  She was concerned about MRSA --

 7   I think it was in the family or somebody she knew -- and

 8   was concerned that this infection that the child had

 9   could have been MRSA.  That's my recollection.

10      Q     Okay.  Anything about vaccines that would

11   interest us there?

12      A     No.

13      Q     All right.  November 13, 2012.

14            What is that visit?

15      A     So this is a two-year physical examination and

16   well child care assessment.  And it was my signature.

17      Q     Anything about vaccines that would interest us

18   there?

19      A     Yes.  They were deferred again per the mother's

20   preference.

21      Q     So November 13, 2012, this was a visit where you

22   had a conversation about vaccines, and she reaffirmed her

23   commitment to not having the child vaccinated?

24      A     Correct.

25      Q     Okay.  And then that's the last visit on that
```

Page 48

David Aaron Borenstein M.D. - March 7, 2019

1    page; is that correct?

2        A    I'm sorry?

3        Q    That's the last visit on that page; correct?

4        A    Yes, it is.

5        Q    Now, let's turn the page to 1359, June 2nd,

6    2011.

7             What is this visit?

8        A    This is a six-month exam, and it's my signature.

9        Q    Anything interesting about vaccines here?

10       A    There's a comment there that -- deferred vaccine

11   by parents' request.

12       Q    Does that indicate that you had a conversation

13   with Ms. Ulikhanova about vaccines on that date?

14       A    I'm assuming the father as well, 'cause I put in

15   the plural.

16       Q    Okay.  Have you met --

17       A    You know, let me qualify that.

18            No.  It is the parents, both of them were there.

19   Yes.

20       Q    Do you recall ever talking to the father about

21   vaccines?

22       A    I don't have a specific recollection, but the

23   notation is that the parents were both there.  And I put

24   on the bottom as "parents" in plural.

25       Q    Okay.  But you don't recall him having a

Page 49

David Aaron Boxer, M.D. - March 7, 2019

```
 1   specifically strong feeling about vaccines one way or the
 2   other?
 3       A    I do not have a specific recollection.
 4       Q    Okay.  Did he ever come to the visits with the
 5   mom?
 6       A    I can only go by the notes.  I do not have a
 7   specific recollection.
 8       Q    Very good.  Then halfway down the page, January
 9   9th, 2012.
10            What is this visit?
11       A    So it's a 14-month health, you know, physical
12   exam, health assessment.
13       Q    Anything interesting about vaccines here?
14       A    Sure.  They were not done, but I didn't -- oh.
15   Yeah.  In the beginning -- in the history, the deferred
16   vaccines per the parents' request was noted again.
17       Q    All right.  Does that indicate that you had a
18   conversation with --
19       A    Yes.
20       Q    Okay.  And that you had a conversation where you
21   would have again recommended that P.G. be vaccinated?
22       A    Yes, and reviewed -- reaffirmed their continued
23   stated preferences.
24       Q    So you discussed on this page then at least
25   twice, June 2011 you recommended the vaccines and then
```

Page 50

David Aaron Bowers, M.D. - March 7, 2019

1   again on January 9, 2012?

2       A    Yes.

3       Q    And the family rejected that both times?

4       A    Correct.

5       Q    Okay.  And that would have been Ms. Ulikhanova

6   both times; correct?

7       A    Yes.

8       Q    And do you have any recollection as to whether

9   or not she asserted a medical reason as to why those

10  vaccines were being rejected?

11      A    I do not have that specific recollection.

12      Q    Okay.  If she had, it would be charted though;

13  is that correct?

14          MS. SEROBIAN:  Objection.  Speculation.

15          THE WITNESS:  No, not necessarily.  My standard

16  of care would not have been to put down all the different

17  reasons, just the fact that I was having conversations

18  and raising the issues and whatever the objections were.

19  I don't necessarily list them, so that would not be my

20  standard to fill out the paper with those kind of things.

21  BY MR. GRAHAM:

22      Q    Understood.  If there were a medical reason that

23  were significant enough for you to issue a medical

24  exemption for vaccination, would you have to chart that

25  medical reason?

                                        Page 51

David Aaron Borenstein, M.D. - March 7, 2019

 1      A     I would have somewhere -- maybe not here -- in

 2   the medical summary or some place.

 3      Q     And have we found that medical reason?

 4      A     No.

 5      Q     Thank you.  And that is the last page.

 6            In these records we've gone over we found at

 7   least three conversations where you discussed vaccination

 8   with Ms. Ulikhanova, and she has rejected it.

 9            Does that sound about right, or do you think

10   you've had more than three conversations with her?

11      A     Definitely more.

12      Q     Okay.  What was the general tenor of those

13   conversations?

14      A     There always was an agreement to disagree.  That

15   contract in my packet everybody understood meant I would

16   keep bringing up the issues, not to be offended, just to

17   do my job and see if I could open up opportunities that

18   were necessarily in my belief of what my job was as a

19   pediatrician.

20            So they're coming here, they knew that was going

21   to happen.  There was no strong-arming, it was just a

22   discussion.  That happened all the time whether I noted

23   it or not.  It would have happened during illnesses.  If

24   I didn't note it -- I can't tell you that.  But for the

25   physical, these examinations, absolutely.  It just has to

                                              Page 52

David Aaron Borkosky, M.D. - March 7, 2019

```
1   be done.  It has to be brought up.
2        Q    Were they -- what I mean what was the tenor, I
3   mean, were they friendly conversations?  For example,
4   both my parents were smokers.  If you told -- if the
5   doctor told my dad stop smoking, he would have gotten
6   angry.  If you told my mom, she would have said, oh,
7   yeah, yeah, yeah.  I know, I know.
8             Was she responsive?  Would she say "I appreciate
9   your concern"?  Or was it more combative?
10       A    I don't remember combative.  I just remember her
11  being assertive in her position --
12       Q    Okay.
13       A    -- and -- and she never changed her mind, which
14  is unusual in my practice.
15       Q    Did she ever assert a religious reason for
16  wanting to not have the child vaccinated?
17       A    Not that I can remember.
18       Q    Okay.  Do you ever recall what specifically her
19  personal reasons were?  She ever give you a reason?
20       A    I don't remember the specifics.  You're
21  awakening memories, but I can't say those are specific
22  memories of mine.
23       Q    Did she ever mention her father?
24       A    I do remember talking about her father.
25       Q    Did she ever mention that she had had vaccines?
```

Hahn & Bowersock, A Veritext Company
800.660.3187

David Aaron Bowersock, M.D. - March 7, 2019

 1     A     I can't remember that specific discussion.

 2     Q     Okay.

 3     A     It is my practice that lots of patients with

 4  refusals, over the years, lots -- I never turn people

 5  away -- so this is a common conversation.  So I have to

 6  be very careful in my recollection of the specifics.  And

 7  so this was just as part of my practice -- I didn't

 8  forget it because it was happening all the time.

 9     Q     Okay.  Would it be inaccurate to say that under

10  your care there was no medical exemption in place?

11     A     Yes, because if there were, it would have been

12  noted.

13     Q     I think I phrased that poorly.

14         This statement during the period that you were

15  the pediatrician, the statement there was no medical

16  exemption for vaccination in place; correct or not

17  correct?

18         MS. SEROBIAN:  Objection.  What is medical

19  exemptions?  Speculation.  What is considered to be

20  medical exemption?  A parent's right to object?  Or what

21  is --

22         I would like clarification on this question.

23         THE WITNESS:  By me?

24         MS. SEROBIAN:  By the asker and then you,

25  because I don't understand what is considered to be

                                            Page 54

1    medical exemption.

2              MR. GRAHAM:  Can that I have question read back.

3              (The record read as follows:

4                 "Q  This statement during the period

5              that you were the pediatrician, the

6              statement there was no medical exemption

7              for vaccination in place; correct or

8              not correct?")

9    BY MR. GRAHAM:

10       Q    You can answer.

11       A    If I had had a medical exemption, I would have

12   written it in the chart.

13             Not being there, there was no medical exemption.

14   Medical exemption would have been based on my

15   examination, my understanding of the history, the

16   conditions of the child, all the things that I can

17   determine that there would be a reason why the child

18   could not safely be vaccinated.  That would not include

19   personal preferences.

20             MR. GRAHAM:  I'm just going to stop this.  This

21   is a deposition that has been noticed by the defendants.

22   This is direct that the defendants are doing.  If the

23   plaintiffs would like to ask a question, they will have

24   time at the end.

25             I would like the question read back and the

                                                    Page 55

David Aaron Bowersock, M.D. - March 7, 2019

```
 1    witness to answer it.  Any objections can be interposed.
 2             (The record read as follows:
 3                 "Q   This statement during the period
 4             that you were the pediatrician, the
 5             statement there was no medical exemption
 6             for vaccination in place; correct or
 7             not correct?")
 8             THE WITNESS:  Correct.
 9             MR. GRAHAM:  Thank you.
10             Any questions from the plaintiffs?
11             MS. SEROBIAN:  Yes.
12
13                          EXAMINATION
14    BY MS. SEROBIAN:
15        Q    Is medical exemption necessary not to vaccinate
16    a child?
17             MR. GRAHAM:  Objection.  Vague.
18    BY MS. SEROBIAN:
19        Q    We're just talking about medical exemptions, so
20    the same type of medical exemption the opposing counsel
21    was asking you about, is that necessary to not vaccinate
22    a child?
23        A    For me not to vaccinate a child?
24        Q    Yes.
25        A    Do I need a medical exemption?
```

Page 56

David Aaron Bowsock, M.D. - March 7, 2019

```
 1        Q     Yes.

 2        A     Yes.

 3        Q     No.  Not for you.  I'm saying not to vaccinate

 4   the child in general.

 5              In this case Penelopy was not vaccinated in

 6   your -- under your care; correct?

 7        A     Correct, based on a personal refusal.

 8        Q     Yes, but my question is -- so medical exemption

 9   was not necessary not to vaccinate her?

10        A     For the patient not to be vaccinated?

11        Q     Yes.

12        A     Not for me to recommend it?

13        Q     For the patient not to --

14        A     For the patient not to be vaccinated, it could

15   go outside the medical exemption, yes.

16        Q     Yes.  So the fact that it's not there in your

17   file, this medical exemption, it's irrelevant to your

18   care of the patient in not vaccinating her?

19        A     It is relevant that the -- I documented that I

20   was recommending them, and that the reason was against

21   medical advice, the parents were refusing to give

22   permission.  And I can't do it without their permission.

23              MR. GRAHAM:  Objection.  Vague as to time and

24   relevance.

25   BY MS. SEROBIAN:
```

Page 57

David Aaron Bouskila, M.D. - March 7, 2019

1    Q    Okay.  Let me rephrase the question.

2         And I would like to strike your answer as

3    nonresponsive, because it was not responding to my

4    question.

5         My question is the following -- first let me lay

6    the foundation.

7         During the time that Penelopy was under your

8    medical care, she was not vaccinated; correct?

9    A    Correct.

10   Q    And what is the reason for that?

11   A    The parents refused permission for the vaccines.

12   Q    Yes.  Now, what is your understanding -- do

13   parents have a right to refuse --

14   A    Yes, they do.

15   Q    They have a right?  Okay.  So if a parent comes

16   to your office -- and it is from your testimony here is

17   that it is your standard practice during the time that

18   vaccination is necessary to recommend vaccination; is

19   that correct?

20   A    Correct.

21        MR. GRAHAM:  Objection.  Calls for a legal

22   conclusion.  And expert testimony from the lay witness.

23        MS. SEROBIAN:  I'm asking during his practice.

24   BY MS. SEROBIAN:

25   Q    During your practice -- you just testified it is

David Aaron Bowersock, M.D. - March 7, 2019

```
 1    your regular course of practice for patients under your
 2    care that you routinely recommend vaccinations when it is
 3    needed; is that a correct summary of your testimony?
 4        A    And appropriate.
 5        Q    Yes.
 6        A    Needed and appropriate.
 7        Q    It is recommended by you basically?
 8        A    Correct.
 9        Q    Now -- however if -- you also said during
10    earlier testimony that there were many patients that --
11    many parents who refuse vaccinations for their children
12    in your practice; is that correct?
13        A    Yes.
14        Q    Okay.  Now, when they do refuse -- and in this
15    case Lucy did refuse and at some point the father as
16    well -- vaccination for their child, then they have a
17    right to do so; is that correct?
18        A    Legally, yes.
19        Q    Legally, yes.
20             MR. GRAHAM:  Objection.  Vague.  Calls for a
21    legal conclusion.  And speculative.
22    BY MS. SEROBIAN:
23        Q    Did you understand my question whether Lucy has
24    a right legally to refuse your recommended vaccination
25    for a child?
```

Hahn & Bowersock, A Veritext Company
800.660.3187

David Aaron Borys, M.D. - March 7, 2019

```
 1      A     Yes, I did.
 2            MR. GRAHAM:  Same objection.  I'll just make a
 3      standing objection.
 4      BY MS. SEROBIAN:
 5      Q     And so you're also aware that you're a mandatory
 6      reporter when a child under your care you suspect to be
 7      neglected or abused; is that correct?
 8      A     Yes.
 9      Q     And you know where to call a hotline -- the
10      child abuse hotline of the Los Angeles County Department
11      of Children and Family Services if you do suspect neglect
12      or abuse of a patient under your care?
13      A     Yes.
14      Q     Okay.  Now, the fact that Lucy, and at times the
15      father of this child, during the entire time that she was
16      under your care as a patient, refused to vaccinate her,
17      did that bring it to the level where you would call the
18      hotline and report them as neglectful?
19      A     No.
20      Q     Did you ever call the hotline and report Lucy as
21      a neglectful parent?
22      A     Not to my recollection and not to my records.
23      Q     Okay.  So the fact that during the entire time
24      under your care from ten days old until the last time you
25      saw her, per your testimony, about 2014, during that
```

Page 60

David Aaron Bowersock, M.D. - March 7, 2019

```
 1    entire time -- I believe about four years or more 'cause
 2    she was born 2010 -- it seems like her date of birth
 3    under your charts is 2010.
 4            So if you saw her sometime in 2014, it could be
 5    about a period of four years or more?
 6    A    Or less.
 7    Q    Or less.  Just about that -- that period, the
 8    fact that Lucy repeatedly refused the routine
 9    vaccinations that you generally do recommend, it never
10    rose to the level of child abuse or neglect for you as a
11    mandatory reporter to make such a claim?
12    A    Correct.
13    Q    All right.  So the -- I'm going to refer to
14    Exhibit 2 of the defendant -- defendant's discovery
15    Exhibit 2, and also -- which correlate with your chart
16    notes.  It's COLA 1413 to 1416.
17    A    Okay.  I have them over here.
18    Q    Great.  So here, the defendant's counsel went
19    through each of these forms 1413, 1414, 1415, 1416.
20            And are these standard forms?
21    A    Yes.
22    Q    They were not made specifically for this child,
23    Penelopy, for the mother to sign?
24    A    No.
25    Q    So these are just fill-in forms?
```

Page 61

David Aaron Bortfeld, M.D. - March 7, 2019

```
 1      A    Correct.
 2      Q    When the defendant asked you for each of these
 3  forms whether you included mother's reasons for
 4  refusal -- for example, she declined, we know she
 5  declined immunization -- but whether her stated reasons,
 6  would those be included in those forms even though she
 7  told you her particular reasons?
 8      A    No.
 9      Q    If she told you that, for example --
10  hypothetically if she told you that her particular
11  reasons were based on medical history of her family
12  and/or religious reasons and/or anything else, would any
13  of those things be included on the standard forms?
14      A    Let me just look at all four of them again.
15           Well, the last one specifically states personal
16  beliefs exemption.  So the first three are -- basically
17  are an agreement to disagree.  The last one is specific
18  to personal beliefs -- and not religious 'cause she
19  didn't check off religious -- so it's just specific to
20  what's on this form.
21      Q    But, I mean, it doesn't allow her -- there's no
22  room for her to fill in any other information that she
23  might have as far as her beliefs -- correct -- just a
24  check-a-box type of documents, all those four documents?
25      A    That's the nature of the document.  Yes.
```

Page 62

David Aaron Bowersock, M.D. - March 7, 2019

```
 1       Q    Yes, but it doesn't allow her if the mother had
 2   her own specific reason such as -- for example,
 3   defendant's counsel said asthma, arthritis, family
 4   history of illness, or whatever other beliefs she had --
 5   there is no room for her to fill any of this in?  There
 6   is no other -- it doesn't allow her to basically fill any
 7   of this in?
 8       A    Well, it's not the nature of the form, but if
 9   she were to write something in, it doesn't necessarily
10   invalidate the form if she wanted to add information,
11   it's just she didn't do it.
12       Q    Yeah, but it doesn't give a room or ask her for
13   a reason --
14       A    No.  That's not the purpose of the form.
15       Q    Yeah.  The purpose is just to -- for her to --
16   if she's declining, check the box for declining and sign
17   her signature; correct?  I mean --
18       A    You're asking my understanding.
19            My understanding of this is to document that the
20   parent had a conversation with a professional about the
21   benefits and risks of the -- so she was -- whatever she
22   was using this -- at daycare -- she had already had a
23   medical professional explain this to her.  She wasn't
24   operating in a vacuum.
25       Q    Yes.  I understand, but basically these are
```

Page 63

David Aaron Bowersock, M.D. - March 7, 2019

1    standard forms --

2        A    Okay.

3        Q    -- and there's, as you see yourself, they don't

4    allow for her to fill in any reasons, medical or any

5    specific reasons, other than just check the box for

6    declining and sign for it?

7        A    I'm just agreeing that it's a standard form that

8    serves a purpose.  It doesn't say anywhere that she can't

9    add something to it.

10       Q    But does it give you a line for her to add

11   anything?

12       A    It's not asking for it.

13            Is that what you're asking?

14       Q    Yes.

15       A    Correct.

16       Q    It doesn't give her that line of --

17       A    The form is what the form is.

18       Q    Yes.  Okay.  Now, my other question is the

19   following:  As far as you mentioned that you -- now more

20   of a general question as far as immunization -- the State

21   or maybe the County has a specific timetable for

22   immunizations; is that correct?  For example --

23       A    Public health.

24       Q    Public health.  So what are those timetables?

25            MR. GRAHAM:  Objection.  Vague.

Page 64

David Aaron Borkosky, M.D. - March 7, 2019

1    BY MS. SEROBIAN:

2        Q    What are those timetables if you could recall?

3        A    Is the schedule you mean?

4        Q    Yes, the schedule.

5        A    You want me to recite them?

6        Q    In a general sense.

7        A    There are vaccines given from birth, I mean,

8    right through all of pediatrics at different ages --

9        Q    Different ages.

10       A    -- so they have changed over the specific years

11   and decades as to what the exact timetables and which

12   things could be combined, so I'd rather not recite what

13   was it that date.

14       Q    But there is a timetable that you would follow?

15       A    Recommended schedule.  Yes.

16       Q    And the reason I'm asking you is when we looked

17   at your note from -- and I'll refer you to your pediatric

18   notes from the visits where, you know, you document the

19   visit and/or if vaccination was discussed -- or

20   recommended or refused, for example -- so basically my

21   question is regarding these forms -- I believe it's COLA

22   1355 to 1359 which --

23       A    Yes.

24       Q    -- documents the visits and if there's anything

25   else that is documenting the visits, similarly the same

Page 65

David Aaron Bowersock, M.D. - March 7, 2019

1    question would apply.

2             So basically here, you know, defendant's counsel

3    went through each visit, and there were several visits

4    where there was a discussion that you wrote down that Mom

5    declined.

6             Would those be correlating with the timetable,

7    basically the timetable the vaccination is due, and so

8    you regularly have this discussion and the mom regularly

9    reinforces her assertion that she's declining?

10       A    That's correct.

11       Q    Okay.  So it's not that you're trying to

12   convince her every single time, but it's a routine that

13   it's due at that specific time, you're reminding her it's

14   due, you recommend it, and then she has a right to

15   decline or accept.

16            And she's declining it?

17       A    No.  It's more.  Then there's the discussion

18   about why I would like her to consider the vaccines or is

19   she open to discussion.  It's more than just let's just

20   go through the formality.

21       Q    No.  I understand --

22       A    Okay.

23       Q    -- but the reasons those visits were -- vaccines

24   were discussed is the timetable basically?  You're going

25   through a timetable, and it's not that you're trying to

Page 66

David Aaron Bowersock, M.D. - March 7, 2019

```
 1   every visit convince her, but when it's due, you are
 2   bringing the issue up trying to discuss --
 3        A    No.  I would say my standard practice is every
 4   visit is an opportunity to vaccinate if it's an
 5   appropriate time to vaccinate.  Every visit is
 6   appropriate to have a discussion if there's time to have
 7   a discussion.  So we'd like to think about no missed
 8   opportunities to at least educate and then to administer
 9   when appropriate, meaning that they're healthy.
10        Q    Now, a question.  You admitted during earlier
11   testimony that there are many parents who do refuse
12   vaccinations; is that correct?
13        A    Yes.
14        Q    Okay.  What is the general reason for that?
15        A    Personal belief that they're risky.
16        Q    And you said when you do consult them regarding
17   vaccinations -- and you personally recommend this -- but
18   you go through safety factors.
19             What are those safety factors that you go over
20   with the parents?
21             MR. GRAHAM:  Vague.  Objection.
22   BY MS. SEROBIAN:
23        Q    Do you understand my question?
24             Would you like me to --
25        A    I think I do.
```

Page 67

1      Q    Okay.

2      A    But it's pretty broad.

3           MR. GRAHAM:  Objection.  Speculative.

4    BY MS. SEROBIAN:

5      Q    My question is the following:  you said every

6    opportunity is given to go over the benefits and the

7    risks of the vaccinations; correct?

8           So I'm asking you what are the risks that you go

9    over with the parents?

10     A    Talk about the risks, meaning like common side

11   effects, how they're handled.  We talk about the rare,

12   you know, side effects -- very rare -- that can be

13   sometimes more extreme.  Anything that the parents have

14   heard about, you know, or people are talking about, try

15   to put them into perspective -- if they're not true or if

16   they're exaggerated.  And then try to talk about the

17   benefits.

18     Q    Now, what are the safety risks specifically,

19   long-term or more of -- not just temporary risk, but what

20   are the potential safety risks of vaccines of which

21   you're aware?

22     A    So now you're lumping them all together, not a

23   specific one.

24     Q    Well, in a general sense.

25     A    In a general sense --

Page 68

David Aaron Bolton, M.D. - March 7, 2019

```
 1            MR. GRAHAM:  Object.  That calls for expert
 2    testimony from a lay witness.
 3            MS. SEROBIAN:  No.  He said he does consult.
 4    BY MS. SEROBIAN:
 5       Q    What are you consulting the parent about?  I am
 6    a parent, for example.  You're consulting me about safety
 7    risk.
 8            What would be that type of consultation?
 9       A    It's usually the balance of risk/benefit.  We
10    talk about how much benefit there is and then any of the
11    risks that people are talking about or they're measured,
12    you know, if this is one in a million, one in 100,000,
13    one in 300,000, what the nature of that is and how that
14    pales compared to the overwhelming benefit and what are
15    the benefits that we're talking about.  So they can look
16    at it, 'cause, like, driving a car has a risk benefit.
17       Q    Now, you did mention during your practice that
18    there was one -- at least one case where there was an
19    extreme side effect and reaction requiring neurological
20    evaluation.
21            MR. GRAHAM:  Can we go off the record.
22            (Whereupon a discussion was held off
23            the record from 11:24 a.m. to 11:25 a.m.)
24            MR. GRAHAM:  Back on.
25            MS. SEROBIAN:  Can I please have my question
```

Page 69

David Aaron Bowersock, M.D. - March 7, 2019

```
 1    read back -- or at least part of it.
 2              (The record read as follows:
 3                  "Q  Now, you did mention during your
 4            practice that there was one -- at least
 5            one case where there was an extreme
 6            side effect and reaction requiring
 7            neurological evaluation.")
 8    BY MS. SEROBIAN:
 9        Q    Yes.  So I'll end the question, and then I'll
10    follow up if necessary.
11              So you do recall that where you had in your
12    practice there was that -- at least one extreme reaction?
13        A    Yes.
14        Q    Okay.  Now, before immunizing that child, would
15    you suspect that that child would have such an extreme
16    reaction requiring neurological evaluation and treatment?
17        A    No.
18        Q    So you admit that there are cases where you
19    would not suspect such a risk, but they do happen?
20              MR. GRAHAM:  I'm going to object as an
21    incomplete hypothetical.
22    BY MS. SEROBIAN:
23        Q    Going back to that same example where you did
24    administer the vaccination you did not suspect it -- you
25    probably recommended it -- but it turned out to be an
```

Page 70

```
 1    extreme reaction requiring a specialist, neurological

 2    evaluation and treatment, did you suspect it before

 3    immunizing the child that this would happen?

 4              MR. GRAHAM:  Objection.  Speculative.

 5    BY MS. SEROBIAN:

 6        Q    You did not suspect that would happen?

 7        A    No.

 8        Q    Okay.  Now, would Penelopy -- going back to

 9    Penelopy, in the record, there are pretty detailed

10    letters or e-mails from Mom talking about her medical

11    history of arthritis.

12              And also you sent Penelopy for evaluation for

13    arthritis; is that correct?

14              MR. GRAHAM:  Objection.

15              THE WITNESS:  No.

16              MR. GRAHAM:  Misstates the record.

17    BY MS. SEROBIAN:

18        Q    Well, I'm going to go --

19        A    She was limping.

20        Q    The knee pain for which you referred her --

21        A    I didn't say specifically for arthritis.

22        Q    I think the letter talks about arthritis.  I'm

23    going to get that exhibit out.

24        A    I don't see any mention of arthritis.

25        Q    I'm going to refer to exhibit -- what did we
```

Page 71

David Aaron Bowsock, M.D. - March 7, 2019

1    number this -- it's a letter from Patricia McKeever.

2        A    Yes.

3        Q    Now, please take your time to review this.  I

4    will myself.

5            Okay.  The first paragraph under "History," it

6    says that the child is complaining -- right -- of right

7    knee pain off and on for two months.  And then the

8    sentence following,

9                "Mother states that she has just

10               become verbal and is now more consistently

11               talking about it.  She has not" --

12               "She has had no witnessed injuries,

13               she has had no episodes of swelling,

14               she has no excessive bruising of her

15               lower extremities.  She's healthy,

16               she's full" --

17               (Reporter clarification.)

18               MS. SEROBIAN:  Yes.  I'm sorry.

19    BY MS. SEROBIAN:

20        Q    So I'm just going to get to the point where it

21    says she -- in capital,

22               "She is allergic to nuts, including

23               peanuts, hazelnuts.  There is a questionable

24               family history of rheumatoid arthritis.

25               She's here for consultation at the

Page 72

1           request of Dr. Boxstein and Dr. Bugliosi"

2           (phonetic).

3                Now, this does mention rheumatoid arthritis in

4      the letter as far as being recommended to the specialist

5      by you and another doctor.

6           A    No.  You're misunderstanding that.

7           Q    Okay.  How should I read it?  It states in the

8      letter --

9           A    In the history, the doctor there is saying she

10     has obtained a questionable family history of rheumatoid

11     arthritis.  That's her words.  That doesn't say that's

12     the reason for the referral.

13          Q    Do you recall what is the reason for the

14     referral to the specialist?

15          A    Well, I'm looking at right here she was

16     complaining about right knee pain on and off for two

17     months.  So the rest of that, I don't have a specific

18     recollection.

19               But you're asking me to speculate.  I don't

20     remember exactly how everything else had transpired.  But

21     lots of kids limp and we don't have an explanation, and

22     we get a consultation to get an opinion, and that her

23     diagnosis has nothing to do with rheumatoid arthritis.

24          Q    Well, here the letter doesn't say she was

25     limping.  It says she has been complaining of right knee

                                                    Page 73

David Aaron Boxstein, M.D. - March 7, 2019

```
 1    pain off and on for two months.  I mean, it's documented,
 2    so you might not have a recollection, but it's
 3    documented.
 4            MR. GRAHAM:  I'm going to object to foundation.
 5    This is a medical record from a different provider.
 6            MS. SEROBIAN:  No.  It mentions this doctor.
 7    It's a referral doctor, so I'm asking him about the
 8    referral.
 9            THE WITNESS:  Right.  So I don't know why he
10    used the word "limp," and I don't know if that's the word
11    that was written in the chart somewhere that I've
12    reviewed.  But I'm referring to this, it's about right
13    knee pain for two months.
14            This is what the doctor was writing what the
15    patient's mother told her at the time of the visit, but
16    it doesn't say that I referred her 'cause I suspected
17    rheumatoid arthritis.
18    BY MS. SEROBIAN:
19        Q    But it also doesn't say that the patient's
20    mother said this.  It just says there is a questionable
21    family history of rheumatoid arthritis.  She's here for
22    consultation.  Directly following that sentence actually,
23                "at the request of Dr. Boxstein and
24            Dr. Bugliosi."
25            But you do not recall referring her for
```

Page 74

David Aaron Bolton, M.D. - March 7, 2019

```
 1    evaluation whether the knee pain for two months was
 2    rheumatoid arthritis?
 3        A    It would have been -- based on this note, it was
 4    about the knee pain --
 5        Q    Yes.
 6        A    -- okay?
 7             The history is what's obtained between the
 8    doctor, meaning Dr. McKeever, and the discussion with the
 9    mother, not a discussion with me.
10        Q    But when you made the referral -- I mean, you
11    didn't tell the mom the knee pain will just go away.  You
12    said, okay, let's send her to a specialist; right?  You
13    referred her to a specialist?
14        A    No.  I think you're confusing things.
15             I don't have that specifically recollected, and
16    I don't remember seeing anything written in my notes.
17             This could have been the mother -- which is a
18    very common practice -- just saying I'm worried, I'd like
19    to get a second opinion.  And my job is to help her, so I
20    refer her to somebody competent to do that without my
21    saying I'm worried, I think it's this diagnosis.  If
22    you'd like a second opinion, I'm perfectly comfortable
23    with it.
24        Q    But the doctor you referred to, was she a second
25    opinion or was she a specialist?
```

Page 75

David Aaron Borukhov, M.D. - March 7, 2019

1       A     Well, that is one and the same.  She's a second

2    opinion to my opinion.  She's a specialist.

3       Q     Okay.  But you cannot as a general pediatrician

4    conclude your opinion on things that may require a

5    specialist's opinion; correct?  I mean --

6       A     I can conclude my own opinion and defer to a

7    specialist's level of expertise thereafter.

8       Q     So in this case you decided to defer to a

9    specialist for expertise?

10      A     I don't have that specific recollection.  I -- I

11   believe we made the referral -- I think we have that

12   note -- but it could have been initiated by the mother's

13   request, levels of concern.  Her father could have talked

14   her into it, husband could have talked her into it.

15            I don't have a problem with parents getting

16   second opinions or -- a second opinion, meaning even if I

17   didn't see the child, to see someone else, we could call

18   that a second opinion.  She's skipping over me, and if

19   they'd like to do that, I don't have a problem with that.

20   I could have helped that without making that diagnosis.

21            MR. GRAHAM:  Just making a standing objection

22   just to all the questions about this document based on

23   speculation.  Foundation.

24   BY MS. SEROBIAN:

25      Q     The document does have you as the referring

                                                  Page 76

David Aaron Boxstein, M.D. - March 7, 2019

```
 1   doctor, and therefore I'm asking if you have any
 2   recollection why you referred the child to this doctor,
 3   Dr. Patricia McKeever.
 4        A    Let me clarify something.
 5             It has me and another doctor.
 6        Q    Yes.
 7        A    I don't know who was pushing this referral, but
 8   for the purposes of her billing, she has to write in
 9   there that there is a request of a doctor.  Otherwise it
10   doesn't -- she can't bill it as a consultation.  So she
11   has to put in there -- even if I never mentioned, I was
12   never even involved -- just because I'm the patient's
13   doctor.  So it doesn't even mean I even made the phone
14   call, I wrote a letter, I gave a prescription.  It
15   doesn't -- that doesn't -- that's not what that means.
16        Q    Are you accusing Ms. -- Dr. McKeever of lying
17   when she wrote here she's here for a consultation at the
18   request of Dr. Boxstein?  Are you accusing her of lying?
19             MR. GRAHAM:  Objection.  Misstates the
20   testimony.
21             THE WITNESS:  I'm saying this is the practice of
22   what these notes mean.  It means that I am the doctor of
23   the patient, and maybe this other doctor who requested it
24   would include me because Mother would say include my
25   primary doctor.
```

Page 77

David Aaron Bornstein, M.D. - March 7, 2019

```
 1              It doesn't mean that I validated what she wrote
 2      above in her history that she took between the mother --
 3      trying to clarify here.
 4      BY MS. SEROBIAN:
 5         Q    In your note here for that same time period
 6      about March 2014 and earlier, do you have a note here
 7      where you made a referral?
 8              MR. GRAHAM:  I'm just going to go on the record
 9      that this is an exhibit that Counsel made from subpoenaed
10      records.
11              I do not represent that these are a full and
12      exhaustive set, this exhibit of the witness's progress
13      notes.
14      BY MS. SEROBIAN:
15         Q    If you can take a look on page 1357, again --
16         A    Say that again.
17         Q    Sure.  Page 1357 of COLA 1357.
18         A    Okay.
19         Q    -- this has some days which may correlate with
20      this letter.
21         A    This is afterwards, isn't it?  This is April and
22      April.  This note is written in March.
23         Q    But there is a February note here, January 29,
24      2014, faxed over, "X-ray RX four" --
25         A    Where she swallowed a quarter.
```

Page 78

David Aaron Bowersock, M.D. - March 7, 2019

```
 1        Q    Quarter that was swallowed.  February 6, 2014,
 2   was x-rayed.
 3             Oh.  So that's x-ray?
 4        A    Yeah.  No foreign body.
 5             So that was about, you know, she ingested it and
 6   wanted to know what happened to it.
 7        Q    So basically defendant's counsel says that this
 8   may not be the complete list of your notes for this
 9   child.  There may be notes in your file which correlate.
10             Do you have the file in front of you?  Can you
11   look it up?
12        A    I have the file here.
13        Q    Perfect.  Could you look it up for those dates?
14        A    Sure.
15             MR. GRAHAM:  Can we go off the record.
16             (Whereupon a discussion was held off the
17             record from 11:37 a.m. to 11:38 a.m.)
18             MS. SEROBIAN:  Back on the record.
19             I was trying to request that you refresh your
20   recollection by looking at Penelopy's file to see if this
21   exhibit produced by defendants of a letter written by
22   Dr. Patricia McKeever says that you requested, you
23   know -- you referred this child to her for consultation,
24   whether this is true or not since you can't remember.
25             But the defendant's counsel is opposing, so this
```

David Aaron Bowsock, M.D. - March 7, 2019

```
 1   is on the record, and we will come back to this part.
 2   BY MS. SEROBIAN:
 3       Q    However, there are other things in the evidence
 4   today that the defendants showed such as a letter from
 5   Mom, COLA page 1372, page 1373.
 6           And the second paragraph of this letter that Mom
 7   wrote to you -- this is also -- this is dated September
 8   25, 2013 -- this -- does this talk about her family
 9   history of having certain issues, medical issues of
10   autoimmune disease and so forth?
11       A    The bottom paragraph.
12       Q    Yes, the second paragraph.  Uh-huh.
13       A    She mentioned she has -- she's been diagnosed
14   with a hereditary autoimmune liver disease.
15       Q    And then that -- what -- it also says that,
16   prescribed --
17               "Metformin that was prescribed for my
18               recent Type II diabetes that gave me
19               horrible side effects for 30 days."
20           Correct?  I mean, she talks about the -- some
21   type of medication given to her that gave her horrible
22   side effects; is that correct?
23       A    That's what's written here.  Yes.
24       Q    Then she goes on to talk about other medical
25   issues.
```

                                              Page 80

David Aaron Bornstein, M.D. - March 7, 2019

```
 1              Was this part -- I mean, this is before the
 2   referral to Dr. Patricia McKeever.
 3              Was this part of that discussion that this child
 4   may have more issues that she needed to be referred to a
 5   specialist to find out what's going on?
 6              MR. GRAHAM:  Objection.  Vague as to "more
 7   issues."
 8              THE WITNESS:  There's no recollection of that,
 9   and I would have no -- I would not -- I would not suppose
10   that.
11   BY MS. SEROBIAN:
12       Q    But there was a discussion from Mom about her
13   medical history of autoimmune disease at least and her
14   horrible reaction to medication?
15       A    Not discussion.  She has this note.
16       Q    Yeah.  A note to you, a discussion meaning that
17   she informed you about --
18       A    Yes.
19       Q    -- this medical history.
20              So you were the aware of that?
21       A    Yes.
22       Q    Okay.  Do you recall what were her reasons for
23   rejecting immunization for Penelopy?
24              MR. GRAHAM:  Objection.  Asked and answered.
25              THE WITNESS:  We discussed it not outside of
```

                                                      Page 81

David Aaron Boxer, M.D. - March 7, 2019

1    what we've already discussed.

2    BY MS. SEROBIAN:

3        Q    Specific reasons other than the ones that she

4    documented in the letter to you or --

5        A    I really -- other than the vague notes that are

6    being brought up, all kinds of medical issues and her

7    personal beliefs against this, I don't have specific

8    recollections.

9        Q    Okay.  Now, are you aware that -- what is the

10   stance of the American Medical -- sorry, my e-mail is --

11            Are you aware of what is the stance that the

12   Association of American Physicians and Surgeons is taking

13   for these forced immunizations on children against

14   parents' consent?

15            MR. GRAHAM:  Objection.  Relevance.

16   BY MS. SEROBIAN:

17       Q    Are you aware of this?

18       A    You're talking about currently or back then?

19   Are you talking about currently?

20       Q    Both current and back then.

21            MR. GRAHAM:  Objection.  Compound.

22            THE WITNESS:  Too vague for me to answer.

23   BY MS. SEROBIAN:

24       Q    Okay.  Well, let me be more specific.

25            Back then, from 2010 to 2014, when Penelopy was

Page 82

David Aaron Borkosky, M.D. - March 7, 2019

1   certainly under your care, what was the stance that the

2   Association of American Physicians and Surgeons, or more

3   directly maybe American Association of Pediatricians, was

4   taking against forced immunizations that were -- while

5   parents were objecting?

6           MR. GRAHAM:  Objection.  Relevance.

7   BY MS. SEROBIAN:

8      Q    In other words, if the parents object to the

9   immunization of their child and you as the physician

10  still recommend it, can you take this stance and force

11  such an immunization on this child?

12     A    Without the parents' consent?

13     Q    Yes.  Without --

14     A    Not without a court order.

15     Q    Not without a court order.

16     A    Right.  I can't do anything without consent.

17     Q    Okay.  Now, are you aware that on February 26,

18  2019, the Association of American Physicians and Surgeons

19  issued a very strong statement opposing any forced

20  immunization of children against their parents' consent?

21     A    I'm not aware of that Association's specific

22  comments, and I certainly have not read it.

23          To clarify, you're talking about less than a

24  month ago; right?

25     Q    February 26, 2019.

David Aaron Baron, M.D. - March 7, 2019

```
 1      A    Right.

 2      Q    Would you like me to read it to you?

 3      A    If you'd like to read it to me.

 4      Q    Yes.

 5           On February 27 (sic), '19, posted on their site,

 6  this is a quote,

 7                "The Association of American Physicians

 8           and Surgeons, AAPS, strongly opposes

 9           federal interference in medical decisions

10           including mandated vaccines.  After being

11           fully informed of the risks and benefits

12           of a medical procedure patients have

13           the right to reject or accept that

14           procedure.  The regulation of medical

15           practice is a state function, not a

16           federal one.  Government preemption

17           of patients' or patients' decisions --

18           or parents' decisions about accepting

19           drugs or other medical intervention" --

20           THE REPORTER:  I'm sorry.  Can you slow down.

21           MS. SEROBIAN:  I'm sorry.

22                -- "governmental preemption of patients'

23           or parents' decisions about accepting

24           drugs or other medical interventions

25           is a serious intrusion into individual
```

Page 84

David Aaron Boxer, M.D. - March 7, 2019

```
1              liberty, autonomy, and parental decisions

2              about child-rearing.  Vaccines are

3              necessarily risky as recognized by

4              the U.S. Supreme Court and by Congress.

5              The vaccine injury compensation program

6              has paid some four billion in damages,

7              and high hurdles must be surmounted

8              to collect compensation.  The damage

9              may be so devastating that most people

10             would prefer restored function to

11             multimillion dollar damage award.

12             Many serious complications have followed

13             MMR vaccination and are listed in

14             the manufacturers' package insert

15             though a casual (sic) relationship

16             may not have been proved.  According

17             to a 2012 report by the Cochrane

18             Collaboration, design and reporting

19             of safety outcomes in MMR vaccines

20             both pre and post marketing are largely

21             inadequate.  The smallpox vaccine is

22             so dangerous that you can't get it

23             now despite the weaponization of smallpox.

24             Rabies vaccine is given only after a

25             suspected exposure or to high-risk
```

David Aaron Boxstein, M.D. - March 7, 2019

1          person such as veterinarians. The

2          whole cell pertussis vaccine was withdrawn

3          from the U.S. market a decade later

4          than from the Japanese market because

5          of reports of severe permanent brain

6          damage. The acellular vaccine that

7          replaced it is evidently safer though

8          somewhat less effective."

9          Quote ends, https://aapsonline.org/measles-

10   outbreak-and-federal-vaccine-mandates -- so this could be

11   found there. The statement was issued February 26, 2019.

12          Were you aware that this medical -- this

13   statement was issued by the Association of American

14   Physicians and Surgeons?

15          MR. GRAHAM: Objection. Relevance.

16          MS. SEROBIAN: What is it?

17          MR. GRAHAM: Objection. Relevance.

18          THE WITNESS: As I said before, I've not read

19   it, and I don't remember that specifically being

20   discussed in my presence.

21   BY MS. SEROBIAN:

22      Q    Would it be important for you to know about

23   those risks when you so strongly recommend vaccination to

24   your patients?

25          MR. GRAHAM: Objection. Speculative.

Page 86

1    Foundation.  Beyond the scope.

2         THE WITNESS:  My discussion with my patients is

3    one-on-one.  That's a position statement, not a risk

4    statement.  And so it's -- it's mixing apples and

5    oranges.

6    BY MS. SEROBIAN:

7         Q    It's a position statement by you?

8         A    No.  That's a position statement by this

9    organization.  It's very broad and political, and it's

10   historical.  And some of it I may disagree with, some of

11   it the majority of physicians and organizations may

12   disagree with.  That just raises a whole, you know, other

13   discussion that's not about what's between me and the

14   patient with their risk this time, this community, their

15   benefit, which is different than what that is referring

16   to.

17        Q    Well, what I read -- that site -- to serious

18   risk and therefore there is a four billion fund to give

19   to those who are damaged by vaccination, so this is part

20   of a fact that's mentioned by the Association of American

21   Physicians and Surgeons.

22             Now, is this the reason that you choose to

23   respectfully disagree with parents when they refuse the

24   vaccination although you do recommend it?

25             MR. GRAHAM:  Objection.  Vague.

Page 87

David Aaron Borison, M.D. - March 7, 2019

```
 1              THE WITNESS:  Which --
 2    BY MS. SEROBIAN:
 3        Q    You just said that throughout your practice,
 4    especially with Penelopy -- specifically to Penelopy, you
 5    and Lucy have decided to respectfully disagree on the
 6    issue of vaccination; is that correct?
 7        A    Correct.
 8        Q    So you recommended the vaccination, and Lucy,
 9    although politely said, but was certain that she was
10    refusing it?
11        A    Correct.  Correct.
12        Q    So is this the reason that you chose as a
13    physician not to take it any further, meaning choose to
14    forcefully vaccinate her or choose to report Lucy as a
15    neglectful parent but leave it as it is on the decision
16    that you are going to respectfully disagree with Lucy?
17        A    This is not a situation that is recognized as
18    outside of the parents' prerogative to refuse.  So that
19    does not rise to the level of referral for neglect.
20              And forceful -- there is no opportunity for me
21    to be forceful about anything that a parent refuses.  I
22    can't examine, I can't do a blood test, I can't do a
23    urine test, I can't make them take antibiotics, I can't
24    make them take vaccines.  There is nothing to be forceful
25    about.
```

                                              Page 88

David Aaron Borkosky, M.D. - March 7, 2019

```
 1        Q    I mean, in the situations where if it's
 2   emergency for the child's safety and -- you would take
 3   such a forceful action; correct?
 4             MR. GRAHAM:  Objection.  Relevance.
 5             THE WITNESS:  But that wasn't what's in the
 6   record.
 7   BY MS. SEROBIAN:
 8        Q    Correct.  So it's not applicable to the
 9   vaccinations here?
10        A    It's not applicable to the circumstances of my
11   care --
12             MR. GRAHAM:  Objection.  Vague.
13             THE WITNESS:  -- with Penelopy Garcia.
14             MR. GRAHAM:  What was that question?  I don't
15   understand what the question or the answer was.
16   BY MS. SEROBIAN:
17        Q    Let me clarify what the question was for
18   Counsel.
19             So question was this:  You admitted that there
20   are circumstances in which you may take a forceful action
21   against parents' consent if it is for the child's safety?
22             MR. GRAHAM:  Vague as to "forceful action."
23   BY MS. SEROBIAN:
24        Q    Forceful medical action if it is --
25        A    About vaccines or something else?
```

Page 89

David Aaron Bouskila, M.D. - March 7, 2019

```
 1       Q    No, no.  In general.  There may be situations
 2   where you may take a forceful medical action if it is
 3   necessary for the child's safety?
 4            MR. GRAHAM:  You're asking if he would jam a
 5   needle in someone's arms?
 6            MS. SEROBIAN:  You gave hypothetical -- many
 7   hypothetical questions.
 8            I'm giving a hypothetical question.  I'm --
 9            MR. GRAHAM:  Objection.  Incomplete
10   hypothetical.
11            MS. SEROBIAN:  Okay.  Let me complete my
12   hypothetical.
13   BY MS. SEROBIAN:
14       Q    Are there situations in your practice where you
15   may choose as the medical professional, as the doctor for
16   that specific child, to take forceful action for
17   medical -- make a forceful medical decision for that
18   child even if it is against their parents' consent?
19            MR. GRAHAM:  Same objections.
20            THE WITNESS:  Can I answer?
21   BY MS. SEROBIAN:
22       Q    Yes.
23       A    I've made referrals -- they're pretty rare -- so
24   obviously when I felt that the child was in some kind of
25   endangerment.
```

Page 90

David Aaron Bowersock, M.D. - March 7, 2019

```
 1       Q    You did not make such a referral in this case,
 2  did you?
 3       A    No.
 4            MS. SEROBIAN:  Okay.  That's it.
 5            MR. GRAHAM:  I have a few follow-ups.
 6
 7                      FURTHER EXAMINATION
 8  BY MR. GRAHAM:
 9       Q    Was there any reason why Ms. Ulikhanova was
10  required to see you for her pediatric care of her child?
11       A    I don't believe she ever was required.  She did
12  it by choice.
13       Q    She was free to go to any other pediatrician
14  that she wanted to; is that correct?
15       A    Yes.
16       Q    Are you under any other legal obligation --
17  pardon -- awful.  Withdraw that.
18            Are you under any legal obligation to vaccinate
19  children that you're aware of?
20       A    The standard of care requires me to do what I'm
21  doing to offer vaccinations --
22       Q    Right, but --
23       A    -- but not force them.
24       Q    There we go.  The law doesn't require you to
25  stab a kid in the arm and stick them with a needle?
```

Page 91

David Aaron Bowersock, M.D. - March 7, 2019

```
 1      A     It prohibits me from doing that.
 2      Q     There we go.  Can you estimate for me how many
 3   times you spoke to Ms. Ulikhanova about vaccines, how
 4   many times you had those conversations where you came to
 5   the respectful difference?
 6      A     10, 12 times.  I don't know.
 7      Q     Okay.  I'd like to put a blank in the deposition
 8   here, just because we don't have comprehensive records,
 9   and I would like you after this at some point to go
10   through your records and just put here in the blank when
11   your care ended.  If you would be able to go through your
12   records and derive from that the last appointment that
13   you had from her.  So I'm going to ask the --
14      A     Last appointment is what's shown on the record.
15      Q     In these records that we have here, that's the
16   last appointment?
17      A     That is the last appointment.
18      Q     Okay.  In that case I'm going to pull it out,
19   and we're going to get that date --
20            MS. SEROBIAN:  Objection.  Misstates testimony.
21   I believe he earlier testified last appointment is not
22   the end of care.
23            Didn't you testify --
24            THE WITNESS:  Clarify --
25            MR. GRAHAM:  You interrupted.
```

Page 92

David Aaron Bortkin, M.D. - March 7, 2019

```
 1              MS. SEROBIAN:  But I think the question was the
 2    date of end of care.  And so -- that their last
 3    appointment date is different from end of care date -- is
 4    different.
 5              MR. GRAHAM:  Off the record.
 6              (Whereupon a discussion was held off the
 7              record from 11:53 a.m. to 11:54 a.m.)
 8              MR. GRAHAM:  Back on the record.
 9    BY MR. GRAHAM:
10       Q    And I want to go to -- it's that exhibit that
11    had your progress notes.  It's COLA 1355 to COLA 1359 --
12    I forget the exact exhibit number, but --
13              So you're saying my suspicions were incorrect?
14    This actually is -- these are the comprehensive progress
15    notes for this patient?
16       A    Yes.
17       Q    Okay.  The last date here is May -- it looks
18    like 13th, 2014.
19              Are you willing to testify that that was the
20    last date that you would have seen --
21       A    When I looked at it yesterday --
22              THE REPORTER:  That you would have seen -- I'm
23    sorry?
24              THE WITNESS:  The patient was seen here.
25    ///
```

Page 93

David Aaron Boxstein, M.D. - March 7, 2019

```
 1    BY MR. GRAHAM:
 2        Q    That you would have seen Penelopy?
 3             So your testimony is that May 13, 2014 is the
 4    last time you saw Penelopy; is that correct?
 5        A    Correct.
 6        Q    Excellent.  Earlier with respect to the exhibit
 7    from Patricia McKeever, M.D., COLA 1370 -- you don't have
 8    to look at it, I'll just ask you -- you were not in the
 9    room when Ms. Ulikhanova, P.G., and Ms. McKeever were
10    having their appointment, were you?
11        A    No.
12        Q    Okay.  You didn't hear the conversation between
13    those three individuals, did you?
14        A    No.
15        Q    Okay.  That conversation was not reported to you
16    by Dr. McKeever in any subjective detail, was it?
17        A    Beyond this written record?
18        Q    I'll withdraw the question.
19             Did Dr. McKeever call you that night and say,
20    Dr. Boxstein, let me give you the play by play of what
21    happened today?
22        A    I have no recollection of that.  It's not in the
23    record.
24        Q    All right.  This is a document that was produced
25    by Dr. McKeever's office; is that correct?
```

Page 94

David Aaron Bowersock, M.D. - March 7, 2019

```
 1      A    Correct.
 2      Q    And it was sent to you based on medical records
 3  being shared between offices -- pretty routine; is that
 4  correct?
 5      A    Correct.
 6      Q    Okay.  When you said previously that you thought
 7  Penelopy had a limp, that was based off your
 8  recollection; is that correct?
 9      A    Or confusion.  I don't remember.
10      Q    Okay.  And then we were talking earlier about
11  Exhibit 52, COLA 1413 through COLA 1416.  There was -- my
12  last question -- there was some questions from opposing
13  counsel about these being "form" forms --
14      A    Yes.
15      Q    -- if you'll pardon the expression -- that
16  there's no way here to report medical history, specific
17  medical conditions.
18           That's not a function of this form, is it?
19      A    Correct.
20      Q    This is not to -- this does not constitute a
21  medical exemption?
22      A    Correct.
23      Q    If I did want to create a medical exemption, I
24  would use a different kind of form, wouldn't I?
25      A    Form or free form.
```

Page 95

David Aaron Bowersock, M.D. - March 7, 2019

1        Q    Right.  The point of this form is to communicate

2    that you as the physician communicated the risk of

3    vaccination; correct?  It's like informed consent; right?

4        A    The point of this form is to document that I

5    didn't vaccinate not because I didn't offer but because

6    the patient took the prerogative to refuse them.

7        Q    But as kind of a high level of abstraction,

8    these forms serve the purpose of ensuring that the

9    patients' parents has the relevant information about

10   vaccinations, about risks, when they make the decision to

11   refuse?

12       A    That, too.

13            MR. GRAHAM:  Okay.  That's all I need.

14            And if you have anything else?

15            MS. SEROBIAN:  Yes, I do.

16

17                      FURTHER EXAMINATION

18   BY MS. SEROBIAN:

19       Q    Doctor, at what age do you start seeing your

20   pediatric patients annually, meaning when they're younger

21   you see them more often, and at some point it starts just

22   annual visits, annual checkups?  At what point --

23            MR. GRAHAM:  We're done paying.

24            MS. SEROBIAN:  You asked for the last date of

25   visit.  We need to know when she was due.

                                            Page 96

David Aaron Boxer, M.D. - March 7, 2019

```
 1              You're not done paying.  I'm following on this
 2    question -- the last visit, when would have been the next
 3    visit.
 4              THE WITNESS:  Annual visits begin at age six.
 5    BY MS. SEROBIAN:
 6         Q    At age six.  So --
 7         A    I'm sorry.  Age four.
 8         Q    Yes.  Okay.
 9         A    I'm sorry.  Why am I saying that?  It's every
10    other year at age six.  From age two it's annual.
11         Q    From age two.  So Penelopy, as soon as she
12    turned age two, would be seen at your office for annual
13    visits when she was about -- when she turning three, when
14    she was turning four --
15         A    That's for well child care?
16         Q    Yes.
17         A    Right.
18         Q    -- for when she was turning five, when she was
19    six, and then every other year thereafter; is that
20    correct?
21         A    That is correct.
22         Q    And then she could be seen sooner if there's a
23    problem like an inner ear infection or knee pain and so
24    forth, but it's not necessary or mandatory?
25         A    That's correct.
```

Page 97

David Aaron Bornstein, M.D. - March 7, 2019

```
 1        Q    Now, when would have been the next visit for
 2   Penelopy following the last visit when you saw her?
 3             Or let me -- let me pull that question and ask
 4   it this way.  Would she be due -- after the 2014 visit,
 5   would she be due for her annual visit when she was five
 6   years old?
 7        A    Her last annual visit was 9/12/13.  That means
 8   she was due to be seen 10/12/13 (sic) for her regular
 9   well child care.
10        Q    Can you say that again.  After -- when was
11   she --
12        A    The last annual -- the last well child care
13   visit in here is 9/12/13, so she would have been due --
14   'cause at that point she was over two -- she would be due
15   annually, let's say, from that date, so her next date
16   would be 9/12/14.
17        Q    And then?  And then 9/12 --
18        A    9/12/15, if you want to go annual from that
19   date.
20             MR. GRAHAM:  I'm going to object that it's
21   speculative.
22             MS. SEROBIAN:  You asked for her last day of
23   visit.  We are trying to find out when would have been
24   her next day of visit.  She was (inaudible) --
25             MR. GRAHAM:  In that --
```

Page 98

David Aaron Bowersock M.D. - March 7, 2019

1          MS. SEROBIAN:  -- at some point in time.

2          We need to know when would have been the next

3    day of visit.

4          MR. GRAHAM:  In that case, I'm going to object

5    that it's irrelevant.  And it's outside the scope of the

6    redirect.

7          MS. SEROBIAN:  It's not outside the scope

8    because it's very relevant to your questioning when was

9    the last date of visit.  We need to know when would she

10   be up for the next visit.

11         MR. GRAHAM:  There's no judge here ruling on the

12   objection.  He can answer.

13         MS. SEROBIAN:  Yes, so -- well, I'm saying why I

14   don't agree with you.

15   BY MS. SEROBIAN:

16      Q    So when was the last date of visit again?

17      A    The last visit for an illness was 5/13/2014.

18      Q    And my other question that I wanted to follow up

19   is -- yes.  Yes.  I remembered my question.  Sorry.

20   Thank you for your patience.

21         So this document, COLA 001413 to -- and then the

22   document, actually, the standard forms, 001413 to 001416.

23   Going to refer you to these documents here.

24      A    Yes.

25      Q    The defense counsel asked you whether these were

                                                   Page 99

```
 1    considered medical exemptions.

 2            And your answer is no; correct?

 3       A    Correct.

 4       Q    What --

 5            MR. GRAHAM:  Objection.  Asked and answered.

 6    BY MS. SEROBIAN:

 7       Q    What type of exemptions are these considered?

 8    What is this document to you?  What does this document

 9    mean to you?

10            MR. GRAHAM:  Objection.  Asked and answered.

11            MS. SEROBIAN:  No.

12            MR. GRAHAM:  There's elaborate testimony on

13    this.

14            MS. SEROBIAN:  No, it's not.  I have a

15    question -- it's a follow-up to your question about this

16    document.  I need to know what --

17            MR. GRAHAM:  Then ask the follow up.

18            MS. SEROBIAN:  I'm asking.

19    BY MS. SEROBIAN:

20       Q    What does this document mean to you?

21       A    The first one is simply a refusal to vaccinate.

22       Q    What does the refusal to vaccinate mean to you?

23       A    What it means to me is that I have explained to

24    the parents the need -- the recommendation for vaccines,

25    the appropriateness of them -- the risk, the benefits, et
```

                                        Page 100

David Aaron Box, M.D. - March 7, 2019

```
 1   cetera -- and that in the face of that, they are choosing
 2   to decline.  It is not my decision to not vaccinate them.
 3       Q    And it is your earlier testimony that the parent
 4   has this legal right to refuse; correct?
 5       A    Correct.
 6       Q    Now --
 7            MR. GRAHAM:  Objection.  Vague as to time.
 8   BY MS. SEROBIAN:
 9       Q    When the mother Lucy signed this document on
10   November 13, 2012, it's your understanding that she had
11   the legal right to do this?
12       A    Yes, she did.
13       Q    Now, looking at document page 1416 --
14       A    Yes.
15       Q    -- here -- the title of this document is
16   "Personal Beliefs Exemption To Required Immunization";
17   correct?
18       A    Yes.
19       Q    Now, what does this document mean to you?
20            MR. GRAHAM:  Objection.  Asked and answered.
21   BY MS. SEROBIAN:
22       Q    Please go ahead and answer.
23            What does this document mean to you?
24       A    That the mother has had a discussion with me as
25   the medical provider about the benefits and risks of the
```

Page 101

David Aaron Boxer, M.D. - March 7, 2019

```
 1    vaccines, and based on her personal beliefs, she is
 2    choosing to refuse the vaccines despite the conversation.
 3        Q    Now, this document is signed September -- it
 4    seems September 20, 2014.
 5        A    Looks like December 25.
 6        Q    Would you read it.  I'm sorry.
 7        A    December 25, if you look at the middle --
 8        Q    The middle?
 9        A    -- at the bottom, makes sense that it matches
10    that.
11        Q    It's either December or September -- you're
12    right -- 25, 2014.
13             Is that correct?
14        A    September 25, 2014; correct.
15        Q    Yes.  So is it your understanding that mother
16    Lucy had the legal right to refuse vaccination for her
17    child Penelopy when she signed this document?
18        A    Yes.
19        Q    Okay.  Now, did mother Lucy need a medical
20    exemption signed by you to refuse legally vaccinations
21    for her child?
22        A    No.
23             MR. GRAHAM:  Objection.  Vague as to time.
24    BY MS. SEROBIAN:
25        Q    When the mother Lucy signed these documents,
```

Page 102

David Aaron Bowman, M.D. - March 7, 2019

```
 1    first one being November 13, 2012, second one being
 2    September 25, 2014, documents page 1413 for COLA and 1416
 3    for COLA, did she need anything further from you such as
 4    a medical exemption?
 5              MR. GRAHAM:  Objection.  Compound.
 6              MS. SEROBIAN:  I'll rephrase it.
 7    BY MS. SEROBIAN:
 8        Q    We already said on the record that mother had
 9    the legal right to refuse vaccinations November 13, 2012
10    and September 25, 2014 when she signed these documents;
11    correct?
12        A    Correct.
13        Q    Now, did she during this time frame when she
14    signed these documents --
15              And these are in your file?
16              MR. GRAHAM:  I'm just going to object.
17    Misstates prior testimony.
18              MS. SEROBIAN:  The witness said correct.
19              Which part is misstated?
20              MR. GRAHAM:  I'm preserving the objection.
21              We don't --
22              MS. SEROBIAN:  No, but you say misstates
23    testimony.
24              Which part -- because the witness said correct.
25    So which part am I misstating?
```

David Aaron Boxerman, M.D. - March 7, 2019

```
 1                 MR. GRAHAM:  That --

 2                 MS. SEROBIAN:  That needs to be on the record.

 3                 MR. GRAHAM:  No.

 4                 MS. SEROBIAN:  It does.

 5                 MR. GRAHAM:  It does not go on the record.  I

 6      make the objection, you keep going, and then the judge --

 7                 MS. SEROBIAN:  No.  You can't make an objection

 8      that is not founded.

 9                 MR. GRAHAM:  That is exactly how this works.

10                 MS. SEROBIAN:  "Misstates the testimony."

11                 Which testimony am I misstating, so I can

12      understand, so I can correct my question?

13                 MR. GRAHAM:  You --

14                 MS. SEROBIAN:  No.  I need to correct my

15      question, but I need to know which statement am I

16      misstating.  The witness said correct.

17      BY MS. SEROBIAN:

18         Q    Okay.  So not knowing which statement I've

19      misstated, I'm going to rephrase my question as follows:

20      You said previously, Doctor, that when mother Lucy signed

21      the document titled "Refusal to Vaccinate" on November

22      13, 2012, she had the legal right to do so; is that

23      correct?

24         A    Yes.

25         Q    You also said previously that when mother signed
```

Page 104

David Aaron Bolton, M.D. - March 7, 2019

```
 1   the document "Personal Beliefs Exemption To Required
 2   Immunization" on September 25, 2014, she had a legal
 3   right to do so; is that correct?
 4        A    That's my understanding.  Yes.
 5             MR. GRAHAM:  I'm going to object to this line of
 6   questioning.  It calls for a legal conclusion.  And
 7   speculative.
 8             MS. SEROBIAN:  Okay.
 9   BY MS. SEROBIAN:
10        Q    My last question to this, as a follow-up, did
11   she need anything more from you such as a medical
12   exemption to exercise her legal right to refuse
13   vaccination for her child --
14             MR. GRAHAM:  Objection.
15             (Reporter clarification.)
16   BY MS. SEROBIAN:
17        Q    The question is the following:  Did the mother
18   Lucy need anything more from you such as a medical
19   exemption to exercise her legal right to refuse
20   vaccination back in November 2012 and September 2014?
21             MR. GRAHAM:  Objection.  Vague.  And legal
22   conclusion.
23   BY MS. SEROBIAN:
24        Q    Do you want me to rephrase?
25        A    Yes.
```

Page 105

David Aaron Bowsock, M.D. - March 7, 2019

1      Q     Of course.

2      A     Please.

3      Q     You basically took this document signed by

4    mother Lucy when -- those days, November 2012 and

5    September 2014, at face value; correct?  You did not

6    require her to obtain a medical exemption either from you

7    or another doctor to refuse vaccination of her child?

8    That's my question.  She didn't need any more to exercise

9    her right to refuse vaccination?  She didn't need

10   anything more from you or anything more from another

11   doctor such as a medical exemption to exercise her legal

12   right to refuse vaccination during those dates the

13   documents are signed?

14          MR. GRAHAM:  Same objections.

15          THE WITNESS:  My problem with answering --

16   BY MS. SEROBIAN:

17     Q     Yeah.  Go ahead.

18     A     This is a -- this is -- 1415 is a document if

19   nothing else to protect me from failing to do my duty.

20          It's not about her legal right.  It's that she

21   has -- she has refused to allow me to do -- to meet the

22   standard of care.

23     Q     But she has the legal right to do so; correct?

24     A     I guess -- I don't know.

25     Q     I mean, you take this document and you don't do

Page 106

David Aaron Bowersock, M.D. - March 7, 2019

1   anything more with it?  You don't call a neglect hotline

2   or do anything?  I mean, you just take her word for it?

3       A    Right.  I do not take any actions.  I do not

4   take any actions on that.  But this is for the purposes

5   of documenting that I did my job.  She refused it, and so

6   if someone questions the care later on as to why didn't

7   you vaccinate -- insurance company, you know, anybody --

8   it is documented that the parents did have the

9   information and they chose not to, whether there was

10  purely legal or anything -- I mean, I'm just --

11      Q    But you don't get in trouble any more once you

12  have the parents' signature refusing basically?

13      A    I don't take this and then use it to do

14  something else.

15      Q    No.  I'm not saying --

16           You don't get in trouble if anybody asks you

17  anything, just say I had the parents' refusal signed, and

18  you're done?

19      A    The trouble is, yes, I do.  We have to defend it

20  all the time, so that's the same question.

21      Q    No, but once you have the signature of the

22  parents, you did your job.  You got the parents'

23  signature refusing to vaccinate, and you're done?

24      A    Right.

25           MR. GRAHAM:  I object to this whole line of

                                           Page 107

David Aaron Boxer, M.D. - March 7, 2019

```
 1    questioning.  It's not relevant.
 2            MS. SEROBIAN:  It's my -- he still didn't answer
 3    my last question --
 4    BY MS. SEROBIAN:
 5      Q    -- was does mother need a medical exemption at
 6    all from you or any other doctor to exercise -- I mean,
 7    you giving her these forms -- to exercise her right to
 8    sign the refusal to vaccinate form or to exercise her
 9    right to sign the Personal Beliefs Exemption form?
10      A    The form is what it is.  All she has to do is
11    check those off and refuse.  That's all it is.
12      Q    Okay.
13      A    There's nothing else attached to this document.
14           That's what you're asking?
15      Q    What is your understanding -- when would the
16    mother ever need a certain medical exemption form from
17    you specifically?
18           MR. GRAHAM:  Objection.  Relevance.  Legal
19    conclusion.
20           MS. SEROBIAN:  We talked about medical
21    exemption.  You kept on asking medical exemption.  I need
22    to know why is that relevant.
23    BY MS. SEROBIAN:
24      Q    Why would mother Lucy need a medical exemption
25    from you to refuse to vaccinate her child?  What is your
```

Page 108

David Aaron Bookstein, M.D. - March 7, 2019

1   understanding?

2        A    Can I answer?

3        Q    Yes.

4        A    Okay.  It comes up most commonly when

5   required -- with requirements to either school or

6   daycare -- I think those are the two -- that will not let

7   them enter if they're not vaccinated or -- or if there's

8   an "unless."

9             If the unless is unless you have a medical

10  exemption, then they would need -- they would request

11  that from me, or they could get it from somebody else.

12       Q    Okay.  So unless mother actually was enrolling

13  her child in a school setting that required such medical

14  exemption, she wouldn't need to come to you and ask for

15  one; is that correct?

16       A    That was one example.  Yes.

17       Q    One example.  Okay.  Any other examples you

18  have?

19       A    Well, daycare is not a school, but daycare.

20       Q    That's correct.

21            MR. GRAHAM:  Objection.  Speculation.

22            THE WITNESS:  Off the top of my head those are

23  the two ones that come up.

24  BY MS. SEROBIAN:

25       Q    From review of your file, do you see notes where

                                        Page 109

David Aaron Bortz, M.D. - March 7, 2019

```
 1   mother Lucy ever asked you for a medical exemption?
 2            MR. GRAHAM:  Objection.  Asked and answered.
 3            MS. SEROBIAN:  I did not ask that question.
 4            MR. GRAHAM:  I did.
 5            MS. SEROBIAN:  I didn't.
 6            THE WITNESS:  No.  I did not see it.
 7   BY MS. SEROBIAN:
 8       Q    So mother Lucy did not ask you for medical
 9   exemption for her child?
10       A    That I can recollect or see in the record,
11   correct.
12       Q    Is it safe to assume that she didn't need that
13   medical exemption for her child?
14            MR. GRAHAM:  Objection.  Calls for speculation.
15            THE WITNESS:  I don't remember any place where
16   she needed it at that time.
17            MS. SEROBIAN:  Okay.  I think I'm done.
18            Thank you so much for your time.
19            THE WITNESS:  Pleasure.
20            MR. GRAHAM:  Stipulation that the transcript
21   will be sent to us.  We will send it to the deponent who
22   will have 30 days to make corrections.  If the deponent
23   does not make any corrections within 30 days it will be
24   presumed correct and true.
25            We will keep the original.
```

Page 110

David Aaron Bowen, M.D. - March 7, 2019

```
 1              If the original is destroyed, a copy can be used
 2     for trial.
 3              Is that everything that we usually stipulate to?
 4              Stipulated?
 5              MS. SEROBIAN:  Yes.  Stipulated.
 6              THE REPORTER:  Will Counsel be purchasing a
 7     certified copy?
 8              MS. SEROBIAN:  Are you providing me a copy?
 9              MR. GRAHAM:  No.  We don't usually provide
10     copies.
11              MS. SEROBIAN:  Yeah.  We will purchase a copy.
12              THE REPORTER:  Okay.
13              (Whereupon a discussion was held off the
14              record from 12:15 to 12:15 p.m.)
15              MR. GRAHAM:  Back on the record.
16              We'll stipulate that you will have until April
17     9th.
18              THE WITNESS:  Okay, but I will be provided --
19              MR. GRAHAM:  Will provide it by April 1st.
20              MS. SEROBIAN:  I'm not stipulating to anything
21     just yet.
22              What are our cut-offs?  I mean, if we're
23     stipulating past cut-off for discovery -- for discovery
24     cut-offs?
25              MR. GRAHAM:  April 22nd.
```

                                          Page 111

David Aaron Born, M.D. - March 7, 2019

```
1              MS. SEROBIAN:  So April 9th is the cut-off for
2   what?  For --
3              MR. GRAHAM:  For him going on his trip.
4              THE WITNESS:  My availability.
5              MS. SEROBIAN:  No, I understand.  But he needs
6   30 days to review it.
7              MR. GRAHAM:  That's what he's saying.  He's
8   waiving -- he doesn't need 30 days.  That's what I just
9   said, so he's saying he'll do it in under 30 days.
10             THE WITNESS:  For sure.
11             MR. GRAHAM:  So we just work it out amongst
12  ourselves -- "we" -- 'cause we're paying for it.
13             We can get it before April 1st --
14             THE REPORTER:  Yes.
15             MR. GRAHAM:  -- and then we'll get it to you by
16  April 1st, and then you get it back to us by April 9th.
17             THE WITNESS:  How do I get it back in that
18  direction in terms of transcript, signed -- I don't
19  remember.
20             MR. GRAHAM:  If you make changes.
21             And then if you are cool with how it is, then
22  you don't make changes, then you just go on your trip
23  and --
24             MS. SEROBIAN:  But tell us in advance that
25  you're cool with it.  Otherwise he gets 30 days.
```

Page 112

David Aaron Boxstein, M.D. - March 7, 2019

1              MR. GRAHAM:  No.  We're going to go on the

2      record and say, yes, April 9th.

3              THE WITNESS:  Correct.

4              MS. SEROBIAN:  Whether you get it back or not?

5              THE WITNESS:  So no answer means I'm cool with

6      it.

7              MS. SEROBIAN:  By April 9th.

8              THE WITNESS:  I'll make sure --

9              MR. GRAHAM:  So we'll go back on the record

10     then?  Or we were on?

11             THE REPORTER:  Yeah.

12             MR. GRAHAM:  Okay.

13             So stipulate that we will obtain the record and

14     get it to you, the deponent, by April 1.

15             And if you have any changes, you will review it,

16     make those changes, and get them to us by April 9th.

17             If you do not get it back to us by April 9th,

18     then there are no changes and that we are good.

19             THE WITNESS:  Agreed.

20             MR. GRAHAM:  And then I need to pay you now.

21             THE REPORTER:  Now we're off?

22             MR. GRAHAM:  Yes.

23             (Whereupon, at 12:17 p.m., the deposition

24             of David Aaron Boxstein, M.D., was adjourned.)

25

                                        Page 113

David Aaron Boxstein, M.D. - March 7, 2019

```
 1   STATE OF CALIFORNIA    )

 2   COUNTY OF LOS ANGELES )    ss.

 3

 4

 5

 6          I, the undersigned, hereby certify under penalty

 7   of perjury under the laws of the State of California that

 8   the foregoing testimony is true and correct.

 9          Executed this _____ day of

10   _____, 20_____, at _____,

11   California.

12

13

14

15                          _____

                            DAVID AARON BOXSTEIN, M.D.

16

17

18

19

20

21

22

23

24

25

                                                    Page 114
```

David Aaron Bowersock, M.D. - March 7, 2019

```
 1   STATE OF CALIFORNIA    )

 2   COUNTY OF LOS ANGELES )     ss.

 3

 4           I, Izumi Kono, CSR 14156, in and for the State

 5   of California, do hereby certify:

 6           That prior to being examined, the witness named

 7   in the foregoing deposition was by me duly sworn to

 8   testify to the truth, the whole truth, and nothing but

 9   the truth;

10           That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced to typewriting under my direction, and

13   the same is a true, correct, and complete transcript of

14   said proceedings;

15           That if the foregoing pertains to the original

16   transcript of a deposition in a federal case, before

17   completion of the proceedings, review of the transcript

18   {X} was { } was not required.

19           I further certify that I am not interested in

20   the event of the action.

21           Witness my hand this 22nd day of March, 2019.

22

23

24

             Certified Shorthand Reporter

25           for the State of California
```

Page 115

David Aaron Bowersock, M.D. - March 7, 2019

**[001355 - 4th]**

| 0 | |
|---|---|
| **001355** | 3:24 |
| **001359** | 3:24 |
| **001360** | 3:14 |
| **001370** | 3:17 |
| **001371** | 3:18 |
| **001372** | 3:19 |
| **001373** | 3:19 |
| **001386** | 3:22 |
| **001388** | 3:23 |
| **001389** | 3:11 |
| **001394** | 3:21 |
| **001397** | 3:21 |
| **001413** | 3:12 99:21 99:22 |
| **001416** | 3:13 99:22 |
| **001420** | 3:16 |
| **0015040** | 4:3 |
| **001511** | 4:3 |

| 1 | |
|---|---|
| **1** | 113:14 |
| **10** | 92:6 |
| **10/12/13** | 98:8 |
| **100** | 2:9,14 |
| **100,000** | 69:12 |
| **10:07** | 2:2 5:2 |
| **10:28** | 25:4,4 |
| **10:55** | 45:9 |
| **10:56** | 45:9 |
| **11/12/10** | 3:11 |
| **11:24** | 69:23 |
| **11:25** | 69:23 |
| **11:37** | 79:17 |
| **11:38** | 79:17 |
| **11:53** | 93:7 |
| **11:54** | 93:7 |
| **12** | 13:21 35:3 92:6 |
| **12:15** | 111:14,14 |
| **12:17** | 113:23 |

**12th** 34:25
**13** 3:11 26:3 46:12 48:13,21 94:3 101:10 103:1,9 104:22
**1355** 45:24 65:22 93:11
**1357** 46:20 78:15 78:17,17
**1358** 48:2
**1359** 45:24 49:5 65:22 93:11
**1360** 36:17
**1370** 38:18 94:7
**1371** 38:18
**1372** 39:15 80:5
**1373** 39:15 80:5
**1386** 43:21
**1388** 43:21
**1394** 41:22
**1397** 41:22
**13th** 93:18
**14** 50:11
**1411** 2:3
**1413** 23:12,13 26:16 29:19 35:22 35:23,25 61:16,19 95:11 103:2
**1414** 26:6 28:3,11 28:13 35:13,15,17 61:19
**1415** 29:17 61:19 106:18
**14156** 1:21 2:4 115:4
**1416** 29:21 31:10 31:14,19 36:5,5,7 61:16,19 95:11 101:13 103:2
**1420** 37:16

**14th** 46:20
**15** 6:8
**1505** 34:21
**1507** 35:11,14
**1508** 35:21,22
**1509** 36:3,4
**17516** 115:24
**19** 84:5
**1st** 111:19 112:13 112:16

| 2 | |
|---|---|
| **2** | 4:3 34:16,18 45:13 61:14,15 |
| **2,595** | 14:12 |
| **2/12/16** | 4:3 |
| **20** | 40:14 102:4 114:10 |
| **2010** | 13:21 61:2,3 82:25 |
| **2011** | 44:10,15 49:6 50:25 |
| **2012** | 26:3 48:3,13 48:21 50:9 51:1 85:17 101:10 103:1,9 104:22 105:20 106:4 |
| **2013** | 39:22 80:8 |
| **2014** | 12:12,25 32:12,15 35:6 46:1,6,12,21 47:15 60:25 61:4 78:6 78:24 79:1 82:25 93:18 94:3 98:4 102:4,12,14 103:2 103:10 105:2,20 106:5 |
| **2016** | 35:1,3 |
| **2019** | 1:14 2:3 5:1 83:18,25 86:11 115:21 |

**21st** 48:2
**22nd** 111:25 115:21
**23** 3:12
**24** 14:24
**245** 44:15,19
**245.1** 44:11
**25** 32:12,15 46:6 80:8 102:5,7,12,14 103:2,10 105:2
**25th** 39:22
**26** 83:17,25 86:11
**27** 84:5
**29** 78:23
**29th** 47:15
**2:17** 1:6
**2nd** 49:5

| 3 | |
|---|---|
| **30** | 5:7 40:12 80:19 110:22,23 112:6,8 112:9,25 |
| **300** | 2:14 |
| **300,000** | 69:13 |
| **3246824** | 1:19 |
| **34** | 4:3 |
| **35** | 14:11,13 20:7 |
| **36** | 3:14 |
| **37** | 3:15 |
| **38** | 3:17 |
| **39** | 3:19 |

| 4 | |
|---|---|
| **4** | 40:7 |
| **4/16/2014** | 47:21 |
| **41** | 3:20 |
| **43** | 3:22 |
| **45** | 3:24 |
| **4th** | 44:10 |

Page 1

David Aaron Bornstein, M.D. - March 7, 2019

**[5 - april]**

**5**

**5**   3:5 46:1
**5/13/2014**   99:17
**50**   3:11 13:20,22
**52**   3:12 23:4,5
   95:11
**539-2249**   2:10
**54**   3:14 36:19
**56**   3:6,15 37:11,12
**562-5800**   2:15
**58**   3:17 38:12,13
   39:7

**6**

**6**   79:1
**60**   3:19 39:8,9,10
**600**   2:9
**62**   3:20 41:16,17
**64**   3:22 43:15,16
**66**   3:24 45:18,19
   45:23

**7**

**7**   1:14 2:2 5:1

**8**

**818**   2:10,15

**9**

**9**   51:1
**9/12**   98:17
**9/12/13**   37:20,21
   98:7,13
**9/12/14**   98:16
**9/12/15**   98:18
**9/25/13**   3:19 37:20
   38:6,10
**91**   3:5
**91203**   2:9
**91502**   2:14
**91505**   2:4
**9193**   1:6

**96**   3:6
**9th**   50:9 111:17
   112:1,16 113:2,7
   113:16,17

**a**

**a.m.**   2:2 5:2 25:4,4
   45:9,9 69:23,23
   79:17,17 93:7,7
**aaps**   84:8
**aapsonline.org**
   86:9
**aaron**   1:13 2:1 3:4
   5:9 9:11 113:24
   114:15
**abbreviated**   14:8
**abc**   40:7
**able**   92:11
**absolutely**   16:16
   21:15 52:25
**abstraction**   96:7
**abuse**   60:10,12
   61:10
**abused**   60:7
**academy**   10:12
**accept**   66:15 84:13
**accepting**   84:18
   84:23
**accuracy**   8:2
**accurate**   7:13
   35:17
**accusing**   77:16,18
**acellular**   24:17
   86:6
**action**   5:20 11:17
   89:3,20,22,24 90:2
   90:16 115:20
**actions**   107:3,4
**add**   63:10 64:9,10
**addressed**   39:20
**adjourned**   113:24

**administer**   67:8
   70:24
**admit**   47:8 70:18
**admittance**   26:11
**admitted**   67:10
   89:19
**adulthood**   10:5
**advance**   112:24
**advice**   57:21
**advised**   23:16
**afterward**   10:20
**age**   20:9 96:19
   97:4,6,7,10,10,11
   97:12
**agency**   11:1
**ages**   10:4 65:8,9
**ago**   83:24
**agree**   99:14
**agreed**   25:25
   113:19
**agreeing**   64:7
**agreement**   30:5,10
   52:14 62:17
**ahead**   101:22
   106:17
**aids**   40:7
**al**   1:4,7
**allergic**   72:22
**allow**   24:3 62:21
   63:1,6 64:4
   106:21
**american**   82:10,12
   83:2,3,18 84:7
   86:13 87:20
**angeles**   1:7 5:20
   10:10,22,23 11:1
   23:12 60:10 114:2
   115:2
**angry**   53:6
**annual**   96:22,22
   97:4,10,12 98:5,7

98:12,18
**annually**   96:20
   98:15
**answer**   55:10 56:1
   58:2 82:22 89:15
   90:20 99:12 100:2
   101:22 108:2
   109:2 113:5
**answered**   45:1
   81:24 100:5,10
   101:20 110:2
**answering**   7:23
   106:15
**answers**   6:17 8:3
**antibiotics**   88:23
**anybody**   47:5
   107:7,16
**appearances**   2:6
**appearing**   44:19
**apples**   87:4
**applicable**   8:19
   89:8,10
**applied**   25:13
**apply**   18:23 20:22
   66:1
**applying**   25:24
**appointment**
   92:12,14,16,17,21
   93:3 94:10
**appreciate**   53:8
**appropriate**   17:18
   17:22 25:12 59:4
   59:6 67:5,6,9
**appropriateness**
   100:25
**approximately**
   14:19,24
**april**   44:10,15
   46:20 47:15 48:2
   78:21,22 111:16
   111:19,25 112:1

Page 2

David Aaron Boxstein, M.D. - March 7, 2019

**[april - brought]**

112:13,16,16
113:2,7,14,16,17
**argue**  40:22
**arm**  91:25
**arming**  52:21
**arms**  90:5
**arthritis**  26:23
28:9 31:2 33:2,21
63:3 71:11,13,21
71:22,24 72:24
73:3,11,23 74:17
74:21 75:2
**asked**  21:7,23 62:2
81:24 96:24 98:22
99:25 100:5,10
101:20 110:1,2
**asker**  54:24
**asking**  19:19 20:5
20:17,25 21:13,14
40:20 56:21 58:23
63:18 64:12,13
65:16 68:8 73:19
74:7 77:1 90:4
100:18 108:14,21
**asks**  26:10 107:16
**assert**  53:15
**asserted**  51:9
**assertion**  66:9
**assertive**  53:11
**assessment**  48:16
50:12
**associate**  38:1
**association**  82:12
83:2,3,18 84:7
86:13 87:20
**association's**
83:21
**assume**  7:17
110:12
**assuming**  32:12
49:14

**asthma**  27:1 28:11
31:4 33:5,21 63:3
**attached**  13:24
23:7 34:18 36:21
37:14 38:15 39:12
41:19 43:18 45:21
108:13
**attention**  40:4
**attorney**  8:15
**autoimmune**  40:6
40:21 80:10,14
81:13
**autonomy**  85:1
**availability**  112:4
**awakening**  53:21
**award**  85:11
**aware**  11:14 21:23
60:5 68:21 81:20
82:9,11,17 83:17
83:21 86:12 91:19
**awful**  91:17

**b**

**b**  9:12 15:8,9,13
24:13
**baby**  13:1 14:4
**back**  13:12,18
24:5 25:5 26:15
35:11 45:10 55:2
55:25 69:24 70:1
70:23 71:8 79:18
80:1 82:18,20,25
93:8 105:20
111:15 112:16,17
113:4,9,17
**bad**  18:3
**balance**  69:9
**based**  18:13 22:25
30:2 31:23 32:2
33:3 55:14 57:7
62:11 75:3 76:22
95:2,7 102:1

**basically**  13:6,7
25:10,15 26:10
59:7 62:16 63:6
63:25 65:20 66:2
66:7,24 79:7
106:3 107:12
**basis**  16:25 17:5,8
**bates**  3:11,12,14
3:15,17,19,20,22
3:24 4:3 23:10
36:17
**becoming**  19:17
20:13
**beginning**  6:2
45:24 50:15
**behalf**  2:1 5:17
8:15
**belief**  52:18 67:15
**beliefs**  29:22 62:16
62:18,23 63:4
82:7 101:16 102:1
105:1 108:9
**believe**  12:12 16:7
32:19 33:21 35:6
37:11 42:4 45:23
61:1 65:21 76:11
91:11 92:21
**beneath**  37:6
**beneficial**  34:3
**benefit**  69:9,10,14
69:16 87:15
**benefits**  29:25
30:2 63:21 68:6
68:17 69:15 84:11
100:25 101:25
**better**  18:17 20:11
**beyond**  87:1 94:17
**bill**  77:10
**billing**  77:8
**billion**  85:6 87:18

**birth**  10:5 12:23
13:17 14:12 15:13
19:4 37:1 44:20
61:2 65:7
**bit**  14:14 32:14
**blank**  92:7,10
**blanket**  25:10
**blood**  41:10 88:22
**board**  10:12
**body**  79:4
**bone**  39:1
**booklet**  7:1
**born**  13:1 14:11
20:6,7 61:2
**bottom**  26:3,10,13
28:18 32:11 37:4
40:4 47:21 49:24
80:11 102:9
**boulevard**  2:9
**box**  23:20 24:9
62:24 63:16 64:5
**boxes**  25:21
**boxstein**  1:13 2:1
3:4 5:9,15 8:24
9:11,18 14:3
23:16 25:7 34:24
43:22 73:1 74:23
77:18 94:20
113:24 114:15
**bradford**  2:13
**brain**  86:5
**brand**  2:9
**brandeis**  10:15
**break**  8:4
**briefly**  10:6
**bring**  60:17
**bringing**  52:16
67:2
**broad**  68:2 87:9
**brought**  13:17
47:12 53:1 82:6

[bruising - comfortable]

| | | | |
|---|---|---|---|
| **bruising** 72:14 | 76:8 91:1 92:18 | 108:11 | **circumstances** |
| **bugliosi** 73:1 | 99:4 115:16 | **checked** 23:20 | 17:18 27:4,8 |
| 74:24 | **cases** 6:9 9:5 70:18 | 24:10 25:22 | 28:14,17 31:7 |
| **burbank** 2:3,14 | **casual** 85:15 | **checkups** 96:22 | 89:10,20 |
| 5:1 9:16,19,20 | **cause** 14:15 15:4 | **chicken** 47:9 | **cites** 39:4 |
| **burkwitz** 2:13 | 21:14 42:5 49:14 | **child** 11:1 16:4 | **citing** 30:4 |
| **business** 9:16 | 61:1 62:18 69:16 | 17:6,9,22,25 18:10 | **civil** 5:20 |

| | | | |
|---|---|---|---|
| **c** | 74:16 98:14 | 18:22 19:14,15,20 | **claim** 61:11 |
| | 112:12 | 20:6,7,8,9,12 | **claims** 44:1 |
| **c** 14:8 38:18 | **caused** 44:2,2 | 23:15,16 34:9 | **clarification** 13:14 |
| **california** 1:2 2:3 | **cease** 35:7 | 39:2 43:11 48:8 | 54:22 72:17 |
| 2:9,14 5:1 114:1,7 | **cell** 86:2 | 48:16,23 53:16 | 105:15 |
| 114:11 115:1,5,25 | **center** 26:6 | 55:16,17 56:16,22 | **clarify** 7:20 77:4 |
| **call** 23:12 60:9,17 | **centers** 26:8 | 56:23 57:4 59:16 | 78:3 83:23 89:17 |
| 60:20 76:17 77:14 | **central** 1:2 | 59:25 60:6,10,15 | 92:24 |
| 94:19 107:1 | **certain** 80:9 88:9 | 61:10,22 70:14,15 | **clear** 9:3,8 32:14 |
| **called** 11:2 14:9 | 108:16 | 71:3 72:6 76:17 | **client** 44:1 |
| 23:10 35:9 47:22 | **certainly** 9:4 19:8 | 77:2 79:9,23 81:3 | **clients** 44:2 |
| **calls** 58:21 59:20 | 83:1,22 | 83:9,11 85:2 | **cloudy** 12:21 |
| 69:1 105:6 110:14 | **certified** 10:12 | 90:16,18,24 91:10 | **cochrane** 85:17 |
| **cannula** 14:18,23 | 111:7 115:24 | 97:15 98:9,12 | **cola** 3:11,12,13,14 |
| **capacity** 9:16 | **certify** 114:6 | 102:17,21 105:13 | 3:16,17,18,19,19 |
| **capital** 72:21 | 115:5,19 | 106:7 108:25 | 3:21,21,22,23,24 |
| **car** 69:16 | **cetera** 17:11 30:1 | 109:13 110:9,13 | 3:24 4:3,3 23:11 |
| **care** 9:6,7 12:24 | 34:4 101:1 | **child's** 17:19 89:2 | 61:16 65:21 78:17 |
| 13:6 14:6,8 15:21 | **chance** 10:16 | 89:21 90:3 | 80:5 93:11,11 |
| 19:3,7 21:9 26:9 | **change** 34:9 | **childcare** 26:6,8 | 94:7 95:11,11 |
| 35:9,10 38:25 | **changed** 53:13 | **children** 10:4 39:1 | 99:21 103:2,3 |
| 43:10 44:9 48:16 | 65:10 | 59:11 60:11 82:13 | **cold** 47:17 |
| 51:16 54:10 57:6 | **changes** 7:7,10,11 | 83:20 91:19 | **collaboration** |
| 57:18 58:8 59:2 | 112:20,22 113:15 | **children's** 10:10 | 85:18 |
| 60:6,12,16,24 83:1 | 113:16,18 | 47:23 | **collect** 85:8 |
| 89:11 91:10,20 | **chart** 12:15 16:7 | **choice** 18:9 91:12 | **college** 10:7 |
| 92:11,22 93:2,3 | 22:4 35:13 46:3 | **choose** 87:22 | **combative** 53:9,10 |
| 97:15 98:9,12 | 47:22 51:24 55:12 | 88:13,14 90:15 | **combined** 65:12 |
| 106:22 107:6 | 61:15 74:11 | **choosing** 101:1 | **come** 50:4 80:1 |
| **careful** 54:6 | **charted** 51:12 | 102:2 | 109:14,23 |
| **carey** 5:18 11:13 | **charting** 21:6 | **chose** 88:12 107:9 | **comes** 44:8 58:15 |
| **caring** 43:8 | **charts** 61:3 | **chronically** 20:9 | 109:4 |
| **case** 1:6 9:7 11:11 | **check** 46:7 62:19 | **circumstance** | **comfortable** 75:22 |
| 19:14 20:14 57:5 | 62:24 63:16 64:5 | 17:24 34:13 | |
| 59:15 69:18 70:5 | | | |

Hahn & Bowersock, A Veritext Company
800.660.3187

David Aaron Borenstein, M.D. - March 7, 2019

[coming - counsel]

| | | | |
|---|---|---|---|
| **coming** 52:20 | **compound** 82:21 | **consistently** 72:10 | 25:23 26:3,4,18,19 |
| **commencing** 5:4 | 103:5 | **constitute** 95:20 | 26:21,22,24,25 |
| **comment** 7:11 | **comprehensive** | **consult** 3:17 38:20 | 27:2,3,5,6,8,9 |
| 38:11 49:10 | 3:14 36:18 43:10 | 67:16 69:3 | 29:16 30:12,13,23 |
| **comments** 38:10 | 92:8 93:14 | **consultation** 69:8 | 32:7 34:10 35:25 |
| 83:22 | **concern** 14:15 | 72:25 73:22 74:22 | 36:2,7 37:18 |
| **commitment** | 39:24 53:9 76:13 | 77:10,17 79:23 | 39:25 48:24 49:1 |
| 48:23 | **concerned** 18:4 | **consultations** 18:5 | 49:3 51:4,6,13 |
| **common** 41:7 | 48:6,8 | **consulting** 69:5,6 | 54:16,17 55:7,8 |
| 42:10 44:7 54:5 | **concerning** 15:2 | **continued** 50:22 | 56:6,7,8 57:6,7 |
| 68:10 75:18 | **concerns** 16:22 | **contract** 52:15 | 58:8,9,19,20 59:3 |
| **commonly** 109:4 | 39:21 | **contraindicated** | 59:8,12,17 60:7 |
| **communicate** 96:1 | **conclude** 76:4,6 | 17:14 | 61:12 62:1,23 |
| **communicated** | **conclusion** 58:22 | **contraindication** | 63:17 64:15,22 |
| 96:2 | 59:21 105:6,22 | 34:1 | 66:10 67:12 68:7 |
| **communicating** | 108:19 | **contraindications** | 71:13 76:5 80:20 |
| 40:16 | **conclusions** 43:9 | 17:19 | 80:22 88:6,7,11,11 |
| **communication** | **condition** 26:18,21 | **conversation** 34:2 | 89:3,8 91:14 94:4 |
| 3:22 43:20 | 28:5,7 30:16,19,22 | 34:5,7 37:23 | 94:5,25 95:1,4,5,8 |
| **communications** | **conditions** 13:7 | 48:22 49:12 50:18 | 95:19,22 96:3 |
| 44:5 | 29:2 55:16 95:17 | 50:20 54:5 63:20 | 97:20,21,25 100:2 |
| **community** 87:14 | **conducted** 46:13 | 94:12,15 102:2 | 100:3 101:4,5,17 |
| **company** 42:9 | 46:21 | **conversations** | 102:13,14 103:11 |
| 107:7 | **confirm** 29:18 | 15:24 16:2 30:8 | 103:12,18,24 |
| **compare** 35:13,21 | 35:14,22 36:4 | 30:12 51:17 52:7 | 104:12,14,16,23 |
| **compared** 69:14 | **conflicts** 10:21 | 52:10,13 53:3 | 105:3 106:5,23 |
| **compensation** | **confusing** 42:20 | 92:4 | 109:15,20 110:11 |
| 85:5,8 | 75:14 | **convince** 66:12 | 110:24 113:3 |
| **competent** 75:20 | **confusion** 95:9 | 67:1 | 114:8 115:13 |
| **complaining** 39:4 | **congress** 85:4 | **cool** 112:21,25 | **corrections** 110:22 |
| 72:6 73:16,25 | **consent** 82:14 | 113:5 | 110:23 |
| **complaint** 44:7 | 83:12,16,20 89:21 | **copies** 45:14 | **correctly** 42:9 |
| **complete** 26:10 | 90:18 96:3 | 111:10 | **correlate** 61:15 |
| 79:8 90:11 115:13 | **consider** 22:15 | **copy** 35:18,25 | 78:19 79:9 |
| **completed** 10:9 | 35:4 66:18 | 36:8 111:1,7,8,11 | **correlating** 66:6 |
| 30:4 | **consideration** | **corner** 23:10 | **counsel** 2:6 5:5 |
| **completely** 19:25 | 21:16 | **corporate** 9:16 | 7:22 8:12,25 |
| **completion** 115:17 | **considerations** | **corporation** 9:19 | 16:17,20 24:3 |
| **complications** | 21:1 | **correct** 9:22,23 | 56:20 61:18 63:3 |
| 85:12 | **considered** 54:19 | 10:24,25 12:2,3 | 66:2 78:9 79:7,25 |
| | 54:25 100:1,7 | 17:23 24:14,18 | 89:18 95:13 99:25 |

David Aaron Boxbaum, M.D. - March 7, 2019

[counsel - discuss]

111:6
**county**  1:7 5:19
  10:21 11:1 23:11
  60:10 64:21 114:2
  115:2
**course**  59:1 106:1
**court**  1:1 6:22,25
  8:1 13:23 23:6
  36:20 37:13 38:14
  39:11 41:18 43:17
  45:20 83:14,15
  85:4
**covered**  42:7
**craig**  3:22 43:20
  43:23
**create**  95:23
**csr**  1:21 2:4 115:4
**curious**  43:5
**current**  12:7 18:13
  44:11 82:20
**currently**  11:7
  82:18,19
**cut**  111:22,23,24
  112:1
**cv**  1:6 3:20 10:16
  42:14 43:4,6

**d**

**d**  9:11,11
**dad**  53:5
**damage**  85:8,11
  86:6
**damaged**  87:19
**damages**  44:1 85:6
**dangerous**  33:20
  85:22
**date**  12:11,24
  17:22 21:5 25:14
  25:24 26:2 32:11
  32:11,13,16 34:25
  44:16 45:3,5
  49:13 61:2 65:13

92:19 93:2,3,3,17
  93:20 96:24 98:15
  98:15,19 99:9,16
**dated**  3:11,19 4:3
  13:21 44:10 46:1
  80:7
**dates**  79:13 106:12
**daughter**  39:24
**david**  1:13 2:1 3:4
  5:9 9:11,18 14:3
  43:22 113:24
  114:15
**day**  19:9 98:22,24
  99:3 114:9 115:21
**daycare**  27:24,25
  29:12 32:2 63:22
  109:6,19,19
**days**  12:23 19:11
  37:1 40:12 60:24
  78:19 80:19 106:4
  110:22,23 112:6,8
  112:9,25
**dcfs**  11:2,3,5,7,15
  34:22
**dear**  14:3,3 42:25
  43:22
**decade**  86:3
**decades**  65:11
**december**  102:5,7
  102:11
**decided**  18:7 76:8
  88:5
**decision**  20:11
  38:9 88:15 90:17
  96:10 101:2
**decisions**  21:2
  84:9,17,18,23 85:1
**declaration**  25:11
**declared**  25:17
**decline**  66:15
  101:2

**declined**  62:4,5
  66:5
**declining**  25:12
  63:16,16 64:6
  66:9,16
**defend**  107:19
**defendant**  34:21
  61:14 62:2
**defendant's**  3:9
  13:22 23:5 36:19
  37:12 38:13 39:10
  41:17 43:16 45:19
  61:14,18 63:3
  66:2 79:7,25
**defendants**  1:8 2:2
  2:12 11:11 55:21
  55:22 79:21 80:4
**defense**  99:25
**defer**  19:11 76:6,8
**deferred**  18:6
  48:19 49:10 50:15
**define**  35:6
**definitely**  52:11
**department**  60:10
**depend**  27:25
  29:13
**depends**  35:5
**deponent**  110:21
  110:22 113:14
**deposed**  6:3,7,10
  9:4
**deposition**  1:13
  2:1 5:4,16,24,25
  8:9,17,25 30:7
  55:21 92:7 113:23
  115:7,10,16
**depositions**  9:4
**derive**  92:12
**describe**  10:6 16:2
  27:14,17 28:24
  29:2,5 31:14,19

36:23 38:19,23
**describes**  37:1
**description**  3:10
  4:2
**design**  85:18
**despite**  85:23
  102:2
**destroyed**  111:1
**detail**  94:16
**detailed**  71:9
**determine**  13:19
  55:17
**devastating**  85:9
**diabetes**  40:11
  80:18
**diagnosed**  40:5
  80:13
**diagnosing**  41:14
**diagnosis**  73:23
  75:21 76:20
**difference**  45:13
  92:5
**different**  20:1,5
  51:16 65:8,9 74:5
  87:15 93:3,4
  95:24
**diphtheria**  24:17
**direct**  40:3 55:22
**direction**  112:18
  115:12
**directly**  74:22
  83:3
**disagree**  26:1 30:6
  52:14 62:17 87:10
  87:12,23 88:5,16
**disagreement**  31:8
**discharging**  14:4
**discovery**  34:15
  61:14 111:23,23
**discuss**  16:25 67:2

David Aaron Boxstein, M.D. - March 7, 2019

[discussed - examination]

**discussed**  19:1
  50:24 52:7 65:19
  66:24 81:25 82:1
  86:20
**discussing**  40:19
**discussion**  16:3
  21:20 22:18 25:3
  33:24 41:2 45:8
  47:12 52:22 54:1
  66:4,8,17,19 67:6
  67:7 69:22 75:8,9
  79:16 81:3,12,15
  81:16 87:2,13
  93:6 101:24
  111:13
**discussions**  16:6
  17:4 19:12 48:6
**disease**  40:6,22
  80:10,14 81:13
**distress**  14:18
**district**  1:1,2
**doctor**  9:14,24
  16:10 23:16 34:23
  42:25 53:5 73:5,9
  74:6,7,14 75:8,24
  77:1,2,5,9,13,22
  77:23,25 90:15
  96:19 104:20
  106:7,11 108:6
**doctor's**  37:5
**doctors**  41:11
**document**  25:8
  26:16 27:11,20
  28:4,21 30:18,21
  31:1,4,6,10,22
  32:19 35:15,18,23
  36:1,5,8,16,23
  37:9,10 38:19
  39:14,16,19 41:21
  62:25 63:19 65:18
  76:22,25 94:24

96:4 99:21,22
  100:8,8,16,20
  101:9,13,15,19,23
  102:3,17 104:21
  105:1 106:3,18,25
  108:13
**documentation**
  29:24 34:7
**documented**  16:6
  57:19 74:1,3 82:4
  107:8
**documenting**  30:5
  65:25 107:5
**documents**  3:12
  12:13 23:2,9
  33:14 35:12 38:17
  62:24,24 65:24
  99:23 102:25
  103:2,10,14
  106:13
**doing**  38:8 41:8
  42:13 55:22 91:21
  92:1
**dollar**  85:11
**doubt**  42:18
**doxstein**  43:1
**dr**  5:15 8:24 14:3
  23:16 25:7 34:23
  38:1,20 41:25
  42:3 73:1,1 74:23
  74:24 75:8 77:3
  77:16,18 79:22
  81:2 94:16,19,20
  94:25
**driving**  69:16
**drugs**  84:19,24
**dtap**  24:17
**due**  19:17 66:7,13
  66:14 67:1 96:25
  98:4,5,8,13,14

**duly**  5:10 115:7
**duplicate**  29:18
**duration**  27:11
  31:12
**duty**  29:24 106:19

e

**e**  1:6 4:3 9:12
  10:18 34:20 35:20
  36:10 45:15 71:10
  82:10
**ear**  46:7,7,16,24
  46:25 47:17 97:23
**earlier**  24:22 30:7
  59:10 67:10 78:6
  92:21 94:6 95:10
  101:3
**early**  14:13
**easiest**  9:9
**eat**  12:5
**educate**  67:8
**education**  10:6
**effect**  6:21 69:19
  70:6
**effective**  86:8
**effects**  16:22 40:12
  68:11,12 80:19,22
**efficiency's**  5:24
**either**  11:8 102:11
  106:6 109:5
**elaborate**  100:12
**electronic**  21:6,8
**embarrassing**
  7:12
**emergency**  89:2
**employed**  11:5,7
**encourage**  34:8
**endangerment**
  90:25
**ended**  92:11
**ends**  86:9

**enrolling**  109:12
**enrollment**  27:24
  29:12,15 32:2
  43:23
**ensuring**  96:8
**enter**  29:8 109:7
**entering**  27:21
**entire**  7:24 60:15
  60:23 61:1
**entry**  31:23
**environment**
  20:13
**environmental**
  19:17
**enzymes**  40:13
**episodes**  72:13
**especially**  88:4
**esq**  2:8,13
**essentially**  30:5
**establish**  33:14
**establishing**  25:20
**estimate**  92:2
**et**  1:4,7 17:11
  29:25 34:3 100:25
**evaluation**  46:24
  69:20 70:7,16
  71:2,12 75:1
**event**  115:20
**everybody**  18:3
  52:15
**evidence**  80:3
**evidently**  86:7
**exact**  12:11 65:11
  93:12
**exactly**  73:20
  104:9
**exaggerated**  68:16
**exam**  46:7 47:16
  49:8 50:12
**examination**  3:3
  5:13 37:2 48:15

David Aaron Boxerman, M.D. - March 7, 2019

[examination - form]

55:15 56:13 91:7
96:17
examinations
52:25
examine  88:22
examined  5:11
115:6
example  19:22
53:3 62:4,9 63:2
64:22 65:20 69:6
70:23 109:16,17
examples  109:17
excellent  94:6
exception  18:2
excessive  72:14
executed  114:9
exempt  27:20,23
29:8,11 31:22
32:1 40:23
exemption  21:11
21:13 22:23 29:22
32:17,20 33:13
51:24 54:10,16,20
55:1,6,11,13,14
56:5,15,20,25 57:8
57:15,17 62:16
95:21,23 101:16
102:20 103:4
105:1,12,19 106:6
106:11 108:5,9,16
108:21,21,24
109:10,14 110:1,9
110:13
exemptions  54:19
56:19 100:1,7
exercise  105:12,19
106:8,11 108:6,7,8
exhaustive  78:12
exhibit  3:11,12,14
3:15,17,19,20,22
3:24 4:3 13:20,22

23:4,5 34:14,16,18
36:15,19 37:11,12
38:12,13 39:7,10
41:16,17 43:15,16
45:13,17,19 61:14
61:15 71:23,25
78:9,12 79:21
93:10,12 94:6
95:11
exhibits  3:9 4:1
experienced  29:3
expert  6:11 9:5
58:22 69:1
expertise  76:7,9
explain  24:25 25:7
25:9 26:7 34:1
46:5 63:23
explained  100:23
explanation  73:21
exposure  85:25
expression  95:15
extent  39:17
extreme  68:13
69:19 70:5,12,15
71:1
extremities  72:15

**f**

face  33:15,22,23
101:1 106:5
fact  15:4 23:20
24:10 25:21 51:17
57:16 60:14,23
61:8 87:20
factors  19:17
28:19 67:18,19
failing  106:19
fair  40:3
fairly  12:21
familiar  6:5 10:22
11:10,16,25 32:23

families  12:5
41:12
family  27:18 29:6
31:20 33:2,8,8,15
33:20,25 40:21
48:7 51:3 60:11
62:11 63:3 72:24
73:10 74:21 80:8
family's  32:23
far  20:6 62:23
64:19,20 73:4
father  49:14,20
53:23,24 59:15
60:15 76:13
fatty  40:8
favor  33:12
faxed  78:24
faxing  43:4
february  34:25
35:3 78:23 79:1
83:17,25 84:5
86:11
federal  5:6,20 84:9
84:16 86:10
115:16
feeling  50:1
fellowships  10:11
felt  21:15 90:24
fictitious  9:18
file  36:1 45:12
57:17 79:9,10,12
79:20 103:15
109:25
filed  5:21,25
files  35:18 36:8
42:3
fill  26:11 51:20
61:25 62:22 63:5
63:6 64:4
find  81:5 98:23

fine  10:21
finish  7:20,22 24:4
finished  37:8
firm  5:16,19
first  2:14 12:24
13:1 20:14 23:9
36:24 45:25 58:5
62:16 72:5 100:21
103:1
five  97:18 98:5
flow  14:18,23 34:2
fmo  1:6
follow  46:16 65:14
70:10 91:5 99:18
100:15,17 105:10
followed  85:12
following  13:7
23:17 58:5 64:19
68:5 72:8 74:22
97:1 98:2 105:17
follows  5:11 24:7
55:3 56:2 70:2
104:19
force  83:10 91:23
forced  82:13 83:4
83:19
forceful  88:20,21
88:24 89:3,20,22
89:24 90:2,16,17
forcefully  88:14
foregoing  114:8
115:7,15
foreign  79:4
foreseeable  18:16
forget  54:8 93:12
form  24:25 26:9
27:14,17 30:14
31:14 62:20 63:8
63:10,14 64:7,17
64:17 95:13,18,24
95:25,25 96:1,4

David Aaron Boxenbaum, M.D. - March 7, 2019

[form - head]

| | | | |
|---|---|---|---|
| 108:8,9,10,16 | **general**  10:2,3 | 34:15 36:13 37:10 | 91:5,8 92:25 93:5 |
| **formality**  66:20 | 16:18 25:25 44:8 | 38:12 40:15 43:8 | 93:8,9 94:1 96:13 |
| **forms**  61:19,20,25 | 52:12 57:4 64:20 | 45:24 52:20 55:20 | 96:23 98:20,25 |
| 62:3,6,13 64:1 | 65:6 67:14 68:24 | 61:13 66:24 70:20 | 99:4,11 100:5,10 |
| 65:21 95:13 96:8 | 68:25 76:3 90:1 | 70:23 71:8,18,23 | 100:12,17 101:7 |
| 99:22 108:7 | **generally**  15:21 | 71:25 72:20 74:4 | 101:20 102:23 |
| **forth**  80:10 97:24 | 30:10 61:9 | 78:8 81:5 88:16 | 103:5,16,20 104:1 |
| **forthcoming**  6:16 | **generate**  33:24 | 92:13,18,19 98:20 | 104:3,5,9,13 105:5 |
| **found**  52:3,6 86:11 | **generating**  34:5 | 99:4,23 103:16 | 105:14,21 106:14 |
| **foundation**  58:6 | **gestation**  14:11 | 104:6,19 105:5 | 107:25 108:18 |
| 74:4 76:23 87:1 | **getting**  23:23 | 112:3 113:1 | 109:21 110:2,4,14 |
| **founded**  104:8 | 76:15 | **good**  10:16 12:16 | 110:20 111:9,15 |
| **four**  10:7 61:1,5 | **girl**  14:4 | 12:20 16:21 18:7 | 111:19,25 112:3,7 |
| 62:14,24 78:24 | **give**  8:3,13 15:9 | 31:10,19 36:10 | 112:11,15,20 |
| 85:6 87:18 97:7 | 16:4 19:18,20 | 37:8 50:8 113:18 | 113:1,9,12,20,22 |
| 97:14 | 21:2 53:19 57:21 | **gotten**  53:5 | **grams**  14:12 |
| **frame**  103:13 | 63:12 64:10,16 | **government**  84:16 | **great**  8:22 36:3 |
| **free**  91:13 95:25 | 87:18 94:20 | **governmental** | 37:8 61:18 |
| **frequently**  16:6 | **given**  6:22 65:7 | 84:22 | **grunt**  7:25 |
| 17:9 18:19 22:18 | 68:6 80:21 85:24 | **graham**  2:13 3:5 | **guess**  106:24 |
| **friend**  38:1 | **giving**  6:20 90:8 | 5:14,16 8:22,23 | |
| **friendly**  53:3 | 108:7 | 13:20 14:1,21,23 | **h** |
| **friends**  12:4 | **glendale**  2:9 | 15:1,20 20:4,17,20 | |
| **friendship**  11:22 | **go**  10:14 12:5 | 20:24 22:5,11,22 | **habit**  44:13 |
| **front**  79:10 | 13:12,18 15:6 | 23:8 24:2,12 25:1 | **halfway**  50:8 |
| **full**  72:16 78:11 | 23:2 24:2 25:1 | 25:5,6 34:19 | **hand**  21:6,9 |
| **fully**  84:11 | 26:15 35:11 45:7 | 36:22 37:15 38:16 | 115:21 |
| **function**  84:15 | 45:25 46:5,20 | 39:9,13 41:20 | **handled**  68:11 |
| 85:10 95:18 | 50:6 57:15 66:20 | 43:19 45:6,10,13 | **handwriting**  37:5 |
| **fund**  87:18 | 67:18,19 68:6,8 | 45:16,17,22 51:21 | 46:2 47:7 |
| **further**  8:20 88:13 | 69:21 71:18 75:11 | 55:2,9,20 56:9,17 | **happen**  52:21 |
| 91:7 96:17 103:3 | 78:8 79:15 91:13 | 57:23 58:21 59:20 | 70:19 71:3,6 |
| 115:19 | 91:24 92:2,9,11 | 60:2 64:25 67:21 | **happened**  13:8 |
| **future**  18:16 | 93:10 98:18 | 68:3 69:1,21,24 | 18:1 52:22,23 |
| | 101:22 104:5 | 70:20 71:4,14,16 | 79:6 94:21 |
| **g** | 106:17 112:22 | 74:4 76:21 77:19 | **happening**  16:23 |
| | 113:1,9 | 78:8 79:15 81:6 | 54:8 |
| **gain**  44:3 | **goal**  34:11 | 81:24 82:15,21 | **happens**  17:8 |
| **gained**  40:14 | **goes**  80:24 | 83:6 86:15,17,25 | **hard**  35:4,7 |
| **garcia**  5:21,22 | **going**  6:25 23:12 | 87:25 89:4,12,14 | **hazelnuts**  72:23 |
| 11:21,25 12:18,20 | 24:2,19 33:21 | 89:22 90:4,9,19 | **he'll**  112:9 |
| 89:13 | | | **head**  109:22 |

David Aaron Bowersock, M.D. - March 7, 2019

[health - issue]

**health** 26:9 50:11
  50:12 64:23,24
**healthy** 13:1 15:22
  67:9 72:15
**hear** 94:12
**heard** 11:3 68:14
**held** 25:3 45:8
  69:22 79:16 93:6
  111:13
**help** 41:9,11 42:10
  75:19
**helped** 76:20
**helpful** 34:5
**helwajian** 5:17
  11:11 34:21
**hep** 40:7
**hepatitis** 15:8,9,13
  24:13
**hereditary** 40:6
  80:14
**hereto** 13:24 23:7
  34:18 36:21 37:14
  38:15 39:12 41:19
  43:18 45:21
**high** 85:7,25 96:7
**historical** 87:10
**history** 27:14,17
  28:24 29:1,5
  31:15,20 32:24
  33:2,8,10,15,19,23
  50:15 55:15 62:11
  63:4 71:11 72:5
  72:24 73:9,10
  74:21 75:7 78:2
  80:9 81:13,19
  95:16
**hiv** 40:7
**hmo** 42:15,19
**hold** 36:11
**hollywood** 2:3

**horrible** 40:11
  47:7 80:19,21
  81:14
**hospital** 10:10
  47:23
**hotline** 60:9,10,18
  60:20 107:1
**hours** 14:24
**https** 86:9
**huh** 21:19 80:12
**hurdles** 85:7
**husband** 76:14
**hypothetical**
  20:18,20,25 21:1
  33:11 34:12,13
  70:21 90:6,7,8,10
  90:12
**hypothetically**
  62:10

### i

**idea** 16:21 42:19
**identification**
  13:23 23:6 36:20
  37:13 38:14 39:11
  41:18 43:17 45:20
**ii** 40:11 80:18
**illness** 63:4 99:17
**illnesses** 16:13
  52:23
**imagine** 9:15
  10:22 44:12
**immune** 19:16
**immunization**
  26:17 27:12 28:4
  28:21 29:22 30:15
  31:11 35:12 62:5
  64:20 81:23 83:9
  83:11,20 101:16
  105:2
**immunizations**
  16:10,14 30:9

37:4,21 47:9
  64:22 82:13 83:4
**immunized** 18:22
**immunizing** 70:14
  71:3
**immunosuppres...**
  19:22
**important** 7:12
  16:11 86:22
**inaccurate** 54:9
**inadequate** 85:21
**inaudible** 13:12
  98:24
**incident** 13:17
  15:4
**include** 46:3 55:18
  77:24,24
**included** 62:3,6,13
**including** 72:22
  84:10
**incomplete** 70:21
  90:9
**incorrect** 93:13
**indefinitely** 18:17
**index** 3:1
**indicate** 37:23
  49:12 50:17
**individual** 84:25
**individuals** 94:13
**infant** 14:11 44:18
  44:21
**infection** 46:8,16
  46:24 47:17 48:8
  97:23
**infections** 46:25
**infer** 40:20
**inference** 31:8
**informal** 6:20
**information** 30:3
  34:4 37:2 40:1
  42:12 62:22 63:10

96:9 107:9
**informed** 16:21
  81:17 84:11 96:3
**informing** 29:25
**ingested** 79:5
**initial** 3:14 36:17
**initially** 14:17
**initiated** 76:12
**injuries** 72:12
**injury** 85:5
**inner** 97:23
**insert** 85:14
**instructions** 6:2
**insulin** 40:13
**insurance** 42:5,7,9
  42:22 107:7
**intensive** 14:6,8
**interest** 46:9,17
  47:2 48:11,17
**interested** 115:19
**interesting** 47:24
  48:5 49:9 50:13
**interests** 5:19 44:3
**interference** 84:9
**interposed** 56:1
**interpreted** 32:20
**interrupted** 92:25
**intervene** 24:20
**intervention** 15:3
  84:19
**interventions**
  84:24
**intrusion** 84:25
**invalidate** 63:10
**involved** 77:12
**irrelevant** 57:17
  99:5
**isolated** 18:2
**issue** 9:6,7 51:23
  67:2 88:6

David Aaron Boxerman, M.D. - March 7, 2019

**[issued - managing]**

**issued**  83:19 86:11
    86:13
**issues**  39:23 40:19
    51:18 52:16 80:9
    80:9,25 81:4,7
    82:6
**izumi**  1:21 2:4
    115:4

**j**

**jam**  90:4
**january**  50:8 51:1
    78:23
**japanese**  86:4
**jaundice**  13:11
**jenny**  3:22 43:20
    43:23
**job**  1:19 52:17,18
    75:19 107:5,22
**joe's**  13:4
**joint**  39:1
**joseph**  14:6
**judge**  99:11 104:6
**judgment**  18:10
**jumped**  48:2
**june**  49:5 50:25
**jury**  7:2
**justify**  18:21

**k**

**keep**  36:12,13
    52:16 104:6
    110:25
**kept**  108:21
**kid**  15:22 33:18
    47:1 91:25
**kids**  73:21
**kind**  9:15 10:1
    33:14 46:4 51:20
    90:24 95:24 96:7
**kinds**  17:4 82:6

**knee**  39:5 71:20
    72:7 73:16,25
    74:13 75:1,4,11
    97:23
**knew**  38:8 48:7
    52:20
**know**  7:16,17 8:4
    9:4 12:4 17:2
    19:11 20:7 21:17
    21:25 22:6,13
    30:1 38:5,9 42:11
    43:7 49:17 50:11
    53:7,7 60:9 62:4
    65:18 66:2 68:12
    68:14 69:12 74:9
    74:10 77:7 79:5,6
    79:23 86:22 87:12
    92:6 96:25 99:2,9
    100:16 104:15
    106:24 107:7
    108:22
**knowing**  104:18
**knowledge**  21:21
**known**  9:19
**kono**  1:21 2:4
    115:4

**l**

**l.serobian**  2:10
**largely**  85:20
**law**  2:8 5:16 6:22
    91:24
**laws**  114:7
**lay**  58:5,22 69:2
**leave**  41:3 88:15
**left**  18:3 23:19
    24:8
**legal**  58:21 59:21
    91:16,18 101:4,11
    102:16 103:9
    104:22 105:2,6,12
    105:19,21 106:11

106:20,23 107:10
    108:18
**legally**  59:18,19
    59:24 102:20
**letter**  3:11,19
    13:21 21:13,18
    39:20 40:17 41:22
    42:23 71:22 72:1
    73:4,8,24 77:14
    78:20 79:21 80:4
    80:6 82:4
**letters**  71:10
**letting**  42:13
**level**  60:17 61:10
    76:7 88:19 96:7
**levels**  76:13
**liana**  2:8 8:15
**liberty**  85:1
**licensed**  42:1
**life**  16:12 17:19
**limp**  73:21 74:10
    95:7
**limping**  71:19
    73:25
**line**  24:21 64:10
    64:16 105:5
    107:25
**list**  23:18 51:19
    79:8
**listed**  85:13
**little**  7:1 14:14
    32:14 42:18
**liver**  40:6,8,13
    80:14
**long**  68:19
**look**  13:12,18 46:6
    62:14 69:15 78:15
    79:11,13 94:8
    102:7
**looked**  65:16
    93:21

**looking**  42:4 73:15
    79:20 101:13
**looks**  93:17 102:5
**los**  1:7 5:20 10:10
    10:22,23 11:1
    23:12 60:10 114:2
    115:2
**lose**  15:17
**lot**  39:23 44:2
**lots**  22:18,19 54:3
    54:4 73:21
**lower**  72:15
**lucy**  1:4 5:21
    11:16 39:21 42:4
    43:25 59:15,23
    60:14,20 61:8
    88:5,8,14,16 101:9
    102:16,19,25
    104:20 105:18
    106:4 108:24
    110:1,8
**lumping**  68:22
**lying**  77:16,18

**m**

**m.d.**  1:13 2:1 3:4
    3:17 5:9 9:12,18
    38:18 94:7 113:24
    114:15
**mail**  4:3 10:18
    34:20 35:20 36:10
    45:15 82:10
**mails**  71:10
**maintenance**  26:9
**majority**  87:11
**making**  76:20,21
**managed**  13:5
**management**
    43:24
**manager**  22:2
**managing**  41:14

**[mandated - named]**

mandated  84:10
mandates  86:10
mandatory  60:5
  61:11 97:24
manufacturers
  85:14
maral  5:17 11:10
  34:21
march  1:14 2:2
  5:1 78:6,22
  115:21
mark  13:20 15:17
  37:10
marked  4:1 13:23
  23:6 34:15,17
  36:20 37:13 38:14
  39:11 41:18 43:17
  45:20
market  86:3,4
marketing  85:20
matches  102:9
matter  8:16 16:17
mckeever  3:17
  38:18,20 72:1
  75:8 77:3,16
  79:22 81:2 94:7,9
  94:16,19
mckeever's  94:25
mean  18:12 19:3,4
  19:8 25:22 29:15
  35:4 39:20 40:1
  42:1 53:2,3 62:21
  63:17 65:3,7 74:1
  75:10 76:5 77:13
  77:22 78:1 80:20
  81:1 89:1 100:9
  100:20,22 101:19
  101:23 106:25
  107:2,10 108:6
  111:22

meaning  67:9
  68:10 75:8 76:16
  81:16 88:13 96:20
means  77:15,22
  98:7 100:23 113:5
meant  38:3,5
  52:15
measles  86:9
measured  69:11
medical  8:18 9:14
  9:19 10:7 18:10
  21:11 22:23 27:4
  27:7,14,17 28:13
  28:16,24 29:2,5
  30:3 31:6,14,20,24
  32:2,17,20,24
  33:13,13,19 51:9
  51:22,23,25 52:2,3
  54:10,15,18,20
  55:1,6,11,13,14
  56:5,15,19,20,25
  57:8,15,17,21 58:8
  62:11 63:23 64:4
  71:10 74:5 80:9
  80:24 81:13,19
  82:6,10 84:9,12,14
  84:19,24 86:12
  89:24 90:2,15,17
  90:17 95:2,16,17
  95:21,23 100:1
  101:25 102:19
  103:4 105:11,18
  106:6,11 108:5,16
  108:20,21,24
  109:9,13 110:1,8
  110:13
medically  29:13
  32:5
medication  17:10
  80:21 81:14

medicine  10:8
meet  106:21
memorialize  30:11
memories  53:21
  53:22
memory  22:3 33:3
  44:8
mention  26:20,23
  27:1,4,7 28:7,9,11
  28:13,16 30:18,21
  31:1,4,6 53:23,25
  69:17 70:3 71:24
  73:3
mentioned  30:7
  64:19 77:11 80:13
  87:20
mentions  74:6
met  49:16
metformin  40:9
  80:17
middle  32:13
  102:7,8
mild  14:17
militate  33:12
million  69:12
mind  33:12 34:9
  53:13
mine  53:22
minor  13:2,9 15:4
missed  67:7
misspelled  43:1
misstated  103:19
  104:19
misstates  19:23
  24:21 71:16 77:19
  92:20 103:17,22
  104:10
misstating  103:25
  104:11,16
misunderstanding
  73:6

mixing  87:4
mmr  85:13,19
mom  37:22 38:4
  47:22 50:5 53:6
  66:4,8 71:10
  75:11 80:5,6
  81:12
mom's  38:9
moment  15:16
  24:20
moments  8:13
month  49:8 50:11
  83:24
months  39:5 72:7
  73:17 74:1,13
  75:1
mother  15:25 19:9
  33:1 39:20 61:23
  63:1 72:9 74:15
  74:20 75:9,17
  77:24 78:2 101:9
  101:24 102:15,19
  102:25 103:8
  104:20,25 105:17
  106:4 108:5,16,24
  109:12 110:1,8
mother's  48:19
  62:3 76:12
mothers  44:7
mrsa  48:3,6,9
mt  10:8
multimillion  85:11
multitude  17:2

**n**

n  9:12 14:8
name  5:15 6:1
  9:10,18 23:15,15
  43:1
named  11:10
  12:17 43:25 115:6
  115:11

David Aaron Boxrud, M.D. - March 7, 2019

**[nasal - okay]**

nasal  14:18,23
naturally  44:3
nature  11:19
  62:25 63:8 69:13
near  18:16
necessarily  51:15
  51:19 52:18 63:9
  85:3
necessary  8:21
  21:15 56:15,21
  57:9 58:18 70:10
  90:3 97:24
need  8:4 42:23
  44:23 56:25 96:13
  96:25 99:2,9
  100:16,24 102:19
  103:3 104:14,15
  105:11,18 106:8,9
  108:5,16,21,24
  109:10,14 110:12
  112:8 113:20
needed  59:3,6 81:4
  110:16
needle  90:5 91:25
needs  104:2 112:5
negative  40:7
neglect  60:11
  61:10 88:19 107:1
neglected  60:7
neglectful  60:18
  60:21 88:15
neonatal  13:11
  14:6,7
nervous  18:4
neurological  69:19
  70:7,16 71:1
neurologists  18:5
never  18:11 22:14
  22:16 24:1 53:13
  54:4 61:9 77:11
  77:12

new  10:8 47:17
newborn  15:10
nice  42:11,13
  43:14
nicu  13:4,10,12,16
  13:18 14:9
night  94:19
nod  7:25
nonresponsive
  58:3
north  2:3,9,14
notation  38:3
  49:23
note  3:17 38:20,21
  39:3,4 52:24
  65:17 75:3 76:12
  78:5,6,22,23 81:15
  81:16
noted  22:3 47:22
  50:16 52:22 54:12
notes  3:15,24
  12:11 13:13,19
  16:9 37:16 45:24
  46:3,3 50:6 61:16
  65:18 75:16 77:22
  78:13 79:8,9 82:5
  93:11,15 109:25
noticed  5:16 55:21
november  13:21
  26:2 48:13,21
  101:10 103:1,9
  104:21 105:20
  106:4
number  18:6
  36:16,17 45:17
  72:1 93:12
numbers  23:10
numerous  16:8
nurse  23:16
nurses  22:1

nuts  72:22

**o**

o  9:12
oath  6:13,15
object  24:20 44:23
  54:20 69:1 70:20
  74:4 83:8 98:20
  99:4 103:16 105:5
  107:25
objecting  83:5
objection  7:21,22
  7:24 19:23 20:16
  20:23 21:24 22:8
  22:14 23:25 24:4
  24:6 51:14 54:18
  56:17 57:23 58:21
  59:20 60:2,3
  64:25 67:21 68:3
  71:4,14 76:21
  77:19 81:6,24
  82:15,21 83:6
  86:15,17,25 87:25
  89:4,12 90:9
  92:20 99:12 100:5
  100:10 101:7,20
  102:23 103:5,20
  104:6,7 105:14,21
  108:18 109:21
  110:2,14
objections  8:13,17
  8:20 51:18 56:1
  90:19 106:14
obligation  91:16
  91:18
obtain  106:6
  113:13
obtained  73:10
  75:7
obvious  47:4,5
obviously  90:24

occupation  9:13
occurred  13:16
offended  52:16
offer  91:21 96:5
office  6:21 12:24
  22:2 23:4 36:24
  41:10 45:11 58:16
  94:25 97:12
offices  9:22 16:15
  95:3
offs  111:22,24
oftentimes  9:5
oh  36:14 50:14
  53:6 79:3
okay  6:5,9,12 7:4
  8:8 10:1,4 11:15
  11:22,25 12:8,13
  12:16,22 14:17
  15:6,12,15,24 16:2
  16:17 17:6,13,24
  18:14,21 21:10,22
  23:2 26:5,8,15
  29:21 30:14 32:4
  32:19,23 33:1,5
  34:8 36:7,10,25
  38:2,12 39:2,6
  40:21 41:3,16
  43:13 44:10 45:6
  46:5 47:5,11,15,19
  47:21 48:2,10,25
  49:16,25 50:4,20
  51:5,12 52:12
  53:12,18 54:2,9
  58:1,15 59:14
  60:14,23 61:17
  64:2,18 66:11,22
  67:14 68:1 70:14
  71:8 72:5 73:7
  75:6,12 76:3
  78:18 81:22 82:9
  82:24 83:17 90:11

Page 13

David Aaron Borsuck, M.D. - March 7, 2019

**[okay - penelopy]**

91:4 92:7,18
93:17 94:12,15
95:6,10 96:13
97:8 102:19
104:18 105:8
108:12 109:4,12
109:17 110:17
111:12,18 113:12
**old** 60:24 98:6
**once** 107:11,21
**one's** 32:14
**ones** 17:2 18:25
19:13 36:14 82:3
109:23
**open** 52:17 66:19
**operating** 63:24
**opinion** 40:1 73:22
75:19,22,25 76:2,2
76:4,5,6,16,18
**opinions** 76:16
**opportunities**
52:17 67:8
**opportunity** 7:4
7:11 67:4 68:6
88:20
**opposes** 84:8
**opposing** 24:3
56:20 79:25 83:19
95:12
**oral** 8:3
**oranges** 87:5
**order** 83:14,15
**organization** 87:9
**organizations**
87:11
**original** 110:25
111:1 115:15
**orthopedic** 39:1
**orthopedist** 38:21
38:24

**outbreak** 86:10
**outcome** 18:8
**outcomes** 85:19
**outside** 57:15
81:25 88:18 99:5
99:7
**oversight** 25:23
**overweight** 45:4
**overwhelming**
69:14

**p**

**p.g.** 5:22,23 12:17
18:23 19:1 22:24
26:17 27:5,9,15,20
27:23 28:14,24
29:8,11 30:22
31:7,15,22 32:1,6
32:17 33:7 40:22
44:18 50:21 94:9
**p.g.'s** 27:18 28:5
30:15 31:20 32:23
**p.m.** 111:14
113:23
**package** 85:14
**packet** 52:15
**page** 3:3,10 4:2
23:9,13 26:5,5,7
26:15 28:3,11,13
29:17,17,18,21,23
31:10,14,19 34:21
35:11,13,14,21,21
35:22,22 36:3,5,7
37:3,16 39:14
45:24,25 46:20
48:2 49:1,3,5 50:8
50:24 52:5 78:15
78:17 80:5,5
101:13 103:2
**pages** 38:17 39:15
41:22 43:21

**paid** 85:6
**pain** 39:5 71:20
72:7 73:16 74:1
74:13 75:1,4,11
97:23
**pales** 69:14
**paper** 51:20
**paperwork** 34:22
**paragraph** 15:7
40:4 72:5 80:6,11
80:12
**pardon** 32:9 39:9
91:17 95:15
**parent** 34:9 58:15
60:21 63:20 69:5
69:6 88:15,21
101:3
**parent's** 54:20
**parental** 85:1
**parents** 15:14
23:15 37:7 41:8,9
44:13 49:11,18,23
49:24 50:16 53:4
57:21 58:11,13
59:11 67:11,20
68:9,13 76:15
82:14 83:5,8,12,20
84:18,23 87:23
88:18 89:21 90:18
96:9 100:24 107:8
107:12,17,22,22
**part** 29:1 40:16
43:10 45:11 47:21
54:7 70:1 80:1
81:1,3 87:19
103:19,24,25
**particular** 28:22
30:19 31:12 44:9
45:5 62:7,10
**patience** 99:20

**patient** 8:18 12:17
18:4 33:15,18,25
43:8,22 57:10,13
57:14,18 60:12,16
77:23 87:14 93:15
93:24 96:6
**patient's** 33:25
34:9 43:24 74:15
74:19 77:12
**patients** 12:7
16:18 22:19,19
24:23 44:13 54:3
59:1,10 84:12,17
84:17,22 86:24
87:2 96:9,20
**patricia** 3:17
38:18 72:1 77:3
79:22 81:2 94:7
**pay** 113:20
**paying** 96:23 97:1
112:12
**pbbllp.com** 2:15
**peanuts** 72:23
**pediatric** 34:23
38:21,23 65:17
91:10 96:20
**pediatrician** 9:14
9:25 10:2,3 35:2
52:19 54:15 55:5
56:4 76:3 91:13
**pediatricians** 83:3
**pediatrics** 9:17,19
9:21 10:10,13
65:8
**penalty** 114:6
**penelopy** 5:21,22
11:21,25 12:10,17
23:21 24:11 57:5
58:7 61:23 71:8,9
71:12 81:23 82:25
88:4,4 89:13 94:2

Page 14

David Aaron Bernstein, M.D. - March 7, 2019

**[penelopy - providing]**

94:4 95:7 97:11
98:2 102:17
**penelopy's** 34:23
35:2 79:20
**people** 7:25 16:14
42:21 54:4 68:14
69:11 85:9
**perfect** 79:13
**perfectly** 75:22
**period** 28:22
54:14 55:4 56:3
61:5,7 78:5
**perjury** 114:7
**permanent** 18:9
18:12,15 86:5
**permission** 57:22
57:22 58:11
**person** 86:1
**personal** 11:22
29:22 53:19 55:19
57:7 62:15,18
67:15 82:7 101:16
102:1 105:1 108:9
**personally** 67:17
**perspective** 68:15
**pertains** 115:15
**pertussis** 24:17
86:2
**peterson** 2:13
**ph.d.** 3:20 41:23
**phone** 77:13
**phonetic** 38:1 73:2
**phrased** 54:13
**physical** 26:18,20
28:5,7 30:15,19,22
48:15 50:11 52:25
**physician** 3:22
38:25 43:21 83:9
88:13 96:2
**physician's** 26:6,9

**physicians** 9:3
82:12 83:2,18
84:7 86:14 87:11
87:21
**place** 52:2 54:10
54:16 55:7 56:6
110:15 115:11
**plaintiff** 11:17
**plaintiff's** 7:21
8:12 34:17
**plaintiffs** 1:5 2:7
8:16 55:23 56:10
**play** 94:20,20
**please** 24:3,5 25:9
69:25 72:3 101:22
106:2
**pleasure** 110:19
**plural** 49:15,24
**point** 13:6 25:17
28:20 34:6 40:2,3
41:6 47:16 59:15
72:20 92:9 96:1,4
96:21,22 98:14
99:1
**policies** 27:25
29:14
**policy** 21:14
**politely** 88:9
**political** 87:9
**poorly** 54:13
**position** 53:11
87:3,7,8
**possible** 7:13
**post** 85:20
**posted** 84:5
**postponing** 18:18
**potential** 68:20
**pounds** 40:14
44:11,15
**ppd** 38:11

**ppds** 41:8
**practice** 10:23
16:19 18:1 41:8
42:7 44:7,13
53:14 54:3,7
58:17,23,25 59:1
59:12 67:3 69:17
70:4,12 75:18
77:21 84:15 88:3
90:14
**pre** 85:20
**preemption** 84:16
84:22
**prefer** 12:11 85:10
**preference** 15:14
16:4,5 21:5 25:17
48:20
**preferences** 50:23
55:19
**premature** 20:6
**preparation** 12:14
**prerogative** 88:18
96:6
**prescribed** 40:10
80:16,17
**prescription** 77:14
**presence** 17:14
86:20
**present** 21:7,8
28:19
**preserving** 103:20
**presumed** 110:24
**pretty** 13:8 42:10
68:2 71:9 90:23
95:3
**prevent** 16:12
**previous** 35:12
**previously** 4:1
26:15 34:15,17
95:6 104:20,25

**primary** 77:25
**print** 10:20
**prior** 5:4 103:17
115:6
**prioritize** 17:3
**privilege** 8:18,19
**probably** 25:22
70:25
**problem** 41:15
76:15,19 97:23
106:15
**problems** 13:2,3,5
13:9 39:1
**procedure** 8:9
84:12,14
**procedures** 6:6
**proceed** 8:6,20
**proceedings**
115:14,17
**produced** 79:21
94:24
**professional** 63:20
63:23 90:15
**program** 43:24
85:5
**progress** 3:15,24
15:5 37:16 45:24
46:3 78:12 93:11
93:14
**prohibits** 92:1
**protect** 106:19
**protection** 19:18
**prove** 7:12
**proved** 85:16
**provide** 111:9,19
**provided** 111:18
**providence** 14:5
**provider** 74:5
101:25
**providing** 111:8

David Aaron Boxerbaum, M.D. - March 7, 2019

**[prudence - reevaluated]**

**prudence**  19:10
**psychologist**  42:1
**psychotherapist**
  8:18
**public**  16:23 64:23
  64:24
**publicly**  5:25
**pull**  92:18 98:3
**purchase**  111:11
**purchasing**  111:6
**purely**  107:10
**purpose**  34:5
  63:14,15 64:8
  96:8
**purposes**  27:21
  29:15 77:8 107:4
**pursuant**  5:6
**pursue**  21:4
**pushing**  77:7
**put**  15:15 42:20
  43:14 47:13 49:14
  49:23 51:16 68:15
  77:11 92:7,10

**q**

**qualifications**  43:9
**qualify**  49:17
**quarter**  78:25
  79:1
**question**  7:15,18
  7:20,23 8:1 20:5
  21:7 22:10 24:5
  32:10 33:16 54:22
  55:2,23,25 57:8
  58:1,4,5 59:23
  64:18,20 65:21
  66:1 67:10,23
  68:5 69:25 70:9
  89:14,15,17,19
  90:8 93:1 94:18
  95:12 97:2 98:3
  99:18,19 100:15

100:15 104:12,15
  104:19 105:10,17
  106:8 107:20
  108:3 110:3
**questionable**
  72:23 73:10 74:20
**questioning**  24:21
  99:8 105:6 108:1
**questions**  6:24 8:8
  16:24 24:4 28:3
  56:10 76:22 90:7
  95:12 107:6
**quick**  10:21 25:2
  26:16 28:4
**quote**  84:6 86:9

**r**

**rabies**  85:24
**raises**  87:12
**raising**  51:18
**rare**  68:11,12
  90:23
**ray**  78:24 79:3
**rayed**  79:2
**reach**  30:9
**reaction**  18:3
  69:19 70:6,12,16
  71:1 81:14
**reactions**  18:5
**read**  5:6,6 7:1 24:5
  24:7 39:17 40:15
  55:2,3,25 56:2
  70:1,2 73:7 83:22
  84:2,3 86:18
  87:17 102:6
**ready**  13:6
**reaffirmed**  48:22
  50:22
**real**  25:1 26:16
  28:3
**really**  38:11 82:5

**rearing**  85:2
**reason**  8:5 18:25
  21:22 22:6,12
  40:22 51:9,22,25
  52:3 53:15,19
  55:17 57:20 58:10
  63:2,13 65:16
  67:14 73:12,13
  87:22 88:12 91:9
**reasonably**  32:20
**reasons**  18:21,23
  31:24 32:2 33:7
  51:17 53:19 62:3
  62:5,7,11,12 64:4
  64:5 66:23 81:22
  82:3
**recall**  13:9 24:23
  39:16 44:4,18
  48:4 49:20,25
  53:18 65:2 70:11
  73:13 74:25 81:22
**receive**  23:17
  24:13,16
**recite**  65:5,12
**recognized**  85:3
  88:17
**recollect**  21:20,21
  39:4 110:10
**recollected**  75:15
**recollection**  12:17
  12:20 23:1 32:25
  40:18,24 41:1
  44:14 48:9 49:22
  50:3,7 51:8,11
  54:6 60:22 73:18
  74:2 76:10 77:2
  79:20 81:8 94:22
  95:8
**recollections**  44:6
  82:8

**recommend**  17:6
  17:25 19:10 23:21
  24:10,16 25:11,15
  42:21 57:12 58:18
  59:2 61:9 66:14
  67:17 83:10 86:23
  87:24
**recommendation**
  25:14 100:24
**recommended**
  23:19 24:8 50:21
  50:25 59:7,24
  65:15,20 70:25
  73:4 88:8
**recommending**
  57:20
**reconsider**  16:5
  17:1
**record**  8:12 24:2,7
  25:1,4,5 38:23
  45:7,9,10 55:3
  56:2 69:21,23
  70:2 71:9,16 74:5
  78:8 79:15,17,18
  80:1 89:6 92:14
  93:5,7,8 94:17,23
  103:8 104:2,5
  110:10 111:14,15
  113:2,9,13
**records**  5:22 8:18
  9:20,21 21:8
  22:25 23:3 39:15
  41:22 52:6 60:22
  78:10 92:8,10,12
  92:15 95:2
**redact**  6:1
**redirect**  99:6
**redo**  18:7
**reduced**  115:12
**reevaluated**  47:18

**[refer - rheum]**

**refer** 39:2,3 61:13 65:17 71:25 75:20 99:23
**referral** 42:5,17 42:21 73:12,14 74:7,8 75:10 76:11 77:7 78:7 81:2 88:19 91:1
**referrals** 42:6,20 90:23
**referred** 5:22 42:8 71:20 74:16 75:13 75:24 77:2 79:23 81:4
**referring** 5:23 27:13 36:13 47:10 74:12,25 76:25 87:15
**reflecting** 39:21
**refresh** 79:19
**refusal** 23:14 57:7 62:4 100:21,22 104:21 107:17 108:8
**refusals** 16:24,25 54:4
**refuse** 16:14 22:15 22:16,19 24:23 58:13 59:11,14,15 59:24 67:11 87:23 88:18 96:6,11 101:4 102:2,16,20 103:9 105:12,19 106:7,9,12 108:11 108:25
**refused** 15:8,13 21:12 22:13 58:11 60:16 61:8 65:20 106:21 107:5
**refuses** 88:21

**refusing** 37:7 57:21 88:10 107:12,23
**regarding** 65:21 67:16
**regular** 17:5 59:1 98:8
**regularly** 66:8,8
**regulation** 84:14
**reinforces** 66:9
**reinhard** 3:20
**reinhart** 41:23,25
**reinhart's** 42:3
**reject** 84:13
**rejected** 51:3,10 52:8
**rejecting** 81:23
**relate** 27:5,9
**related** 39:1
**relating** 28:14 31:7
**relationship** 11:19 25:20,25 85:15
**relationships** 42:6
**relevance** 57:24 82:15 83:6 86:15 86:17 89:4 108:18
**relevant** 20:23 40:2 57:19 96:9 99:8 108:1,22
**religious** 53:15 62:12,18,19
**remember** 13:17 16:3 18:24 19:13 21:12 22:17,20 33:3,6 35:19 41:7 42:9,16 44:6,9,16 44:24 45:1,2,4,5 48:5 53:10,10,17 53:20,24 54:1 73:20 75:16 79:24

86:19 95:9 110:15 112:19
**remembered** 99:19
**reminding** 66:13
**repeated** 16:6
**repeatedly** 61:8
**rephrase** 7:16 32:10 33:16 58:1 103:6 104:19 105:24
**replaced** 86:7
**report** 26:6,10 60:18,20 85:17 88:14 95:16
**reported** 1:21 94:15
**reporter** 5:5,10 6:25 7:23 8:1 13:14,24 14:20,22 15:17 20:21 22:9 23:7,23 36:21 37:14 38:15 39:8 39:12 41:19 43:18 45:18,21 60:6 61:11 72:17 84:20 93:22 105:15 111:6,12 112:14 113:11,21 115:24
**reporting** 85:18
**reports** 86:5
**represent** 78:11
**represented** 8:24
**represents** 5:19
**request** 43:4 49:11 50:16 73:1 74:23 76:13 77:9,18 79:19 109:10
**requested** 41:11 43:5,23 77:23 79:22

**require** 34:6 42:17 76:4 91:24 106:6
**required** 14:18,22 15:3 29:22 42:22 91:10,11 101:16 105:1 109:5,13 115:18
**requirements** 109:5
**requires** 6:16 91:20
**requiring** 42:20 69:19 70:6,16 71:1
**residency** 10:9
**resolution** 13:8
**respect** 94:6
**respectful** 92:5
**respectfully** 87:23 88:5,16
**respiratory** 14:18
**responding** 58:3
**response** 8:1
**responsibilities** 35:7
**responsibility** 34:11
**responsive** 53:8
**rest** 40:15 73:17
**restored** 85:10
**resume** 41:22 42:3
**review** 7:5 12:13 12:15 72:3 109:25 112:6 113:15 115:17
**reviewed** 22:25 50:22 74:12
**revisited** 18:13,19
**rgraham** 2:15
**rheum** 30:21

Page 17

**[rheumatoid - shorthand]**

**rheumatoid** 26:23
28:9 31:1 33:2,20
72:24 73:3,10,23
74:17,21 75:2
**right** 6:15 8:11 9:3
10:19 12:4,16
17:12 20:17,17
25:16 30:24 31:22
35:17,20 37:6,17
41:13 43:2,13
44:15 45:6,12,16
46:20 47:8 48:13
50:17 52:9 54:20
58:13,15 59:17,24
61:13 65:8 66:14
72:6,6 73:15,16,25
74:9,12 75:12
83:16,24 84:1,13
91:22 94:24 96:1
96:3 97:17 101:4
101:11 102:12,16
103:9 104:22
105:3,12,19 106:9
106:12,20,23
107:3,24 108:7,9
**rights** 5:20
**rise** 40:14 88:19
**risk** 28:19 68:19
69:7,9,16 70:19
85:25 87:3,14,18
96:2 100:25
**risks** 17:3 30:2
63:21 68:7,8,10,18
68:20 69:11 84:11
86:23 96:10
101:25
**risky** 67:15 85:3
**room** 62:22 63:5
63:12 94:9
**rose** 61:10

**routine** 13:6 16:18
61:8 66:12 95:3
**routinely** 59:2
**rule** 5:7
**ruling** 99:11
**run** 9:16 23:9
**rx** 78:24
**ryan** 2:13 5:15

**s**

**s** 9:12
**safe** 26:17 28:5
30:15 110:12
**safely** 55:18
**safer** 86:7
**safest** 21:5
**safety** 67:18,19
68:18,20 69:6
85:19 89:2,21
90:3
**sake** 5:24
**saw** 60:25 61:4
94:4 98:2
**saying** 19:25 20:2
25:16 40:24 57:3
73:9 75:18,21
77:21 93:13 97:9
99:13 107:15
112:7,9
**says** 14:2,17 15:7
23:11,14,15,17,19
24:8 26:6 28:18
34:21 37:4,21
40:4 42:25,25
43:3,21 44:10,11
72:6,21 73:25
74:20 79:7,22
80:15
**schedule** 65:3,4,15
**school** 10:8,8
26:11 27:21 28:1
29:9,14 31:23

109:5,13,19
**scope** 87:1 99:5,7
**scratch** 47:9
**second** 15:6 46:1
75:19,22,24 76:1
76:16,16,18 80:6
80:12 103:1
**see** 12:22 13:13
16:15 23:11 33:14
37:20 52:17 64:3
71:24 76:17,17
79:20 91:10 96:21
109:25 110:6,10
**seeing** 35:5 75:16
96:19
**seeking** 41:5 42:8
**seen** 93:20,22,24
94:2 97:12,22
98:8
**send** 75:12 110:21
**sense** 28:18,25
65:6 68:24,25
102:9
**sent** 34:20 71:12
95:2 110:21
**sentence** 15:6 72:8
74:22
**september** 32:12
32:15 39:22 80:7
102:3,4,11,14
103:2,10 105:2,20
106:5
**series** 39:21 43:15
45:23
**serious** 16:12,24
18:4 84:25 85:12
87:17
**serobian** 2:8,8 3:6
8:15,15 19:23
20:16,22 21:24
22:8,14 23:22,25

24:19 44:23,25
45:11,15 51:14
54:18,24 56:11,14
56:18 57:25 58:23
58:24 59:22 60:4
65:1 67:22 68:4
69:3,4,25 70:8,22
71:5,17 72:18,19
74:6,18 76:24
78:4,14 79:18
80:2 81:11 82:2
82:16,23 83:7
84:21 86:16,21
87:6 88:2 89:7,16
89:23 90:6,11,13
90:21 91:4 92:20
93:1 96:15,18,24
97:5 98:22 99:1,7
99:13,15 100:6,11
100:14,18,19
101:8,21 102:24
103:6,7,18,22
104:2,4,7,10,14,17
105:8,9,16,23
106:16 108:2,4,20
108:23 109:24
110:3,5,7,17 111:5
111:8,11,20 112:1
112:5,24 113:4,7
**serve** 34:4 96:8
**serves** 64:8
**services** 60:11
**set** 78:12
**setting** 6:20
109:13
**severe** 86:5
**shared** 95:3
**she'd** 35:9
**short** 18:22
**shorthand** 115:11
115:24

[showed - suppose]

| | | | |
|---|---|---|---|
| **showed** 80:4 | **smoking** 53:5 | 86:19 88:4 108:17 | **statement** 54:14 |
| **shown** 92:14 | **social** 5:17 11:15 | **specifics** 22:17 | 54:15 55:4,6 56:3 |
| **sic** 84:5 85:15 98:8 | **somebody** 19:21 | 44:9 53:20 54:6 | 56:5 83:19 86:11 |
| **sick** 17:9 48:3 | 42:5,8 48:7 75:20 | **speculate** 73:19 | 86:13 87:3,4,7,8 |
| **side** 15:15 16:22 | 109:11 | **speculation** 21:24 | 104:15,18 |
| 40:12 68:10,12 | **someone's** 90:5 | 22:8 23:22,25 | **states** 1:1 44:2 |
| 69:19 70:6 80:19 | **somewhat** 86:8 | 24:21 51:14 54:19 | 62:15 72:9 73:7 |
| 80:22 | **soon** 97:11 | 76:23 109:21 | **stayed** 20:9 |
| **sign** 61:23 63:16 | **sooner** 97:22 | 110:14 | **stds** 40:8 |
| 64:6 108:8,9 | **soonest** 21:4 | **speculative** 59:21 | **stephen** 5:18 |
| **signature** 16:8 | **sorry** 14:20 20:21 | 68:3 71:4 86:25 | 11:13 |
| 26:13 47:16 48:16 | 22:9 23:23 49:2 | 98:21 105:7 | **stick** 91:25 |
| 49:8 63:17 107:12 | 72:18 82:10 84:20 | **spell** 9:10 | **stipulate** 47:8 |
| 107:21,23 115:24 | 84:21 93:23 97:7 | **spoke** 92:3 | 111:3,16 113:13 |
| **signed** 34:22 101:9 | 97:9 99:19 102:6 | **ss** 114:2 115:2 | **stipulated** 5:5 |
| 102:3,17,20,25 | **sort** 42:20 | **st** 13:4 14:5 | 111:4,5 |
| 103:10,14 104:20 | **sound** 52:9 | **stab** 91:25 | **stipulating** 111:20 |
| 104:25 106:3,13 | **sounds** 44:14 | **stable** 13:6 | 111:23 |
| 107:17 112:18 | 46:25 | **stamped** 3:11,12 | **stipulation** 110:20 |
| **significant** 51:23 | **speaking** 20:19 | 3:14,15,17,19,21 | **stop** 53:5 55:20 |
| **similarly** 65:25 | **special** 10:1 | 3:22,24 4:3 | **street** 2:14 |
| **simply** 100:21 | **specialist** 42:11 | **stamps** 23:10 | **stress** 44:2 |
| **simultaneous** | 43:7 71:1 73:4,14 | **stance** 82:10,11 | **strike** 58:2 |
| 20:19 | 75:12,13,25 76:2,9 | 83:1,10 | **strong** 50:1 52:21 |
| **sinai** 10:8 | 81:5 | **standard** 26:8 | 83:19 |
| **single** 66:12 | **specialist's** 76:5,7 | 51:15,20 58:17 | **strongly** 84:8 |
| **sir** 37:5 | **specializes** 38:25 | 61:20 62:13 64:1 | 86:23 |
| **sit** 40:25 | **specific** 16:18 | 64:7 67:3 91:20 | **subject** 19:17 |
| **site** 84:5 87:17 | 27:10 28:16 40:18 | 99:22 106:22 | 20:13 |
| **situation** 16:25 | 41:1 44:6 45:3 | **standing** 8:13,17 | **subjective** 94:16 |
| 88:17 | 46:4 49:22 50:3,7 | 60:3 76:21 | **subpoenaed** 9:20 |
| **situations** 17:21 | 51:11 53:21 54:1 | **standpoint** 42:22 | 23:3 36:17 38:17 |
| 89:1 90:1,14 | 62:17,19 63:2 | **start** 8:9 96:19 | 39:14,15 41:21 |
| **six** 49:8 97:4,6,10 | 64:5,21 65:10 | **starts** 96:21 | 78:9 |
| 97:19 | 66:13 68:23 73:17 | **state** 26:17 27:11 | **suffering** 17:9 |
| **skipping** 76:18 | 76:10 82:3,7,24 | 28:4,21 30:14 | **suite** 2:9,14 |
| **slow** 14:20 84:20 | 83:21 90:16 95:16 | 31:10 32:4 64:20 | **summarized** 37:2 |
| **small** 20:8,9 | **specifically** 22:20 | 84:15 114:1,7 | **summary** 38:21 |
| **smallpox** 85:21,23 | 28:14 33:4,6 50:1 | 115:1,4,25 | 52:2 59:3 |
| **smokers** 53:4 | 53:18 61:22 62:15 | **stated** 8:16 50:23 | **suppose** 81:9 |
| | 68:18 71:21 75:15 | 62:5 | |

Hahn & Bowersock, A Veritext Company
800.660.3187

David Aaron Bowersock, M.D. - March 7, 2019

[supreme - truthful]

| | | | |
|---|---|---|---|
| **supreme** 85:4 | 71:10 72:11 82:18 | **thing** 9:9 26:12 | **timetable** 64:21 |
| **sure** 14:21 17:8 | 82:19 83:23 95:10 | 41:7 | 65:14 66:6,7,24,25 |
| 20:3 36:15,24 | **talks** 71:22 80:20 | **things** 12:6 41:11 | **timetables** 64:24 |
| 43:12 44:17 47:10 | **tdap** 24:17 | 51:20 55:16 62:13 | 65:2,11 |
| 47:14 50:14 78:17 | **tell** 16:10 33:1 | 65:12 75:14 76:4 | **title** 101:15 |
| 79:14 112:10 | 39:19 52:24 75:11 | 80:3 | **titled** 29:21 36:17 |
| 113:8 | 112:24 | **think** 8:5 16:21 | 38:18 104:21 |
| **surgeons** 82:12 | **telling** 33:18 | 19:1,25 21:22 | **today** 6:12,20,24 |
| 83:2,18 84:8 | **temporary** 13:5 | 22:6,12 34:1 39:6 | 8:6 9:2 12:14 14:4 |
| 86:14 87:21 | 17:8,16 68:19 | 47:14 48:7 52:9 | 18:16 37:4 40:25 |
| **surmounted** 85:7 | **ten** 12:23 37:1 | 54:13 67:7,25 | 80:4 94:21 |
| **suspect** 60:6,11 | 60:24 | 71:22 75:14,21 | **told** 33:10 53:4,5,6 |
| 70:15,19,24 71:2,6 | **tendency** 7:25 | 76:11 93:1 109:6 | 62:7,9,10 74:15 |
| **suspected** 74:16 | **tenor** 52:12 53:2 | 110:17 | **tons** 46:25 |
| 85:25 | **term** 18:22 68:19 | **thought** 95:6 | **top** 23:14 34:25 |
| **suspicions** 93:13 | **terms** 41:14 | **threatening** 16:12 | 109:22 |
| **swallowed** 78:25 | 112:18 | **three** 10:9 16:7,8 | **toss** 36:12 |
| 79:1 | **terrible** 32:10 | 52:7,10 62:16 | **total** 25:11 |
| **swelling** 72:13 | 33:16 | 94:13 97:13 | **track** 15:18 |
| **switching** 40:9 | **test** 41:8 88:22,23 | **thursday** 1:14 2:2 | **training** 10:9 |
| **sworn** 5:10 115:7 | **testified** 5:11 | 5:1 | **transcript** 7:5,8 |
| **system** 19:16 | 58:25 92:21 | **till** 12:24 | 110:20 112:18 |
| | **testify** 92:23 93:19 | **time** 7:2 10:20 | 115:13,16,17 |
| **t** | 115:8 | 12:10 15:3 17:12 | **transpired** 73:20 |
| **t** 9:12 | **testifying** 9:5 | 21:9 22:15 25:16 | **treat** 10:4 |
| **take** 8:1 16:20 | 28:20 | 25:17 28:20,22 | **treated** 12:10 |
| 17:1 33:15,23 | **testimony** 6:19 | 34:6 42:4 44:20 | **treatment** 12:1 |
| 72:3 78:15 83:10 | 19:24 24:22,22 | 52:22 54:8 55:24 | 39:24 41:5 70:16 |
| 88:13,23,24 89:2 | 58:16,22 59:3,10 | 57:23 58:7,17 | 71:2 |
| 89:20 90:2,16 | 60:25 67:11 69:2 | 60:15,23,24 61:1 | **trial** 7:2,11 111:2 |
| 106:25 107:2,3,4 | 77:20 92:20 94:3 | 66:12,13 67:5,6 | **trip** 112:3,22 |
| 107:13 | 100:12 101:3 | 72:3 74:15 78:5 | **trouble** 107:11,16 |
| **taken** 2:1 6:25 | 103:17,23 104:10 | 87:14 94:4 99:1 | 107:19 |
| 35:10 115:10 | 104:11 114:8 | 101:7 102:23 | **true** 28:2 35:17,25 |
| **talk** 13:3 17:17 | **tests** 41:10 | 103:13 107:20 | 36:7 44:16 68:15 |
| 22:1,2 68:10,11,16 | **tetanus** 24:17 | 110:16,18 115:11 | 79:24 110:24 |
| 69:10 80:8,24 | **thank** 5:15 15:19 | **times** 6:7 16:7,8,8 | 114:8 115:13 |
| **talked** 76:13,14 | 25:19,21 52:5 | 17:15,17 25:12 | **truly** 37:5 |
| 108:20 | 56:9 99:20 110:18 | 45:1 51:3,6 60:14 | **truth** 115:8,8,9 |
| **talking** 19:4 20:15 | **thea** 3:20 41:23 | 92:3,4,6 | **truthful** 6:16 |
| 49:20 53:24 56:19 | | | |
| 68:14 69:11,15 | | | |

Page 20

David Aaron Boxerbaum, M.D. - March 7, 2019

[try - visit]

**try** 34:8 68:14,16

**trying** 40:21,22
47:13 66:11,25
67:2 78:3 79:19
98:23

**tuberculin** 41:8

**tuberculosis** 28:19

**turn** 26:5 35:11,20
36:3 49:5 54:4

**turned** 70:25
97:12

**turning** 97:13,14
97:18

**twice** 50:25

**two** 5:17 39:5,14
48:15 72:7 73:16
74:1,13 75:1
97:10,11,12 98:14
109:6,23

**type** 6:9 9:24
40:11 56:20 62:24
69:8 80:18,21
100:7

**typewriting**
115:12

**typical** 15:9

**u**

**u** 14:8

**u.s.** 85:4 86:3

**uh** 21:19 80:12

**ulikhanova** 1:4
5:21 11:16 14:5
15:25 21:10 30:8
34:20 40:24 41:6
42:15 43:25 44:19
49:13 51:5 52:8
91:9 92:3 94:9

**ulikhanova's** 44:4

**unconditionally**
25:13

**undergrad** 10:14

**undersigned** 114:6

**understand** 6:12
6:15,19,24 7:7,14
7:15,17 16:23
20:3 33:11 43:8
54:25 59:23 63:25
66:21 67:23 89:15
104:12 112:5

**understanding**
14:7 15:12 19:19
29:23 41:24 42:2
55:15 58:12 63:18
63:19 101:10
102:15 105:4
108:15 109:1

**understandings**
18:13

**understands** 30:1

**understood** 21:3
26:2 34:14 51:22
52:15

**undertaking** 17:3

**underweight** 20:8

**uneventfully** 13:8

**unit** 14:6,8

**united** 1:1

**university** 10:15

**unsafe** 27:12,13
28:22 31:11 32:5

**unusual** 53:14

**update** 39:22

**ups** 91:5

**urine** 88:23

**use** 32:13 40:21
95:24 107:13

**usually** 69:9 111:3
111:9

**v**

**v** 9:11

**vaccinate** 16:4
17:22 19:15 20:11
20:12 23:14 33:7
41:9 56:15,21,23
57:3,9 60:16 67:4
67:5 88:14 91:18
96:5 100:21,22
101:2 104:21
107:7,23 108:8,25

**vaccinated** 17:4,7
17:25 18:11 19:2
19:9 31:9,18
33:19 34:10 48:23
50:21 53:16 55:18
57:5,10,14 58:8
109:7

**vaccinating** 57:18

**vaccination** 21:11
27:20 29:11 31:23
32:1 33:13 52:7
54:16 55:7 56:6
58:18,18 59:16,24
65:19 66:7 70:24
85:13 86:23 87:19
87:24 88:6,8 96:3
102:16 105:13,20
106:7,9,12

**vaccinations** 15:25
24:24 40:23 59:2
59:11 61:9 67:12
67:17 68:7 89:9
91:21 96:10
102:20 103:9

**vaccine** 15:8,9
17:11,11,15,20
18:2,7 19:20
24:13,18 38:11
49:10 85:5,21,24
86:2,6,10

**vaccines** 17:2 21:4
21:12 22:19 23:17
23:18 25:11,15
28:25 29:25 34:3
37:7,19 38:8 46:9
46:17 47:2,19,24
48:10,17,22 49:9
49:13,21 50:1,13
50:16,25 51:10
53:25 58:11 65:7
66:18,23 68:20
84:10 85:2,19
88:24 89:25 92:3
100:24 102:1,2

**vaccinization**
27:23 29:8 32:4
32:21 51:24

**vacuum** 63:24

**vague** 56:17 57:23
59:20 64:25 67:21
81:6 82:5,22
87:25 89:12,22
101:7 102:23
105:21

**validated** 78:1

**value** 33:15,22,23
33:24 106:5

**verbal** 72:10

**veterinarians** 86:1

**visit** 3:14 19:4
35:6 36:18,24
37:25 46:4,4,10,13
46:15,21,23 48:14
48:21,25 49:3,7
50:10 65:19 66:3
67:1,4,5 74:15
96:25 97:2,3 98:1
98:2,4,5,7,13,23
98:24 99:3,9,10,16
99:17

David Aaron Bonsrock, M.D. - March 7, 2019

**[visits - younger]**

| | | |
|---|---|---|
| **visits**  19:12 37:20<br>48:6 50:4 65:18<br>65:24,25 66:3,23<br>96:22 97:4,13<br>**vs**  1:6 | **welfare**  11:1<br>**went**  10:7 47:23<br>61:18 66:3<br>**when's**  12:10<br>**willing**  93:19<br>**withdraw**  32:9<br>91:17 94:18 | **written**  7:1 22:23<br>32:16 55:12 74:11<br>75:16 78:22 79:21<br>80:23 94:17<br>**wrote**  13:13 66:4<br>77:14,17 78:1<br>80:7 |

**w**

**wait**  7:20
**waive**  5:5
**waiving**  112:8
**want**  7:19 19:15
  19:20 23:2 26:16
  33:14 35:13 36:11
  40:3 42:21 65:5
  93:10 95:23 98:18
  105:24
**wanted**  8:12 19:9
  19:18 25:7 35:9
  39:21 42:5 47:22
  63:10 79:6 91:14
  99:18
**wanting**  53:16
**way**  2:3 7:23
  21:25 40:2 42:19
  42:20 43:14 44:8
  50:1 95:16 98:4
**ways**  42:13
**we've**  52:6 82:1
**weakened**  19:16
**weakens**  17:10
**weaponization**
  85:23
**week**  19:11
**weekends**  12:5
**weeks**  14:11,13
  20:7
**weigh**  21:2 44:19
**weighed**  44:15
**weighing**  44:13
**weight**  14:12
  43:24 44:3,5,11

**withdrawn**  86:2
**witness**  3:3 6:11
  13:15 20:2,18,22
  22:1,14,17 23:25
  24:22,25 44:24
  45:3 51:15 54:23
  56:1,8 58:22 69:2
  71:15 74:9 77:21
  81:8,25 82:22
  86:18 87:2 88:1
  89:5,13 90:20
  92:24 93:24 97:4
  103:18,24 104:16
  106:15 109:22
  110:6,15,19
  111:18 112:4,10
  112:17 113:3,5,8
  113:19 115:6,21
**witness's**  78:12
**witnessed**  72:12
**word**  18:17 74:10
  74:10 107:2
**words**  73:11 83:8
**work**  6:1 112:11
**workers**  5:17
  11:15
**working**  42:6
**works**  104:9
**worried**  75:18,21
**worse**  40:13
**write**  21:13,18
  63:9 77:8
**writing**  74:14

**x**

**x**  9:12 45:25 78:24
  79:2,3 115:18

**y**

**yahoo.com**  2:10
**yeah**  41:4 44:25
  50:15 53:7,7,7
  63:12,15 79:4
  81:16 106:17
  111:11 113:11
**year**  48:15 97:10
  97:19
**years**  10:7,9 12:22
  18:6,7 22:21 54:4
  61:1,5 65:10 98:6
**yesterday**  39:18
  93:21
**york**  10:8
**young**  10:5
**younger**  96:20

Page 22

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is stenographically recorded, the deposition officer shall send written notice to the deponent and to all parties attending the deposition when the Original transcript of the testimony for each session of the deposition is available for reading, correcting, and signing, unless the deponent and the attending parties agree on the record that the reading, correcting, and signing of the transcript of the testimony will be waived or that the reading, correcting, and signing of a transcript of the testimony will take place after the entire deposition has been concluded or at some other specific time.

(b) For 30 days following each notice under subdivision (a), unless the attending parties and the deponent agree on the record or otherwise in writing to a longer or shorter time period, the deponent may change the form or the substance of the answer to a question, and may either approve the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.