**SEROBIAN LAW, INC.**

# DEPOSITION OF
# MARAL HELWAJIAN

# EXHIBIT 1

*Lucy Ulikhanova, et al. v. County of Los Angeles, et al.*
(C.D. Cal. 2:17-CV-9193-FMO-E)

Atkinson-Baker, Inc.
www.depo.com

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        - - -

4

LUCY ULIKHANOVA, et al.,          )

5                                 )     **CERTIFIED COPY**

                    Plaintiffs,   )

6                                 )

        vs.                       )     Case No.

7                                 )

COUNTY OF LOS ANGELES, et al.,    )     2:17-CV-9193-FMO-E

8                                 )

                    Defendants.   )

9                                 )

10

11

12

13

14

15              DEPOSITION OF

16              MARAL HELWAJIAN

17             GLENDALE, CALIFORNIA

18           FRIDAY, MARCH 29, 2019

19

20

21

22   ATKINSON-BAKER, INC.
     (800) 288-3376
23   www.depo.com

24   REPORTED BY:   MARY FERGUSON, CSR NO. 8769

25   FILE NO.:   AD03529

Atkinson-Baker, Inc.
www.depo.com

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                      -  -  -

 4
    LUCY ULIKHANOVA, et al.,          )
 5                                    )
                      Plaintiffs,     )
 6                                    )
           vs.                        )    Case No.
 7                                    )
    COUNTY OF LOS ANGELES, et al.,    )    2:17-CV-9193-FMO-E
 8                                    )
                      Defendants.     )
 9                                    )

10

11

12

13

14

15

16  Deposition of MARAL HELWAJIAN, taken on behalf of

17  Plaintiffs, at 100 North Brand Boulevard, Suite 600,

18  Glendale, California, commencing at 10:15 a.m., Friday,

19  March 29, 2019, before Mary Ferguson, CSR No. 8769.

20

21

22

23

24

25
```

```
 1                 A P P E A R A N C E S

 2

 3    FOR PLAINTIFFS ULIKHANOVA AND MINOR P.G.:

 4    SEROBIAN LAW, INC.
      BY:  LIANA SEROBIAN, ESQUIRE
 5    100 North Brand Boulevard
      Suite 600
 6    Glendale, California  91203
      (818) 539-2249
 7    l.serobian@yahoo.com

 8

 9    FOR THE DEFENDANTS:

10    PETERSON BRADFORD BURKWITZ
      BY:  AVI BURKWITZ, ESQUIRE
11    100 North First Street
      Suite 300
12    Burbank, California  91502-1845
      (818) 562-5800
13    aburkwitz@pbbllp.com

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  I N D E X

 2

 3  WITNESS:   MARAL HELWAJIAN

 4  EXAMINATION                                PAGE

 5        BY MS. SEROBIAN                        6

 6

 7

 8  EXHIBITS

                          PLAINTIFFS'
 9  NUMBER        DESCRIPTION                   PAGE

10  3        E-mail dated 4/6/2016 from Lucy
             Ulikhanova to Stephen Carey, with
11           attachments, 5 pages               24

12  5        E-mail from Stephen Carey to Ronald
             Funk, Ms. Ulikhanova and Ms. Helwajian,
13           2 pages                            41

14  7        E-mail from Stephen Carey to Ronald
             Funk, et al., dated 6/4/2016, 3 pages  45
15
    9        Letter, May 23, 2017, To Whom It May
16           Concern, from Dr. Tara Zandvliet, 2
             pages                              52
17
    11       E-mail dated March 23, 2017, from
18           Ms. Helwajian to Ms. Ulikhanova, 13
             pages                              54
19
    17       Medical records re Penelopy Garcia,
20           11 pages                           61

21  19       E-mail dated March 7, 2019 from Lucy
             Ulikhanova to Ms. Helwajian and several
22           people in the United States Senate, re
             H Resolution 179, 6 pages          65
23  ///

24  ///

25  ///
```

Atkinson-Baker, Inc.
www.depo.com

```
 1   EXHIBITS (Cont'd.)

 2                        DEFENDANT'S
     NUMBER        DESCRIPTION                      PAGE
 3
                         (NONE)
 4

 5

 6   QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER:

 7                       (NONE)

 8

 9
     INFORMATION TO BE SUPPLIED:
10
                         (NONE)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson-Baker, Inc.
www.depo.com

```
 1                      MARAL HELWAJIAN,

 2             having first been duly sworn, was

 3             examined and testified as follows:

 4

 5                      EXAMINATION

 6   BY MS. SEROBIAN:

 7       Q.   Can you please state your name for the record.

 8       A.   Maral Helwajian.

 9       Q.   Go ahead and spell it, please.

10       A.   M-A-R-A-L, H-E-L-W-A-J-I-A-N.

11       Q.   The testimony given today will be used -- can

12   be used in a court of law, just as if you are testifying

13   in court, correct?

14       A.   Yes.

15       Q.   Is there anything today that makes you

16   uncomfortable testifying or makes you in a state of --

17   are you in a state of mind to testify?

18       A.   I am fine, thank you.

19       Q.   Can you please tell us your position with the

20   County of Los Angeles?

21       A.   Sure.

22            I am currently a Children's Social Worker 3.

23       Q.   How long have you been a social worker with the

24   County of Los Angeles?

25       A.   Ten years.
```

1    Q.   Are you familiar with plaintiffs in this case,

2  Lucy Ulikhanova, and her minor child, Penelopy?

3    A.   Yes, I am.

4    Q.   How are you related within your position to

5  their case?

6    A.   I was a continuing services social worker on

7  their case.

8    Q.   And for what time period?

9    A.   The whole time the case was open, January 2016

10  to October 2017.

11    Q.   So you were assigned in January 2016?

12    A.   Yes.

13    Q.   Can you remember who the case was transferred

14  to you from?

15    A.   Yes.

16    Q.   Can you please tell the name of the social

17  worker?

18    A.   The emergency response worker was Maria Sosa.

19    Q.   How is Mr. -- your codefendant, Mr. Stephen

20  Carey, related to this case; do you know?

21    A.   Yes.  He was the dependency investigator.

22    Q.   Did he, along with you, service the case for

23  the remainder?

24    A.   He serviced the case until disposition.

25    Q.   And following disposition up until the

1   termination, you were the sole assigned social worker

2   to the case?

3       A.   Yes.

4       Q.   What was your recommendation for the case when

5   it closed?

6            MR. BURKWITZ:  Lacks foundation, as phrased.

7            MS. SEROBIAN:  Let me rephrase.

8       Q.   Did you make continuing recommendations to the

9   juvenile court regarding this case?

10      A.   I recommended termination of jurisdiction.

11      Q.   When did you recommend termination of

12  jurisdiction; do you remember?

13      A.   October of 2017.

14      Q.   What were your recommended orders?

15      A.   Family law order with full physical and legal

16  custody to the mother, Lucy Ulikhanova.

17      Q.   What were your recommendations as to the

18  father?

19      A.   Continued monitored visitation.

20      Q.   Why did you make this recommendation to the

21  general court?

22      A.   For which one?

23      Q.   For both parents.

24           Why did you make those certain recommendations

25  to the general court?

Atkinson-Baker, Inc.
www.depo.com

1      A.    For the mother, the recommendations were made

2  due to her compliance with the court case plan.

3           For the father, the recommendations were made

4  because of his lack of progress.

5      Q.    Did father test positive for any drugs in the

6  case?

7           MR. BURKWITZ:   Calls for speculation, overbroad

8  as phrased.

9  BY MS. SEROBIAN:

10     Q.    If you remember, during the time you serviced

11 the case, and you said he failed to comply, correct?

12     A.    Yes.

13     Q.    Was part of the failure to comply -- had to do

14 with his substance abuse?

15     A.    Yes.

16     Q.    Do you remember if he tested positive for any

17 substances during the case that you serviced?

18     A.    Yes, he did.

19     Q.    For what substance did he test positive?

20     A.    Methamphetamine.

21     Q.    How many times did he test positive for

22 methamphetamines?

23     A.    I can't recall at this time.

24     Q.    Did he also fail to drug-test when called,

25 causing for it to be -- you would -- the Department

1    generally determines is deemed positive?

2            MR. BURKWITZ:  Compound, lacks foundation.

3            MS. SEROBIAN:  I will rephrase.

4        Q.   When a parent is ordered to drug-test and fails

5    to do so, does the Department deem that failure to

6    drug-test as a deemed positive drug test?

7        A.   Missed tests are positive drug tests.

8        Q.   Did the father in this -- for child Penelopy,

9    have missed tests that were deemed positive tests?

10       A.   Yes.

11       Q.   Do you know for how long or what time period?

12       A.   I don't know.

13       Q.   Did the father make any threats to servicing

14   social workers in this case; do you know?

15       A.   Yes.

16       Q.   Do you know who he made the threats to?

17       A.   To me.

18       Q.   Do you know if he made threats to any other

19   social workers?

20       A.   Not to a social worker that I know of.

21       Q.   Did father make any threats to monitored

22   visit -- monitors for visits?

23       A.   Yes.

24       Q.   Do you have the name for that monitor?

25       A.   I can't recall which one it was.

Atkinson-Baker, Inc.
www.depo.com

1     Q.   What steps did the Department take to protect

2  the social workers like you and the monitor against

3  those threats?

4          MR. BURKWITZ:  Overbroad, speculation, no

5  foundation.

6          You can answer all these questions; I am just

7  objecting for the record.

8          MS. SEROBIAN:  I can clarify just to make it

9  more clear.

10     Q.   Did the Department, your employer, make any

11  efforts to protect you from these threats?

12          MR. BURKWITZ:  Lacks foundation, speculation.

13          THE WITNESS:  I don't know.

14          We made sure all his visits were in the office,

15  only to keep it contained, so.

16  BY MS. SEROBIAN:

17     Q.   Did you file a request for a restraining order

18  against the father in this case?

19     A.   No.

20     Q.   Did you file a police report against the father

21  in this case?

22     A.   No.

23     Q.   Did you file an incident report for the threats

24  made?

25          MR. BURKWITZ:  Lacks foundation.

Atkinson-Baker, Inc.
www.depo.com

```
 1            THE WITNESS:  I can't recall.
 2   BY MS. SEROBIAN:
 3       Q.   You did testify that there were threats made,
 4   correct?
 5       A.   Yes.
 6       Q.   What kind of threats were those that were made
 7   against you by father in this case?
 8       A.   As I reported to the court back then, just
 9   threats that we were going to, you know, regret
10   everything we were doing, that he was going to go
11   down -- wasn't going to go down without a fight, that
12   he was going to -- you know, guns a-blazing; that's kind
13   of what he said.
14       Q.   Did he use the word "guns" in those threats?
15       A.   Yes, yes.
16       Q.   Did you take it as criminal then, those
17   threats?
18            MR. BURKWITZ:  Lacks foundation.
19   BY MS. SEROBIAN:
20       Q.   As you perceived the threats made to you while
21   guns were used in the sentence, did you perceive those
22   to be criminal threats?
23       A.   I didn't think anything of it.
24       Q.   But you think -- thought enough to report it to
25   the general court?
```

Atkinson-Baker, Inc.
www.depo.com

```
 1       A.    Yes.

 2       Q.    Did you report it to your supervisor?

 3       A.    Yes.

 4       Q.    Did your supervisor take an incident report?

 5             MR. BURKWITZ:  Calls for speculation.

 6             THE WITNESS:  I can't recall.

 7   BY MS. SEROBIAN:

 8       Q.    Did your supervisor call the police?

 9             MR. BURKWITZ:  Calls for speculation.

10             THE WITNESS:  No.

11   BY MS. SEROBIAN:

12       Q.    Were you protected in any way?

13             MR. BURKWITZ:  Lacks foundation, overbroad.

14             You can answer all these questions; go ahead.

15             THE WITNESS:  No.

16   BY MS. SEROBIAN:

17       Q.    Did you know that mother continued to have her

18   educational rights throughout the pendency of the

19   dependency case for Penelopy?

20       A.    Yes.

21       Q.    Did you ever ask the mother, the plaintiff,

22   Lucy Ulikhanova, whether she wanted her child enrolled

23   in school prior to enrolling her in school?

24       A.    No.

25       Q.    But you admitted you knew she had educational
```

1    rights, correct?

2        A.    Yes.

3        Q.    What is the general practice for the

4    Department, social workers like you, when you are aware

5    that a parent has educational rights and has the right

6    to make decisions for their child's schooling, do you

7    not then ask the parent about whether to enroll the

8    child into school or not?

9            MR. BURKWITZ:   It's vague and ambiguous.

10           You are asking her double negatives.

11           You can answer, if you understand.

12           MS. SEROBIAN:   I will clarify, just to make it

13   easier.

14       Q.    In your general practice as a social worker,

15   when you are aware that a parent does have educational

16   rights, as you did in this case, what does your social

17   workers or your supervisors -- your supervising social

18   workers or training social workers tell you about the

19   parent's rights as far as educational rights.

20           Do you need to ask them before enrolling their

21   child into a school when they have those rights?

22           MR. BURKWITZ:   Compound.

23           You can answer.

24           THE WITNESS:   As far as to my knowledge, a

25   foster parent has the right to enroll the child in

Atkinson-Baker, Inc.
www.depo.com

1    school.

2              Parents' rights to hold educational rights

3    when it comes to making decisions as far as IEPs,

4    services they will be receiving at school, but not that

5    they -- not that the foster parent does not have a right

6    to enroll the child in school.

7        Q.   So is it your understanding that the foster

8    parent has somewhat of an educational right that they

9    can make decisions to enroll or not enroll a child into

10   school?

11             MR. BURKWITZ:  Vague and ambiguous.

12             THE WITNESS:  I don't see the enrollment as an

13   educational right.  It's -- that's --

14   BY MS. SEROBIAN:

15       Q.   You are not trained to see enrollment as an

16   educational right; is that correct?

17       A.   In my experience, a school-aged child goes to

18   school.  If they are in foster care, the foster parent

19   has a right to enroll them in school.

20       Q.   Great point, school-aged child.

21             What is your understanding as far as the

22   California law that applies to when is the child

23   considered school-aged; what is your understanding

24   about that?

25       A.   Well, I understand that a parent has a right

Atkinson-Baker, Inc.
www.depo.com

```
 1   to skip kindergarten, yes.
 2        Q.   So a parent has a right to skip kindergarten;
 3   that is your understanding?
 4        A.   Uh-huh.
 5        Q.   So the mother in this case who held
 6   educational rights had a right to skip kindergarten for
 7   her child?
 8        A.   If the child was in her custody, sure.
 9        Q.   But at the same time, you testified she still
10   had educational rights, correct?
11             MR. BURKWITZ:  You are asking her what she
12   testified before; is that the question?
13             MS. SEROBIAN:  I am asking -- I will rephrase
14   the question.
15             MR. BURKWITZ:  You said, "Did you testify like
16   this before?"  It's asked and answered --
17   BY MS. SEROBIAN:
18        Q.   I am asking if you testified that this parent
19   had educational rights.  Yes, you testified --
20        A.   Yes, yes.
21        Q.   So your understanding of educational rights is
22   that she has some educational rights, but she doesn't
23   have a whole lot, basically; is that correct?
24             MR. BURKWITZ:  Vague and ambiguous, no
25   foundation.
```

Atkinson-Baker, Inc.
www.depo.com

1   BY MS. SEROBIAN:

2       Q.   What is your understanding as to what is

3   included in the educational rights of a parent, like

4   Lucy Ulikhanova, for example?

5       A.   To make decisions as far as, you know,

6   individual education plans, to make decisions as far

7   as -- I don't know.  I don't know any other.

8       Q.   So just for me to understand clearly, your

9   understanding is once the child is taken from a

10  parent's physical custody because -- let me clarify

11  this.

12          When was Penelopy enrolled in school?

13          MR. BURKWITZ:  Overbroad, vague as to time.

14  BY MS. SEROBIAN:

15      Q.   When did the Department give authority to the

16  foster parent to enroll Penelopy to school?

17      A.   She started school August 2016.

18      Q.   August 2016.

19      A.   Uh-huh.

20      Q.   Was she enrolled prior to August 2016 in any

21  type of day care or preschool?

22      A.   No, she was not enrolled in a day care or free

23  school.

24      Q.   Did the foster parent have full care of the

25  child during the entire day; she did not go to any kind

Atkinson-Baker, Inc.
www.depo.com

1    of day care or free school?

2        A.    The foster parent at the time was the paternal

3    aunt who ran a day care out of her house.

4        Q.    So she also took care of Penelopy during that

5    time?

6        A.    Correct.

7        Q.    But as far as school, public school, Penelopy

8    started in August 2016; is that correct?

9        A.    Correct.

10       Q.    What level of public school did she start in

11   August 2016?

12       A.    Kindergarten.

13       Q.    You earlier testified that a parent would have

14   a right to skip kindergarten under California law; is

15   that correct?

16       A.    Yes.

17       Q.    Did you ask the mother, Plaintiff Lucy

18   Ulikhanova, whether she wanted to skip kindergarten for

19   her child, Penelopy?

20       A.    I don't recall.

21       Q.    Were you made aware by the mother that she

22   objected to her child being immunized or vaccinated?

23       A.    Yes.

24       Q.    How many times did the mother inform you of

25   this objection that she have?

Atkinson-Baker, Inc.
www.depo.com

```
 1      A.   I don't know how many times.
 2      Q.   How early did she start telling you about this
 3 objection?
 4      A.   I don't recall.
 5      Q.   Would it be fair to say that pretty early on
 6 in the case?
 7      A.   Yes.
 8      Q.   Do you recall an e-mail sometime in maybe
 9 February --
10      A.   February 2016?
11      Q.   February 2016.
12      A.   Yes, I recall.
13      Q.   What do you recall in that e-mail; what did
14 the mother tell you in that e-mail?
15      A.   I don't know exactly.  I remember February 2016
16 is when we asked the court to set a date to make a
17 decision about the immunizations.
18      Q.   What happened; did the court make a decision at
19 that time?
20      A.   The decision was made in June of 2016.
21      Q.   But did you actually petition the court in
22 February 2016 for that decision?
23      A.   I did not petition to the court; I let the
24 court know the mother's position about the
25 immunizations.  I let the court know about the father's
```

1   position, and I asked the court to make an order.

2        Q.   Uh-huh.

3             That is in February 2016?

4        A.   Yes.

5        Q.   Did the court make on order in February 2016?

6        A.   No.

7        Q.   Do you know the reasons why the court did not

8   make that order?

9        A.   I don't know.

10        Q.   Do you recall when the court actual took

11   jurisdiction, legal jurisdiction of Penelopy in this

12   case?

13        A.   I don't know.

14        Q.   You testified that your codefendant, Stephen

15   Carey, was also assigned the case up in the disposition

16   hearing?

17        A.   When the disposition happened.

18        Q.   What do you mean, "When the disposition

19   happened"?

20        A.   When the case disposed.

21        Q.   Can you explain, please, what do you mean by

22   that, "When the case disposed"?

23        A.   When the allegations -- all the allegations

24   were sustained, the court made their orders and their

25   recommendations.

1    Q.    Would part of the orders be that court took

2  legal jurisdiction of Penelopy?

3    A.    I believe so.

4    Q.    What do you understand the disposition hearing

5  to be for; what do you think it is for, the disposition

6  hearing?  What is your understanding?

7    A.    As I said, to sustain or not sustain the

8  allegations that brought the case before the court and

9  then for the court to make disposition case plan

10  orders.

11    Q.    If, for example, the court did not sustain the

12  allegations that the Department brought against the

13  parent, what do you think would happen then?

14    A.    I mean, if the court does not sustain any of

15  the allegations, the court could dismiss the case.

16    Q.    Dismiss the case?

17    A.    Uh-huh.

18    Q.    So who then gets -- from your understanding,

19  being the social worker for ten years, when the court

20  dismisses the case at disposition, what happens; who

21  gets legal custody again?

22        MR. BURKWITZ:  Lacks foundation.  It's so

23  overbroad.

24        THE WITNESS:  Whoever the court decided at that

25  point.

```
1  BY MS. SEROBIAN:
2      Q.   Okay, that's fair.
3           But I just want to understand.  What does the
4  disposition mean to you?
5           Does it mean to you that that's the point when
6  the court takes legal custody from a parent and orders
7  the parent to comply with certain general court orders;
8  what does that mean to you?
9           What does the disposition hearing mean to you?
10     A.   Like I said already, that they have already
11 completed the investigation phase, that all the
12 allegations have been either sustained, dismissed or --
13 and then the orders are made as to what the parents
14 have to do to comply to either to reunify with their
15 child.
16     Q.   Do you remember until what month did your
17 codefendant remain on the case?
18     A.   October 2016.
19     Q.   Would it then be fair to say that the
20 disposition hearing that you are referring to took place
21 sometime in October 2016?
22     A.   The disposition hearing, to my knowledge, kept
23 getting postponed.  So --
24     Q.   It finally took place --
25     A.   It finally took place in October.  So from
```

1    January to October of 2016.

2        Q.    So the case started, was initiated in January

3    2016, correct?

4        A.    Uh-huh, yes.

5        Q.    How was it initiated?

6              Just for the record, can you explain how the

7    case was initiated?

8        A.    Do you mean why the case came to our attention?

9        Q.    No, how was it initiated.

10             How did the Department initiate the case,

11   procedurally?

12       A.    I am not sure.

13       Q.    Did the Department file a Section 300 petition

14   with allegations against the parents?

15       A.    Yes.

16       Q.    To initiate the case?

17       A.    Yes.

18       Q.    And there was supposed to be a hearing for the

19   general court to make findings whether to sustain or

20   dismiss those allegations, correct?

21       A.    Yes.

22       Q.    And you were saying that hearing was continued

23   several times until finally it was -- it took place in

24   October 2016?

25       A.    Yes, because it was months of trial on the

1    case.

2        Q.    But the orders didn't happen until October

3    2016?

4        A.    The disposition orders, yes.

5        Q.    When did you actually petition the court to get

6    an order to immunize or vaccinate Penelopy against her

7    mother's wishes?

8        A.    Again, I didn't petition.  I -- in February of

9    2016, I wrote a report to the court asking for a date to

10   be set for the court to hear the matter regarding the

11   immunizations.

12           I stated what the mother's perspective was

13   about the immunizations, what the father's beliefs and

14   requests were about the immunizations, and let the court

15   know that we wanted them to make a decision about the

16   immunizations.

17           MS. SEROBIAN:  Let me refer you to a certain

18   exhibit.  This is Plaintiff's Exhibit 3.

19           (Plaintiffs' Exhibit 3 was marked for

20   identification.)

21   BY MS. SEROBIAN:

22       Q.    Please take a look at the e-mail so I can ask

23   you questions about it and to refresh your recollection.

24       A.    Okay.

25       Q.    Who, aside from forwarding it to me, but who is

Atkinson-Baker, Inc.
www.depo.com

1    this e-mail from and to and the date, please?

2         A.   It's from Lucy Ulikhanova to Stephen Carey, the

3    defendant's investigator, Ronald Funk, her attorney, and

4    I don't know who Rachel Raymond is.

5         Q.   Can you please tell us the date of the e-mail?

6         A.   April 6, 2016.

7         Q.   It's a very brief sentence.

8              Can you please tell us what Lucy wrote to your

9    codefendant, Mr. Carey?

10        A.    "Don't know why if it's any

11             use, but here's a vaccine waiver I

12             signed when I took Penelopy to

13             pre-K St. Marks private school."

14        Q.   Is there an attachment to this e-mail?

15        A.   Looks like there is, yes.

16        Q.   The attachment is printed out.

17             Can you look at it and tell us how many pages

18   of attachments you see?

19        A.   Three pages.

20        Q.   Please tell us what are each of these pages?

21        A.   What do you mean?

22        Q.   Just titles of the pages, if you can read the

23   titles.

24        A.   First page says "Physician's Report."

25             At the bottom of that, "Immunization History."

Atkinson-Baker, Inc.
www.depo.com

```
 1          Second page, it talks about all the
 2   vaccinations, refusal to vaccinate.
 3      Q.   The second page, do you see a signature at the
 4   bottom?
 5      A.   That says, "Parent guardian signature" and,
 6   "Witness signature."
 7      Q.   Can you read whose signature that may be?
 8      A.   I can't read that.
 9           Well, Lucy, her parent, and I don't know who
10   the witness is.
11      Q.   But there's also a parent name at the top of
12   the page.
13           Can you please -- and the child's name.
14           Can you please tell us who is the child and the
15   parent on this?
16      A.   The child is Penelopy Garcia and the parent is
17   Lucy Ulikhanova.
18      Q.   And for which doctor's office is this being
19   declined or refusal to vaccinate signed for?
20      A.   Dr. Boxstein.
21      Q.   What is the date of this, please?
22      A.   11/13/2012.
23      Q.   What is the next page, please?
24      A.   The next page is "Personal Beliefs Exemption to
25   Required Immunizations."
```

Atkinson-Baker, Inc.
www.depo.com

1    Q.   Can you tell us the name of the child?  It
2   says, "Student name" and then, "Parent's name."
3    A.    Student name, Penelopy Garcia; parent, Lucy
4   Ulikhanova.
5    Q.    And the date of the document?
6    A.    This document is dated September 25, 2014.
7    Q.    Can you tell whose signature that may be at the
8   bottom?
9    A.    The mother, Lucy Ulikhanova.
10    Q.    Going back to the first attachment, when you
11   read physician's report, child care center, can you see
12   the name of the child and the name of the child care
13   center, please?
14    A.    Penelopy Garcia and St. Marks Day School.
15    Q.    What is the date of this document?
16    A.    It says physical exam 9/12/13.  Form signed
17   10/1/2014.
18    Q.    So this was -- what do you understand this
19   document to be?
20    A.    Just a report that the doctor filled out about
21   her last physical exam.
22    Q.    Do you think this also has to do with the
23   immunizations that is crossed out, everything that the
24   child -- it would tell us if and when she was
25   immunized, it's completely crossed out, and then the

```
 1   check -- the doctor signed off on this form?
 2           MR. BURKWITZ:  Calls for speculation, vague and
 3   ambiguous.
 4   BY MS. SEROBIAN:
 5       Q.   Do you see doctor's signature on this form, at
 6   the bottom where it says, "Physician"?
 7       A.   Yes.
 8       Q.   Do you see the name of the doctor's office?
 9       A.   Burbank Pediatrics.
10       Q.   What does it say after, "I have"?
11       A.    "I have reviewed the above
12            information with the parent
13            guardian."
14       Q.   Why was Lucy e-mailing this document to your
15   codefendant?
16           MR. BURKWITZ:  Calls for speculation.
17   BY MS. SEROBIAN:
18       Q.   Do you know?  If you know.
19       A.   I don't know.  Just to show that she had a
20   physical exam, but there's no immunization record.
21       Q.   Attached to this are refusal to vaccinate
22   signed, and then the personal beliefs form for an
23   exemption signed.
24           So does this kind of validate what she wrote in
25   her e-mail that:
```

Atkinson-Baker, Inc.
www.depo.com

 1                    "Don't know why if it's any

 2            use, but here's a vaccine waiver I

 3            signed when I took Penelopy to

 4            pre-K St. Marks private school."

 5            Does this tell Stephen Carey that she actually

 6   signed a waiver for -- for vaccination, and there is a

 7   doctor's signature on it, as well?

 8            Does this tell you that?

 9       A.   No, because it's not an exemption.  This is not

10   an exemption for vaccinations.

11       Q.   You don't consider a parent's signature as an

12   exemption to vaccination?

13       A.   No.  It's not an exemption that's been granted

14   by a doctor.  This is just her declining the

15   vaccinations.

16       Q.   At the time when the case was open, did you

17   think this was insufficient for mom to refuse to

18   vaccinate her child?

19            MR. BURKWITZ:  Again, calls for speculation.

20   BY MS. SEROBIAN:

21       Q.   What is your understanding as to the laws

22   regarding parents' rights to refuse to vaccinate their

23   child?

24       A.   Well, the laws actually -- from what I read and

25   understood back then, in 2016 the law did change, and

Atkinson-Baker, Inc.
www.depo.com

1    that a parent couldn't just ask for a child not to be

2    vaccinated anymore based on their personal beliefs.

3            And that was Senate Bill 277, which I looked

4    up.

5        Q.   Do you remember there was also a grandfather

6    clause for one year, if the parent had signed a similar

7    waiver form?

8        A.   But she --

9        Q.   Wouldn't that --

10       A.   This is not a granted exemption.   There was no

11   exemption.

12       Q.   You mentioned a bill, a Senate bill.

13       A.   Uh-huh.

14       Q.   I am asking whether you remember, when you read

15   that Senate bill, whether there was a grandfathered

16   clause --

17       A.   Yes.

18       Q.   -- that parent's refusal to vaccinate on

19   personal belief or on similar form was granted --

20   grandfathered for one year.

21           Do you remember reading that same grandfather

22   clause within that Senate bill?

23       A.   I did not remember that back then, but I read

24   it this morning.

25       Q.   So you were not familiar with that grandfather

1    clause back then?

2        A.    Again, we are going based off that this was not

3    a granted exemption.

4        Q.    I am asking about the state of the law.

5        A.    I didn't know all of it back -- all I know is

6    the law went into effect that year, that no child, as of

7    July 1, 2016, could be in a day care or school without

8    proper vaccinations.

9        Q.    But you did not know the complete law that

10   there was also a grandfather clause for one year?

11          MR. BURKWITZ:   Calls for speculation, no

12   foundation.

13          MS. SEROBIAN:   The witness --

14       Q.    If you could clarify your testimony, did you

15   just testified that you read it this morning about the

16   grandfather clause?

17       A.    I was briefly looking through it, and I read --

18   I didn't read all of it, but I did see.

19       Q.    What did you see this morning; what is your

20   understanding of what you saw this morning about the

21   grandfather clause?

22       A.    My belief is that it did not apply to this

23   because she didn't have an actual granted waiver.

24       Q.    So what is -- do you remember what you read

25   about the grandfather clause?

1          Did it require a medical exemption, or just the

2    grandfather clause meant that a parent's waiver --

3    because when the law changed, what did that change mean

4    to you?

5          What did the change mean to you back in

6    January 2016?

7          How did the law change back in January 2016?

8          MR. BURKWITZ:  I am not sure which question she

9    is asking you, so it's compound.

10          If you understand --

11          MS. SEROBIAN:  I will rephrase it and make it

12    one question.

13          Because the witness is silent and not

14    answering, so I keep on changing my question to make

15    it --

16          THE WITNESS:  I am trying to understand what

17    you are getting at.

18          MR. BURKWITZ:  Let her ask the question and

19    answer it, and I will object.  That's it; that's the

20    way it goes.  If she asks multiple questions, then

21    you'll answer whichever one you wish.

22          MS. SEROBIAN:  I will rephrase so it is a

23    clear record and the witness has an understanding of

24    what my question is.

25      Q.   You just testified that your understanding is

1  that in January 2016, the law regarding vaccinations

2  changed, correct?

3      A.   Yes.

4      Q.   You also testified that at that time, back in

5  January 2016, up until this morning, you were not aware

6  about the grandfather clause of that same Senate bill

7  that changed the law; is that correct?

8      A.   To my knowledge, I don't recall if I knew it

9  back then but, like I said, I read it this morning.

10      Q.   You read it this morning?

11      A.   Uh-huh.

12      Q.   And what is your understanding as to how the

13  law changed back in January 2016?

14           What was the previous law and how did it

15  change?

16           MR. BURKWITZ:  She said July of 2016, not

17  January of 2016.

18           You can answer.

19           MS. SEROBIAN:  No, if I misstated the month, I

20  will correct it.

21      Q.   You said the law changed in January 2016,

22  correct; is that what you said?

23      A.   I believe the law was taking effect July 1,

24  2016.

25           MS. SEROBIAN:  This really misstates testimony.

1    I don't think she testified to July.

2            MR. BURKWITZ:  She did.  It's okay.

3            MS. SEROBIAN:  No, I believe you clearly said

4    the law changed January 1, 2016.

5            We can have a read-back, actually.

6            Can you please read back as to when the witness

7    said the law changed, that the parent no longer could

8    make a personal waiver?

9            MR. BURKWITZ:  You can have her read back for

10   tomorrow, but you are not going to keep doing the rest

11   of the deposition, "You testified to this."  I am going

12   to start telling her not to answer the question.

13           MS. SEROBIAN:  I just want to have her read

14   back, because you said something I want to clarify.

15           MR. BURKWITZ:  It's your deposition; do

16   whatever you wish.

17           MS. SEROBIAN:  Thank you.

18           (Record read.)

19   BY MS. SEROBIAN:

20      Q.   What is your understanding as to the previous

21   law prior to the change that took effect in July 2016

22   regarding a parent's right to vaccinate or refuse

23   vaccination of their child?

24      A.   I am not too knowledgeable on the previous laws.

25   I don't know.

Atkinson-Baker, Inc.
www.depo.com

1      Q.    Were you a social worker for -- for ten years,
2   you said?
3      A.    Yes, but I have never had an issue of
4   immunizations come up in my ten years with DCFS.
5      Q.    Parents never rejected or refused?
6      A.    I have never had a case like this with refusal
7   of immunizations.
8      Q.    Did you ever ask the parent whether they
9   wanted their child immunized or not during your practice
10   as a social worker?
11      A.    No.
12      Q.    So you routinely scheduled children to be
13   immunized without asking their parents whether they
14   wanted this or not?
15      A.    I did not routinely schedule anybody's
16   appointments.  The court orders you have physical
17   examinations and it's part of the routine care, so it's
18   not something I ordered to get done.
19      Q.    The question was not whether you ordered it.
20   I understand you are not in juvenile court; you can't
21   order things.  But neither does juvenile court schedule
22   physical examinations.
23          So did you routinely have the foster parents
24   take children to be immunized without asking their
25   parents?

Atkinson-Baker, Inc.
www.depo.com

1    A.    Again, I didn't ask -- foster parents took the

2  children to their doctors' appointments as needed and

3  they got their vaccinations by the doctors.  It's not I

4  order -- I did not order foster parents to take them for

5  vaccinations.

6    Q.    But did you ask the parents of the children in

7  foster care, the biological parents of those children in

8  foster care, whose social worker you -- you were

9  assigned to be their social worker, whether the parent

10  was okay with their child being vaccinated or was

11  refusing to do so?

12        Because there's a form, you know, that they

13  could sign.

14        MR. BURKWITZ:  Lacks foundation.

15  BY MS. SEROBIAN:

16    Q.    Did you ever ask the parent --

17    A.    No, I have never asked the parents.

18    Q.    You never asked?

19    A.    No.

20    Q.    So was Lucy the first parent that actually,

21  early on in the case when this started, initiated this

22  discussion with you saying she objected?

23    A.    Yes.

24    Q.    No other parent initiated a discussion --

25    A.    Never.

Atkinson-Baker, Inc.
www.depo.com

1    Q.    And you never asked them if they wanted to or

2  not?

3    A.    No.

4    Q.    You routinely had the children in foster care

5  immunized without their parents' approval?

6        MR. BURKWITZ:  That lacks foundation.

7  BY MS. SEROBIAN:

8    Q.    That was a question, still.

9        MR. BURKWITZ:  You can answer.

10        THE WITNESS:  Can you repeat the question?

11  BY MS. SEROBIAN:

12    Q.    So you routinely had the children in foster

13  care immunized without asking first if their parent

14  agreed or not agreed to said immunization?

15        MR. BURKWITZ:  Lacks foundation.

16        THE WITNESS:  As court ordered to have medical

17  care -- I didn't order them to be immunized.  The foster

18  parents took them to regular doctor appointments as

19  needed.

20  BY MS. SEROBIAN:

21    Q.    As far as the training and general policy and

22  practice of your employer, the County of L.A., did they

23  ever discuss with you the parent's right before the

24  change of law took effect that they had a right to

25  refuse their child to be immunized by simply filling out

Atkinson-Baker, Inc.
www.depo.com

```
1   a standard form?  I am showing you this exhibit.

2        A.   No, I don't think so.

3        Q.   So you are not aware of this right that the

4   parent had?

5        A.   Which right?

6        Q.   You were not made aware by your employer, the

7   County of Los Angeles, that a parent can refuse to have

8   their child immunized by simply signing a form?

9        A.   No.  Like I said, it's never come up before in

10  any of my cases.

11       Q.   I am not asking about the case; I am asking

12  about the training you received from your employer.

13       A.   No, no.

14       Q.   And you have been a social worker for ten

15  years; is that correct?

16            MR. BURKWITZ:  Asked and answered.

17            THE WITNESS:  Yes.

18  BY MS. SEROBIAN:

19       Q.   What did you read about the grandfather clause

20  this morning and what is your understanding about the

21  grandfather clause?

22       A.   Like I said, I didn't sit there and read this

23  thing for hours; I was scrolling while I was waiting

24  for everybody to show up.  So I didn't really go in

25  depth.  I just --
```

Atkinson-Baker, Inc.
www.depo.com

1          MR. BURKWITZ:  You can just tell her what you

2    saw and that's it.

3          What did you see?  Maybe you saw nothing --

4          THE WITNESS:  They had an exemption a year

5    ago, a granted exemption -- or something like that --

6    then, that grandfather clause.

7    BY MS. SEROBIAN:

8      Q.   Uh-huh.

9          The exemption, did it have to be medical

10   exemption or a waiver or refusal by a parent is

11   sufficient?

12     A.   I didn't get into all that.

13     Q.   So you -- as you sit here today, you still

14   don't know what the grandfather clause really is?

15     A.   No, no.

16     Q.   Is it fair to say that you were never really

17   trained about this grandfather clause when the change

18   of law regarding immunization took effect in July of

19   2016?

20     A.   Yes.

21     Q.   Previous to me showing you this exhibit, did

22   you ever see this document?

23     A.   You know, I can't recall, and I am not

24   included in this e-mail with the attachment, so I don't

25   know.

Atkinson-Baker, Inc.
www.depo.com

1      Q.    Were there other e-mails that Lucy Ulikhanova

2   sent that you were included in?

3      A.    Multiple.

4      Q.    Do you think maybe the same -- there were

5   topics, again, immunization, was that like a hot topic

6   for her?

7      A.    Yes.

8      Q.    Do you think maybe in other e-mails, you were

9   included?

10      A.    Yes.

11      Q.    Do you think maybe Lucy gave you these

12   documents in person?

13      A.    I don't recall.

14      Q.    Do you recall if you ever presented this

15   refusal to vaccinate a personal beliefs exemption form

16   to the juvenile court?

17      A.    I don't know.

18      Q.    You don't know if you presented it to juvenile

19   court?

20      A.    Like I said, it didn't come to me, so I don't

21   know if I ever presented it to the court or my

22   codefendant presented it to the court; I don't know.

23      Q.    Do you know if the juvenile court was aware

24   that mother did sign this documents at the time?

25      A.    I don't know.  I am not sure.  But the court

Atkinson-Baker, Inc.
www.depo.com

1   was made aware that she did not want them.

2        Q.   But the court was not aware that she had

3   signed document --

4        A.   I don't --

5        Q.   -- document the grandfather clause could apply

6   to?

7        A.   I don't know.

8             MR. BURKWITZ:  Let her finish her question.

9             THE WITNESS:  Okay.

10            MS. SEROBIAN:  I am going to turn to my next

11   exhibit, Plaintiffs' Exhibit 5.

12            (Plaintiffs' Exhibit 5 was marked for

13   identification.)

14   BY MS. SEROBIAN:

15        Q.   Tell us who the e-mail is from, the date and

16   if you were copied on it.

17        A.   The e-mail is from my codefendant, Stephen

18   Carey, and the e-mail is to Ronald Funk, her attorney,

19   to Ms. Ulikhanova and to myself.

20        Q.   Can you briefly tell us what is this e-mail

21   about?

22        A.   So it says:

23             "I am writing to notice you

24             that DCFS has requested a hearing

25             to address two issues.

Atkinson-Baker, Inc.
www.depo.com

1              "1, the court issue a temporary

2         order restraining the mother from

3         the paternal aunt, her family

4         members living at her residence,

5         her residence and her business.

6              "And, 2, the court order

7         Penelopy to be vaccinated so she

8         can attend school."

9         So this was an e-mail from the dependency

10   investigator to the -- notifying the mother and her

11   attorney that there would be a hearing on June 9, 2016,

12   for the judge to make orders regarding those two matters

13   I stated.

14      Q.   What is the hearing date it says on this

15   e-mail?

16      A.   It says June 9, 2016.

17      Q.   Do you know if the hearing took place on

18   June 9th or was it continued to another date?

19      A.   I believe it was continued to the following

20   date on June 10th.

21      Q.   Were you present at any of the two hearings,

22   June 9th or June 10th, 2016?

23      A.   No, I was not.

24      Q.   Did you prepare any report for these hearings?

25           MR. BURKWITZ:  Vague and ambiguous.

1          THE WITNESS:  I can't recall.

2    BY MS. SEROBIAN:

3       Q.   You, as a social worker, do prepare reports

4    prior to hearings in juvenile court, correct?

5       A.   Not always.  Most of the time, since there's a

6    dependency investigator, they handle most of the

7    reports.

8       Q.   Are you saying that if there was a hearing to

9    be reported -- if there was to be a report filed for

10   this hearing, it would be Mr. Carey and not you?

11      A.   I believe so, since he is the one notifying

12   them of the court date.

13          I did write -- you know, it is possible that we

14   can write reports, but normally dependency investigators

15   write reports.

16      Q.   Do you recall, as you sit here today, if you

17   did write a report for any of these two hearings or an

18   information report, something short like a summary

19   report?

20      A.   I made a request in February to have a date set

21   to have those issues heard, but it wasn't scheduled,

22   like Mr. Carey reported, until June.

23      Q.   So if a report was written and didn't include

24   attachments mother did provide, you are saying it would

25   be Mr. Carey who would need to prepare the report and

Atkinson-Baker, Inc.
www.depo.com

1    include attachments, not you; is that what you are

2    saying?

3         A.    If he wrote the report, he has to provide

4    whatever he is providing with his report.

5         Q.    This is a hypothetical.

6               If you were the one who wrote the report and

7    you had access to this documents -- I mean, they are

8    going to a file, correct?

9         A.    Uh-huh, yes.

10        Q.    Would you include it for the juvenile court to

11   know about them?

12        A.    Yes, yes.

13        Q.    Would that be your practice, to include them,

14   the documents provided?

15        A.    Yes.

16        Q.    And if we have a report that does not have

17   these documents attached, how would you explain that?

18             MR. BURKWITZ:  Calls for speculation, no

19   foundation.

20             THE WITNESS:  I don't know.

21   BY MS. SEROBIAN:

22        Q.    Do you know the reasons why Ms. Ulikhanova

23   objected to her child being vaccinated?

24             Do you know her reasons?

25        A.    She spoke of her father, who is a natural like

Atkinson-Baker, Inc.
www.depo.com

1    healing doctor, and she just didn't believe in those

2    kind of medications.

3        Q.   Uh-huh.

4            Do you remember getting an e-mail in response

5    to the June 9, 2016 notice?

6            MS. SEROBIAN:   And this is Plaintiffs'

7    Exhibit 7.

8            (Plaintiffs' Exhibit 7 was marked for

9    identification.)

10   BY MS. SEROBIAN:

11       Q.   I am going to refer you --

12           First of all, can you please tell us who this

13   e-mail is from, if you were copied on it, the subject

14   and date, please?

15       A.   The e-mail is from Stephen Carey, and the

16   e-mail is to Ronald Funk, her attorney, to

17   Ms. Ulikhanova and to myself, the dependency

18   investigator, the attorney, myself and multiple people.

19       Q.   The date of that e-mail, please?

20       A.   June 4, 2016.

21       Q.   You can take a minute to take a look, but can

22   you please tell us what it is that Lucy is trying to

23   convey to you and others in this e-mail?

24       A.   Basically that she is against the vaccinations.

25       Q.   Does she give her reasons why?

Atkinson-Baker, Inc.
www.depo.com

1      A.    She just talks about alternative medication,

2  talks about other children who have caught things,

3  caught diseases.

4      Q.    Can you please read from paragraph that says --

5  it will be the second paragraph on page 1 of the e-mail.

6  It starts with, "You know."

7          Can you please read that paragraph?  It's a

8  short one.

9      A.      "You know that this subject

10             touched close to me, you know my

11             father was a pioneer leader in

12             alternative healthcare in this

13             country, to attempt this what she's

14             not even legal age to go to school

15             and is not in jurisdiction shows

16             you are antagonist."

17     Q.    Can you continue to the next paragraph?

18     A.      "There are support group teams

19             out there, thousands of mothers,

20             fathers against this, my father

21             healed children who were sick on

22             vaccines, suffered side effects and

23             autism."

24     Q.    Please read the next paragraph.

25     A.      "I, myself, my brother, brought me up on

Atkinson-Baker, Inc.
www.depo.com

1    vaccinations by my mother.  We didn't know at the time

2    the ingredients.  I have nothing but health issues,

3    allergic reactions.  Once my father switched me to an

4    organic lifestyle, those started to fade.

5        Q.    Continue the next two sentences, please.

6        A.     "You will not force vaccination

7              on my child.  I will be the decider

8              of and what vaccine it will be."

9        Q.    Thank you so much.

10            In this couple of paragraphs that you read,

11   she talks about her not even being legal age to go to

12   school, right?

13       A.    Yes.

14       Q.    Is she correct?  Could Penelopy have skipped

15   kindergarten?

16       A.    Yes.

17       Q.    She also talks about her not being under the

18   jurisdiction of the court.

19            Is she correct; is the mother correct by June

20   2016?

21            MR. BURKWITZ:  Calls for speculation.

22            THE WITNESS:  I don't know.

23   BY MS. SEROBIAN:

24       Q.    You previously testified that the jurisdiction

25   and disposition hearing when the court made orders was

Atkinson-Baker, Inc.
www.depo.com

1    in October 2016, correct?

2        A.   Uh-huh.

3        Q.   So would that be after the June 2016 hearing,

4    where you and Mr. Carey were trying to get an order to

5    vaccinate her child?

6        A.   I am not sure.  At one point, the court took --

7    like the disposition happened in October 2016, but I

8    don't know if -- at what point.  It took so long to get

9    there, at what point that they had full -- I guess -- I

10   don't know.

11            I am not a dependency investigator, so I don't

12   know exactly, and I can't recall when they took full

13   jurisdiction over her.  But I know the jurisdiction --

14   the disposition happened in October 2016.

15       Q.   And would October 2016 be couple of months

16   after June 2016?

17            Just calendar --

18       A.   Four months.

19       Q.   Four months after.

20       A.   Uh-huh.

21       Q.   Okay.

22            She also talked about here having numerous

23   health issues connected to vaccinations, herself.

24            Is that correct?

25       A.   That's what the e-mail says.

Atkinson-Baker, Inc.
www.depo.com

1    Q.   And she also talks about knowing thousands of

2   parents in support groups complaining about their

3   children suffering side effects and autism due to

4   vaccination.

5        Is that correct?

6    A.   That's what her e-mail says.

7    Q.   So you knew she had some specific reasons for

8   which she was really objecting and this was a hot topic

9   for her?

10   A.   Yes.

11   Q.   Before Penelopy was vaccinated, as a routine

12  practice you mentioned, did you attempt to ask the

13  mother to maybe get a medical exemption if she is

14  worried about the medical reasons and side effects?

15   A.   No.

16   Q.   Did you know that a parent can attempt to have

17  a doctor observe their child and provide a medical

18  exemption if necessary?

19   A.   I am not an expert on medical exemptions, so I

20  don't know.

21   Q.   As you sit here today, do you know if there is

22  any way to exempt a child who is school-aged from being

23  vaccinated?

24   A.   Well, I do know now because of Lucy, because

25  she did it after she got Penelopy back.  She went to

Atkinson-Baker, Inc.
www.depo.com

1   some doctor and got some sort of exemption.

2       Q.   So as a social worker who deals with children

3   taken away from biological parents, you are not aware

4   what is the state of law as to having those children in

5   foster care exempting from being vaccinated?

6           MR. BURKWITZ:   It's argumentative.

7           THE WITNESS:   We don't have -- there's never

8   been a conversation about the laws regarding

9   vaccinations.

10  BY MS. SEROBIAN:

11      Q.   When you say, "There's never been a

12  conversation," what do you mean?

13          Do you mean training --

14      A.   Training.   There's never been a specific

15  training for vaccinations.

16      Q.   Do you generally, as a social worker, get

17  training on certain things?

18      A.   Yes.

19      Q.   What topics are you trained on, generally?

20      A.   Warrants, sexual harassment, different types

21  of abuse, but not vaccinations.

22      Q.   How did you learn about the change of law that

23  took effect July 2016?

24      A.   It was just asking I had read.

25      Q.   Just on a personal level?

Atkinson-Baker, Inc.
www.depo.com

```
 1        A.   Yes, on a personal level.

 2        Q.   Is it maybe because of Lucy, that she brought

 3   all this information to you?

 4        A.   I can't recall.

 5        Q.   But as a social worker who is supposed to get

 6   training from its employer county, you do not remember

 7   getting any training on past or present vaccination

 8   laws of the State of California?

 9             MR. BURKWITZ:  Argumentative.

10             THE WITNESS:  Yes.

11   BY MS. SEROBIAN:

12        Q.   "Yes," can you explain?

13        A.   Yes, no training.

14        Q.   Yes, no training.

15             What is the general practice of your other

16   co-social workers, for example.

17             Do they all work like you, just kind of if they

18   learn anything on a personal level, they learn it; if

19   not, they are not trained?

20        A.   I can't speak for anybody else, any of my

21   co-workers.

22        Q.   But as for you, you have not been called to

23   attend a training for past or present vaccination laws

24   of the State of California?

25        A.   No, no training on vaccinations, ever.
```

1          MS. SEROBIAN:  I am going to refer you now to

2    Exhibit 9, please.

3          (Plaintiffs' Exhibit 9 was marked for

4    identification.)

5          MS. SEROBIAN:  Please take a look and let me

6    know if you have seen this document before.

7          THE WITNESS:  Yes, I have.

8    BY MS. SEROBIAN:

9      Q.   Can you tell us what it is, please.

10     A.   So it's a letter that when Penelopy returned

11   back home to Ms. Ulikhanova's care, she took her to this

12   special doctor that she said her lawyer recommended back

13   then to me, and she got some sort of exemption for any

14   further vaccinations because of family history of

15   certain conditions.

16     Q.   Do you know if this worked, meaning that

17   Penelopy does not need to be further vaccinated?

18     A.   I believe so.  She took this to the public

19   school she continued to attend after she returned them.

20     Q.   Do you know if Penelopy is missing certain

21   vaccinations after she has been returned to mother's

22   care?

23     A.   I don't know what she's missing.  I do know

24   when she returned to mother's care, mother no longer

25   vaccinated her.

1      Q.   Based on this medical exemption?

2           MR. BURKWITZ:  Calls for speculation.

3           THE WITNESS:  I don't know.  Based on she

4    didn't get her any more vaccinations, so.

5    BY MS. SEROBIAN:

6      Q.   But you are aware that mother took this letter

7    to the school?

8      A.   Yes.

9      Q.   And Penelopy continues to be enrolled in

10   school, public school?

11          MR. BURKWITZ:  Calls for speculation.

12   BY MS. SEROBIAN:

13     Q.   Are you aware if Penelopy is enrolled in a

14   public school?

15          MR. BURKWITZ:  Are you talking about right now?

16          MS. SEROBIAN:  Yes.

17          THE WITNESS:  Right now, I don't know.  I am

18   not having any contact with her.

19   BY MS. SEROBIAN:

20     Q.   When is the last time that you were aware that

21   Penelopy was enrolled in a public school?

22     A.   Right when the case closed.

23     Q.   When was that?

24     A.   October -- was it October 2017?

25     Q.   So from -- can you tell us the date of this

Atkinson-Baker, Inc.
www.depo.com

1   letter, please?

2       A.   May 23, 2017.

3       Q.   So from May 23, 2017 to sometime in October

4   2017, are you aware whether Penelopy was still enrolled

5   in a public school?

6       A.   Yes, she was.

7            MS. SEROBIAN:  I am going to refer you to

8   Plaintiffs' Exhibit 11.

9            (Plaintiffs' Exhibit 11 was marked for

10  identification.)

11  BY MS. SEROBIAN:

12      Q.   Tell us who the e-mail is from and to whom and

13  the date and subject, please.

14      A.   The e-mail date March 23, 2017.

15           The e-mail is from myself to the mother,

16  Ms. Ulikhanova.

17           It says:

18               "This is all the medical

19           information I have on Penelopy.

20           Hope the document helps."

21           And what I attached to her, because she had

22  requested any medical information I have on her and

23  whatever shots she's had.

24           So I downloaded the Health and Education

25  Passport from our system.  It has every medical

1    information that we have on her and her shot records

2    and everything, and I provided it to the mother to have

3    for her records.

4         Q.   Okay.

5              Can you please take a look to page 4 of the

6    attachment you just mentioned, the Health and Education

7    Passport, pages 4 and 5.

8              Can you please tell us under the topic

9    "Immunization," what does it tell us, the document?

10        A.   Which part?

11        Q.   Under pages 4 and 5 of the Health and Education

12   Passport, under the topic immunizations?

13        A.   It says November 13, 2012, that she waived

14   immunizations, Dr. Boxtein, and then after that, it has

15   all the dates of all the different types of

16   vaccinations she received from the different doctors

17   she went to.

18        Q.   And "she," you mean --

19        A.   She, Penelopy.

20        Q.   She, Penelopy.

21             Can you take a look at pages 4 and 5 and see if

22   there are common dates, because there are kind of

23   repetitive dates, and tell us what are the common dates

24   for these immunizations.

25        A.   First one being June 10, 2016, August 9, 2016,

Atkinson-Baker, Inc.
www.depo.com

1    October 6, 2016, January 19, 2017.

2        Q.    Would this mean that Penelopy was vaccinated on

3    these four occasions?

4        A.    Yes.

5        Q.    Can you tell us how many vaccinations she

6    received on those four occasions?

7        A.    Total?

8        Q.    Total, please.

9        A.    18.

10       Q.    18.

11            Now, during this four occasions, did you ever

12   inform mother in advance that Penelopy was going to

13   have a doctor's appointment, at which they were going

14   to vaccinate her?

15       A.    No, I don't believe so.

16       Q.    Given that you never informed her, I am

17   assuming that the mother was also not invited to any of

18   those appointments?

19            MR. BURKWITZ:  Calls for speculation.

20   BY MS. SEROBIAN:

21       Q.    Was mother ever invited by you to attend any

22   of those appointments?

23       A.    No, she was not.  Especially with a protective

24   custody between her and the aunt, she could not be at

25   the doctor's appointment with the aunt.

Atkinson-Baker, Inc.
www.depo.com

1      Q.    That was your decision that the aunt could go,

2    but not the mother?

3      A.    Well, the aunt was a foster caregiver.

4            Because there was a restraining order between

5    the aunt against the mother, of course the mother could

6    not be there.

7      Q.    But could the mother go with a monitor or

8    supervisor?

9      A.    I am sure she could have.

10     Q.    So you could have chosen for mother to be there

11   with a monitor or supervisor and not the aunt?

12     A.    Perhaps.  Maybe, yes.

13     Q.    And did mother still retain medical rights

14   during the time that the child was being immunized?

15     A.    Yes.

16     Q.    So what is your understanding when a parent

17   retains medical rights, do that give them access to

18   attend the medical appointments?

19     A.    If they ask to want to attend.

20     Q.    Is that yes?

21     A.    Yes, if they ask.

22     Q.    But if they are not informed about the

23   appointments, how would they ask?

24           MR. BURKWITZ:  It's argumentative.

25           THE WITNESS:  In the beginning, "Hey, I would

1    like to know whenever my child is going, and if I can

2    be there."

3    BY MS. SEROBIAN:

4        Q.   Are they given that option?

5            Do you generally give parents the option to

6    tell you in the beginning, "This is the time to tell me,

7    for example, if you want to attend your child's

8    appointment, so I will let you know every time we have

9    one, you can attend."

10           Do you generally do that with your parents in

11   your case care as a social worker?

12       A.   Sometimes, yes.

13       Q.   Did you do that with Lucy Ulikhanova in this

14   case?

15       A.   I can't recall.  I don't think so.

16       Q.   Do you know if the child's father attended any

17   of these appointments?

18       A.   I can't recall.

19       Q.   Did you approve his attendance at any of the

20   appointments?

21       A.   No.

22       Q.   If I were to show you a document that shows

23   that father was present at a doctor's appointment with

24   Penelopy, would that surprise you?

25       A.   No, because his aunt was his monitor, and if

Atkinson-Baker, Inc.
www.depo.com

1    he went with her, then that's not something I would have

2    control over.

3        Q.    Did father have monitored visits throughout the

4    case?

5        A.    Yes.

6        Q.    Who were the approved monitors for them?

7        A.    The approved monitor in the beginning was his

8    aunt, the father's child was in the aunt's custody.

9              When we moved Penelopy to a foster agency

10   home, it was DCFS.

11       Q.    Do you know when that removal took place?

12             MR. BURKWITZ:  Vague and ambiguous.  I assume

13   you mean removal from the aunt, but it's not clear on

14   the record.

15             MS. SEROBIAN:  Thank you, Counsel.

16       Q.    When did the removal from the foster home aunt

17   take place to another foster home?

18       A.    December 2016.

19       Q.    Do you remember the date?

20       A.    It was right before Christmas.

21       Q.    Before Christmas?

22       A.    A few days, yes.

23       Q.    What were the reasons for the removal of the

24   foster home of the aunt to another foster home?

25       A.    Just ongoing issues with the aunt with the

1    Department.  It was -- on more than one occasion, she

2    would say, "You don't like how I want to do something,

3    go ahead and remove Penelopy," so we actually did.

4        Q.   Were there -- was there a concern that the aunt

5    was actually allowing the father unmonitored contact

6    with the child against the court orders?

7        A.   There was no concern over that, not from us.

8        Q.   Were there concerns from other parties?

9             MR. BURKWITZ:  Calls for speculation.

10   BY MS. SEROBIAN:

11       Q.   Of which you are aware?

12       A.   Mother would always make allegations that she

13   would think that he would have unmonitored contact, but

14   we didn't believe that to be the case.

15       Q.   Did you ever ask Penelopy?

16       A.   Yes, I did.

17       Q.   What did she say?

18       A.   Every time I asked about her visitations with

19   father, it was that he was there at the aunt's house;

20   the aunt was there.  Penelopy never indicated she was

21   alone with her father.

22            MS. SEROBIAN:  I am now going to refer you to

23   document Plaintiffs' Exhibit -- just to clarify the

24   record, the last exhibit, could you please tell me the

25   number on that.

Atkinson-Baker, Inc.
www.depo.com

1          THE WITNESS:  11.

2          MS. SEROBIAN:  This will be Plaintiffs'

3   Exhibit 17.  I am sorry; it's a little out of order.

4          (Plaintiffs' Exhibit 17 was marked for

5   identification.)

6   BY MS. SEROBIAN:

7      Q.   Please take a look at this document and tell us

8   what do you think it is.

9      A.   Just looks like her medical records from...

10     Q.   Can you tell the doctor's office, please.

11         Let me direct you to the last page; maybe it

12   will help.

13         Do you see a name of the pediatric's office on

14   the last page of this document?

15     A.   Just says Burbank Pediatric Affiliates.

16     Q.   Who is the patient in this patient chart?

17     A.   Penelopy Garcia.

18     Q.   I am going to refer you to page 4 of this

19   document titled, "Patient Chart from Burbank Pediatric

20   Affiliates."

21         Could you please tell us the date of the visit?

22     A.   Progress -- office visit 12/6/16.

23     Q.   Now, do you remember if Penelopy was already

24   removed from the foster home of the aunt at this time?

25     A.   No, she was not.

Atkinson-Baker, Inc.
www.depo.com

1      Q.   Under the subjective, could you please read

2  that one paragraph under the title "subjective"?

3      A.    "This six-year one-month-old

4           female presents with father and

5           Nathan (supervisor) for evaluation

6           of the following problems:  Had a

7           cough for two weeks.  Resolved for

8           one week.  Cough returned three

9           days ago.  Sounds croupy.  Has been

10          afebrile, has a low grade temp

11          right now.  Also gets congested.

12          Cough gets worse in the evening."

13     Q.   Does this document tell you that father and

14  Nathan took her to this doctor's appointment?

15     A.   That's what it says.

16     Q.   Do you know who is "Nathan" that is titled

17  "Supervisor"?

18     A.   I don't recall a Nathan, no.

19     Q.   Do you remember if he is any of the approved

20  parties to monitor his visits?

21     A.   I don't know who Nathan is.

22     Q.   Did you schedule a monitor named Nathan or any

23  monitor to attend this visit with Penelopy, along with

24  father?

25     A.   No.

Atkinson-Baker, Inc.
www.depo.com

1     Q.    Were you aware that father went to a visit with
2   Penelopy and Nathan?
3     A.    No.
4     Q.    Do you know, if you recall, if Nathan is on the
5   list of approved monitors for father?
6     A.    No.
7     Q.    So you earlier testified that the mother, Lucy
8   Ulikhanova, had suspicion that father was having
9   unauthorized visits with Penelopy.
10        Would this document support her, you know,
11  concerns in that regard?
12    A.    It might, but I don't know.  I don't know for
13  sure.  I don't have that information.
14    Q.    But you don't know who Nathan is?
15    A.    I don't know because I can't recall the aunt's
16  husband's name.  I don't know if -- I don't know who
17  Nathan is, off the top of my head.
18    Q.    And you did not schedule this visit?
19    A.    This is not a visit.  This is a doctor's
20  appointment.
21    Q.    Well, you did not allow father to attend this
22  doctor's appointment with Nathan?
23        You don't recall allowing this -- you do recall
24  or you do not recall?
25    A.    I was not made aware of every time she had a

Atkinson-Baker, Inc.
www.depo.com

1    cough and went to the doctor.

2        Q.    But you would need to know if the father who

3    has monitored visits is the one taking her to a doctor,

4    correct?

5        A.    Well, if I was told, it would be a different

6    situation, so I don't know -- I never knew that he took

7    her to the doctor on that day.

8        Q.    And if you were told in advance that father is

9    going to take her to a doctor that day, what would your

10   response be?

11       A.    The answer would be no, unless he was with a

12   monitor or the aunt.

13       Q.    And we don't see -- aunt here -- because Nathan

14   is not the aunt, obviously.

15            And you are saying Nathan is also not a

16   Department monitor?

17       A.    Nathan is not a Department monitor.

18            I don't know who Nathan is to the father or to

19   Penelopy or to the aunt.

20       Q.    So this may support mother's concern that

21   father was having unauthorized contact with Penelopy?

22       A.    It may.

23       Q.    And this was back on December 6, 2016.

24            Do you remember the date of the removal from

25   the aunt's home?

Atkinson-Baker, Inc.
www.depo.com

1    A.    It was a few days before Christmas, so the

2    20th -- I don't know, exactly.  It was after this,

3    before Christmas.

4         MS. SEROBIAN:  I am going to refer you to

5    Plaintiffs' Exhibit 19.

6         (Plaintiffs' Exhibit 19 was marked for

7    identification.)

8         MS. SEROBIAN:  Please take a look at this

9    e-mail and tell us who it is from, the date, subject,

10   and who do you think it may be to.

11        THE WITNESS:  It's dated March 7, 2019 from

12   Lucy Ulikhanova, and she sent it to you and several

13   people in the Senate, talking about this H Resolution

14   179.

15   BY MS. SEROBIAN:

16   Q.    Can you please tell us the first -- the first

17   four lines, please, of the content of the e-mails.

18   A.    Yes.

19        "Dear Senators, I do not consent to

20        mandatory vaccinations.

21        "This bill, H Res. 179,

22        recognizing the importance of

23        vaccinations and immunizations in

24        the United States 116th Congress

25        (2019-2020) is unconstitutional and

Atkinson-Baker, Inc.
www.depo.com

1           is taking our rights away as

2           people."

3      Q.    You can go to the next sentence, and then we

4  will go on to something else.

5      A.     "We should always retain our

6           right to medical freedom."

7      Q.    The next sentence, please.

8      A.     "I have autoimmune diseases

9           (asthma and eczema, as well as

10          suffer from locked jaw) since after

11          being vaccinated as a child.

12     Q.    Can you read the next, please.

13     A.     In my close immediate family

14          history, there are relatives with

15          the same or different type of

16          autoimmune diseases manifested

17          after vaccination."

18     Q.    I will stop you there.

19          The date shows that this is March 7, 2019, and

20  this still remains a hot topic for Lucy, correct?

21          MR. BURKWITZ:  Calls for speculation.

22          You can speculate, if you wish.  You don't

23  know what is going on with her now, but if you want to.

24          MS. SEROBIAN:  Let me rephrase, just for the

25  record.

Atkinson-Baker, Inc.
www.depo.com

1      Q.   Do you think the topic of vaccination remains

2    a hot topic for Plaintiff Lucy Ulikhanova --

3           MR. BURKWITZ:  Calls for speculation --

4    BY MS. SEROBIAN:

5      Q.   -- based on this e-mail to the senators dated

6    March 7, 2019?

7           MR. BURKWITZ:  Speculation, irrelevant --

8           (The court reporter requests one speaker at a

9    time.)

10   BY MS. SEROBIAN:

11     Q.   Do you think the topic of vaccination remains a

12   hot topic for Plaintiff Lucy Ulikhanova, based on this

13   e-mail to senators dated March 7, 2019?

14          MR. BURKWITZ:  Speculation.

15          THE WITNESS:  She is e-mailing them just to

16   continue to express her thoughts about immunizations.

17   BY MS. SEROBIAN:

18     Q.   I am going to refer you to page -- there is no

19   number, but if you go through, it would be page third of

20   this e-mail, third and fourth and fifth, actually,

21   because of the way it's printed, it's the third, fourth

22   and fifth.

23          Could you please read the part that is quoted.

24          It would be starting page third, 3, 4, 5, and

25   it starts with a quote on line 5.

Atkinson-Baker, Inc.
www.depo.com

1     A.   Line 5 or line 3?

2     Q.   I believe it's line 5.

3     A.   It says February 26, 2019, posted on their

4   site.

5     Q.   Continue reading, please.

6     A.   "The Association of American

7           Physicians and Surgeons (AAPS)

8           strongly opposes federal

9           interference in medical decisions,

10          including mandated vaccines.

11          After being fully informed of the

12          risks and benefits of a medical

13          procedure, patients have the right

14          to reject or accept that procedure.

15          The regulation of a medical practice

16          is a state function, not a federal

17          one.  Governmental preemption of

18          patients' or parents' decisions

19          about accepting drugs or other

20          medical interventions is a serious

21          intrusion into individual liberty,

22          autonomy and parental decisions

23          about child rearing.

24           "Vaccines are necessarily risky

25          as recognized by the U.S. Supreme

1  Court and by Congress.  The vaccine
2  injury compensation program has
3  paid some $4 billion in damages,
4  and high hurdles must be surmounted
5  to collect compensation.  The
6  damage may be so devastating that
7  most people would prefer restored
8  function to a multimillion-dollar
9  damage award.  Many serious
10  complications have followed MMR
11  vaccination and are listed in the
12  manufacturer's package insert,
13  though a causal relationship may
14  not have been proved.  According to
15  a 2012 report by the Cochrane
16  Collaboration, the design and
17  reporting of safety outcomes in MMR
18  vaccine studies, both pre and post
19  marketing, are largely inadequate.
20  The smallpox vaccine is so dangerous
21  that you can't get it now, despite
22  the weaponization of smallpox.
23  Rabies vaccine is given only after
24  a suspected exposure or to high-risk
25  persons, such as veterinarians.

1              The whole-cell pertussis vaccine

2              was withdrawn from the U.S. market

3              a decade later than from the

4              Japanese market, because of reports

5              of severe, permanent brain damage.

6              The acellular vaccine that replaced

7              it is evidently safer, though

8              somewhat less effective."

9         Q.    Thank you so much for reading.

10             Was this an eye opener for you in the sense of

11   the dangers vaccinations can cause to children?

12             MR. BURKWITZ:  Calls for speculation, no

13   foundation.

14             THE WITNESS:  No, I don't -- no.  I don't know

15   where it comes from.  It's just something she copied and

16   pasted.

17   BY MS. SEROBIAN:

18        Q.    Let me refer you back to page 3, and it tells

19   you exactly where it's coming from.

20             Can you tell us where it's coming from?

21        A.    Just says posted on their site.

22        Q.    It says the title of where it's coming from?

23        A.    Association of American Physicians and

24   Surgeons.

25        Q.    Correct.

Atkinson-Baker, Inc.
www.depo.com

1          So this is coming from this association,

2    Association of American Physicians and Surgeons.  It is

3    their official statement regarding that.

4          Again, were you aware of any of the safety

5    risks prior to me showing you this statement by the

6    Association of American Physicians and Surgeons?

7       A.   That's -- I don't know.  That's their opinion

8    or that's their findings.  I mean, I don't know -- I

9    don't know this association.  I don't have any -- I

10   don't follow them.  I don't.

11      Q.   I understand, but I am asking whether you were

12   aware of the safety risks of --

13      A.   This is the safety risks according to them, so.

14   This is the first time I have read this.

15      Q.   Are you aware of any safety risks associated

16   with vaccinations?

17      A.   No.

18      Q.   So you are not trained on particular safety

19   risks that may take place?

20          MR. BURKWITZ:  Lacks foundation.

21          THE WITNESS:  No.

22   BY MS. SEROBIAN:

23      Q.   So, to clarify the earlier testimony, you were

24   aware that Plaintiff Lucy Ulikhanova did have

25   educational rights in this case?

Atkinson-Baker, Inc.
www.depo.com

1      A.   Yes, yes.

2      Q.   Did she have it throughout the case until it

3   closed in October 2017?

4      A.   Yes.

5      Q.   Did you ever petition the juvenile court to

6   limit her educational rights?

7      A.   No.

8      Q.   Are you aware whether there were any orders

9   made limiting her educational rights?

10      A.   I don't think so.

11      Q.   But you also testified you never asked her

12   whether she wanted to skip kindergarten for Penelopy;

13   is that correct?

14      A.   No, I didn't.

15      Q.   You automatically chose to enroll her child

16   into a kindergarten in August 2016?

17           MR. BURKWITZ:  Lacks foundation, misstates her

18   testimony.

19           You can answer it again; go ahead.

20           MS. SEROBIAN:  Let me rephrase --

21           THE WITNESS:  I did not ask her if she wanted

22   her child to go to kindergarten.

23   BY MS. SEROBIAN:

24      Q.   Who made the decision to enroll her child in

25   kindergarten in August 2016?

Atkinson-Baker, Inc.
www.depo.com

1      A.   She was school-aged; she was in foster care and

2   I -- I know her preference was home schooling, but that

3   was not an option with the aunt.

4      Q.   When you say "her preference," whose preference

5   do you mean?

6      A.   Ms. Ulikhanova stated she wanted no

7   vaccinations and she was going to home school.

8           But at that point, the child was in foster care

9   and gotten rolled into school.

10     Q.   Could the child also remain in this aunt's day

11  care and not been enrolled in kindergarten?

12     A.   No, she could not have.

13     Q.   Do you know why?

14     A.   Because when the law changed -- the law for

15  vaccinations changed, it applied for day care centers as

16  well, so she could not legally with her license, run a

17  day care with a nonvaccinated child being there.

18     Q.   You know there are programs for home schooling

19  that the child can be enrolled while being placed with

20  the aunt?

21          MR. BURKWITZ:  Lacks foundation.

22          THE WITNESS:  No, I don't.

23  BY MS. SEROBIAN:

24     Q.   Did you ever look into any type of programs

25  that could have -- mother's preference was home

Atkinson-Baker, Inc.
www.depo.com

1    schooling.

2          Did you ever look into a program that would

3    have allowed for Penelopy to be home schooled while

4    being under the aunt's care?

5          A.   No, I did not.

6          Q.   You earlier testified that you did not receive

7    any training on vaccinations or the parents' rights for

8    refusal prior to the change of law or after until now;

9    is that correct?

10         A.   Yes.

11         Q.   Now, how about parents' educational rights.

12         Did you ever receive training on what does it

13   mean for the parents to have educational rights and how

14   can they exercise those rights?

15         Did you ever have any training on that?

16         A.   Not that I can recall.

17         Q.   So is it you, as a social worker, your practice

18   and the general practice of the Department to routinely

19   enroll children in kindergarten without asking their

20   parents?

21         MR. BURKWITZ:  Lacks foundation, speculation.

22         THE WITNESS:  It is routine for the Department

23   to enroll children in school.

24   BY MS. SEROBIAN:

25         Q.   I am asking about kindergarten.

Atkinson-Baker, Inc.
www.depo.com

1    A.    I have never had a child not go to

2  kindergarten.

3    Q.    So if the child is removed at an age where

4  they were of age to kindergarten, they will be enrolled

5  in kindergarten by the Department?

6    A.    By the caregiver, yes.

7    Q.    Is it then the routine of the Department to

8  vaccinate the children because now they are enrolled

9  into kindergarten, without asking for the parents'

10 refusal or agreement to do so?

11   A.    Like I said, this is the first case where

12 someone has refused.  I have never had a case where a

13 child didn't already come vaccinized into the

14 Department

15 and this issue came up.

16   Q.    You, personally, didn't have --

17   A.    No, I, personally, did not.

18   Q.    And you were never trained on how to deal with

19 such a situation?

20   A.    No.

21        MS. SEROBIAN:  I think that's it for now.

22        MR. BURKWITZ:  Okay.

23        Stipulation?

24        MS. SEROBIAN:  Do you have --

25        MR. BURKWITZ:  No questions.

Atkinson-Baker, Inc.
www.depo.com

1        MS. SEROBIAN:  No questions, okay.

2        Can we go off the record?

3        (Discussion held off the record.)

4        MR. BURKWITZ:  I will propose the following

5   stipulation.

6        We will have an agreement to relieve the court

7   reporter of her duties under the Code.

8        She will forward the transcript directly to

9   the witness, who will provide her office location off

10  the record to the court reporter.

11       The transcript will go directly to the

12  witness.

13       I will advise Ms. Serobian within seven days of

14  her receipt of those transcripts if there's any changes

15  to the transcript.

16       I will maintain the original transcript, but if

17  for whatever reason -- and I will produce it for

18  whatever purpose, law and motion, trial, whatever.

19       And an unsigned, certified copy can be used in

20  lieu thereof, regardless.

21       Good?

22       MS. SEROBIAN:  Good, unless -- should I order

23  my own transcript, too?

24       MR. BURKWITZ:  Yeah, unless you want to

25  maintain the copy of the original, and I will order the

Atkinson-Baker, Inc.
www.depo.com

1    transcript, whatever you want.

2           You want to keep the copy of the original?

3    That way, you won't have to order it.

4           MS. SEROBIAN:  Sure.

5           MR. BURKWITZ:  So we will just amend the

6    stipulation that I will provide the original transcript

7    back to Plaintiff's counsel, and I will order a copy of

8    the transcript.

9           And Ms. Serobian will have the transcript and

10   will produce it, if necessary.

11          MS. SEROBIAN:  Perfect.  So stipulated.

12          (Ending time:  11:45 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1 | STATE OF CALIFORNIA                )
   |                                   )  SS.
2 | COUNTY OF LOS ANGELES              )

3

4

5

6

7       I, the undersigned, declare under penalty of

8 perjury that I have read the foregoing transcript,

9 and I have made any corrections, additions or

10 deletions that I was desirous of making; that the

11 foregoing is a true and correct transcript of my

12 testimony contained therein.

13       EXECUTED this _____, day of _____,

14 20 ____, at _____, _____.
                   (City)                (State)

15

16

17

18

19

20

21

22       _____

23              MARAL HELWAJIAN

24

25

REPORTER'S CERTIFICATE

1

2

3          I, MARY FERGUSON, CSR No. 8769, Certified

4     Shorthand Reporter, certify;

5          That the foregoing proceedings were taken before

6     me at the time and place therein set forth;

7          That the testimony, if any, of witnesses, the

8     questions propounded, and all objections and statements

9     made at the time of the proceedings were recorded

10    stenographically by me and were thereafter transcribed;

11         That the foregoing is a true and correct

12    transcript of my shorthand notes so taken.

13         I further certify that I am not a relative or

14    employee of any attorney of the parties, nor financially

15    interested in the action.

16         I declare under penalty of perjury under the laws

17    of California that the foregoing is true and correct.

18    Dated this 19th day of _April_ , 20 19.

19

20

21    _____

22

                    MARY FERGUSON, RPR
23                  C.S.R. No. 8769

24

25

**Exhibits**

**AD03529A_Exhibit-03** 4:10
24:18,19

**AD03529A_Exhibit-05** 4:12
41:11,12

**AD03529A_Exhibit-07** 4:14
45:7,8

**AD03529A_Exhibit-09** 4:15
52:2,3

**AD03529A_Exhibit-11** 4:17
54:8,9

**AD03529A_Exhibit-17** 4:19
61:3,4

**AD03529A_Exhibit-19** 4:21
65:5,6

**$**

**$4** 69:3

**1**

**1** 31:7 33:23 34:4 42:1 46:5

**10** 55:25

**10/1/2014** 27:17

**10th** 42:20,22

**11** 54:8,9 61:1

**11/13/2012** 26:22

**116th** 65:24

**11:45** 77:12

**11th** 79:21

**12/6/16** 61:22

**13** 55:13

**17** 61:3,4

**179** 65:14,21

**18** 56:9,10

**19** 56:1 65:5,6

**2**

**2** 42:6

**20** 78:14

**2012** 55:13 69:15

**2014** 27:6

**2016** 7:9,11 17:17,18,20 18:8,11
19:10,11,15,20,22 20:3,5 22:18,
21 23:1,3,24 24:3,9 25:6 29:25
31:7 32:6,7 33:1,5,13,16,17,21,
24 34:4,21 39:19 42:11,16,22
45:5,20 47:20 48:1,3,7,14,15,16
50:23 55:25 56:1 59:18 64:23
72:16,25

**2017** 7:10 8:13 53:24 54:2,3,4,14
56:1 72:3

**2019** 65:11 66:19 67:6,13 68:3
79:21

**2019-2020** 65:25

**20th** 65:2

**23** 54:2,3,14

**25** 27:6

**26** 68:3

**277** 30:3

**3**

**3** 6:22 24:18,19 67:24 68:1 70:18

**300** 23:13

**4**

**4** 45:20 55:5,7,11,21 61:18 67:24

**5**

**5** 41:11,12 55:7,11,21 67:24,25
68:1,2

**6**

**6** 25:6 56:1 64:23

**7**

**7** 45:7,8 65:11 66:19 67:6,13

**8**

**8769** 79:3,25

**9**

**9** 42:11,16 45:5 52:2,3 55:25

**9/12/13** 27:16

**9th** 42:18,22

**A**

**a-blazing** 12:12

**a.m.** 77:12

**AAPS** 68:7

**abuse** 9:14 50:21

**accept** 68:14

**accepting** 68:19

**access** 44:7 57:17

**acellular** 70:6

**action** 79:17

**actual** 20:10 31:23

**additions** 78:9

**address** 41:25

**admitted** 13:25

**advance** 56:12 64:8

**advise** 76:13

**afebrile** 62:10

**Affiliates** 61:15,20

**age** 46:14 47:11 75:3,4

**agency** 59:9

**agreed** 37:14

**agreement** 75:10 76:6

**ahead** 6:9 13:14 60:3 72:19

Atkinson-Baker, Inc.
www.depo.com

Index: allegations..case

**allegations** 20:23 21:8,12,15 22:12 23:14,20 60:12

**allergic** 47:3

**allowed** 74:3

**allowing** 60:5 63:23

**alternative** 46:1,12

**ambiguous** 14:9 15:11 16:24 28:3 42:25 59:12

**amend** 77:5

**American** 68:6 70:23 71:2,6

**Angeles** 6:20,24 38:7 78:2

**answering** 32:14

**antagonist** 46:16

**anybody's** 35:15

**anymore** 30:2

**applied** 73:15

**applies** 15:22

**apply** 31:22 41:5

**appointment** 56:13,25 58:8,23 62:14 63:20,22

**appointments** 35:16 36:2 37:18 56:18,22 57:18,23 58:17,20

**approval** 37:5

**approve** 58:19

**approved** 59:6,7 62:19 63:5

**April** 25:6 79:21

**argumentative** 50:6 51:9 57:24

**asks** 32:20

**assigned** 7:11 8:1 20:15 36:9

**association** 68:6 70:23 71:1,2, 6,9

**assume** 59:12

**assuming** 56:17

**asthma** 66:9

**attached** 28:21 44:17 54:21

**attachment** 25:14,16 27:10 39:24 55:6

**attachments** 25:18 43:24 44:1

**attempt** 46:13 49:12,16

**attend** 42:8 51:23 52:19 56:21 57:18,19 58:7,9 62:23 63:21

**attendance** 58:19

**attended** 58:16

**attention** 23:8

**attorney** 25:3 41:18 42:11 45:16,18 79:16

**August** 17:17,18,20 18:8,11 55:25 72:16,25

**aunt** 18:3 42:3 56:24,25 57:1,3,5, 11 58:25 59:8,13,16,24,25 60:4, 20 61:24 64:12,13,14,19 73:3,20

**aunt's** 59:8 60:19 63:15 64:25 73:10 74:4

**authority** 17:15

**autism** 46:23 49:3

**autoimmune** 66:8,16

**automatically** 72:15

**autonomy** 68:22

**award** 69:9

**aware** 14:4,15 18:21 33:5 38:3,6 40:23 41:1,2 50:3 53:6,13,20 54:4 60:11 63:1,25 71:4,12,15,24 72:8

---

**B**

**back** 12:8 27:10 29:25 30:23 31:1,5 32:5,7 33:4,9,13 34:6,9,14 49:25 52:11,12 64:23 70:18 77:7

**based** 30:2 31:2 53:1,3 67:5,12

**basically** 16:23 45:24

**beginning** 57:25 58:6 59:7

**belief** 30:19 31:22

**beliefs** 24:13 26:24 28:22 30:2 40:15

**benefits** 68:12

**bill** 30:3,12,15,22 33:6 65:21

**billion** 69:3

**biological** 36:7 50:3

**bottom** 25:25 26:4 27:8 28:6

**Boxstein** 26:20

**Boxtein** 55:14

**brain** 70:5

**briefly** 31:17 41:20

**brother** 46:25

**brought** 21:8,12 46:25 51:2

**Burbank** 28:9 61:15,19

**BURKWITZ** 8:6 9:7 10:2 11:4, 12,25 12:18 13:5,9,13 14:9,22 15:11 16:11,15,24 17:13 21:22 28:2,16 29:19 31:11 32:8,18 33:16 34:2,9,15 36:14 37:6,9,15 38:16 39:1 41:8 42:25 44:18 47:21 50:6 51:9 53:2,11,15 56:19 57:24 59:12 60:9 66:21 67:3,7,14 70:12 71:20 72:17 73:21 74:21 75:22,25 76:4,24 77:5

**business** 42:5

---

**C**

**C.S.R.** 79:25

**calendar** 48:17

**California** 15:22 18:14 51:8,24 78:1 79:19

**call** 13:8

**called** 9:24 51:22

**calls** 9:7 13:5,9 28:2,16 29:19 31:11 44:18 47:21 53:2,11 56:19 60:9 66:21 67:3 70:12

**care** 15:18 17:21,22,24 18:1,3,4 27:11,12 31:7 35:17 36:7,8 37:4, 13,17 50:5 52:11,22,24 58:11 73:1,8,11,15,17 74:4

**caregiver** 57:3 75:6

**Carey** 7:20 20:15 25:2,9 29:5 41:18 43:10,22,25 45:15 48:4

**case** 7:1,5,7,9,13,20,22,24 8:2,4, 9 9:2,6,11,17 10:14 11:18,21 12:7 13:19 14:16 16:5 19:6 20:12,15,20,22 21:8,9,15,16,20 22:17 23:2,7,8,10,16 24:1 29:16 35:6 36:21 38:11 53:22 58:11,14

Maral Helwajian
March 29, 2019

59:4 60:14 71:25 72:2 75:11,12

**cases** 38:10

**caught** 46:2,3

**causal** 69:13

**causing** 9:25

**center** 27:11,13

**centers** 73:15

**CERTIFICATE** 79:1

**certified** 76:19 79:3

**certify** 79:4,15

**change** 29:25 32:3,5,7 33:15 34:21 37:24 39:17 50:22 74:8

**changed** 32:3 33:2,7,13,21 34:4, 7 73:14,15

**changing** 32:14

**chart** 61:16,19

**check** 28:1

**child** 7:2 10:8 13:22 14:8,21,25 15:6,9,17,20,22 16:7,8 17:9,25 18:19,22 22:15 26:14,16 27:1,11, 12,24 29:18,23 30:1 31:6 34:23 35:9 36:10 37:25 38:8 44:23 47:7 48:5 49:17,22 57:14 58:1 59:8 60:6 66:11 68:23 72:15,22,24 73:8,10,17,19 75:1,3,13

**child's** 14:6 26:13 58:7,16

**children** 35:12,24 36:2,6,7 37:4, 12 46:2,21 49:3 50:2,4 70:11 74:19,23 75:8

**Children's** 6:22

**chose** 72:15

**chosen** 57:10

**Christmas** 59:20,21 65:1,3

**City** 78:14

**clarify** 11:8 14:12 17:10 31:14 34:14 60:23 71:23

**clause** 30:6,16,22 31:1,10,16,21, 25 32:2 33:6 38:19,21 39:6,14,17 41:5

**clear** 11:9 32:23 59:13

**close** 46:10 66:13

**closed** 8:5 53:22 72:3

**co-social** 51:16

**co-workers** 51:21

**Cochrane** 69:15

**Code** 76:7

**codefendant** 7:19 20:14 22:17 25:9 28:15 40:22 41:17

**Collaboration** 69:16

**collect** 69:5

**common** 55:22,23

**compensation** 69:2,5

**complaining** 49:2

**complete** 31:9

**completed** 22:11

**completely** 27:25

**compliance** 9:2

**complications** 69:10

**comply** 9:11,13 22:7,14

**compound** 10:2 14:22 32:9

**concern** 60:4,7 64:20

**concerns** 60:8 63:11

**conditions** 52:15

**congested** 62:11

**Congress** 65:24 69:1

**connected** 48:23

**consent** 65:19

**considered** 15:23

**contact** 53:18 60:5,13 64:21

**contained** 11:15 78:12

**content** 65:17

**continue** 46:17 47:5 67:16 68:5

**continued** 8:19 13:17 23:22 42:18,19 52:19

**continues** 53:9

**continuing** 7:6 8:8

**control** 59:2

**conversation** 50:8,12

**convey** 45:23

**copied** 41:16 45:13 70:15

**copy** 76:19,25 77:2,7

**correct** 6:13 9:11 12:4 14:1 15:16 16:10,23 18:6,8,9,15 23:3, 20 33:2,7,20,22 38:15 43:4 44:8 47:14,19 48:1,24 49:5 64:4 66:20 70:25 72:13 74:9 78:11 79:13,20

**corrections** 78:9

**cough** 62:7,8,12 64:1

**counsel** 59:15 77:7

**country** 46:13

**county** 6:20,24 37:22 38:7 51:6 78:2

**couple** 47:10 48:15

**court** 6:12,13 8:9,21,25 9:2 12:8, 25 19:16,18,21,23,24,25 20:1,5, 7,10,24 21:1,8,9,11,14,15,19,24 22:6,7 23:19 24:5,9,10,14 35:16, 20,21 37:16 40:16,19,21,22,23, 25 41:2 42:1,6 43:4,12 44:10 47:18,25 48:6 60:6 67:8 69:1 72:5 76:6,10

**criminal** 12:16,22

**crossed** 27:23,25

**croupy** 62:9

**CSR** 79:3

**custody** 8:16 16:8 17:10 21:21 22:6 56:24 59:8

---

**D**

---

**damage** 69:6,9 70:5

**damages** 69:3

**dangerous** 69:20

**dangers** 70:11

**date** 19:16 24:9 25:1,5 26:21 27:5,15 41:15 42:14,18,20 43:12, 20 45:14,19 53:25 54:13,14 59:19 61:21 64:24 65:9 66:19

Atkinson-Baker, Inc.
www.depo.com

**dated** 27:6 65:11 67:5,13 79:21

**dates** 55:15,22,23

**day** 17:21,22,25 18:1,3 27:14 31:7 64:7,9 73:10,15,17 78:13 79:21

**days** 59:22 62:9 65:1 76:13

**DCFS** 35:4 41:24 59:10

**deal** 75:18

**deals** 50:2

**Dear** 65:19

**decade** 70:3

**December** 59:18 64:23

**decided** 21:24

**decider** 47:7

**decision** 19:17,18,20,22 24:15 57:1 72:24

**decisions** 14:6 15:3,9 17:5,6 68:9,18,22

**declare** 78:7 79:18

**declined** 26:19

**declining** 29:14

**deem** 10:5

**deemed** 10:1,6,9

**defendant's** 25:3

**deletions** 78:10

**Department** 9:25 10:5 11:1,10 14:4 17:15 21:12 23:10,13 60:1 64:16,17 74:18,22 75:5,7,14

**dependency** 7:21 13:19 42:9 43:6,14 45:17 48:11

**deposition** 34:11,15

**depth** 38:25

**design** 69:16

**desirous** 78:10

**determines** 10:1

**devastating** 69:6

**direct** 61:11

**directly** 76:8,11

**discuss** 37:23

**discussion** 36:22,24 76:3

**diseases** 46:3 66:8,16

**dismiss** 21:15,16 23:20

**dismissed** 22:12

**dismisses** 21:20

**disposed** 20:20,22

**disposition** 7:24,25 20:15,17,18 21:4,5,9,20 22:4,9,20,22 24:4 47:25 48:7,14

**doctor** 27:20 28:1 29:14 37:18 45:1 49:17 50:1 52:12 64:1,3,7,9

**doctor's** 26:18 28:5,8 29:7 56:13,25 58:23 61:10 62:14 63:19,22

**doctors** 36:3 55:16

**doctors'** 36:2

**document** 27:5,6,15,19 28:14 39:22 41:3,5 52:6 54:20 55:9 58:22 60:23 61:7,14,19 62:13 63:10

**documents** 40:12,24 44:7,14,17

**double** 14:10

**downloaded** 54:24

**drug** 10:6,7

**drug-test** 9:24 10:4,6

**drugs** 9:5 68:19

**due** 9:2 49:3

**duly** 6:2

**duties** 76:7

---

**E**

---

**e-mail** 19:8,13,14 24:22 25:1,5, 14 28:25 39:24 41:15,17,18,20 42:9,15 45:4,13,15,16,19,23 46:5 48:25 49:6 54:12,14,15 65:9 67:5,13,20

**e-mailing** 28:14 67:15

**e-mails** 40:1,8 65:17

**earlier** 18:13 63:7 71:23 74:6

**early** 19:2,5 36:21

**easier** 14:13

**eczema** 66:9

**education** 17:6 54:24 55:6,11

**educational** 13:18,25 14:5,15, 19 15:2,8,13,16 16:6,10,19,21,22 17:3 71:25 72:6,9 74:11,13

**effect** 31:6 33:23 34:21 37:24 39:18 50:23

**effective** 70:8

**effects** 46:22 49:3,14

**efforts** 11:11

**emergency** 7:18

**employee** 79:16

**employer** 11:10 37:22 38:6,12 51:6

**ending** 77:12

**enroll** 14:7,25 15:6,9,19 17:16 72:15,24 74:19,23

**enrolled** 13:22 17:12,20,22 53:9,13,21 54:4 73:11,19 75:4,8

**enrolling** 13:23 14:20

**enrollment** 15:12,15

**entire** 17:25

**evaluation** 62:5

**evening** 62:12

**evidently** 70:7

**exam** 27:16,21 28:20

**examination** 6:5 79:10

**examinations** 35:17,22

**examined** 6:3

**EXECUTED** 78:13

**exempt** 49:22

**exempting** 50:5

**exemption** 26:24 28:23 29:9,10, 12,13 30:10,11 31:3 32:1 39:4,5, 9,10 40:15 49:13,18 50:1 52:13 53:1

**exemptions** 49:19

exercise 74:14

exhibit 24:18,19 38:1 39:21 41:11,12 45:7,8 52:2,3 54:8,9 60:23,24 61:3,4 65:5,6

experience 15:17

expert 49:19

explain 20:21 23:6 44:17 51:12

exposure 69:24

express 67:16

eye 70:10

---

### F

fade 47:4

fail 9:24

failed 9:11

fails 10:4

failure 9:13 10:5

fair 19:5 22:2,19 39:16

familiar 7:1 30:25

family 8:15 42:3 52:14 66:13

father 8:18 9:3,5 10:8,13,21 11:18,20 12:7 44:25 46:11,20 47:3 58:16,23 59:3 60:5,19,21 62:4,13,24 63:1,5,8,21 64:2,8,18, 21

father's 19:25 24:13 59:8

fathers 46:20

February 19:9,10,11,15,22 20:3, 5 24:8 43:20 68:3

federal 68:8,16

female 62:4

FERGUSON 79:3,24

fight 12:11

file 11:17,20,23 23:13 44:8

filed 43:9

filled 27:20

filling 37:25

finally 22:24,25 23:23

financially 79:17

findings 23:19 71:8

fine 6:18

finish 41:8

follow 71:10

force 47:6

foregoing 78:8,11 79:5,13,19

form 27:16 28:1,5,22 30:7,19 36:12 38:1,8 40:15

forward 76:8

forwarding 24:25

foster 14:25 15:5,7,18 17:16,24 18:2 35:23 36:1,4,7,8 37:4,12,17 50:5 57:3 59:9,16,17,24 61:24 73:1,8

foundation 8:6 10:2 11:5,12,25 12:18 13:13 16:25 21:22 31:12 36:14 37:6,15 44:19 70:13 71:20 72:17 73:21 74:21

fourth 67:20,21

free 17:22 18:1

freedom 66:6

full 8:15 17:24 48:9,12

fully 68:11

function 68:16 69:8

Funk 25:3 41:18 45:16

---

### G

Garcia 26:16 27:3,14 61:17

gave 40:11

general 8:21,25 12:25 14:3,14 22:7 23:19 37:21 51:15 74:18

generally 10:1 50:16,19 58:5,10

give 17:15 45:25 57:17 58:5

Good 76:21,22

Governmental 68:17

grade 62:10

grandfather 30:5,21,25 31:10, 16,21,25 32:2 33:6 38:19,21

39:6,14,17 41:5

grandfathered 30:15,20

granted 29:13 30:10,19 31:3,23 39:5

Great 15:20

group 46:18

groups 49:2

guardian 26:5 28:13

guess 48:9

guns 12:12,14,21

---

### H

H-E-L-W-A-J-I-A-N 6:10

handle 43:6

happen 21:13 24:2

happened 19:18 20:17,19 48:7, 14

harassment 50:20

head 63:17

healed 46:21

healing 45:1

health 47:2 48:23 54:24 55:6,11

healthcare 46:12

hear 24:10

heard 43:21

hearing 20:16 21:4,6 22:9,20,22 23:18,22 41:24 42:11,14,17 43:8, 10 47:25 48:3

hearings 42:21,24 43:4,17

held 16:5 76:3

helps 54:20

Helwajian 6:1,8 78:22

Hey 57:25

high 69:4

high-risk 69:24

history 25:25 52:14 66:14

hold 15:2

home 52:11 59:10,16,17,24
61:24 64:25 73:2,7,18,25 74:3

Hope 54:20

hot 40:5 49:8 66:20 67:2,12

hours 38:23

house 18:3 60:19

hurdles 69:4

husband's 63:16

hypothetical 44:5

**I**

identification 24:20 41:13 45:9
52:4 54:10 61:5 65:7

IEPS 15:3

immunization 25:25 28:20
37:14 39:18 40:5 55:9

immunizations 19:17,25 24:11,
13,14,16 26:25 27:23 35:4,7
55:12,14,24 65:23 67:16

immunize 24:6

immunized 18:22 27:25 35:9,
13,24 37:5,13,17,25 38:8 57:14

importance 65:22

inadequate 69:19

incident 11:23 13:4

include 43:23 44:1,10,13

included 17:3 39:24 40:2,9

including 68:10

individual 17:6 68:21

inform 18:24 56:12

information 28:12 43:18 51:3
54:19,22 55:1 63:13

informed 56:16 57:22 68:11

ingredients 47:2

initiate 23:10,16

initiated 23:2,5,7,9 36:21,24

injury 69:2

insert 69:12

insufficient 29:17

interested 79:17

interference 68:9

interventions 68:20

intrusion 68:21

investigation 22:11

investigator 7:21 25:3 42:10
43:6 45:18 48:11

investigators 43:14

invited 56:17,21

irrelevant 67:7

issue 35:3 42:1 75:15

issues 41:25 43:21 47:2 48:23
59:25

**J**

January 7:9,11 23:1,2 32:6,7
33:1,5,13,17,21 34:4 56:1

Japanese 70:4

jaw 66:10

judge 42:12

July 31:7 33:16,23 34:1,21 39:18
50:23

June 19:20 42:11,16,18,20,22
43:22 45:5,20 47:19 48:3,16
55:25

jurisdiction 8:10,12 20:11 21:2
46:15 47:18,24 48:13

juvenile 8:9 35:20,21 40:16,18,
23 43:4 44:10 72:5

**K**

kind 12:6,12 17:25 28:24 45:2
51:17 55:22

kindergarten 16:1,2,6 18:12,14,
18 47:15 72:12,16,22,25 73:11
74:19,25 75:2,4,5,9

knew 13:25 33:8 49:7 64:6

knowing 49:1

knowledge 14:24 22:22 33:8

knowledgeable 34:24

**L**

L.A. 37:22

lack 9:4

lacks 8:6 10:2 11:12,25 12:18
13:13 21:22 36:14 37:6,15 71:20
72:17 73:21 74:21

largely 69:19

law 6:12 8:15 15:22 18:14 29:25
31:4,6,9 32:3,7 33:1,7,13,14,21,
23 34:4,7,21 37:24 39:18 50:4,22
73:14 74:8 76:18

laws 29:21,24 34:24 50:8 51:8,
23 79:19

lawyer 52:12

leader 46:11

learn 50:22 51:18

legal 8:15 20:11 21:2,21 22:6
46:14 47:11

legally 73:16

letter 52:10 53:6 54:1

level 18:10 50:25 51:1,18

liberty 68:21

license 73:16

lieu 76:20

lifestyle 47:4

limit 72:6

limiting 72:9

lines 65:17

list 63:5

listed 69:11

living 42:4

location 76:9

locked 66:10

long 6:23 10:11 48:8

longer 34:7 52:24

**looked** 30:3

**Los** 6:20,24 38:7 78:2

**lot** 16:23

**low** 62:10

**Lucy** 7:2 8:16 13:22 17:4 18:17 25:2,8 26:9,17 27:3,9 28:14 36:20 40:1,11 45:22 49:24 51:2 58:13 63:7 65:12 66:20 67:2,12 71:24

--------

**M**

**M-A-R-A-L** 6:10

**made** 9:1,3 10:16,18 11:14,24 12:3,6,20 18:21 19:20 20:24 22:13 38:6 41:1 43:20 47:25 63:25 72:9,24 78:9 79:10

**maintain** 76:16,25

**make** 8:8,20,24 10:13,21 11:8,10 14:6,12 15:9 17:5,6 19:16,18 20:1,5,8 21:9 23:19 24:15 32:11, 14 34:8 42:12 60:12

**makes** 6:15,16

**making** 15:3 78:10

**mandated** 68:10

**mandatory** 65:20

**manifested** 66:16

**manufacturer's** 69:12

**Maral** 6:1,8 78:22

**March** 54:14 65:11 66:19 67:6, 13

**Maria** 7:18

**marked** 24:19 41:12 45:8 52:3 54:9 61:4 65:6

**market** 70:2,4

**marketing** 69:19

**Marks** 25:13 27:14 29:4

**MARY** 79:3,24

**matter** 24:10

**matters** 42:12

**meaning** 52:16

**meant** 32:2

**medical** 32:1 37:16 39:9 49:13, 14,17,19 53:1 54:18,22,25 57:13, 17,18 61:9 66:6 68:9,12,15,20

**medication** 46:1

**medications** 45:2

**members** 42:4

**mentioned** 30:12 49:12 55:6

**Methamphetamine** 9:20

**methamphetamines** 9:22

**mind** 6:17

**minor** 7:2

**minute** 45:21

**missed** 10:7,9

**missing** 52:20,23

**misstated** 33:19

**misstates** 33:25 72:17

**MMR** 69:10,17

**mom** 29:17

**monitor** 10:24 11:2 57:7,11 58:25 59:7 62:20,22,23 64:12,16, 17

**monitored** 8:19 10:21 59:3 64:3

**monitors** 10:22 59:6 63:5

**month** 22:16 33:19

**months** 23:25 48:15,18,19

**morning** 30:24 31:15,19,20 33:5,9,10 38:20

**mother** 8:16 9:1 13:17,21 16:5 18:17,21,24 19:14 27:9 40:24 42:2,10 43:24 47:1,19 49:13 52:24 53:6 54:15 55:2 56:12,17, 21 57:2,5,7,10,13 60:12 63:7

**mother's** 19:24 24:7,12 52:21, 24 64:20 73:25

**mothers** 46:19

**motion** 76:18

**moved** 59:9

**multimillion-dollar** 69:8

**multiple** 32:20 40:3 45:18

--------

**N**

**named** 62:22

**Nathan** 62:5,14,16,18,21,22 63:2,4,14,17,22 64:13,15,17,18

**natural** 44:25

**necessarily** 68:24

**needed** 36:2 37:19

**negatives** 14:10

**nonvaccinated** 73:17

**notes** 79:14

**notice** 41:23 45:5

**notifying** 42:10 43:11

**November** 55:13

**number** 60:25 67:19

**numerous** 48:22

--------

**O**

**oath** 79:7

**object** 32:19

**objected** 18:22 36:22 44:23

**objecting** 11:7 49:8

**objection** 18:25 19:3

**objections** 79:9

**observe** 49:17

**occasion** 60:1

**occasions** 56:3,6,11

**October** 7:10 8:13 22:18,21,25 23:1,24 24:2 48:1,7,14,15 53:24 54:3 56:1 72:3

**office** 11:14 26:18 28:8 61:10, 13,22 76:9

**official** 71:3

**one-month-old** 62:3

**ongoing** 59:25

**open** 7:9 29:16

Atkinson-Baker, Inc.
www.depo.com

**opener** 70:10

**opinion** 71:7

**opposes** 68:8

**option** 58:4,5 73:3

**order** 8:15 11:17 20:1,5,8 24:6 35:21 36:4 37:17 42:2,6 48:4 57:4 61:3 76:22,25 77:3,7

**ordered** 10:4 35:18,19 37:16

**orders** 8:14 20:24 21:1,10 22:6, 7,13 24:2,4 35:16 42:12 47:25 60:6 72:8

**organic** 47:4

**original** 76:16,25 77:2,6

**outcomes** 69:17

**overbroad** 9:7 11:4 13:13 17:13 21:23

**P**

**package** 69:12

**pages** 25:17,19,20,22 55:7,11, 21

**paid** 69:3

**paragraph** 46:4,5,7,17,24 62:2

**paragraphs** 47:10

**parent** 10:4 14:5,7,15,25 15:5,8, 18,25 16:2,18 17:3,16,24 18:2,13 21:13 22:6,7 26:5,9,11,15,16 27:3 28:12 30:1,6 34:7 35:8 36:9, 16,20,24 37:13 38:4,7 39:10 49:16 57:16

**parent's** 14:19 17:10 27:2 29:11 30:18 32:2 34:22 37:23

**parental** 68:22

**parents** 8:23 22:13 23:14 35:5, 13,23,25 36:1,4,6,7,17 37:18 49:2 50:3 58:5,10 74:13,20

**parents'** 15:2 29:22 37:5 68:18 74:7,11 75:9

**part** 9:13 21:1 35:17 55:10 67:23

**parties** 60:8 62:20 79:16

**Passport** 54:25 55:7,12

**past** 51:7,23

**pasted** 70:16

**paternal** 18:2 42:3

**patient** 61:16,19

**patients** 68:13

**patients'** 68:18

**Pediatric** 61:15,19

**pediatric's** 61:13

**Pediatrics** 28:9

**penalty** 78:7 79:18

**pendency** 13:18

**Penelopy** 7:2 10:8 13:19 17:12, 16 18:4,7,19 20:11 21:2 24:6 25:12 26:16 27:3,14 29:3 42:7 47:14 49:11,25 52:10,17,20 53:9, 13,21 54:4,19 55:19,20 56:2,12 58:24 59:9 60:3,15,20 61:17,23 62:23 63:2,9 64:19,21 72:12 74:3

**people** 45:18 65:13 66:2 69:7

**perceive** 12:21

**perceived** 12:20

**Perfect** 77:11

**period** 7:8 10:11

**perjury** 78:8 79:18

**permanent** 70:5

**person** 40:12

**personal** 26:24 28:22 30:2,19 34:8 40:15 50:25 51:1,18

**personally** 75:16,17

**persons** 69:25

**perspective** 24:12

**pertussis** 70:1

**petition** 19:21,23 23:13 24:5,8 72:5

**phase** 22:11

**phrased** 8:6 9:8

**physical** 8:15 17:10 27:16,21 28:20 35:16,22

**Physician** 28:6

**physician's** 25:24 27:11

**Physicians** 68:7 70:23 71:2,6

**pioneer** 46:11

**place** 22:20,24,25 23:23 42:17 59:11,17 71:19 79:6

**plaintiff** 13:21 18:17 67:2,12 71:24

**Plaintiff's** 24:18 77:7

**plaintiffs** 7:1

**plaintiffs'** 24:19 41:11,12 45:6,8 52:3 54:8,9 60:23 61:2,4 65:5,6

**plan** 9:2 21:9

**plans** 17:6

**point** 15:20 21:25 22:5 48:6,8,9 73:8

**police** 11:20 13:8

**policy** 37:21

**position** 6:19 7:4 19:24 20:1

**positive** 9:5,16,19,21 10:1,6,7,9

**post** 69:18

**posted** 68:3 70:21

**postponed** 22:23

**practice** 14:3,14 35:9 37:22 44:13 49:12 51:15 68:15 74:17, 18

**pre** 69:18

**pre-k** 25:13 29:4

**preemption** 68:17

**prefer** 69:7

**preference** 73:2,4,25

**prepare** 42:24 43:3,25

**preschool** 17:21

**present** 42:21 51:7,23 58:23

**presented** 40:14,18,21,22

**presents** 62:4

**pretty** 19:5

**previous** 33:14 34:20,24 39:21

**previously** 47:24

Maral Helwajian
March 29, 2019

**printed** 25:16 67:21

**prior** 13:23 17:20 34:21 43:4
 71:5 74:8

**private** 25:13 29:4

**problems** 62:6

**procedurally** 23:11

**procedure** 68:13,14

**proceedings** 79:5

**produce** 76:17 77:10

**program** 69:2 74:2

**programs** 73:18,24

**progress** 9:4 61:22

**proper** 31:8

**propose** 76:4

**propounded** 79:9

**protect** 11:1,11

**protected** 13:12

**protective** 56:23

**proved** 69:14

**provide** 43:24 44:3 49:17 76:9
 77:6

**provided** 44:14 55:2

**providing** 44:4

**public** 18:7,10 52:18 53:10,14,
 21 54:5

**purpose** 76:18

**put** 79:7

---

**Q**

**question** 16:12,14 32:8,12,14,
 18,24 34:12 35:19 37:8,10 41:8

**questions** 11:6 13:14 24:23
 32:20 75:25 76:1 79:9

**quote** 67:25

**quoted** 67:23

---

**R**

**Rabies** 69:23

**Rachel** 25:4

**ran** 18:3

**Raymond** 25:4

**reactions** 47:3

**read** 25:22 26:7,8 27:11 29:24
 30:14,23 31:15,17,18,24 33:9,10
 34:6,9,13,18 38:19,22 46:4,7,24
 47:10 50:24 62:1 66:12 67:23
 71:14 78:8

**read-back** 34:5

**reading** 30:21 68:5 70:9

**rearing** 68:23

**reason** 76:17

**reasons** 20:7 44:22,24 45:25
 49:7,14 59:23

**recall** 9:23 10:25 12:1 13:6 18:20
 19:4,8,12,13 20:10 33:8 39:23
 40:13,14 43:1,16 48:12 51:4
 58:15,18 62:18 63:4,15,23,24
 74:16

**receipt** 76:14

**receive** 74:6,12

**received** 38:12 55:16 56:6

**receiving** 15:4

**recognized** 68:25

**recognizing** 65:22

**recollection** 24:23

**recommend** 8:11

**recommendation** 8:4,20

**recommendations** 8:8,17,24
 9:1,3 20:25

**recommended** 8:10,14 52:12

**record** 6:7 11:7 23:6 28:20 32:23
 34:18 59:14 60:24 66:25 76:2,3,
 10

**recorded** 79:11

**records** 55:1,3 61:9

**refer** 24:17 45:11 52:1 54:7
 60:22 61:18 65:4 67:18 70:18

**referring** 22:20

**refresh** 24:23

**refusal** 26:2,19 28:21 30:18 35:6
 39:10 40:15 74:8 75:10

**refuse** 29:17,22 34:22 37:25
 38:7

**refused** 35:5 75:12

**refusing** 36:11

**regard** 63:11

**regret** 12:9

**regular** 37:18

**regulation** 68:15

**reject** 68:14

**rejected** 35:5

**related** 7:4,20

**relationship** 69:13

**relative** 79:15

**relatives** 66:14

**relieve** 76:6

**remain** 22:17 73:10

**remainder** 7:23

**remains** 66:20 67:1,11

**remember** 7:13 8:12 9:10,16
 19:15 22:16 30:5,14,21,23 31:24
 45:4 51:6 59:19 61:23 62:19
 64:24

**removal** 59:11,13,16,23 64:24

**remove** 60:3

**removed** 61:24 75:3

**repeat** 37:10

**repetitive** 55:23

**rephrase** 8:7 10:3 16:13 32:11,
 22 66:24 72:20

**replaced** 70:6

**report** 11:20,23 12:24 13:2,4
 24:9 25:24 27:11,20 42:24 43:9,
 17,18,19,23,25 44:3,4,6,16 69:15

Atkinson-Baker, Inc.
www.depo.com

Index: reported..speaker

reported 12:8 43:9,22

reporter 67:8 76:7,10 79:4

REPORTER'S 79:1

reporting 69:17

reports 43:3,7,14,15 70:4

request 11:17 43:20

requested 41:24 54:22

requests 24:14 67:8

require 32:1

Required 26:25

Res 65:21

residence 42:4,5

Resolution 65:13

Resolved 62:7

response 7:18 45:4 64:10

rest 34:10

restored 69:7

restraining 11:17 42:2 57:4

retain 57:13 66:5

retains 57:17

returned 52:10,19,21,24 62:8

reunify 22:14

reviewed 28:11

rights 13:18 14:1,5,16,19,21
15:2 16:6,10,19,21,22 17:3 29:22
57:13,17 66:1 71:25 72:6,9 74:7,
11,13,14

risks 68:12 71:5,12,13,15,19

risky 68:24

rolled 73:9

Ronald 25:3 41:18 45:16

routine 35:17 49:11 74:22 75:7

routinely 35:12,15,23 37:4,12
74:18

RPR 79:24

run 73:16

**S**

safer 70:7

safety 69:17 71:4,12,13,15,18

schedule 35:15,21 62:22 63:18

scheduled 35:12 43:21

school 13:23 14:8,21 15:1,4,6,
10,18,19 17:12,16,17,23 18:1,7,
10 25:13 27:14 29:4 31:7 42:8
46:14 47:12 52:19 53:7,10,14,21
54:5 73:7,9 74:23

school-aged 15:17,20,23 49:22
73:1

schooled 74:3

schooling 14:6 73:2,18 74:1

scrolling 38:23

Section 23:13

Senate 30:3,12,15,22 33:6 65:13

senators 65:19 67:5,13

sense 70:10

sentence 12:21 25:7 66:3,7

sentences 47:5

September 27:6

Serobian 6:6 8:7 9:9 10:3 11:8,
16 12:2,19 13:7,11,16 14:12
15:14 16:13,17 17:1,14 22:1
24:17,21 28:4,17 29:20 31:13
32:11,22 33:19,25 34:3,13,17,19
36:15 37:7,11,20 38:18 39:7
41:10,14 43:2 44:21 45:6,10
47:23 50:10 51:11 52:1,5,8 53:5,
12,16,19 54:7,11 56:20 58:3
59:15 60:10,22 61:2,6 65:4,8,15
66:24 67:4,10,17 70:17 71:22
72:20,23 73:23 74:24 75:21,24
76:1,13,22 77:4,9,11

service 7:22

serviced 7:24 9:10,17

services 7:6 15:4

servicing 10:13

set 19:16 24:10 43:20 79:6

severe 70:5

sexual 50:20

short 43:18 46:8

shorthand 79:4,14

shot 55:1

shots 54:23

show 28:19 38:24 58:22

showing 38:1 39:21 71:5

shows 46:15 58:22 66:19

sick 46:21

side 46:22 49:3,14

sign 36:13 40:24

signature 26:3,5,6,7 27:7 28:5
29:7,11

signed 25:12 26:19 27:16 28:1,
22,23 29:3,6 30:6 41:3

signing 38:8

silent 32:13

similar 30:6,19

simply 37:25 38:8

sit 38:22 39:13 43:16 49:21

site 68:4 70:21

situation 64:6 75:19

six-year 62:3

skip 16:1,2,6 18:14,18 72:12

skipped 47:14

smallpox 69:20,22

social 6:22,23 7:6,16 8:1 10:14,
19,20 11:2 14:4,14,16,17,18
21:19 35:1,10 36:8,9 38:14 43:3
50:2,16 51:5 58:11 74:17

sole 8:1

sort 50:1 52:13

Sosa 7:18

Sounds 62:9

speak 51:20

speaker 67:8

special 52:12

specific 49:7 50:14

speculate 66:22

speculation 9:7 11:4,12 13:5,9
28:2,16 29:19 31:11 44:18 47:21
53:2,11 56:19 60:9 66:21 67:3,7,
14 70:12 74:21

spell 6:9

spoke 44:25

SS 78:1

St 25:13 27:14 29:4

standard 38:1

start 18:10 19:2 34:12

started 17:17 18:8 23:2 36:21
47:4

starting 67:24

starts 46:6 67:25

state 6:7,16,17 31:4 50:4 51:8,24
68:16 78:1,14

stated 24:12 42:13 73:6

statement 71:3,5

statements 79:10

States 65:24

stenographically 79:11

Stephen 7:19 20:14 25:2 29:5
41:17 45:15

steps 11:1

stipulated 77:11

stipulation 75:23 76:5 77:6

stop 66:18

strongly 68:8

Student 27:2,3

studies 69:18

subject 45:13 46:9 54:13 65:9

subjective 62:1,2

substance 9:14,19

substances 9:17

suffer 66:10

suffered 46:22

suffering 49:3

sufficient 39:11

summary 43:18

supervising 14:17

supervisor 13:2,4,8 57:8,11
62:5,17

supervisors 14:17

support 46:18 49:2 63:10 64:20

supposed 23:18 51:5

Supreme 68:25

Surgeons 68:7 70:24 71:2,6

surmounted 69:4

surprise 58:24

suspected 69:24

suspicion 63:8

sustain 21:7,11,14 23:19

sustained 20:24 22:12

switched 47:3

sworn 6:2

system 54:25

---

**T**

takes 22:6

taking 33:23 64:3 66:1

talked 48:22

talking 53:15 65:13

talks 26:1 46:1,2 47:11,17 49:1

teams 46:18

telling 19:2 34:12

tells 70:18

temp 62:10

temporary 42:1

ten 6:25 21:19 35:1,4 38:14

termination 8:1,10,11

test 9:5,19,21 10:6

tested 9:16

testified 6:3 16:9,12,18,19 18:13
20:14 31:15 32:25 33:4 34:1,11
47:24 63:7 72:11 74:6

testify 6:17 12:3 16:15

testifying 6:12,16

testimony 6:11 31:14 33:25
71:23 72:18 78:12 79:8

tests 10:7,9

thereof 76:20

thing 38:23

things 35:21 46:2 50:17

thought 12:24

thoughts 67:16

thousands 46:19 49:1

threats 10:13,16,18,21 11:3,11,
23 12:3,6,9,14,17,20,22

time 7:8,9 9:10,23 10:11 16:9
17:13 18:2,5 19:19 29:16 33:4
40:24 43:5 47:1 53:20 57:14
58:6,8 60:18 61:24 63:25 67:9
71:14 77:12 79:6,7,10

times 9:21 18:24 19:1 23:23

title 62:2 70:22

titled 61:19 62:16

titles 25:22,23

today 6:11,15 39:13 43:16 49:21

told 64:5,8

tomorrow 34:10

top 26:11 63:17

topic 40:5 49:8 55:8,12 66:20
67:1,2,11,12

topics 40:5 50:19

Total 56:7,8

touched 46:10

trained 15:15 39:17 50:19 51:19
71:18 75:18

training 14:18 37:21 38:12
50:13,14,15,17 51:6,7,13,14,23,
25 74:7,12,15

Atkinson-Baker, Inc.
www.depo.com

Index: transcribed..years

**transcribed** 79:12

**transcript** 76:8,11,15,16,23
77:1,6,8,9 78:8,11 79:14

**transcripts** 76:14

**transferred** 7:13

**trial** 23:25 76:18

**true** 78:11 79:13,19

**turn** 41:10

**type** 17:21 66:15 73:24

**types** 50:20 55:15

---
**U**

**U.S.** 68:25 70:2

**Uh-huh** 16:4 17:19 20:2 21:17
23:4 30:13 33:11 39:8 44:9 45:3
48:2,20

**Ulikhanova** 7:2 8:16 13:22 17:4
18:18 25:2 26:17 27:4,9 40:1
41:19 44:22 45:17 54:16 58:13
63:8 65:12 67:2,12 71:24 73:6

**Ulikhanova's** 52:11

**unauthorized** 63:9 64:21

**uncomfortable** 6:16

**unconstitutional** 65:25

**undersigned** 78:7

**understand** 14:11 15:25 17:8
21:4 22:3 27:18 32:10,16 35:20
71:11

**understanding** 15:7,21,23
16:3,21 17:2,9 21:6,18 29:21
31:20 32:23,25 33:12 34:20
38:20 57:16

**understood** 29:25

**United** 65:24

**unmonitored** 60:5,13

**unsigned** 76:19

---
**V**

**vaccinate** 24:6 26:2,19 28:21
29:18,22 30:18 34:22 40:15 48:5

56:14 75:8

**vaccinated** 18:22 30:2 36:10
42:7 44:23 49:11,23 50:5 52:17,
25 56:2 66:11

**vaccination** 29:6,12 34:23 47:6
49:4 51:7,23 66:17 67:1,11 69:11

**vaccinations** 26:2 29:10,15
31:8 33:1 36:3,5 45:24 47:1
48:23 50:9,15,21 51:25 52:14,21
53:4 55:16 56:5 65:20,23 70:11
71:16 73:7,15 74:7

**vaccine** 25:11 29:2 47:8 69:1,
18,20,23 70:1,6

**vaccines** 46:22 68:10,24

**vaccinized** 75:13

**vague** 14:9 15:11 16:24 17:13
28:2 42:25 59:12

**validate** 28:24

**veterinarians** 69:25

**visit** 10:22 61:21,22 62:23 63:1,
18,19

**visitation** 8:19

**visitations** 60:18

**visits** 10:22 11:14 59:3 62:20
63:9 64:3

---
**W**

**waiting** 38:23

**waived** 55:13

**waiver** 25:11 29:2,6 30:7 31:23
32:2 34:8 39:10

**wanted** 13:22 18:18 24:15 35:9,
14 37:1 72:12,21 73:6

**Warrants** 50:20

**weaponization** 69:22

**week** 62:8

**weeks** 62:7

**whichever** 32:21

**whole-cell** 70:1

**wishes** 24:7

**withdrawn** 70:2

**word** 12:14

**work** 51:17

**worked** 52:16

**worker** 6:22,23 7:6,17,18 8:1
10:20 14:14 21:19 35:1,10 36:8,9
38:14 43:3 50:2,16 51:5 58:11
74:17

**workers** 10:14,19 11:2 14:4,17,
18 51:16

**worried** 49:14

**worse** 62:12

**write** 43:13,14,15,17

**writing** 41:23

**written** 43:23

**wrote** 24:9 25:8 28:24 44:3,6

---
**Y**

**year** 30:6,20 31:6,10 39:4

**years** 6:25 21:19 35:1,4 38:15